**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Vertiv Holdings Co. Securities Litigation* | Case No. 1:22-cv-3572-GHW<br><br>CLASS ACTION<br><br>**AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

## **TABLE OF CONTENTS**

**Page**

EXCHANGE ACT CLAIMS ................................................................................................ 2

I.      INTRODUCTION ....................................................................................................... 2

JURISDICTION AND VENUE ......................................................................................... 8

II.     THE PARTIES............................................................................................................ 9

      A.     Lead Plaintiffs ................................................................................................ 9

      B.     Corporate Defendant .................................................................................... 10

      C.     Officer Defendants ....................................................................................... 10

III.    OVERVIEW OF THE FRAUD ............................................................................... 14

      A.     Vertiv Goes Public And Unveils A Margin Expansion Plan Via "Pricing
              Initiatives" That Was Critical To Its Success As A Public Company ................. 14

      B.     Throughout The Class Period, Defendants Repeatedly Claimed—
              Including In Direct Response To Numerous Analyst Inquiries—That They
              Were Successfully Implementing Pricing Actions That Would "Fully
              Offset" Inflationary Headwinds ......................................................................... 16

      C.     In A Partial Revelation That Representations Concerning Margin
              Expansion Were False, Vertiv Discloses Reduced Guidance But Continues
              To Tell Investors That It Is Taking "Robust Pricing Actions" ............................ 21

      D.     Vertiv and the Officer Defendants Continue To Claim That Their Pricing
              Actions Are Effectively Offsetting Inflation—Causing Vertiv's Stock
              Price To Surge Just Before The Company's Announcement Of A
              Significant Secondary Public Offering .............................................................. 22

IV.    THE TRUTH IS REVEALED ................................................................................. 24

      A.     Defendants Outright Admit That, In Direct Contravention Of Their
              Repeated Assurances About "Getting Price," In Reality, Vertiv "Didn't
              And Wasn't Set Up To Drive A Lot Of Price" ................................................. 24

      B.     "We Cannot Defend The Results Or The Guidance": Analysts Are
              "Stunned" Over The "Shockingly Bad" Financial Results, And Excoriate
              Defendants' Credibility For Their Prior Misrepresentations ............................... 28

V.     DEFENDANTS' POST-CLASS PERIOD ADMISSIONS CONFIRM THEIR
      FRAUD .................................................................................................................... 30

VI.   FORMER VERTIV EXECUTIVES CONFIRM THAT THE COMPANY HAD NOT TAKEN THE PRICING ACTIONS THAT DEFENDANTS HAD CLAIMED ............................................................................................................ 34

    A.   Former Company Employees Unanimously Confirm That Vertiv "Was Not Issuing Price Increases in 2021" And Was Instead Heavily Discounting ............................................................................................................ 35

    B.   Former Employees Confirm That Vertiv In Fact Had No Ability To Raise Prices On The Enterprise Contracts That Comprised The Majority Of Its Backlog ............................................................................................................ 39

    C.   Former Employees Confirm That Vertiv's Salesforce Was Not Incentivized To Drive Price ............................................................................. 42

    D.   Former Vertiv Employees Confirm That Contrary To Defendants' Public Statements, Vertiv's Inability to Get Critical Components Was A Persistent And Worsening Issue Throughout 2021 .............................................. 43

    E.   Former Employees Confirm That The Company's CPQ System Did Not Have Accurate Pricing Information And "Was Not Ready For Primetime" ........ 45

VII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 48

    A.   February And March 2021 Statements Regarding 2020 Fourth Quarter And Annual Results ............................................................................... 48

    B.   April 28, 2021 Statements Concerning First Quarter 2021 Results..................... 52

    C.   Statements In Form 10-K/A Filed On April 30, 2021 .......................................... 58

    D.   Statements At The May 26, 2021 Wolfe Industrials And Transports Conference ............................................................................................ 58

    E.   Statements At The June 2, 2021 49th Annual TMT Conference .......................... 60

    F.   Statements At The June 9, 2021 ISI Inaugural TMT Conference ........................ 61

    G.   July 28, 2021 Statements Concerning Second Quarter 2021 Results.................. 62

    H.   Statements On September 8, 2021 ....................................................................... 69

    I.   October 27, 2021 Statements Concerning Third Quarter 2021 Results............... 70

    J.   Statements Regarding The Company's November 2021 Offering ...................... 74

    K.   Statements At The November 16, 2021 Deutsche Bank Industrials Conference ............................................................................................ 75

VIII.    ADDITIONAL ALLEGATIONS OF SCIENTER ............................................................ 79

IX.     LOSS CAUSATION ......................................................................................................... 86

X.      INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................ 86

XI.     PRESUMPTION OF RELIANCE .................................................................................. 87

XII.    EXCHANGE ACT COUNTS ........................................................................................ 88

        COUNT I ........................................................................................................................ 88

        COUNT II ....................................................................................................................... 90

SECURITIES ACT CLAIMS ........................................................................................................ 90

XIII.   VIOLATIONS OF THE SECURITIES ACT ................................................................. 90

        A.      The Securities Act Defendants ............................................................................ 90

                1.      Director Defendants ................................................................................. 91

                2.      Selling Shareholder Defendants .............................................................. 94

                3.      Underwriter Defendants ........................................................................... 95

        B.      Vertiv and the Secondary Public Offering ......................................................... 96

        C.      Platinum Equity Controlled Vertiv At The Time Of The SPO ........................... 97

        D.      The Offering Materials Contain Untrue Statements Of Material Fact And
                Omitted Other Facts Necessary To Make The Statements Made Not
                Misleading ........................................................................................................... 99

XIV.    SECURITIES ACT COUNTS ...................................................................................... 101

        COUNT III .................................................................................................................... 101

        COUNT IV .................................................................................................................... 103

        COUNT V ..................................................................................................................... 104

XV.     CLASS ACTION ALLEGATIONS .............................................................................. 105

XVI.    PRAYER FOR RELIEF ............................................................................................... 106

XVII.   JURY DEMAND ........................................................................................................... 107

1.      Lead Plaintiffs Louisiana Sheriffs' Pension & Relief Fund, Orlando Police Pension Fund, City of Plantation General Employees Retirement System, Riviera Beach Municipal Firefighters' Pension Trust Fund, and City of Riviera Beach General Employees' Retirement System (collectively, "Lead Plaintiffs" or "Plaintiffs"), bring this action on behalf of themselves and all other persons and entities that (a) purchased shares of Vertiv Holdings Co. ("Vertiv" or the "Company") Class A common stock between February 24, 2021, and February 22, 2022, inclusive (the "Class Period"); or (b) purchased Vertiv shares in or traceable to the Company's secondary public offering of Class A common stock conducted on or around November 4, 2021 (the "SPO"). Lead Plaintiffs assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against defendants (defined below).

2.      Lead Plaintiffs allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.  Lead Plaintiffs' information and belief is based upon, *inter alia*, Lead Counsel's investigation, which includes: (a) review and analysis of regulatory filings made by Vertiv with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Vertiv; (d) other public information concerning Vertiv; (e) transcripts of Vertiv's investor and analyst conference calls; (f) research reports by financial analysts and news reports concerning Vertiv; (g) Lead Counsel's review and analysis of trading data for Vertiv securities and related documents; (h) other publicly available sources as described below; (i) consultations with relevant experts and consultants; (j) Lead Counsel's communications with knowledgeable individuals, including former employees of Vertiv; and (k) other sources.

3.      Lead Plaintiffs' and Lead Counsel's investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

**EXCHANGE ACT CLAIMS**
**(Sections I through XII)**

## I.      INTRODUCTION

4.      Vertiv designs, manufactures and services critical digital infrastructure and data centers for large enterprise customers such as Google, Microsoft, and Twitter.  Prior to the Class Period, the Company's growth potential was hindered by profit margins that were significantly lower than its competitors—a dynamic that concerned investors as Vertiv prepared to go public in February 2020.  To bring the Company in line with its industry peers, Defendants unveiled a plan that would purportedly expand Vertiv's margins by up to 500 basis points, which was predicated on the Company's ability to increase product pricing while keeping costs fixed.  When demand for Vertiv's data center services soared in 2020 at the onset of the COVID-19 pandemic, Defendants' plan appeared to be working, as senior management specifically attributed Vertiv's significant margin growth that year to "strong execution of purchasing and pricing initiatives."

5.      However, by the start of the Class Period in early 2021, COVID-related manufacturing shutdowns and travel restrictions caused raw material and freight costs to rise. Accordingly, analysts' and investors' "big focus" was whether Vertiv could effectively manage these inflationary costs while still achieving its margin expansion plan, which was critical to Vertiv's financial success as a now-public company.  To assuage investors' concerns, throughout the Class Period, Defendants made clear to investors that Vertiv had the ability to increase, and

was readily increasing, the price of its products to offset any additional costs and maintain its profit margins—in the Company's own words, the Company was "getting price." Indeed, Defendants repeatedly and staunchly assured investors throughout the Class Period that Vertiv's plan remained perfectly on track because the Company was implementing "robust pricing actions" that would allow Vertiv to increase prices for its products as needed to meet its profit margin goals.

6.     Thus, for example, Defendants specifically claimed that Vertiv was "***achieving significant margin expansion***" precisely because it was successfully "***contui[ing] [to] pass[] price along***" to its customers.[1] These actions purportedly included retroactively raising prices on Vertiv's over $2 billion backlog through "material clauses" in the Company's contracts with major customers that allowed it to "institute[] surcharges" to offset inflation. Defendant Johnson further claimed that Vertiv's ability to "get price" was so successful that the Company would "now and going forward cover" even "potentially worse" inflation. In describing the Company's expected profit margin expansion, Defendants also repeatedly represented that Vertiv was achieving these results without resorting to substantial discounting, as it had instituted these "price increases" while being "much more judicious" with its "discount levels." Even as late as November 2021— shortly before Defendants were forced to reveal the truth—Defendants maintained that they were "***controlling the discounts that our own salespeople are able to have***."

7.     To further buttress these representations, Defendants increased Vertiv's annual guidance on two successive occasions during the Class Period, and in each case specifically represented that the increases were directly attributable to Vertiv's "additional pricing actions." Defendants also emphasized to investors that they were personally monitoring the rising costs and the Company's pricing response in real time, "8 days a week." Defendant Niederpruem even said

---

[1] Unless otherwise noted, all emphasis in quotations is added.

that as a result of this close monitoring, Defendants were "***really, really confident that we will be able to recover the vast, vast, vast majority***" of Vertiv's increased inflationary costs through the Company's "pricing actions."

8.      Analysts and investors heavily relied on Defendants' specific and repeated representations.  In turn, Vertiv's stock price skyrocketed by over 37%, from $20.80 per share at the start of the Class Period to reach a Class Period high of $28.59 per share on September 2, 2021.

9.      However, as Vertiv and the Officer Defendants would be forced to concede, these statements were unequivocally, and knowingly, false.  The first indication that the Company was not able to raise prices to keep up with inflation and supply chain problems came on September 8, 2021, when Vertiv disclosed that it was reducing its expected operating income for fiscal 2021 by 10% and attributed such reduction to "supply challenges" that would cause Vertiv to "fall a bit short of 2021 pricing targets."  This disclosure wiped out over $700 million of Vertiv's market capitalization.  But Vertiv and the Officer Defendants continued to falsely reassure investors on that date, and throughout the balance of the Class Period, that the Company would take pricing actions to capture inflation.  These representations were also false.

10.      At the end of the Class Period, Defendants admitted the full truth.  Specifically, on February 23, 2022, Vertiv shocked the market by reporting adjusted operating income for fiscal 2021—the metric Vertiv had touted as being the most critical to investors—was ***43%*** below the low-end of management's fourth-quarter guidance range, and that it had missed its annual guidance for that metric ***by over $80 million***.  In the ensuing analyst conference call, Defendants ***admitted***—in stark contrast to their numerous Class Period statements that Vertiv had implemented "robust pricing actions" to increase its prices that would more than "cover" inflationary costs— that the exact opposite was true:  Vertiv was ***unable*** to increase prices for its services, and as a

result, its business was decimated.  Indeed, Vertiv's CEO, Defendant Johnson, starkly admitted that "***the [Vertiv] organization . . . didn't and wasn't set up to drive a lot of price***."  Similarly, Vertiv's Executive Chairman, David Cote, also admitted that, far from successfully raising prices as Defendants had claimed, Vertiv had in fact been "***generally underpric[ing]***" its contracts, and as a result, it got "***behind on the inflation recovery curve with insufficient price and stayed there all year***."

11.     Defendants also made clear during the February 23, 2022 earnings call that not only was Vertiv unable to raise its prices, but that in reality the Company's sales force had been forced to provide substantial discounts to customers in order to make sales—a practice that was so pervasive and endemic that Defendants conceded that discounting was part of Vertiv's "culture." Indeed, Defendant Johnson explicitly admitted that the Company had "***los[t] price through discounting***" and had been routinely "***giv[ing] away the pricing that we were getting through discounting***," and Defendant Cote likewise confirmed that Vertiv regularly "underpric[ed]" because it "***had a predisposition or a deference to not lose the order***."  Moreover, while Defendants had steadfastly touted Vertiv's multi-billion dollar backlog as a source of strength precisely because the Company could supposedly retroactively raise prices on that backlog, Defendants now revealed that the opposite was true.  As Defendant Johnson ultimately admitted, "***[w]e didn't get a lot of pricing on the backlog that we had[,] [t]hat was part of our problem. We had to burn through that***."

12.     Further, during the February 23 earnings call, the Company's most senior officers made clear that Vertiv's massive problems had nothing to do with external market forces or industry issues, but instead were due to Vertiv's own significant operational failings.  Indeed, in a series of striking admissions rarely seen by a public company, Defendants essentially conceded

that they had fundamentally misrepresented the state of their business to investors, acknowledging on multiple occasions that their disclosures had damaged their own credibility. Specifically, Defendant Johnson starkly admitted that Vertiv management had "***screwed up***" and was "***full[y] responsible***" for the Company's disastrous financial results. As a result, Defendants openly admitted that they were "***disappointed and embarrassed***" by the Company's "***unimpressive***" performance, while tacitly acknowledging that they had misled investors, stating that they now "***realize[d]—absolutely realized we have likely damaged some of our credibility in 2021***."

13. In response to this news, Vertiv's stock price was decimated, falling by 37% in a single day, or $7.19 per share, to close at $12.39 per share—over 56% lower than the Class Period high from just a few months earlier, and wiping out over $2.7 billion in market capitalization.

14. Analysts were utterly stunned, describing the Company's fourth quarter and annual results as "***shockingly bad***" and excoriating management's credibility for their prior misrepresentations. For example, on February 23, 2022, Deutsche Bank analysts stated that "we were—to put it frankly—***a bit stunned by the magnitude of the . . . profit miss this morning***," to the extent that that the analysts "***cannot defend the results or the guidance***," and concluded that "***it will take time for [Vertiv] to regain credibility***." A Wolfe Research report similarly underscored the historic nature of Vertiv's disastrous financial results as well as the fact that Vertiv management was to blame, stating that "[i]n our 17 years of covering industrials ***we can't recall a drawdown of this magnitude***, even during the [Great Financial Crisis]"—and pointedly noted that "***management credibility is completely shot***." A Cowen report also highlighted that Defendants' admissions materially misled the market and stood in stark contrast to their Class Period representations, noting that Vertiv's management's "***credibility [was] in question***" because "management shared that the price actions it took" earlier in 2021 would "deliver meaningful

tailwind throughout 2022, ***providing the investment community with a sense that it was in control of pricing conditions***"—but "Vertiv's fourth quarter results suggest otherwise."

15.    Significantly, as part of Plaintiffs' independent investigation into their allegations, Plaintiffs interviewed former high-ranking Vertiv employees, each of whom uniformly confirmed Defendants' fraud.   Indeed, these former senior employees corroborated that, contrary to Defendants' repeated and specific representations, the Company had failed to take any pricing actions in response to inflation in 2021—and that, in reality, Vertiv's larger long-term contracts representing the vast majority of the Company's revenue during the Class Period did not even allow Defendants to raise prices to offset inflation or to pass along costs to customers.   These former employees stated that, as a result, Vertiv ended up with a huge backlog that was "***off the charts unprofitable.***"

16.    For example, the former Vice President of Channel Strategies for Vertiv's Americas Region described how, far from raising prices, the Company sought to build a large backlog by entering into numerous long-term enterprise contracts with the likes of Amazon, Facebook, and Google that the Company attained ***only by discounting its prices***.   Moreover, this former executive stated that these contracts "were not good for Vertiv" because—contrary to Defendants' public statements—they expressly ***did not*** allow the Company to raise pricing if costs increased.   Significantly, this executive's account was independently corroborated by two other former Vertiv executives—the former Vice President of Global Channel and a former Senior Account Manager—both of whom confirmed that, rather than raising prices, Vertiv's strategy upon going public was to build a large backlog through discounted long-term contracts with large enterprise customers that ***did not*** allow for any price increases.   These former employee accounts corroborate Defendants' post-Class Period admissions.

17.     While public investors have lost upwards of $3.4 billion in market capitalization as a result of Defendants' fraud, the Company's majority shareholder and co-founder, private equity firm Defendant Platinum Equity, fared significantly better.  Indeed, on November 1, 2021—just after Defendants had raised Vertiv's annual guidance for a third time and falsely assured the market that they were implementing "robust pricing actions" that "now and going forward [would] cover" even "potentially worse" inflation—Vertiv announced a secondary public offering of stock ("SPO") at just under $25 per share, which closed on November 4, 2021.  Thus, just three months prior to the revelation of Defendants' fraud at the end of the Class Period, Platinum Equity unloaded 20 million shares of Vertiv stock through the SPO—a full one-third of its holdings— yielding it over *$544 million in net proceeds*.

## JURISDICTION AND VENUE
### (Both Securities Act and Exchange Act Claims)

18.     The claims asserted in this Complaint arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this District under Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1391(b), (c), and (d). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Each of the Underwriter Defendants (defined below) is headquartered in this District.  Defendant Platinum Equity also has offices in this District.  Many of the acts charged in this Complaint, including the dissemination of materially false and misleading information,

occurred in substantial part in this District.  In addition, at all relevant times, Vertiv's common stock was offered, sold, and traded on the New York Stock Exchange ("NYSE"), which is located in this District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## II.    **THE PARTIES**

### A.    **Lead Plaintiffs**

21.     Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") is based in Baton Rouge, Louisiana, and is a public pension fund that provides pension and other benefits for sheriffs, deputy sheriffs, and tax collectors in the State of Louisiana.  Louisiana Sheriffs is responsible for the retirement income of these employees and their beneficiaries. Louisiana Sheriffs manages approximately $5 billion in assets for the benefit of its approximately 25,000 active and retired sheriffs and deputy sheriffs.

22.     Lead Plaintiff Orlando Police Pension Fund ("Orlando Police") is based in Orlando, Florida, and is a single-employer, defined benefit public pension fund.  Orlando Police manages more than $800 million in assets for the benefit of its approximately 1,900 active and retired participants.

23.     Lead Plaintiff City of Plantation General Employees Retirement System ("Plantation Employees") is based in Plantation, Florida, and is a single-employer, defined benefit public pension fund.  Plantation Employees manages approximately $230 million in assets for the benefit of its approximately 1,000 active and retired participants.

24.     Lead Plaintiff Riviera Beach Municipal Firefighters' Pension Trust Fund ("Riviera Beach Fire") is based in Riviera Beach, Florida, and is a single-employer, defined benefit public pension fund.  Riviera Beach Fire manages approximately $106 million in assets for the benefit of its approximately 120 active and retired participants.

25.     Lead Plaintiff Riviera Beach General Employees' Retirement System ("Riviera Beach") is based in Riviera Beach, Florida, and is a single-employer, defined benefit public pension fund.  Riviera Beach Employees manages approximately $140 million in assets for the benefit of its approximately 350 active and retired participants.

### B.     Corporate Defendant

26.     Defendant Vertiv is a data center solutions company, focused on the development and sale of hardware, software, and analytics for the global data center industry.  Incorporated in Delaware, the Company maintains its corporate headquarters at 1050 Dearborn Drive, Columbus, Ohio.  The Company is the issuer of the shares sold in the SPO.  Vertiv's common stock trades on the NYSE under the ticker symbol "VRT."  As of February 22, 2022, Vertiv had over 375 million shares of Class A common stock outstanding, owned by thousands of investors.

### C.     Officer Defendants

27.     Defendant Robert "Rob" Johnson ("Johnson") is, and was at all relevant times, Vertiv's Chief Executive Officer ("CEO") and a Director of the Company.  Defendant Johnson joined Vertiv in December 2016 as CEO, as endorsed by Platinum Equity.  According to the Company's 2021 proxy statement, Defendant Johnson's qualifications include "his knowledge of the data center industry."   In 2020, Defendant Johnson received nearly $20 million in

compensation, which increased by 496% compared to 2019 ($19,627,189 compared to $3,295,644). Defendant Johnson's brothers and sons work at the Company.[2]

28.     During the Class Period, Defendant Johnson made materially false and misleading statements and omissions in Vertiv's SEC filings and during earnings calls, investor conferences and industry presentations, including on February 24, 2021; March 1, 2021; April 28, 2021; April 30, 2021; July 28, 2021; September 8, 2021; October 27, 2021; and November 16, 2021.

29.     Defendant David Fallon ("Fallon") is, and was at all relevant times, Vertiv's Chief Financial Officer ("CFO"). Defendant Fallon was appointed CFO of Vertiv in July 2017 and has more than 25 years of experience in financial management with global companies. In 2020, Defendant Fallon received a compensation package of approximately $5.7 million, which increased by 183% compared to previous year.

30.     During the Class Period, Defendant Fallon made materially false and misleading statements and omissions in Vertiv's SEC filings and during earnings calls, investor conferences and industry presentations, including on March 1, 2021; April 28, 2021; April 30, 2021; May 26, 2021; June 2, 2021; June 9, 2021; July 28, 2021; October 27, 2021; and November 16, 2021.

31.     Defendant Gary Niederpruem ("Niederpruem") is, and was at all relevant times, Vertiv's Chief Strategy and Development Officer. According to the Company's biography for Defendant Niederpruem he is "responsible for leading the organization's marketing, strategy and

_____

[2] According to the Company's 2022 proxy statement, Patrick Johnson, the brother of Defendant Johnson, serves as the Company's Executive Vice President of Integrated Rack Solutions and previously served as Vertiv's Executive Vice President of Information Technology and Edge Infrastructure. Richard Johnson, the brother of Defendant Johnson, serves as the Company's Director of Global Strategic Clients and previously served as Vertiv's Director of Global Strategic Clients. Alexander Johnson, the son of Defendant Johnson, serves as Vertiv's Director of Channel Accounts and previously served as Vertiv's Manager Channel Accounts CDW from April 2018. Michael Johnson, the son of Defendant Johnson, serves as a National Account Manager.

M&A functions.  [Defendant Niederpruem] has more than 20 years of experience in harmonizing market trends, engaging customers and setting corporate-wide and business unit strategies to align to the market.  [Defendant Niederpruem] has driven strategy and growth initiatives through both organic and inorganic activities."  In 2016, Defendant Niederpruem was directly involved in divesting the Emerson Network power business and selling it to Vertiv's now majority shareholder Platinum Equity, with the resulting entity being rebranded as "Vertiv."

32.     During the Class Period, Defendant Niederpruem made materially false and misleading statements and omissions in Vertiv's SEC filings and during earnings calls, investor conferences and industry presentations, including on February 24, 2021; April 28, 2021; May 26, 2021; June 2, 2021; June 9, 2021; July 28, 2021; September 8, 2021; and November 16, 2021.

33.     Defendants Johnson, Fallon, and Niederpruem are collectively referred to in this Complaint as the "Officer Defendants."  For purposes of Lead Plaintiffs' Exchange Act claims, "Defendants" refers to Vertiv and the "Officer Defendants."

34.     During the Class Period, the Officer Defendants, as senior executive officers and/or directors of Vertiv, were privy to confidential, proprietary and material adverse non-public information concerning Vertiv, its operations, finances, financial condition, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Officer Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

35.     The Officer Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Officer Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Officer Defendants were able to and did, directly or indirectly, control the conduct of Vertiv's business.

36.     The Officer Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.  The Officer Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Officer Defendants had the opportunity to commit the fraudulent acts alleged herein.

37.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Officer Defendants had a duty to disseminate promptly accurate and truthful information with respect to Vertiv's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Vertiv's stock would be based on truthful and accurate information.  The Officer Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

III.   **OVERVIEW OF THE FRAUD**

A.   **Vertiv Goes Public And Unveils A Margin Expansion Plan Via "Pricing Initiatives" That Was Critical To Its Success As A Public Company**

38.    Vertiv was established in 2016 after private equity company Platinum Equity acquired Network Power (a business division of Emerson Electric Co.) and rebranded it as "Vertiv."  Vertiv designs, manufactures, and services critical digital infrastructure for data centers and communication networks worldwide, including for large "hyperscale" enterprise customers such as Google, Amazon, and Microsoft.  During the Class Period, the vast majority of Vertiv's revenue was derived from long-term contracts to provide custom-built products for large enterprise and hyperscale customers that would take several months to complete, resulting in the Company carrying an exceedingly large backlog.  For example, for the year 2021, Vertiv's publicly-reported backlog was a staggering $3.2 billion, with nearly $2 billion of that amount originating from the Company's Americas region from which the Company derived the majority of its revenues.

39.    On February 7, 2020, Vertiv went public through a merger with GS Acquisition Holdings Corp. ("GSAH"), a special purpose acquisition company (SPAC).  Upon the closing of the transaction, majority shareholder Defendant Platinum Equity held approximately 38% of the outstanding common stock of Vertiv.  Upon going public, Defendant Robert Johnson, Vertiv's CEO, promptly announced that the Company—which was historically known for having strong growth potential but weak profit margins that were substantially lower than its peers—would embark upon a "margin expansion" plan that would significantly increase Vertiv's profit margins.  Indeed, in a March 9, 2020 press release, Johnson touted the Company's "long-term value creation" plan, the key feature of which was "expanding margins 500 basis points" to "match peers."

40.     Both prior to and throughout the Class Period, Defendants[3] told investors that the key "lever" Defendants would use to achieve their critical "margin expansion" plan was "strong execution of purchasing and pricing initiatives"—or what Defendants described as Vertiv's unique ability to raise prices and pass along costs to its customers due to high demand for its innovative and differentiated products.  Indeed, during the Company's first earnings call on March 9, 2020, Defendant Johnson emphasized that Vertiv had been "able to get price in 2019" and would "continue to exercise that muscle as we go forward" to achieve significant margin expansion for the Company.  Analysts were quick to champion this plan, as they viewed Vertiv as having substantial potential upside if it could get its profit margins to match its peers.  For example, an August 2020 Bank of America report highlighted Vertiv stock as a "Buy" precisely because of the Company's "Potential Margin Expansion" and emphasized that it appeared that the "procurement and pricing" efforts Vertiv would use to achieve this goal were "gaining momentum."

41.     Just prior to the Class Period and throughout 2020, Vertiv's margin expansion plan appeared to be working.  Indeed, by November 2020, Vertiv reported that the "margin in [the] Americas"—the Company's most critical region—"had increased 400 basis points from last year, illustrating the progress we have made with our margin expansion initiatives in a relatively short period of time."  Vertiv also touted its ability to take market share without sacrificing price, with Defendant Niederpruem, Vertiv's Chief Strategy and Development Officer, proclaiming that Vertiv had successfully "honed in on what the right price point needs to be" to "take share," and that "the answer is not really to give away price."

---

[3] Unless otherwise noted, for purposes of Lead Plaintiffs' claims brought pursuant to the Exchange Act, references to "Defendants" includes Vertiv and the Officer Defendants.

42.     Furthermore, Vertiv emphasized to investors that, through its efforts, the Company had built a massive backlog of sales, amounting to $1.85 billion, at purportedly higher price points—a dynamic that Defendants would emphasize to investors in each of the Company's SEC filings.   Indeed, Defendants repeatedly used this significant backlog as emblematic of the Company's success and to signify the strength of Vertiv's business, which was purportedly set up for margin success moving forward.

**B.     Throughout The Class Period, Defendants Repeatedly Claimed—Including In Direct Response To Numerous Analyst Inquiries—That They Were Successfully Implementing Pricing Actions That Would "Fully Offset" Inflationary Headwinds**

43.     By the start of the Class Period in early 2021, Vertiv's strong start to its margin expansion plan was called into question by manufacturing shut-downs and travel restrictions caused by the continuing effects of the COVID-19 pandemic.   These developments resulted in rapidly rising costs for raw materials, critical component parts, and freight expenses.   Given these inflationary headwinds, analysts queried whether Vertiv's margin expansion plan was still viable. Indeed, a January 25, 2021 Evercore ISI report issued just prior to the Class Period flagged that "the big focus" for investors in 2021 would be whether Vertiv's "[current year] '21 guide and the implied operating margins" were still achievable.

44.     In an effort to strongly reassure investors in this regard, on February 24, 2021, the first day of the Class Period, Vertiv issued an extremely bullish earnings release, stating that the Company expected to achieve adjusted operating profit of $565 to $585 million—***a staggering 68% higher than Vertiv's adjusted operating profit the prior year***.   Significantly, on the Company's earnings call held the same day, Defendants confirmed that inflation was of minimal concern because Vertiv had the ability to increase—and was increasing—its prices to offset those costs.   Indeed, in direct response to an analyst question about whether "recent raw material

inflation" headwinds were "embedded in the guidance," Defendant Niederpruem specifically assured investors that they were—and that the Company expected to fully offset those headwinds by having "positive price" and "continu[ing] [to] pass[] price along" to Vertiv's customers.

45.     From that day forward and through the end of the Class Period, ***Defendants repeatedly asserted during every single earnings and investor call that Vertiv was successfully offsetting inflation by aggressively raising its prices***.   For example, Defendants claimed— including in direct response to numerous analyst inquiries—that despite increasing inflationary and supply chain headwinds, Vertiv was "able to go forward [and] price things at that higher cost rate" and that it had "a pretty good process now in our ability to drive prices through with our customers on a global scale."   Defendants also emphasized to the market that Vertiv possessed significant data and sophisticated technological tools to ensure that its pricing actions were successfully implemented, including that "[t]he higher the commodity logistics headwind and inflation is, the more data we have . . . to reasonably take price up consistently with competitors" and that the Company was "getting more and more sophisticated with our ways we get price" by instituting "AI [artificial intelligence] and really pricing tools that allow our salespeople to understand when we lose at what price and when we win."

46.     Furthermore, Defendants assured the market that Vertiv was able to institute these practices without resorting to significant discounting, as the Company was purportedly being "***much more judicious***" with its "***discount levels***" in an effort to ensure its sales team was driving price and that, due to the Company's aggressive pricing actions, "by the time we get to Q4, we will have pricing that fully offset[s] inflationary costs."   Indeed, Defendant Johnson claimed during the Company's July 28, 2021 second quarter earnings call that the Company's pricing actions were so significant that Defendants were "estimating having $65 million of pricing actions for the full

17

year versus 2020"—which Defendants represented would offset their estimated material and freight inflation by 60%. Defendants also represented that the price increases Vertiv was making were "sticky upwards"—meaning that once Vertiv raised its prices they were purportedly staying at that higher level—such that the Company "***actually look[ed] at [inflation headwinds] strategically as a way to get additional price***."

47.     Defendants further claimed that the Company's over $2 billion backlog at the start of the Class Period—which chiefly consisted of existing long-term contracts with large enterprise customers, meaning those contracts' pricing terms were already fixed at the time of the order— would not impact the Company's ability to offset inflation through pricing actions precisely because the Company purportedly had "levers" to retroactively raise prices on those contracts as costs increased. Specifically, during the Company's April 28, 2021 first quarter earnings call, Defendant Niederpruem represented in response to an analyst question about whether the Company had "some mechanism" to retroactively increase prices in Vertiv's backlog that Vertiv had "***material clauses***" in those "larger contracts" that allowed the Company to raise prices as costs increased—and further that with respect to rising freight costs in particular, the Company was able to "***institute[] surcharges as well***." Defendant Niederpruem thus confirmed that "***by no means [was Vertiv] going to just discount the $2 billion [backlog] that we have and say there's nothing we can do there***"—rather, the Company was "***taking action on that as well***."

48.     To buttress these representations, Defendants substantially raised the Company's already strong 2021 annual guidance in April and July 2021—and in both instances directly attributed the raised guidance to the Company's pricing actions that were purportedly successfully offsetting inflationary headwinds. Specifically, on April 28, 2021, in connection with Vertiv's first quarter results, Defendants increased annual guidance for adjusted operating income by $20

million, from a midpoint of $575 million to $595 million.  In so doing, Defendants claimed that this increase included "expected negative net impact in the remainder of the year of higher commodity and freight costs," which the Company stated in its accompanying investor presentation would be offset by "implementing pricing actions."  Similarly, on July 29, 2021, the Company announced that it was again "increasing full year guidance" for adjusted operating income to a midpoint of $600 million, which the Company attributed to "additional pricing actions" and "pricing programs" that were "already underway."

49.    Significantly, in making the above representations, Defendants provided investors with even more assurance by strongly emphasizing their personal real-time monitoring of both the rising material and freight costs and Vertiv's pricing response.  For example, during a May 26, 2021 investor conference, Defendant Niederpruem assured investors—in direct response to an analyst question about whether Vertiv could "cover[] the inflation you're seeing"—that he and CFO Defendant Fallon "*review[ed] pricing and the commodity stuff . . . 8 days a week at this point in time*" to "*make sure that we're doing all the right things*."  Defendant Niederpruem further assured investors that Defendants "*h[eld] monthly reviews with each one of the businesses to make sure there's nothing that skews*" with "*very real-time updates there.*"  Defendant Niederpruem proclaimed that, as a result of Defendants' close monitoring, they were "*really, really confident that we will be able to recover the vast, vast, vast majority of any inflationary stuff.*"

50.    In response to Defendants' strong reassurances regarding Vertiv's ability to handle inflationary and supply chain headwinds, the Company's stock price skyrocketed by over 37%, from $20.80 per share at the start of the Class Period to reach a Class Period high of $28.59 per share on September 2, 2021.  Analysts fully credited Defendants' statements.  For example, an April 28, 2021 Evercore report commented that "[f]undamentally, we think VRT is executing

rather well given the ongoing supply chain and component challenges, and as we go forward, we expect some of these headwinds to be ***offset by pricing*** that we think is sticking fairly well with customers."  A May 26, 2021 Wolfe report stated that it was "***[c]onfident that VRT will be able to recapture the cost inflation***" and that "[p]ricing is sticky and will likely turn into a tailwind in FY22." A July 28, 2021 Citi report stated that "[w]hile price cost could pose headwinds, we think that ***VRT has good visibility to the pace of price realization*** through its $2.3 [billion] record backlog exiting the quarter."  A July 28, 2021 Deutsche Bank report stated that "***we were encouraged to hear that pricing has moved from an expected $25m top-line tailwind to $65m, as management is having greater success with new pricing mechanisms, aided by 'big data' and AI***."  Finally, a July 28, 2021 Evercore report noted that "VRT's [raised] guidance includes expected pricing actions, which the company projects will fully offset inflation in the supply chain in the [fourth quarter] and provide a tailwind in FY22."

51.     However, as Defendants would be forced to admit just a few short months later in February 2022, all of their statements were unequivocally false.  In truth, Defendants were not taking any of the pricing actions they were touting to investors, and thus had no basis whatsoever to claim that Vertiv was successfully offsetting increasing supply chain and inflationary headwinds—because, as Defendant Johnson would directly admit, Vertiv "***didn't and wasn't set up to drive a lot of price***."  Later, Defendants would admit that, far from raising prices, and directly contradicting their repeated assurances throughout the Class Period, they were in fact routinely "***giv[ing] away the pricing that we were getting through discounting***" and thus "***generally underpric[ing]***" the Company's contracts even as costs continued to rise.  In fact, in their February 2022 disclosures, Defendants would concede that they only barely began to take any of the pricing actions they had been touting to investors over the past year "over the last 60, 90 days"—meaning

the *end* of the Company's 2021 fourth quarter.  Moreover, despite Defendants' representations to the contrary, Vertiv had no ability to raise prices on the majority of the large enterprise contracts that comprised the Company's over $2 billion backlog—because, in reality, there were no "material clauses" that allowed Vertiv to raise its prices as costs increased.  To the contrary, Vertiv had entered into the backlog deals by locking in discounted prices regardless of inflation.

      **C.**      **In A Partial Revelation That Representations Concerning Margin Expansion Were False, Vertiv Discloses Reduced Guidance But Continues To Tell Investors That It Is Taking "Robust Pricing Actions"**

      52.      On September 8, 2021—just six weeks after Vertiv had increased its annual guidance for the second time—Vertiv surprised investors by suddenly reversing course and slashing its annual guidance.  Specifically, the Company revised its projected annual adjusted operating income from a midpoint of $600 million to $540 million—a significant 10% reduction and well below the initial guidance of $575 million.  A press release issued before the market opened, in which Vertiv announced its agreement to acquire E&I Engineering Ireland Limited ("E&I"), attributed the guidance reduction to "supply challenges" that had resulted in "production and delivery challenges pressuring the top line."  The investor presentation accompanying the press release stated that, as a result of these supply chain challenges, Vertiv "[l]ikely w[ould] fall a bit short of 2021 pricing targets (primarily in the Americas)."  During an investor call the same day, Defendants confirmed that they had been forced "to take our numbers down because supply conditions have worsened significantly," such that Vertiv was forced to make "spot buys" by paying "elevated prices" for critical components and thus reducing the offsetting effect of Vertiv's purported pricing actions.  However, as discussed below, Vertiv and the Officer Defendants falsely reassured investors that the Company would continue to take pricing actions to capture inflation and continued to conceal that Vertiv was not increasing prices and could not increase prices on orders in the backlog.

53.     As a result of this news, Vertiv's stock price fell approximately 11% over the next two trading days, from a $28.04 per share closing price on September 7, 2021 to close at $25.07 on September 9, 2021.   Analysts were taken aback.   A September 9, 2021 Cowen report commented that "[t]he [guidance] cut comes as a surprise given Vertiv addressed supply chain constraints when it reported 2Q21 earnings just five weeks ago."   A September 9, 2021 Wolfe Research report similarly commented that "[t]he guide down on price/cost and supply chain headwinds is very disappointing, since margin expansion and deliverance on financial commitments are particularly important factors for this stock."

**D.     Vertiv and the Officer Defendants Continue To Claim That Their Pricing Actions Are Effectively Offsetting Inflation—Causing Vertiv's Stock Price To Surge Just Before The Company's Announcement Of A Significant Secondary Public Offering**

54.     Faced with this sudden decline in the Company's stock price—and in light of the fact that Defendants were set to announce the Secondary Public Offering less than two months later—Defendants were quick to reassure investors that Vertiv's pricing initiatives were still very effective and successfully offsetting inflation.   This damage control began as part of the Company's September 8, 2021 disclosure.   For example, during the September 8, 2021 investor call, Defendant Johnson assured investors that "*[o]ur pricing has continued to ramp*" and "*[w]e continue to drive pricing*."   Defendant Niederpruem similarly confirmed that "*you can see the pricing ramping every quarter, every month as we track this*."

55.     Then, on October 27, 2021, when the Company announced its third quarter results, Defendants sought to further assuage investors' concerns by issuing a press release claiming that "our pricing response continues to meaningfully increase sequentially each quarter, and we anticipate another sequential increase in the fourth quarter."   To emphasize the point, Vertiv announced that it was *re-raising* its adjusted operating income guidance by $13 million—from a

midpoint of $540 million to $553 million—and also issued strong fourth quarter guidance of $166 to $186 million in adjusted operating profit.  During the Company's earnings call held the same day, Defendants confirmed to investors that Vertiv "***was making sure that our pricing actions now and going forward***" would "***cover***" inflation—even if it got "potentially worse"—and claimed that they were "***certainly encouraged with what we're seeing in the pricing environment here in the fourth quarter***."  Defendant Fallon further claimed that the Company was so certain of its pricing actions that Defendants expected "a much more significant dollar tailwind" before the end of the year because "we are in our pricing plans anticipating that inflation will continue to accelerate."

56.     Defendants' false assurances had their intended effect, as the Company's stock price surged by over 6% from $24.53 per share on September 10, 2021 to $26.05 per share on November 1, 2021, the day Defendants announced the SPO.  Indeed, analysts reacted very positively to Defendants' representations regarding the Company's ability to increase prices.  For example, an October 29, 2021 Wolfe Research report commented that "***what shone through loud and clear here was confidence on improving price realization***."  Evercore ISI similarly found in its October 27, 2021 report that "[m]anagement tone was notably positive . . . with ***confidence around price increases***."  An October 27, 2021 Deutsche Bank report headlined that "***Today's results calmed fears of 'another shoe to drop' in 4Q***," and likewise commented that while "***several investors had expressed concern***" that Vertiv was going to cut its guidance again, Deutsche Bank was "pleased to see [Vertiv] maintain its underlying full year adj. operating profit guidance—***and so was the market***."

57.     Shortly thereafter, the Company's majority shareholder and co-founder, private equity company Platinum Equity, took the opportunity to capitalize on Defendants' materially

false statements.  Specifically, on November 1, 2021—in the immediate wake of the Company's stock price surge in direct response to Defendants' positive representations, and just three months before the end of the Class Period—Vertiv announced the SPO priced at just under $25 per share (the price paid to Platinum Equity—SPO shares were sold to investors at various prices).  Through the SPO, Platinum Equity would be selling off over 20,000,000 shares of Vertiv common stock— amounting to a full third of its 15.9% stake.  Significantly, when the SPO closed on November 4, 2021, Platinum Equity received a staggering ***$544 million*** in proceeds.

58.     As late as November 16, 2021—well into the fourth quarter and shortly before Defendants would be forced to admit the truth—Defendants continued to strongly assert that "as inflation continues to rise . . . we'll continue to take pricing action" by instituting "additional price increases," and Defendants told investors that they fully expected to achieve a pricing "tailwind" by the end of the fourth quarter.  Indeed, Defendant Niederpruem went so far as to assert that this fourth quarter "tailwind" was virtually confirmed because, in light of "additional pricing actions" the Company had launched "over the last 2 or 3 weeks," "***from an absolute standpoint, we're going to get a year's worth of price in just in the fourth quarter***."  Defendant Niederpruem further specifically affirmed that the Company was achieving these milestones without resorting to substantial discounting, as Vertiv was purportedly continuing to "***control[] the discounts and multipliers that our own salespeople are able to have***" in order to ensure the Company's price increases would be effective.

## IV.    THE TRUTH IS REVEALED

### A.     Defendants Outright Admit That, In Direct Contravention Of Their Repeated Assurances About "Getting Price," In Reality, Vertiv "Didn't And Wasn't Set Up To Drive A Lot Of Price"

59.     On the morning of February 23, 2022, Vertiv shocked the market by disclosing what was, by the Company's own admission, terrible results for the fourth quarter and full year

2021. Specifically, the Company announced that it had missed its fourth quarter guidance issued just a few months earlier by $72 million—a staggering 43% below the lower-end of the Company's fourth quarter guidance range of $166 million—and had missed its projected annual adjusted operating income guidance by $82 million below the projected mid-point of $553 million. The press release announcing the dreadful results contained a stunning admission from Defendant Johnson that in the face of its rising costs, far from implementing "robust" and "accelerating" pricing actions, Vertiv had in fact had only a "*tepid 2021 pricing response*" to inflationary headwinds. The press release made clear that despite Defendants repeatedly claiming they were aggressively raising prices in response to inflation over the course of the last year, in truth, Defendants had only barely begun to "act[] decisively *late last year and early this year* [2022] with aggressive price actions."

60.     The precise nature of the pricing failures was further revealed through a series of extraordinary admissions Defendants made during the Company's fourth quarter earnings call held later that day—admissions that directly contradicted Defendants' prior public statements that they had touted to investors throughout the Class Period.

61.     *First*, in a complete about-face to Defendants' prior consistent statements that Vertiv had implemented "robust pricing actions" and was actively "driving price" to more than "cover" inflationary costs and achieve its margin expansion goals, Defendants now admitted that the exact opposite was true. Specifically, Defendants admitted that Vertiv was decidedly unable to increase prices for its services, and that as a result, the Company's business results suffered. Indeed, Defendant Johnson starkly admitted that, in reality, "*the [Vertiv] organization probably— not probably—[the] organization didn't and wasn't set up to drive a lot of price*." Significantly, in making this admission, Defendant Johnson made clear that, on a cultural level, Vertiv would

25

now have to completely and radically transform the way it was doing business in order to "get price":

> [W]hat we really had to do, really top down, Dave [Cote], myself and others and the management team, is ***really drive all the way down to the salespeople what it means to get price, how to get price and not to be afraid to lose orders as we go through that.*** So that['s] something culturally losing orders was something that we had to overcome and say it's okay from the perspective of we've got to go drive price.

62. Defendant Cote likewise confirmed that not only was the Company unable to raise prices, but that Vertiv had in fact been "***generally underpric[ing]***" its contracts—because Vertiv "had a predisposition or a deference to not lose the order"—and as a result, the Company "***got behind on the inflation recovery curve with insufficient price and stayed there all year***."

63. ***Second,*** contrary to Defendants' Class Period representations that the Company was "taking action" on its backlog by leveraging purported "material clauses" in Vertiv's larger long-term contracts with enterprise customers that allowed the Company to raise prices, Defendants now conceded that those representations were false. Indeed, Defendant Johnson acknowledged that, in truth, Vertiv had no ability to take any such action because these contracts were utterly devoid of any such clauses. Johnson admitted that Vertiv had only recently made the "change" of adding an "escalator" provision to its contracts to recoup costs in instances where the commodity inputs rose above a certain level—a provision that "***wasn't in all of [Vertiv's] contracts prior***":

> As it relates to getting price and getting that in the contract, there's a couple of things we've changed is getting that price but also ***putting escalators in there if commodities change outside a certain boundary.*** So that's something we've done and put into the contract. ***So it wasn't in all of our contracts prior.***

64. ***Third,*** Defendants made clear during the analyst conference call that the reason the Company was unable to "get price" was that, contrary to Defendants' repeated Class Period

representations, Vertiv's sales force had in fact been providing substantial discounts to customers in order to make sales. Specifically, Defendant Johnson confirmed that, far from aggressively raising prices, the Company had "*los[t] price through discounting*" as it had been routinely "*giv[ing] away the pricing that we were getting through discounting*." As Johnson explained, discounting by the sales force was not limited to a few isolated individuals or sales, but was instead a rampant and pervasive practice that existed throughout the organization—and was so ingrained at Vertiv that it was part of the Company's "culture." As Defendant Johnson made clear, "culturally," Vertiv's sales force was "afraid to lose orders" throughout 2021, even if that meant sacrificing price—meaning that the Company would now have to institute top-down "behavioral changes" Company-wide in order for Vertiv to truly "guarantee that we get this price":

> As I mentioned earlier, some of the behavioral changes that we've put in place across the world is really authority and approval. *One of the quickest ways to get there is stop discounting*. We've raised list prices appropriately, but *you can lose price through discounting.* So we've changed those thresholds across the globe. We changed the level in which those decisions can be made all the way up to David as CFO, *so that we don't give away the pricing that we were getting through discounting.* So that is a, I'd call it, *a cultural thing and a change that we implemented over the last 60, 90 days.* And we believe that's very effective. Although painful for the organization, it's the right thing to do to guarantee that we get this price.

65. Thus, despite representing just a few months earlier that the Company was actively "*controlling the discounts that our own salespeople are able to have*," Johnson admitted that, in reality, Vertiv had just barely begun to institute "process changes" to require "higher levels of approval" on discounts. Tellingly, Johnson tacitly admitted that Defendants' true motivation during the Class Period was to provide the market with the appearance of Vertiv's financial success, as he stated that those "process changes" were necessary to ensure "*that we're not giving price away*" and "*just discount[ing] to build backlog*." Indeed, Johnson admitted that Vertiv's sales team's incentives were not even based on margin expansion or profitability—to the contrary,

the Company's sales force incentives were "***driven by their ability to discount or not discount***" rather than "***get sales with price***."

66.     ***Fourth***, Vertiv's most senior officers made crystal clear during the call that the Company's abysmal financial results and guidance miss were not due to external market forces or pandemic-related issues, but instead were directly tied to Defendants' own failures.  Indeed, Defendants themselves essentially conceded that they had fundamentally misrepresented Vertiv's state of operations during the Class Period, and that as a result, they had damaged their credibility with investors.  For example, Defendant Johnson directly confirmed that, despite Defendants' consistent public statements about how Vertiv was "getting price," Vertiv management was "***full[y] responsible***" for the guidance miss and had in fact "***screwed up***" by "underpricing the market in 2021" and utterly failing to recapture inflationary costs.  Defendant Cote stated that he was "***disappointed and embarrassed***" by Vertiv's "***unimpressive***" performance.  Defendant Fallon acknowledged that Defendants "***understand our credibility was harmed as it related to forecasting***."  Indeed, and as a result of the magnitude of the Company's revelations, Defendants openly acknowledged that they "***realize[d]—absolutely realized we have likely damaged some of our credibility in 2021***, notably with the quality of our external guidance."

67.     In direct response to Defendants' stark admissions, Vertiv's share price plummeted, falling 37% in a single day from $19.57 to $12.38 per share, or $7.19 per share—representing a $2.7 billion decline in market capitalization.

**B.     "We Cannot Defend The Results Or The Guidance": Analysts Are "Stunned" Over The "Shockingly Bad" Financial Results, And Excoriate Defendants' Credibility For Their Prior Misrepresentations**

68.     The magnitude of Vertiv's abysmal financial results and Defendants' prior misrepresentations is underscored by the reaction of the market to Defendants' admissions. Indeed, analysts were utterly stunned at Defendants' revelations, excoriating management for

misleading investors throughout the Class Period and now admitting that their prior assurances were plainly false.

69.     For example, following the Company's press release but before even hearing Defendants' further admissions during the Q4 earnings call, Deutsche Bank noted that "***this is becoming a management credibility issue***" in light of the Company's "[s]hockingly bad" financial results, and underscored that they were "***stunned by the magnitude of VRT's adj. operating profit miss***."  Deutsche Bank was even more perturbed after Defendants' admissions during the earnings call, writing "***we cannot defend the results or the guidance***," and that "***it will take time for VRT to regain credibility***."  The report also underscored that Vertiv's financial results were particularly problematic and "especially frustrating" given Defendants' past representations as recently as the prior quarter:

> As soon as we laid eyes on VRT's 4Q press release this morning, we knew that it would be an ugly day for the stock.  After all, adj. operating income came in 43% below the low end of management's own guidance range, and while it is true that most MI/EE companies have struggled to execute flawless operating beats in such a challenging inflationary/supply chain environment, we think a miss of this magnitude warranted a pre-announcement.  ***This is especially frustrating in the midst of what we would characterize as constructive management commentary at conferences throughout the quarter, even into December.  Truth be told, we still aren't totally comfortable believing that the 'cultural' pricing issues flagged on the conference call could have been truly fixed in the space of 1.5 months***.

70.     Cowen's report similarly noted that, in light of the disastrous financial results and Defendants' prior assurances regarding the Company's pricing actions, management's "***credibility [was] in question***."  Cowen explained that investors no longer trusted Vertiv, as Defendants had previously claimed that their past pricing actions in 2021 would pass along its rising costs to customers—which was "evidently" not true:

> Recall that in response to underestimating the effects of supply constraints and cost inflation that dampened 3Q21 results, management introduced a price regime that was intended to battle the aforementioned headwinds.  ***Particularly, management***

*shared that the price actions it took late in the third quarter would not only keep up with inflation during the fourth quarter, but also deliver meaningful tailwind throughout 2022, providing the investment community with a sense that it was in control of pricing conditions.  Evidently, Vertiv's fourth quarter results suggests otherwise*.  On yesterday's earnings call, management once again repeated that it had enacted new aggressive price actions to combat inflationary pressures, pointing out that this time the full impact of the augmented price regime will not yield results until the second half of 2022.  Despite management's conviction for the new price actions it has taken, *we believe investors have lost confidence in management's commentary surrounding financial guidance.*

71.    Similarly, a Wolfe Research report highlighted both the historic nature of Vertiv's financial miss and Defendants' central role in the debacle, bluntly stating that "***management credibility is completely shot***" as it could not "***recall a drawdown of this magnitude***":

In our 17 years of covering industrials, *we can't recall a drawdown of this magnitude*, even during the [Great Financial Crisis].  As such, the 37% post-earnings sell-off, after pretty meaningful underperformance leading in, ranks as a record in our books that nobody wants to own.  So with the stock down to $12.39 from its 2021 high of $28.80, where do we stand?  *First management credibility is completely shot.  The miss vs. the guide given in early-Nov is so wide that this is a failure of planning as much as any culture gap between sales vs. ops, or a malfunctioning ERP.*

## V.   DEFENDANTS' POST-CLASS PERIOD ADMISSIONS CONFIRM THEIR FRAUD

72.    Even after the Class Period ended, Defendants made even more admissions confirming the falsity of their prior statements.

73.    On February 24, 2022, the day after the Q4 earnings call, Defendants Johnson and Fallon participated in Citi's 2022 Global Industrial Tech and Mobility Conference.  During the conference, Johnson stated that the Company's "mantra" under Platinum Equity's ownership had been "grow, grow," and "take share [under] any contribution margins"—thus Vertiv had historically not focused on getting price.  Significantly, Johnson admitted that this historical "culture" did not change until the end of 2021—and that it was only at that point, just weeks before the end of the Class Period, that the Company started to "drive more systems and more processes"

to cut back on the discounting.  Johnson stated that only "now," however—meaning in February 2022—did the Company feel that it had "the process in place" to get price and had changed its culture to "really incent people to go after that."  Johnson later further conceded that—contrary to Defendants' express assurances that they were "controlling" discounting in the Vertiv organization—in reality, throughout 2021, the Company's sales team "***had a lot more freedom to discount in a price range***" and was "very afraid to lose a deal," resulting in a failure to get price.  Notably, Johnson again confirmed that it was not until 2022 that the Company belatedly "tightened up [through a] discounting ban specifically, so we don't lose price."  Johnson conceded that these new processes were stark departures from Vertiv's Class Period reality—in his words: "I would say ***it is a different way of life here at Vertiv***, and if you talk to any one of the salespeople . . . we've got a very rigid process in place now."

74.     Next, on March 16, 2022, Defendants Fallon and Niederpruem participated in a JPMorgan conference where they made further admissions about Vertiv's past pricing failures and misleading public statements.  Indeed, Fallon admitted that Vertiv previously told investors that the Company was capable of delivering on higher prices despite knowing that this representation was false.  Fallon confessed that as of March 2022, the Company "look[ed] at price as a strategic lever," but in 2021, the Company was in truth "tepid to raise price"—such that "any time we talk[ed] about long-term margin goals, we would put price on the list, ***but it probably was fourth or fifth and maybe hoping that we wouldn't get to that when talking to investors***."  Defendant Fallon further claimed that, while Defendants had previously told investors that Defendants were reviewing pricing "8 days a week," in truth they had only just begun to obtain "daily information out of the Americas from a cost perspective"—such that it was only now that the Company was

"tracking costs across all regions, but more specifically in the Americas on a daily basis" and "looking at pricing in orders on a daily basis as well."

75.     Defendant Niederpruem further admitted during the March 16 conference that, just as Defendant Johnson had acknowledged during the Company's February 23, 2022 earnings call, Vertiv's contracts with its larger enterprise customers in place as of 2021 were completely devoid of any "material escalation clauses" that would have allowed Vertiv to raise prices as inflation increased.  Specifically, Niederpruem admitted that it was only "now" that there were "material escalation clauses" included in "some" of those larger contracts—which the Company was "adding [] as the MSA [master services agreement] expires" so "that way, we don't get caught in the same situation again."

76.     Finally, later during the same conference, Defendant Niederpruem divulged details confirming that Vertiv's Class Period compensation structure was misaligned with—and negatively impacted—the Company's proclaimed ability to increase price.   According to Niederpruem, "*in '21 probably only about 1/3 of our active sales force had, in their sales incentive plan, something to do with price or margin*.  In '22, 100% of our sellers will have some metric into their sales compensation structure that is either price or margin.   So there's a mechanical change there."   Thus, throughout the Class Period, most of Vertiv's sales force was not properly incentivized to increase prices, as they received higher commissions for entering into additional orders regardless of pricing and profitability.   Defendant Fallon confirmed this fact during a May 5, 2022 interview, in which he stated that there was a "favorable change to the [sales force] incentive structure," as "we've included in all regions, an element of pricing and product profitability in the formula for commissions, *whereas historically, the more orders, the higher your commission* . . . now there is component for pricing."

77.     Just two months later, on May 11, 2022, Defendant Fallon verified that the Company was knowingly dishonest with shareholders during the Class Period.  Specifically, during a May 11, 2022 interview with Goldman Sachs, Fallon again confessed that Vertiv put pricing on the list of actions it was implementing to reach its margin expansion goals—despite knowing that the Company was, in fact, not focused on pricing at all:

> I would say the ironic thing as it relates to all the bad stuff that has happened over the last 12 months is that we are actually better positioned today than we were a year ago as it relates to having fortitude and getting to that 16%.  We had a plan, but the ***one thing that we would always explain as a potential lever and we would generally mention it at the end of our conversation would be pricing because we never were super aggressive with pricing as we were trying to grow this business****.* . . . . [W]e really had to motivate the growth, ***and we weren't super aggressive for pricing****.*  And I think we underestimated the uniqueness of our product and the value it added to our customers.  ***And we were never aggressive with pricing****.*

78.     Defendants' continuing admissions into the summer of 2022 have further corroborated the falsity of Vertiv's Class Period statements.  For example, during the Company's recent second quarter earnings call, held on August 3, 2022, in response to a an analyst question about the Company's pricing recovery, Defendant Johnson admitted that—contrary to Defendants' prior statements that they had "levers" to retroactively raise prices on the Company's large backlog—"***[w]e didn't get a lot of pricing on the backlog that we had[,] [t]hat was part of our problem.  We had to burn through that****.*"  Additionally, later during the call, Defendant Fallon again admitted that, while pricing was now a "lever" for the Company to achieve its margin goals, "***we've never been super aggressive with pricing****,*" resulting in the Company "***le[aving] a lot of money on the table*****"—"[w]e could have been pricing much more aggressively for a long while here."

79.     Defendants' numerous post-Class Period admissions further confirm that their repeated public statements touting Vertiv's purportedly "robust" pricing actions throughout 2021 were false and materially misleading when made.

## VI.   FORMER VERTIV EXECUTIVES CONFIRM THAT THE COMPANY HAD NOT TAKEN THE PRICING ACTIONS THAT DEFENDANTS HAD CLAIMED

80.     Lead Plaintiffs' independent investigation included interviews with former high-level Vertiv employees[4] across the country—including former Vice Presidents and Senior Account Executives who had direct knowledge of the Company's pricing practices.   These former executives uniformly confirmed that Vertiv was not taking and, in fact, was unable to take, the pricing actions that Defendants were touting to investors throughout the Class Period.

81.     Significantly, these high-level former employees confirmed that, both before and during the Class Period, (i) Vertiv did not increase pricing during 2021 in response to inflation; (ii) Vertiv's sales force engaged in routine discounting that was directly approved by senior management throughout the Class Period, and the sales force was not incentivized to sell products at higher price points or increase Vertiv's profit margins; (iii) Vertiv had implemented a strategy of entering into low-margin contracts with "enterprise" customers in an effort to build up its backlog that did not contain cost-escalation clauses and therefore locked the Company into fixed discounted prices regardless of rising raw material costs; (iv) suppliers of critical components for Vertiv's products were aggressively decommitting throughout 2021 and requiring the Company to make expensive "spot buys" on the grey market while also putting Vertiv on "credit holds" for its failure to pay vendors; and (v) well-known problems with the Company's internal pricing system,

---

[4] Former Vertiv employees are referred to herein as "FE#" and are all referenced using feminine pronouns to maintain their confidentiality.

known as "CPQ," caused Vertiv's sales force to not have accurate information about material costs and pricing to enable them to set prices above their increased costs.

**A. Former Company Employees Unanimously Confirm That Vertiv "Was Not Issuing Price Increases in 2021" And Was Instead Heavily Discounting**

82.     Former Vertiv employees confirmed that, directly contrary to Defendants' public statements, the Company did ***not*** raise prices in response to increasing commodity and inflationary costs throughout 2021—to the contrary, the Company's senior management habitually approved steep discounting in order to grow Vertiv's business.

83.     For example, FE-1,[5] the former Vice President of Channel Strategies for the Americas who reported to John Hewitt (Vertiv's former President of the Americas who in turn reported to Defendant Johnson), stated that as of the time FE-1 left the Company in March 2021, there had been no discussion at all of raising prices to customers despite rising freight costs.  FE-1 stated that senior management was fully "aware" of the rising costs "since we had an analysis on the impact on the pricing of copper and components in terms of costs" that began at the start of the pandemic.  According to FE-1, while increased freight and shipping costs were considered when evaluating pricing, the pressure to sell won out.  "We tracked all of that but ***the pressure to sell was so great that we had an inability to transfer those price costs to our customers***."  FE-1 stated that during sales meetings, the sales team would complain that they could not increase their prices because customers would not accept it.  According to FE-1, Vertiv made a conscious

---

[5] FE-1 worked for Vertiv from January 2018 until March 2021.  FE-1 was Vertiv's Vice President of Channel Strategies for the Americas. FE-1 previously held the position of Vice President for the Latin American Channel at Vertiv.  FE-1 reported to John Hewitt, Vertiv's President of the Americas, who in turn reported to Defendant Johnson.  FE-1 was responsible for selling hardware, software, solutions, and services to two tier channels in the US market: distributors, IT resellers, retailers, and ecommerce.

decision not to pass these costs on to customers because of pressure to grow the business—such that executive management was agreeing more and more to deals without costs being passed on.

84.     According to FE-1, Vertiv's top executives knew that the Company's deals were being underpriced and even directly approved entering deals without price increases.  Specifically, FE-1 participated in in Monthly Business Meetings ("MBRs") and Quarterly Business Meetings ("QBRs") with senior management where these issues were discussed.  FE-1 recalled that during the MBRs and QBRs, the finance team would provide in-depth financial reports, which detailed margin and profitability information, including comparisons between budget and results.  FE-1 recalled personally attending QBRs with Defendant Johnson during which the Company's practice of underpricing was discussed.  FE-1 recalled, "***Rob Johnson agreed to do these deals without price increases.  These exceptions were being approved and their recent quarterly miss was all self-inflicted***."

85.     FE-2,[6] a former Senior Account Manager for Vertiv and a current customer of Vertiv, similarly described how the Company's pricing failures were exacerbated by Vertiv's policy allowing salespeople to give large discounts.  FE-2 stated that Vertiv's factory set the list price for the Company's products and that the offices directly owned by the Company—the Vertiv factory direct offices ("FDOs")—could sell these products up to a certain discount level without management approval.  For example, a product with a 7.0 multiplier meant that a salesperson could sell that product at 70% of the factory list price, giving their customer a 30% discount (in other

---

[6] FE-2 worked for Vertiv (and previously at Emerson Network Power) from July 1999 until May 2019 as a Sales Engineer and Senior Account Manager within Thermal Air.  Her responsibilities included advising mission critical facility through service, software and equipment technology.  Since her departure in May 2019, she has been a customer of Vertiv while working as a Senior Account Executive at one of the Company's customers.  FE-2 explained that because of her experience at Vertiv and then as a customer of Vertiv (and other similar sellers), she is and continues to be well versed with Limited Vertiv Offices and Vertiv's pricing.

words, the lower the multiplier, the more substantial the discount). If sales personnel wanted to go below a pre-set multiplier, they had to submit a Deviation of Policy or Deviation of Price ("DOP") for approval to the Product Manager. According to FE-2, the Company became so focused on pursuing sales to major accounts that margins no longer mattered to Defendants. FE-2 recalled that Vertiv sold to major accounts at "dirt cheap" prices, with multipliers ranging from 3.5 to 5.0 (i.e., 65% to 50% discounts). As a result, the Company's major accounts seized on these opportunities and began to reserve all of the Company's production slots.

86.    FE-2 further confirmed that Vertiv's prices were in fact ***not*** increased during 2021, including both the list prices and the actual prices after accounting for the "multiplier" discounts. FE-2 reported that while Vertiv's competitors were raising their prices by 5% to 15% in 2021, Vertiv did not raise its list prices at all. According to FE-2, despite the fact that vendor prices increased in 2021, Vertiv held its prices steady and continued to offer highly substantial 6.0 multipliers (*i.e.*, 40% discounts from list prices). FE-2 recalled that in the summer of 2021, she made a purchase from a Vertiv FDO sales representative and received a 6.0 multiplier on products that had not had any list price increases. She commented: "***Vertiv was not raising their prices like everyone else was.***"

87.    In addition to multipliers, FE-2 reported that throughout 2021, Vertiv customers could obtain an additional discount by paying cash up-front within the first 10 days. These discounts were around 2% or 3%. In 2021, while in her current role placing orders on behalf of a Vertiv customer, FE-2 placed an order for units with a multiplier of 6.5 and also was offered the extra 2% to 3% discount for paying cash up-front. Vertiv was still offering these additional discounts leading up to their "big miss" in the fourth quarter of 2021.

88.     FE-3,[7] former Vice President of Field Sales who reported to Hewitt (former President of Americas who in turn reported to Defendant Johnson), also confirmed that Vertiv did not raise pricing in response to inflation in 2021.  Like FE-1, FE-3 stated that the Company had in fact been experiencing inflationary challenges ever since the pandemic started.  Despite this, FE-3 confirmed that, rather than raising prices as Defendants had publicly represented, "*[w]e made an error in not getting ahead of it in regards to raising price to offset inflation*."

89.     FE-3 additionally described how sales, pricing, and margins were reported and directly tracked by executive management.  Orders, sales, margins, and profitability were made available to executive management by through downloading "Power BI Reports."  FE-3 explained that Power BI Reports was a software tool that generated ten to twelve key reports that Vertiv's data warehouse would feed.  Power BI Reports were updated daily and were available on a daily, weekly, and monthly basis.  She added, "We could get reports as frequently as we wanted them."  FE-3 added that Defendants Johnson and Fallon had access to the Power BI Reports.  In addition, FE-3 attended MBR and QBR meetings with Defendants Johnson and Fallon where sales, margins and profitability were discussed.

90.     Finally, FE-5,[8] a former Vertiv Account Executive from December 2010 until September 2021, described how it was executive management who established and reviewed

---

[7] FE-3 worked for the Company from May 2020 until July 2022 as a Vice President of Field Sales who managed all of the U.S. field sales teams and regularly presented sales data at Vertiv's MBR and QBR meetings.  She reported to John Hewitt, former President of Americas, who in turn reported to Defendant Johnson.

[8] FE-5 began working for Emerson in December 2010 and worked at Vertiv until September 2021 as an Account Executive.  FE-5 worked with the Company's channel division, selling IT solutions and infrastructure within a 150-square-mile territory assigned to her.  FE-5 worked in an FDO, meaning that she was a direct Vertiv employee.  She reported to General Manager Robert Sakowitz until the end of 2020 when Sakowitz was moved to government contracts.  She then reported to GM Omar McKee until her departure from the Company.

policy manuals dictating pricing and discount multipliers.  Specifically, FE-5 reported that Vertiv's policy manuals set forth the level of multipliers that salespeople could use to quote a product at a discounted rate without any higher-level approval.  FE-5 explained that a multiplier of 1.0 was full list price, which none of Vertiv's customers would actually pay.  The policy manual stated that Vertiv salespeople could sell up to multiplier of 5.5—which corresponded to a highly substantial discount of 45% off list price—without needing to obtain any higher-level approval.  Like FE-2, FE-5 similarly described how if salespeople wanted to discount below this level, they would have to submit a "DOP" to higher level management for approval.  FE-5 stated that DOPs were generally approved.

91.    FE-5 further stated that Vertiv did not even have a mechanism in place to increase pricing once the Company had a purchase order.  FE-5 stated that, in fact, there were no changes to pricing in 2021 at all, as the Company still had the exact same discounting practices throughout that year.  FE-5 concluded, "*[t]hey were not issuing price increases in 2021*."

92.    FE-5 also independently noted that Defendant Johnson participated in QBRs where sales related efforts were discussed.  FE-5 stated that Johnson typically deferred to FE-3 to comment on forecasting and sales metrics during these QBRs.  Regarding Vertiv's February 23, 2022 earnings call where Defendants admitted to utterly failing to raise prices, FE-5 stated, "[o]n that one call, it felt that it was kind of their way out.  We'll blame this lower revenue on sales people.  *You can say that if you want, but you guys approved it*."

### B.    Former Employees Confirm That Vertiv In Fact Had No Ability To Raise Prices On The Enterprise Contracts That Comprised The Majority Of Its Backlog

93.    Numerous former Vertiv employees further confirmed that, despite Defendants' representations to the contrary, the Company did not have the ability to raise prices for the larger enterprise contracts that comprised the vast majority of its backlog—because those contracts in

fact locked in discounted prices and did not allow the Company to raise prices even if costs increased.

94.     Specifically, FE-1 explained that larger enterprise contracts, such as those for Facebook, Google, Microsoft, and other hyperscale data centers, were very competitive and price sensitive.  Vertiv was "trying to win Amazon, Facebook, and Google with $100 million dollar projects that all have ***very strict RFPs with the prices that they are paying***."  According to FE-1, once selected, these enterprise customers squeezed Vertiv with the pricing, such that Vertiv was at the risk of losing some of these megaprojects if they did not offer discounted prices.  FE-1 stated that these large enterprise contracts comprised between 85% and 90% of Vertiv's business. Significantly, FE-1 stated that once an order was set with an accepted RFP for a large deal, Vertiv's pricing was locked in—Vertiv had no ability to raise pricing on these orders if costs increased. FE-1 stated that, as a result, "***the contract terms were not good for Vertiv***."  FE-1 added that if pricing exceptions on large deals were made, those had to be approved by John Hewitt, President of the Americas, who reported directly to Defendant Johnson.  Additionally, discounted pricing on large deals sometimes would need to be directly approved by Defendant Johnson.

95.     FE-2 similarly stated that Vertiv had a strategy of entering into long-term contracts with large enterprise customers such as Google, Facebook, Twitter, etc., that locked in discounted prices at very low margins—because rather than getting higher prices, the Company was instead focused on building a large backlog to prop up the Company's stock price.  FE-2 stated that this strategy began when Vertiv was publicly listed.  "When they went public is when they put an absolute effort into going after the major accounts."  She added, "***[i]t was all slash and burn to get the stock price up as high as you can.  That is why they went out and targeted all of those large customers***."

96.     FE-2 described how the Company's strategy successfully caused Vertiv's backlog to become "huge" which "made [Vertiv] look great on paper"—but this put Vertiv at significant risk for losing money from inflation due to the fact that Vertiv's custom-made projects were booked several months out.  FE-2 commented, "[w]hen you book all these orders at low margins, what happens in seven months to your price?  You end up losing money because of inflation."  FE-2 explained that customers would pay the price agreed to at the time the order was placed—meaning that the Company bore the risk of any changes in the cost of production that occurred between order placement and manufacturing.  Significantly, FE-2 stated that "*[t]here was no mechanism to increase prices in those contracts, you had to eat it*."  FE-2's experience in her current role as a Vertiv customer confirmed this shortcoming—FE-2 stated that Vertiv never once asked her to renegotiate or pay additional expenses on orders that she placed during 2020 or 2021, even though there were long lead times before those orders were fulfilled as inflation costs were rising.

97.     FE-6,[9] former Vice President of Sales at Vertiv from July 2010 until September 2021, similarly stated that the Company was saddled with an "*off the charts unprofitable*" backlog.  Specifically, FE-6 stated that even though Vertiv's major competitors had been raising their prices on a quarterly basis beginning in mid-2020 and throughout 2021 in response to increasing costs for critical components—and in some cases, raising them as often as every two months—her manager, Pete Klanian (Vice President of North America Channel and Federal Sales at Vertiv), informed her that Vertiv was not going to raise prices, and that instead, the Company

---

[9] FE-6 is a former Director of Sales at Geist (acquired by Vertiv in 2018) and later Vice President of Sales at Vertiv until August 2021.  In that role, FE-6 was responsible for selling Channel products to third party distributors.  FE-6 reported to Pete Klanian, Vice President of North America Channel and Federal Sales at Vertiv.

41

wanted to seize the opportunity to gain market share.  FE-6 stated that, as a result, Vertiv ended up with a huge backlog that was "***off the charts significantly and also off the charts unprofitable***." FE-6 commented "***They had a huge backlog and if they shipped at the prices that they agreed to, they were going to be in trouble***."

      **C.**     **Former Employees Confirm That Vertiv's Salesforce Was Not Incentivized To Drive Price**

     98.     Former Vertiv employees also confirmed that, as Defendants ultimately admitted at the end of the Class Period, the Company's salesforce operation was fundamentally not set up to "drive price," as Defendant consistently represented to investors.  Rather, the Company's underpricing was exacerbated by Vertiv's failure to align sales commissions with margins and profitability.  For example, FE-2 recalled that a Business Development Manager he knew had generated $14 million of business in one year, but nevertheless received the same compensation as FE-2, who only had averaged $3 to $5 million a year.  FE-2 further noted that this Business Development Manager mainly sold services, which yielded a much higher margin than the other products that Vertiv was selling, and yet this manager did not receive higher compensation as a result of selling higher volume at higher margins.  FE-2 explained that sales personnel were not compensated better for selling business with higher profit margins.  FE-2 also reported that the Company in fact cut commissions for major accounts sales personnel and instead paid them a salary, meaning that those sales representatives had no incentive to get higher prices.

     99.     FE-1 similarly recalled that commissions paid to salespeople at Vertiv were based on the profitability of a deal.  If the costs for a particular project increased by the time of fulfillment, for instance, the salesperson's commission on that deal would remain unchanged—even if the increased costs significantly drove down the profit margin for the project.

D.    **Former Vertiv Employees Confirm That Contrary To Defendants' Public Statements, Vertiv's Inability to Get Critical Components Was A Persistent And Worsening Issue Throughout 2021**

100.    While Defendants publicly claimed during the Class Period that Vertiv's ability to raise prices insulated the Company from increased costs due to supply chain constraints, in reality, the opposite was true.  Indeed, former Vertiv employees further confirmed that, far from adequately preplanning for supply chain issues as Defendants represented during the Class Period, the Company was in fact overly dependent on regional suppliers and plagued by increasingly aggressive supplier decommits throughout 2021 that Defendants were unable to manage.

101.    For example, FE-3, former Vice President of Field Sales, confirmed that, throughout 2021, suppliers of critical components for Vertiv's products were aggressively decommitting which resulted in "***crisis meetings all over***," such that the Company's "suppliers really impacted us significantly."  According to FE-3, the decommits "***got really serious in the second half of 2021 and that was when the wheels really fell off of the cart***."

102.    In describing the decommits, FE-3 explained that the key suppliers consisted of circuit board suppliers and fan suppliers, among other components.  FE-3 commented, "***[t]hese key suppliers were decommitting so much that it was really screwing up our supply chain***." According to FE-3, the decommits started in the beginning of the pandemic and ramped up more aggressively throughout 2021.  At this time, Vertiv's volume was going through the roof, but the Company's key suppliers were at the same time decommitting.  FE-3 stated that the decommits got so bad that the Company had to reallocate 50% of its engineering group to go and work with other suppliers so it could get second and third suppliers.  FE-3 further described how Defendant Johnson and former President of the Americas, John Hewitt, were directly involved in aggressively attempting to address these vendor and supplier challenges throughout the Class Period.

103.     FE-4,[10] a former Company Business Development Manager in Columbus, Ohio from July 2007 until September 2021, similarly confirmed that, dating back to 2020, Vertiv had long been resorting to alternative or "gray" markets outside of the Company's traditional supply chain to obtain raw goods at prices that were three to four times higher—while not passing those costs along to customers.  FE-4 explained that delays in paying vendors also was a "***huge***" issue for Vertiv that impacted its ability to get supplies.  FE-4 stated "I was there when this started and it became the writing on the wall.  ***They were having troubles paying vendors and getting raw goods which was affecting our delivery dates***."  FE-4 added that as a result, Vertiv was being put on credit holds during this time.  For example, according to FE-4, Vertiv was put on a credit hold by a company in Germany selling EC Fans, a critical component for Vertiv's products.  FE-4 stated that several other vendors also put credit holds on the Company and were giving them the "***SOS signals***."

104.     FE-2 similarly described how the Company could not pay vendors on time, resulting in the Company's inability to obtain critical components.  FE-2 recalled that Vertiv had "stopped paying their vendors in a timely manner and they really pissed them off.  They did not work the supply chain as they should have."  FE-2 reported that as a result, several of Vertiv's suppliers of critical components (e.g., a German EC fans company and Delaware Valley Manufacturing, a switch gear manufacturer in Pennsylvania) had placed the Company on credit holds.  FE-2 explained that when a vendor places the Company on a credit hold, the vendor stops manufacturing for the Company until it pays the outstanding balances that it owes.  FE-2 stated

---

[10] FE-4 initially worked for the Company from July 2007 until September 2021.  FE-4 commenced her employment as a Strategic Controls Product Manager at Liebert Corporation, which was later acquired by Emerson.  As a Business Development Manager at Vertiv from April 2018 through September 2021, FE-4 reported to FE-3 who reported to John Hewitt, President of the Americas.

that "[s]ome of [the Company's] long lead time issues are because they were not paying their vendors and the vendors placed them on a backburner. Vendors always remember who pays them right away."

  **E.**  **Former Employees Confirm That The Company's CPQ System Did Not Have Accurate Pricing Information And "Was Not Ready For Primetime"**

  105. During the Class Period, Defendants repeatedly touted to investors that Vertiv used "sophisticated" pricing tools to ensure that the Company was setting its prices at optimal levels, the most notable of which was Vertiv's full implementation of its new CPQ (configure, price quote) system in mid-2021. However, former high-ranking Vertiv employees confirmed that, in reality, Defendants botched the implementation of the new CPQ system—to the point that, contrary Defendants' public claims, the Company's pricing tools were anything but "sophisticated" and in fact severely hampered Vertiv's pricing capabilities.

  106. For example, FE-3, former Vice President of Field Sales, stated that Vertiv had substantial issues with CPQ throughout the Class Period. According to FE-3, these issues included visibility to data and difficulty in ordering materials. FE-3 concluded that "[i]t took a system that was working fairly well but was very aged and it made some of the processes in the business more challenging and took longer to implement. It went from having a front-end order management system that ran fairly smoothly and then we rolled out CPQ and a new Oracle ERP, *it made things much more challenging for the Company*."

  107. Additionally, FE-1, former Vice President of Channel Strategies for the Americas, described CPQ as a "*total disaster*" that took years to develop. FE-1 spoke with Gary Pagan, a customer relationship management ("CRM") expert at Vertiv, who explained that the CPQ system did not integrate well with Vertiv's CRM system and that as a result, the Company's pricing was off and required a lot of manual inputs. FE-1 recalled numerous presentations concerning the

implementation of CPQ.  In one such presentation, FE-1 learned that Schneider, a top competitor of Vertiv, had been using CPQ for a decade and found the system to be worthless.  FE-1 also recalled that a lot of internal mistakes were made with CPQ.

108.    FE-5, former Vertiv Account Executive, similarly confirmed that CPQ "***was not good***."  FE-5's summary of CPQ was that "***this thing isn't doing what it should be doing***."  FE-5 explained that CPQ was first implemented for Channel, one of Vertiv's three business divisions that she worked in, and later in Vertiv's two other Power and Air divisions.  FE-5 was part of the original team that was involved with the CPQ implementation from the very beginning.  She stated that CPQ took significantly longer than planned to implement, with the original timeline of six months turning out to be two years; and even still CPQ was fraught with issues and many salespeople kept resorting to Vertiv's legacy system, Partner Web.  FE-5 added, "Every office with a Channel person had to deal with CPQ.  We would go run a report on Power BI and ***nothing matched up***.  The problem with CPQ from the beginning was that you couldn't go in there.  With Partner Web, you could see expected ship date and invoice and there was none of that with CPQ. ***We were constantly going in looking where is this stuff?  Information on where the job was and what was happening with it, was horrible***."

109.    Due to the numerous CPQ issues, FE-5 expressed her concerns to her GM, Omar McKee, in February or March 2021.  "I told him that they wanted everyone to go to this new ERP system and ***it was still not working for the Channel.   I told him that it was not ready for primetime***," she commented.  Vertiv moved forward with CPQ anyway.  According to FE-5, McKee told FE-5 that the Company had spent a lot of money on the new system, and they were at a point of no return.  FE-5 stated that by the time she left in September 2021, everyone at Vertiv was pushed into CPQ, and they were not getting accurate details from the sales side with

46

deliverables.  There were also price and cost issues when the sales representatives tried to price products in CPQ and the system did not have accurate information.  This forced sales representatives to get pricing from the legacy system and then have it entered into CPQ by employees working at the factory.

110.    Significantly, FE-4, a former Company Business Development Manager, stated unequivocally that Vertiv management knew the full extent of the CPQ issues that they were facing as the Company had several soft rollouts that were "*disasters*."  FE-4 explained that CPQ issues were escalated to John Hewitt, former president of the Americas who reported directly to Defendant Johnson.  FE-4 stated: "Hewitt knew and he may have been the fall guy.  *We had All-Hands Meetings where it was discussed and they tried to calm the crowd*."

111.    With respect to the specific issues with CPQ, FE-4 explained that "*[t]hings did not work and you could not submit orders*."  For example, when FE-4 submitted an order, a process that should have taken fifteen minutes, was taking five hours or the order could not go through at all.  When the order could not be entered, the issue was escalated, causing rippling effects like backlog.  It took FE-4 up to three to four weeks just to get an order entered into CPQ.  She commented, "I left with six of my close friends that worked in sales and *CPQ was driving us crazy*."

112.    Finally, FE-6 also recounted significant issues with CPQ, describing it as an unstable tool, particularly with respect to the highly significant enterprise side of the business where all products had to be customized.  FE-6 commented that sales reps "couldn't get orders entered and could not turn those orders into work orders to build product," such that "[e]veryone was complaining about CPQ."  FE-6 stated that, as a result, "*CPQ stopped commerce.*"

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

113.   Defendants made materially false and misleading statements and omitted to disclose material facts that they were required to disclose during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants' SEC filings, press releases, and analyst and investor presentations included material misstatements and omissions concerning the Company's financial condition, which included, among other misrepresentations, statements concerning Defendants' pricing actions and initiatives to meet supply chain challenges and contend with inflationary pressures.

114.   As discussed above, Defendants' representations were false and misleading and omitted material facts either required to be disclosed or necessary to make the statements not misleading.   These material misstatements and omissions had the effect of creating an unrealistically positive assessment of Vertiv's business, operational status and future growth prospects as, in truth, Defendants had falsely presented to investors a materially misleading portrayal of the Company's ability to drive higher pricing and pass costs onto customers throughout the Class Period.

### A.   February And March 2021 Statements Regarding 2020 Fourth Quarter And Annual Results

115.   On February 24, 2021, the first day of the Class Period, Defendants caused Vertiv to issue a press release announcing strong financial results for the fourth quarter and full year ended December 31, 2020.  In the press release, which the Company filed with the SEC on Form 8-K, Defendant Johnson stressed that Vertiv had "made *good progress in achieving significant margin expansion*."  Vertiv then issued strong guidance for the full year 2021, stating that the Company expected *adjusted operating profit of $565 to $585 million—a staggering 68%*

*increase over the Company's adjusted operating profit the prior year—in addition to adjusted*

*earnings per share ("EPS") of $1.01 to $1.06, and an adjusted operating margin of 11.9% to*

*12.2%.*

116.    Also on February 24, 2021, Vertiv held a conference call with analysts and
investors to discuss the Company's 2020 results and 2021 guidance.  During the call, Defendant
Johnson attributed Vertiv's significant margin expansion to its "***pricing initiatives***," stating that
the "foundation we've established and the trajectory that we are on, gives me confidence in our
ability to achieve the expansion plans we laid out a year ago."  Indeed, Vertiv's slide presentation
accompanying the conference highlighted Vertiv's "***pricing initiatives***" (*i.e.*, passing costs along
to customers), which, according to Defendant Johnson, "***continued to yield favorable results***."

117.    Later during the call, an analyst directly queried whether the Company could "offset
recent raw material inflation with pricing," and whether this inflation was "embedded in the
guidance": "[W]hat have you guys embedded for pricing for 2021?  And I guess further to that, *is*
*the expectation that you can offset recent raw material inflation with pricing*?"  In response,
Defendant Niederpruem unequivocally stated that the Company would have "***positive price***" in
2021 despite commodity and inflationary headwinds because Vertiv was able to "***continue passing***
***price along***" to its customers:

> So I would say, if you reflect back on pricing for 2019, we had a pretty good year.
> I think we've told everybody we were about $20 million still positive.  In 2020, we
> were somewhere in that $15 million to $20 million range.  And ***our expectation is***
> ***that for '21, we will have positive price as well***.  Certainly some headwinds coming
> from commodity and inflationary aspects all around the globe.  ***But we feel pretty***
> ***good about w[h]ere we sit right now to continue passing price along . . . .  [W]e'll***
> ***certainly be on the plus side of that equation from where we sit today***.

118.    The statements in paragraphs 115 to 117 above were materially false and
misleading and omitted material facts when made.  Contrary to Vertiv and the Officer Defendants'
representations that Vertiv's "pricing initiatives" would drive margin expansion in 2021, the exact

opposite was true: as Vertiv and the Officer Defendants admitted at the end of the Class Period, in reality, the "***organization didn't and wasn't set up to drive a lot of price***." As a result, far from "continu[ing] [to] pass[] price along" to Vertiv's customers, the Company had in fact been "***giv[ing] up the pricing that we were getting through discounting***." Indeed, Vertiv and the Officer Defendants admitted that, rather than driving price, Vertiv had a cultural "predisposition or a deference to not lose the order," resulting in routine discounting and the "***general[] underpric[ing]***" of deals.

119.    Moreover, Defendants did not even have the ability to "***pass[] price along***" for majority of the contracts in the Company's backlog. Rather, as Defendants admitted at the end of the Class Period, they had only just barely begun to make the critical "change" of "putting escalators in [the Company's larger contracts] if commodities" prices go up that "wasn't in all of our contracts prior." As FE-1 , FE-2, and FE-5 all confirmed, Vertiv "had an inability to transfer those price costs to our customers" because the orders in its "backlog" were to enterprise customers that had locked in discounted prices at very low margins. FE-3 similarly confirmed that, directly contrary to Defendants' public statements, the Company did not "raise[] price to offset inflation" in 2021. For these reasons, Defendants did not "embed" any "positive price" that would offset inflationary headwinds into Vertiv's strong 2021 annual guidance, as in reality, Defendants were not taking any actions to increase price—rendering Vertiv's issued guidance completely without basis.

120.    On March 1, 2021, Vertiv filed its annual report on Form 10-K ("2020 10-K"), which was signed by Defendants Johnson, Fallon, and Vertiv's directors. The Form 10-K included purported "risk factors," including with respect to the Company's "backlog." That risk factor

stated that "*we may not realize the revenue we expect to generate from our backlog, or, if realized, may not result in profitable revenue*."

121.    The above purported "risk factor" was materially false and misleading and omitted material facts because the "risk" of the Company's backlog not yielding "profitable revenue" had already materialized—as Defendant Johnson unequivocally admitted at the end of the Class Period, Vertiv "*didn't get a lot of pricing on the backlog that we had*"—"*[t]hat was part of our problem [in 2021].  We had to burn through that*."  As FE-1, FE-2, and FE-5 all confirmed, the Company had built its backlog by entering into long-term contracts with large enterprise customers that locked in discounted prices.  Indeed, as Defendant Johnson admitted at the end of the Class Period, Vertiv had only just barely begun to make the critical "change" of "putting escalators in [the Company's larger contracts] if commodities" prices go up that "wasn't in all of our contracts prior."

122.    The 2020 10-K also included a "risk factor" stating that the Company's contracts with its "large" customers, "such as communication network and cloud/hyperscale and colocation data center providers," may "*require more favorable terms and conditions in our contracts that could result in downward pricing pressures in our business*."  The risk factor stated that these more favorable contracts "*may include terms that affect [our] . . . ability to recognize revenue, and could have an adverse effect on our business, results of operations and financial condition*."

123.    The above purported "risk factor" was materially false and misleading and omitted material facts because the "risk" of the Company's contracts with larger customers containing terms that were unfavorable to Vertiv or could have an "adverse effect" on its "results" had already resulted in "pricing pressures" and margin compression in the Company's business.  As Defendants admitted in February 2022, in reality, Vertiv's contracts with larger enterprise

customers—which comprised the majority of the Company's backlog—in fact locked Vertiv into discounted prices that Defendants knew would adversely affect Vertiv's margins in light of increasing inflationary costs. Indeed, Defendant Johnson admitted in February 2022 that the Company's larger contracts did in fact contain unfavorable terms that prevented the Company from offsetting inflationary costs. As Defendant Johnson stated, Vertiv had only just barely begun to make the critical "change" of "putting escalators in [the Company's larger contracts] if commodities" prices go up that "wasn't in all of our contracts prior"—and the Company had in fact built its backlog by entering into contracts with large enterprise customers that locked in discounted prices.

**B.**     **April 28, 2021 Statements Concerning First Quarter 2021 Results**

124.    On April 28, 2021, Vertiv issued a press release, which the Company filed with the SEC on Form 8-K, announcing an increase in its earnings guidance for the full year 2021. The press release stated that "we are increasing our full year 2021 adjusted operating profit guidance to $595 million (at the mid-point), $20 million higher than our previous guidance." Specifically, Vertiv increased its forecast for the Company's annual (i) adjusted operating profit from "565M – $585M" to "$585M – $605M," (ii) adjusted operating margin from "11.9% – 12.2%" to "12.0% – 12.3%," and (iii) adjusted EPS from "$1.01 – $1.06" to "1.08 to 1.14." Importantly, the Company specifically said that "[t]his full year guidance includes expected negative net impact in the remainder of the year of higher commodity and freight costs."

125.    A Company presentation dated April 28, 2021 similarly explained that although Vertiv was "seeing some increased costs for materials and logistics," the Company was "*[m]anaging the disruptions*" and "*[i]nstituting pricing actions around the globe to partially pass through the increased costs*." In discussing the full-year guidance improvement, the

presentation noted "supply challenges" of approximately $25 million but reassured investors that Vertiv was "*[i]mplementing pricing actions to partially offset these new headwinds*."

126.    The statements made in paragraphs 124 and 125 were materially false and misleading and omitted to state material facts.  In reality, and as Vertiv and the Officer Defendants subsequently admitted, Vertiv was not "*instituting pricing actions*" to offset increased costs at all.  Rather, as Defendant Johnson admitted at the end of the Class Period, the "*organization didn't and wasn't set up to drive a lot of price*"—such that, throughout 2021, far from implementing any price increases, the Company had in fact been "*giv[ing] up the pricing that we were getting through discounting*," resulting in the "*general[] underpric[ing]*" of deals.  Moreover, as Defendant Johnson ultimately admitted and as several FEs confirmed, Vertiv did not even have the ability to raise prices on the majority of the orders in its backlog because those sales were to enterprise customers that had locked in discounted prices at very low margins.  Vertiv and the Officer Defendants therefore had no basis whatsoever to increase their annual guidance at this time, or to explain that increase as based, even in part, on "pricing actions."

127.    Also on April 28, 2021, Vertiv held its first quarter 2021 earnings call.  During the call, Defendant Johnson reassured investors that although the "market is facing supply chain and commodity cost challenges," Vertiv had taken action to offset increased costs by "*executing strategies to share the cost with our customers where possible*."  Moreover, while Defendant Johnson noted that there were "cost increases on both material and the logistics side," he assured investors that "*[t]his is being tracked and managed and closely monitored, and we are taking actions to offset the increased costs*."  Indeed, despite the increased costs, Johnson proclaimed that Vertiv was "raising our 2021 sales guidance by $125 million" and its "*adjusted operating profit guidance by $20 million*."  On the earnings call following the gleaming first quarter

reporting, Johnson reiterated that while the market was facing "supply chain and commodity cost challenges," the Company was "***developing and executing strategies to share the cost with our customers***."

128.   Defendants' assurances were highly material, as reflected by the fact that analysts specifically asked these Defendants to elaborate on how the Company was "trying to offset some of these extra costs of pricing."  In response, Defendant Johnson again expressly assured investors of Vertiv's ability to drive prices, and made clear that the Company had the systems and processes in place to "***drive prices through with our customers on a global scale***":

> That's a great question, Nicole.  We have, as we've talked about before, ***been able to get price the last year, couple of years.  I think we're getting pretty good at doing that***.  When we've had times before where freight costs have gone up like they have been, ***we've been able to institute surcharges***.  Sometimes that's lagging, and I mentioned a few—in some of my comments, some of the lagging to pick that up.  And then based on contracts and orders, working with our customers, everyone understands that commodity prices are going up, steel is doubled, that type of thing.  Our customers are pretty good about working with us and going through that.  Certainly, ***we're able to go forward price things at that higher cost rate.  And we're able to get that.  So we feel good.  We have $10 million, I think Dave [Fallon] showed in his bridge, of incremental additional pricing this year.  While that's something we're striving for, we think we could probably do better than that.  But based on what we see, based on where we're at, that's kind of what we built into our plan.  But no, we've got a pretty good process now in our ability to drive prices through with our customers on a global scale***.

129.   The statements made in paragraphs 127 and 128 were materially false and misleading and omitted to state material facts.  In reality, Vertiv and the Officer Defendants did not have a "good process" in place to "drive prices through to [Vertiv's] customers on a global scale," or to "share the cost with our customers."  To the contrary, as Defendant Johnson explicitly admitted at the end of the Class Period, Vertiv "***didn't and wasn't set up to drive a lot of price***."  Indeed, far from raising prices to offset or pass along costs, the Company had in fact been "***giv[ing] away price that we were getting through discounting***" in order to obtain more business—a practice that was so prevalent and pervasive that Johnson would ultimately be forced to admit that

discounting was part of the Company's "culture."  Furthermore, as Johnson admitted at the end of the Class Period, the Company did not even have the ability to raise prices in response to inflation at this time because its existing contracts with large enterprise customers did not permit it to raise prices even if inflationary and commodity costs increased.  Indeed, FE-1, FE-2, and FE-5 all confirmed that the orders in Vertiv's "backlog" were for enterprise customers that had locked in discounted prices at very low margins—such that Vertiv "had an inability to transfer those price costs to our customers."  FE-3 further confirmed that, in reality, and directly contrary to Defendants' public statements, the Company did not "raise[] price to offset inflation" in 2021.

130.    Then, in response to a Cowen and Company analyst's question regarding if Vertiv was at risk if inflationary costs rose faster than expected, Defendant Fallon stated that not only could the Company "***get additional price***," but that high inflation was in fact "***somewhat of a positive***" because the Company was purportedly able to use inflation "***strategically as a way to get additional price***."  In making these comments, Fallon specifically misrepresented Vertiv's ability to pass on cost increases, and further suggested that the Company's ability to increase prices in scale with its cost increases scaled linearly:

> **Lance William Vitanza, Cowen and Company, LLC, Research Division**: And then just maybe one last one for me.  On Slide 13, where you lay out the bridge and focusing on the cost pressures and sourcing and so forth, you show the $10 million kind of recovery from passing price-throughs and this $25 million hit from commodity and logistics headwinds.  And I guess my question is, how are those 2 numbers related?  In other words, if it turns out that the commodity and logistics turns out to be maybe a $50 million headwind, should we assume that you can pass on perhaps $20 million of the costs?  Are they variable in that way?  Or no, is it sort of like a hard stop?  You think it's going to be tough to pass on more than $10 million so we just need to hope that the impact from the logistics isn't much greater than that?  Could you comment on that?

> **David J. Fallon, Chief Financial Officer:** Yes, Lance, this is David.  I'll start, and Gary and Rob can jump in.  I would definitely say the 2 are correlated, right?  ***The higher the commodity logistics headwind and inflation is, the more data we have and to reasonably take price up consistently with competitors, right?***  So there's definitely a high correlation.  The one thing that we're seeing here is that there's

generally a lag.  So we will see the negative impact from commodity and logistics sooner in our costs, then we do have the ability to pass that through for higher pricing.  ***Now one thing that we did see, which turns this into somewhat of a positive, the last time we saw significant commodity and logistics headwinds, what we found is that the pricing is actually a little bit sticky upwards.  So we actually look at this strategically as a way to get additional price***.  And then if the commodity and logistics headwinds abate at some point this year or even early next year, generally, the pricing that we see remains where it's at.  There's always some give and take*.  **But on the way up, that pricing opportunity is certainly going to be correlated with the headwinds we're seeing***.

And the other thing that I probably want to point out on this slide and remind folks is that this is versus prior guidance.  So this is the overlay for additional commodity and logistics headwinds versus our beginning of the year assumptions.  If you looked at this for a full year, we had about $20 million of headwinds for commodity and freight inflation in that beginning of the year guidance.  So if you add the $20 million and the $25 million, you get about $45 million.  We also had assumed about $15 million of pricing in that prior guidance as well.  So full year pricing expectations are now right around $25 million. ***And if there is additional inflation, we do believe there's opportunity to take those pricing assumptions up as well.***

131.    The statements made in paragraph 130 were materially false and misleading and omitted to state material facts.  In reality, inflation was not in any way benefitting Vertiv's ability to raise prices, nor was it resulting in the Company "ramp[ing] up" its prices as the year progressed.  To the contrary, Defendant Johnson explicitly admitted at the end of the Class Period that, in truth, Vertiv "didn't and wasn't set up to drive a lot of price"—such that, rather than raising prices in response to inflation, the Company had been "giv[ing] away price that we were getting through discounting."   Defendant Cote similarly confirmed that, in reality, Vertiv had a "cultural" "predisposition or a deference to not lose the order" that had resulted in the "general[]" underpric[ing]" of deals.  Indeed, Vertiv and the Officer Defendants admitted at the end of the Class Period that, directly contrary to their public statements, they had only just begun to raise prices in response to inflation "[i]n late 2021 and early 2022" and had not done so before.  As FE-3 confirmed, in reality, and directly contrary to Vertiv and the Officer Defendants' public statements, the Company did not "raise[] price to offset inflation" in 2021.

132.    Also during the Q1 2021 earnings call, an analyst from Wolfe Research asked whether there was "some mechanism" to increase the prices in Vertiv's backlog.   Defendant Niederpruem responded that Vertiv was "***taking action***" to combat the rising costs with regard to its large backlog. Niederpruem added, "***by no means are we just taking a look at that $2 billion of backlog and saying, well, there's nothing we can do***."   Instead, the Company purportedly had a "***real-time mechanism***" and "***lever[s]***" to increase its pricing:

> I mean obviously, it's a little bit easier to get price on new orders.   ***But by no means are we just taking a look at that $2 billion of backlog and saying, well, there's nothing we can do.   It's already in backlog.   So we do have some other mechanisms, sometimes in larger contracts that have material clauses in them.   Certainly, freight is another lever that we can utilize.   That is a real-time mechanism.   There's been times when we've instituted surcharges as well***.   So I would say that, yes, it's easier to get price on new orders coming through the door.   ***But by no means are we going to just discount the $2 billion that we have and say there's nothing we can do there.   We're looking at that, taking action on that as well***.   With all that said, I do think price probably continues to ramp throughout the year, as David [Fallon] mentioned earlier.   So I think in general, that ***pricing will ramp***.   But those are the different ways we're looking and trying to execute that pricing and freight scenario.

133.    The statements made in paragraph 132 were materially false and misleading and omitted to state material facts.   Indeed, rather than Defendants having ability to raise pricing on its backlog, as Defendant Johnson starkly admitted after the end of the Class Period, the exact opposite was true—namely, Vertiv "***didn't get a lot of pricing on the backlog that we had . . . [t]hat was part of our problem [in 2021].   We had to burn through that***."   Thus, contrary to Vertiv and the Officer Defendants' representations above, Vertiv's customer contracts did not allow Vertiv to escalate price, and it was not until the very end of 2021 that the Company even started to make the critical "change" of "putting escalators in [the Company's contracts] if commodities" prices went up.   Defendant Niederpruem similarly admitted after the Class Period that the Company's services agreements with its larger customers in truth lacked any "material escalation clauses," and the Company had only begun to add them in "as the [contracts] expire[] . . . ***[s]o that***

*way, we don't get caught in the same situation again*."  This is further confirmed by accounts from FE-1, FE-2, and FE-5, who all stated that the orders in Vertiv's "backlog" were to enterprise customers that had locked in discounted prices at very low margins—such that the Company "had an inability to transfer those price costs to our customers."

      **C.**    **Statements In Form 10-K/A Filed On April 30, 2021**

    134.    On April 30, 2021, Vertiv filed an amended annual report on Form 10-K/A ("Amended 10-K"), which was signed by Defendants Johnson, Fallon, and the Company's directors.  The Amended Form 10-K included the same purported "risk factors" disclosure as the prior Form 10-K (¶¶120, 122), which were materially false and misleading for the reasons alleged in ¶¶121, 123.

      **D.**    **Statements At The May 26, 2021 Wolfe Industrials And Transports Conference**

    135.    On May 26, 2021, Defendants Fallon and Niederpruem presented at the Wolfe Industrials and Transports Conference, during which Defendants made a series of statements claiming that "*pretty serious pricing initiatives*" were underway at Vertiv.

    136.    For example, Defendant Niederpruem represented in direct response to an analyst inquiry about whether the Company could "*cover[] the inflation that you're seeing*" that the Company controlled its pricing by being "*much more judicious*" with "*multipliers and . . . discount levels,*" and that Vertiv's pricing techniques across all regions were "*significantly advanced from where we were a couple of years ago*"—such that Vertiv would "*be able to recover the vast, vast, vast majority of any inflationary stuff*":

> **Nigel Edward Coe, Wolfe Research, LLC:** Great.  There's one more question from the audience.  But this will be a good time to take a pulse on pricing.  And yes, I think there's a perception, probably going back to the Emerson ownership days, that pricing in this market is intrinsically weak.  And in the [phase and] time, that creates some risks around margins.  So maybe just address that, Gary.  *How do you see pricing power?*  Maybe just dissect that between enterprise and hyperscale

or co-lo[cation customers] and ***what is your confidence that over time, you can cover the inflation that you're seeing?***

**Gary John Niederpruem, Chief Strategy & Development Officer**: Yes.   No, we've been dealing with that, obviously, for real time.   So I think a couple of things. So David [Fallon] says it very well that prior to 2017-ish or so, there really wasn't a focus on pricing, and I think the perception was exactly what you said.   And maybe that was part perception, maybe it was even part reality back then.   ***But we kicked off some pretty serious pricing initiatives several years ago.***   And if you look at—in 2019, we got somewhere between $20 million to $25 million of positive price.   In 2020, it was probably $20 you raise list prices every year in some places. But that don't only get to so far.

***After that, you need to become much more judicious with your multipliers and your discount levels and how are you handling rebates?   And let's make sure that we have scattered thoughts of, "like jobs to like customers," in the same region in the same category***.   We weren't doing those types of things before.   So those are not out things that we do almost every day, maybe not in every region, but sort of ***Americas is the most mature***.   Europe is the second mature.   Asia is the least mature, but ***they're all significantly advanced from where we were a couple of years ago***. So we have 2 years of demonstrated track record of getting positive price.   When you look at this year, in our Q1 report, we had a Q1 presentation.   We had there was about $25 million of headwinds and $10 million is going to be offset by price. So I would say 2 things.   ***One is that $10 million clearly is the floor. I mean there is more upside and more runway on that number even***—and we sort of even knew that at the time, but we wanted to be a little bit conservative on that point.   So there's clearly more upside and runway in-year than that $10 million.

***And David and I review pricing and the commodity stuff probably got—it seems like it's 8 days a week at this point in time***.   That's because we want to make sure that we're doing all the right things.   And I am sitting here right now, ***I am really, really confident that we will be able to recover the vast, vast, vast majority of any inflationary stuff***.

137.   Defendant Niederpruem's statements in paragraphs 135 and 136 above were materially false and misleading and omitted to state material facts.   In reality, Vertiv's "pricing initiatives" had not "significantly advanced" and were not even in place at this time.   To the contrary, as Defendants admitted at the end of the Class Period, Vertiv actually "***wasn't set up to drive a lot of price***"—such that Defendants had only barely begun to implement price increases in response to inflation "[i]n late 2021 and early 2022."   Thus, Niederpruem's statements regarding the Company's ability to "recover the vast, vast, vast majority of any inflationary stuff" through

pricing actions the Company was in fact not taking were false.  Indeed, Johnson admitted that the Company did not even have the ability to raise prices in response to inflation, as it had only just begun to make the critical "change" of "putting escalators in [the Company's contracts] if commodities" prices went up that "wasn't in all of our contracts prior."  As FE-1 and FE-2 both confirmed, Vertiv had built its large backlog through sales to enterprise customers that, far from allowing Vertiv to raise prices to offset costs, in fact locked in discounted prices at very low margins—such that the Company "had an inability to transfer those price costs to our customers." Additionally, far from being "judicious'" in controlling multipliers, discount levels, and rebates, Defendants admitted that the Company had in fact been "***generally underpric[ing]***" and "***giv[ing] away the pricing that [we] were getting through discounting.***"  Indeed, Defendant Johnson admitted after the Class Period that "the field had a lot more freedom to discount in a price range in the past and [was] very afraid to lose a deal"—it was only after the Class Period that Vertiv finally "tightened up" with a "discounting ban specifically, so [they] don't lose price."

      E.       **Statements At The June 2, 2021 49th Annual TMT Conference**

      138.   On June 2, 2021, Defendants Fallon and Niederpruem spoke at Cowen and Company, LLC's 49th Annual TMT Conference.  At the conference, Fallon touted that Vertiv had "some pretty significant plans to [] improve [its] contribution margin," a focus of which would be the Company's ongoing pricing initiatives.  Indeed, Defendant Fallon represented—in direct response to an analyst's question about whether the Company's margins were being impacted by recent supply chain shortages—that Vertiv had "***developed that pricing muscle to offset periods of inflation like we're seeing right now***."  Defendant Fallon further asserted, in response to an analyst's follow-up question about whether the Company would "make[] a margin on the price increase that you're experiencing," that it was "***[a]bsolutely right***" that the Company's price

increases in response to inflationary costs would benefit Vertiv because "*[p]rices are sticky upwards*."

139.    The statements in paragraph 138 above were materially false and misleading and omitted to state material facts.  Contrary to having "developed that pricing muscle to offset periods of inflation like we're seeing right now," Defendants later admitted that the exact opposite was true: The Company "*wasn't set up to drive a lot of price*," that it was in fact "*generally underpric[ing]*" deals, and that it routinely "*[gave] away the pricing that [we] were getting through discounting*."  Furthermore, Defendant Johnson later admitted that the Company did not even have the ability to raise prices in response to inflation at this time, as it had only just begun in late 2021/early 2022 to make the critical "change" of "putting escalators in [the Company's contracts] if commodities" prices went up that "wasn't in all of our contracts prior."  Indeed, as FE-1 and FE-2 confirmed, Vertiv had in truth built its large backlog through sales with long lead times to large enterprise customers that, far from allowing Vertiv to raise prices to offset costs, in fact locked in discounted prices at very low margins—such that the Company "had an inability to transfer those price costs to our customers."

### F.    Statements At The June 9, 2021 ISI Inaugural TMT Conference

140.    On June 9, 2021, Defendants Fallon and Niederpruem participated in Evercore ISI's Inaugural TMT Conference, where Fallon commented on Vertiv's ongoing actions to increase its margins.  During the conference, Fallon explained that the Company would achieve 20% plus margin growth by operating "two levers," productivity and price.  With respect to price, Fallon emphasized that the Company's "strategic approach" of actively increasing pricing in direct response to the inflation Vertiv was witnessing had confirmed Vertiv's "pricing power":

> And then the other lever, which has been getting a lot of attention more recently is from a pricing perspective.  That is something that this company historically kind of convinced itself that if we were flat on a pricing perspective, it was a good year.

*We've leaned into that and taken more of a strategic approach to pricing*.  And as a result, we got about $25 million in pricing in 2019 [and] last year between $15 and $20.  And certainly, *partly because of—due to a [pricing] response with the inflation we're seeing in '21, we should be a lot higher than that this year*.  And we've talked about the timing of the commodity and freight inflation has actually been somewhat beneficial to us because it forced us to see what is the art of the possible from a pricing perspective.  And I think *what we've learned over the last 3 or 5 months is that we probably have more pricing power than we had previously thought or wanted to risk for customers*.  So that's something that certainly is going to benefit us going forward.

141.    Defendant Fallon's statements in paragraph 140 above were false and misleading and omitted material information.  Contrary to Fallon's representations that the Company was using its "pricing power" to offset inflation, the exact opposite was true.  As Defendants admitted at the end of the Class Period, in truth, the Company "*wasn't set up to drive a lot of price*"—such that it was in fact "*generally underpric[ing]*" deals and routinely "*giv[ing] away the pricing that [we] were getting through discounting*."   Furthermore, Defendant Johnson admitted that the Company did not even have the ability to raise prices in response to inflation at this time, as it had only just begun in 2022 to make the critical "change" of "putting escalators in [the Company's contracts] if commodities" prices went up that "wasn't in all of our contracts prior."  Indeed, as FE-1 and FE-2 confirmed, Vertiv had in truth built its large backlog through sales with long lead times to large enterprise customers that, far from allowing Vertiv to raise prices to offsets costs, in fact locked in discounted prices at very low margins.

**G.    July 28, 2021 Statements Concerning Second Quarter 2021 Results**

142.    On July 28, 2021, Vertiv issued a press release, which the Company filed with the SEC on Form 8-K, announcing the Company's "strong financial results for the second quarter" of 2021 and "*increasing full year guidance for sales, adjusted operating profit and adjusted diluted earnings per share*."   Vertiv and the Officer Defendants were raising the mid-point of the

Company's guidance precisely because of their "***additional pricing actions and fixed cost reductions to help offset***" material inflation, and Defendant Johnson stated

> Following a strong start to 2021, we are pleased to report that through the first half of the year, Vertiv performance remains on track. . . .

> On a quarterly basis, our headline results continue to highlight strong order growth and related sales, and our outlook remains very positive.  While inflation is a challenge facing all companies, we are navigating this with additional pricing actions and fixed-cost reductions.  We decided in the second quarter to increase spot buys of key electronic components and use expedited freight to best meet the customer requirements of an incredibly strong demand environment.  We feel good about market activity levels and coupled with our growth programs, ***pricing programs and margin improvement initiatives already underway, we are well positioned for the second half of 2021. . . .***

143.    The press release also emphasized that Vertiv expected its continuing price increases to "completely offset gross material and freight inflation": "***We expect pricing to ramp-up as we progress through 2021 and to completely offset gross material and freight inflation within the fourth quarter.***"

144.    Indeed, discussing full year and third quarter 2021 guidance, the press release explicitly noted that Vertiv had supposedly already implemented "pricing actions" that would fully "offset" any inflation in the Company's costs:

> **Full Year and Third Quarter 2021 Guidance**

> End-market demand remains robust, and we are increasing our full-year net sales guidance to 14% growth at the midpoint (12% organic growth).  While material inflation and supply-chain challenges continue, ***we have implemented additional pricing actions and fixed cost reductions to help offset these challenges.***  We are raising the midpoint of our full year adjusted operating profit guidance to $600 million.  ***This full year guidance includes the expected negative net impact in the remainder of the year of current commodity and freight costs as well as price recovery, which typically lags inflation.***

145.    The Company's revised, raised guidance for 2021 included adjusted operating profit of $590 million to $610 million (up from $585 million to $605 million) and adjusted EPS of $1.12 to $1.18 (up from $1.08 to $1.14).

146.    The statements in paragraphs 142 to 145 above were materially false and misleading and omitted material information.  Vertiv had not implemented "additional pricing actions and fixed cost reductions to help offset" material inflation.  Rather, as Defendants admitted at the end of the Class Period, the opposite was true: The Company "***wasn't set up to drive a lot of price,***" it was in fact "***generally underpric[ing]***" deals, and it routinely *"**[gave] away the pricing that [we] were getting through discounting**.*"  Furthermore, Defendant Johnson admitted that the Company did not even have the ability to raise prices in response to inflation at this time, as it had only just begun in late 2021/early 2022 to make the critical "change" of "putting escalators in [the Company's contracts] if commodities" prices went up that "wasn't in all of our contracts prior."  Indeed, as FE-1, FE-2, and FE-5 all confirmed, Vertiv had in truth built its large backlog through sales with long lead times to large enterprise customers that, far from allowing the Company to raise prices to offsets costs, in fact locked in discounted prices at very low margins.

147.    Also on July 28, 2021, the Company publicly released a presentation that further falsely represented that the Company had successfully implemented increased pricing.   The presentation noted that Vertiv had "***[p]ricing actions in place to recover market based commodity and freight inflation and premiums for spot buys of electronic parts***" that would "***fully offset inflation in Q4 and provide tailwind***."  The presentation also included a slide showing the "[f]ull year 2021 inflation and pricing evolution," which claimed that the Company's "***pricing actions,***" including "***list price increases, discount and rebate reductions, pass through commodity pricing (lead) and pricing recovery on outbound freight,***" would yield significant results, substantially offsetting "material and freight inflation," including "premiums paid for spot-buys and expedited shipments due to parts availability challenges."  This slide is reproduced below:

148.     The statements in paragraph 147 were materially false and misleading and omitted

material facts.  In reality, and as Vertiv and the Officer Defendants would later admit, they had not

implemented "pricing actions" that would "recover market based commodity and freight inflation

and premiums for spot buys of electronic parts" and "fully offset inflation in Q4 and provide

tailwind."  To the contrary, the Company had in fact been "generally underpric[ing]" deals and

"giv[ing] away the pricing that [we] were getting through discounting" because Vertiv actually

"wasn't set up to drive a lot of price."  Moreover, Defendant Johnson admitted that the Company

did not even have the ability to raise prices in response to inflation, as it had only just begun to

make the critical "change" of "putting escalators in [the Company's contracts] if commodities"

prices went up that "wasn't in all of our contracts prior."  Indeed, multiple FEs confirmed that

Vertiv had built its large backlog through sales with long lead times to large enterprise customers

that locked in discounted prices at very low margins—such that the Company had no ability to

raise pricing at all even if costs later significantly increased.  Thus, as Vertiv and the Officer

Defendants revealed at the end of the Class Period, Vertiv did not come close to offsetting inflation

or supply chain "spot buys" with $65 million worth of pricing actions—to the contrary, the Company only "partially offset" inflation "by $30 million of incremental pricing," or over 50% less than the $65 million Vertiv and the Officer Defendants represented to investors at this time.

149.    The Company also held an earnings conference call on July 28, 2021, during which Defendant Johnson told investors that a "***key message***" was that "we're raising our 2021 guidance by $100 million in sales and $5 million in adjusted operating profit."  To allay investors' supply chain and inflation fears, Johnson stated that the Company had "made spot buys" to ease supply chain challenges "so that we can meet the delivery customers to serve our customers" and that the Company had "***implemented strategies to recapture [the] costs***" for those spot buys.  Specifically, Johnson explained that Vertiv was continuing to increase its pricing, such that "***[w]e are estimating having $65 million of pricing actions for the full year versus 2020***," which meant that "***by the time we get to Q4, we will have pricing that fully offset inflationary costs***."  Johnson stated that the Company would accomplish this full offset of inflationary costs by the fourth quarter because "***[t]he pricing actions will accelerate in Q3, driving margin recovery***" as "***the pricing plan is fully implemented***," thus resulting in "***full recovery by Q4***."  Defendant Fallon echoed Defendant Johnson's statements, saying that "***we do anticipate a full offset pricing versus inflation in the fourth quarter***" due to the Company's pricing actions.

150.    Then, in response to an analyst's question about whether the Company's pricing actions that were expected to result in a $65 million offset by Q4 were "***already made***," Defendant Johnson confirmed that the pricing actions had long been underway: "***Pricing actions were actually underway at the beginning of Q2 as we began to see this inflationary environment***."  Johnson further confirmed that the Company had full visibility into the pricing of its backlog, and

that far from discounting any orders, Vertiv had successfully "*got price*" on those orders, such that

the Company was "*confident that we will get the price and we are getting the price*":

> **Nigel Edward Coe (Wolfe Research, LLC**): So surprise, surprise, a question on
> price. So the $65 million, how do we interpret that?  *Are these [pricing] actions
> already made to the customers?*  And obviously, there's an assumption about how
> much fixes and how much is given away in, I don't know, concessions, etc.  *Is this
> $65 million sort of like what's been actioned* and what we hope to get? . . .

> **Robert J. Johnson (CEO & Director):** . . . *Pricing actions were actually
> underway at the beginning of Q2 as we beg[a]n to see this inflationary
> environment*.  As you know, we feed a lot off our backlog.  And some of those
> things in our backlog, we can look at price, we can look at freight.  But for the most
> part, as we've indicated on the call, you'll see that really come to life in Q3 and Q4.
> So *we know orders that we got in Q2 that we'll ship in Q3, Q4, Q1, we know we
> got price on those.  So that's why we feel confident that we will get the price and
> we are getting the price*.  The same thing we've done which has been talked about
> widely with industrials is the ability to get price in the channel and distribution . . . .
> So we have taken pricing actions in some cases, 3 times within that space that will—
> we've seen stick . . . .  We expect to continue to take share in that space while *we
> continue to raise price and drive that.*"

151.   The statements in paragraphs 149 and 150 above were materially false and

misleading and omitted material facts when made.  Indeed, far from increasing prices or "getting

the price," the Company had in fact been "generally underpric[ing]" and discounting deals

because, in truth, Vertiv actually "wasn't set up to drive a lot of price," and Vertiv had no "pricing

actions" that were "underway" at this time.  Moreover, as Defendant Johnson admitted at the end

of the Class Period, rather than "pricing actions" being "underway," the Company only began

implementing price increases in response to inflation "[i]n late 2021 and early 2022."  In addition,

Defendant Johnson admitted that the Company did not even have the ability to raise prices to offset

inflation, as it had only just begun to make the critical "change" of "putting escalators in [the

Company's contracts] if commodities" prices go up that "wasn't in all of our contracts prior."

Indeed, FE-1, FE-2, and FE-5 confirmed that Vertiv had built its large backlog through sales with

long lead times to large enterprise customers that locked in discounted prices at very low

margins—such that the Company had no ability to raise pricing at all even if costs later significantly increased.

152.    Also during the call, Defendant Johnson touted, in direct response to an analyst's question about Vertiv's "increased focus on dynamic pricing and how it's been working in the current environment," the "*sophisticated*" methods and "pricing tools" that Vertiv employed to ensure its pricing was profitable:

> *[W]e're getting more and more sophisticated with our ways we get price*.  We've talked about it in the past where *we've instituted some AI and really pricing tools that allow our salespeople to understand when we lose at what price and when we win* . . . . So this will continue to be a muscle that will flex and grow and get more and more mature and use more data analytics to drive it.  So we continue to believe that pricing will be one of those levers that will continue to drive for years to come.   But *I feel good about where we're at.   I feel good about the methodologies that we have* and the ability to get that and really stemmed from a couple of years ago when we first started it, and we just continue to drive that.

153.    Defendant Fallon further responded to the analyst's question by emphasizing that the challenging economic environment Vertiv was facing had in fact made Vertiv's pricing power even stronger: "[I]f anything, *what we have seen this year has actually allowed us to develop some muscle from a pricing perspective*.  So that's always been a part of the equation to improve margins.  And *I think what we've seen this year gives us even more confidence that we can use that as a lever to—on our path to 16% and then 20% [margin]*."

154.    Defendants Johnson and Fallon's statements in paragraphs 152 and 153 were materially false and misleading and omitted material facts.  Contrary to having "develop[ed] . . . muscle from a pricing perspective," Defendants later admitted that the exact opposite was true: far from having developed pricing "muscle," the Company had been "generally underpric[ing]" and routinely discounting deals because Vertiv actually "didn't and *wasn't set up to drive a lot of price*."  Moreover, Defendant Johnson admitted that the Company did not even have the ability to raise prices to offset inflation, as it had only just begun to make the critical

"change" of "putting escalators in [the Company's contracts] if commodities" prices go up that "wasn't in all of our contracts prior."  Indeed, FE-1, FE-2, and FE-5 all confirmed that Vertiv had built its large backlog through sales with long lead times to large enterprise customers that locked in discounted prices at very low margins—such that the Company had no ability to raise pricing at all even if costs later significantly increased.

155.    Furthermore, the Company did not have any "sophisticated methods" or "pricing tools" in place "to get price."  To the contrary, the Company had botched the implementation of its CPQ system, which had caused the Company to "ha[ve] a lack of visibility for a period of time" with respect to both inflation and price.  Indeed, as Defendant Fallon admitted after the end of the Class Period, due to the faulty CPQ system, there was in reality a "lack of available data," including real-time information regarding rising inflationary and commodity costs.

**H.      Statements On September 8, 2021**

156.    As discussed above, Defendants' false and misleading statements, and omission of material facts, first began to be revealed on September 8, 2021 when the Company announced that "supply chain challenges" were hindering its pricing efforts, causing the Company to slash the Company's annual guidance for adjusted operating profit by 10%.  However, the partial corrective disclosures on that date were accompanied by Defendants' strong false reassurances and other false statements and omissions that continued to artificially inflate Vertiv's stock price.

157.    Specifically, during a conference call held on September 8, 2021, Defendant Johnson assured investors that "*[o]ur pricing has continued to ramp*."  Then, in response to an analyst's question about the Company's confidence in its pricing power despite supply chain challenges, Johnson stated that "*[w]e continue to drive pricing*" and asserted that "*we feel good about our pricing process, getting price in the market and continue as inflationary measures impact us*."  Defendant Niederpruem echoed Johnson's statements by assuring investors that

Vertiv was actively raising its prices as it "track[ed]" the cost headwinds, and that those higher prices were successfully "sticking": "*[Y]ou can see the pricing ramping every quarter, every month as we track this.  And the pricing that we are getting, we do feel is really pretty sticky.  So it's not really can we get price*.  It's just more of a timing issue than anything."

158.    The statements in paragraphs 156 and 157 were false and misleading and omitted material facts.  In reality, Vertiv was neither continuing to "drive price" nor "getting price in the market" in response to inflationary headwinds.  Rather, as Defendants admitted at the end of the Class Period, in truth, the Company "*wasn't set up to drive a lot of price*"—such that it was in fact "*generally underpric[ing]*" deals and routinely "*giv[ing] away the pricing that [we] were getting through discounting*."  Furthermore, Defendant Johnson admitted that the Company had only just begun in late 2021/early 2022 to make the critical "change" of "putting escalators in [the Company's contracts] if commodities" prices went up that "wasn't in all of our contracts prior."  Indeed, as FE-1, FE-2, and FE-5 all confirmed, Vertiv had in truth built its large backlog through sales with long lead times to large enterprise customers that, far from allowing Vertiv to raise prices to offsets costs, in fact locked in discounted prices at very low margins.

I.    **October 27, 2021 Statements Concerning Third Quarter 2021 Results**

159.    On October 27, 2021, just over a week before the SPO, Vertiv issued a press release announcing its financial results for the third quarter of 2021, which was filed with the SEC on Form 8-K.  In the press release, Vertiv comforted investors' concerns about inflation by again raising its financial guidance and claiming that "*our pricing response continues to meaningfully increase sequentially each quarter, and we anticipate another sequential increase in the fourth quarter*":

> Supply chain issues have continued to accelerate in the third quarter and no improvement is expected in the fourth quarter, although *our pricing response continues to meaningfully increase sequentially each quarter*, and *we anticipate*

70

*another sequential increase in the fourth quarter.  Cost containment actions have been accelerated heading into the fourth quarter to mitigate impacts from increased supply chain disruptions.*

160.    Vertiv and the Officer Defendants' positive statements concerning pricing actions were also reflected in the Company's increased fiscal 2021 and fourth quarter 2021 guidance. Specifically, Vertiv announced that for full-year 2021, it was ***raising*** its (i) adjusted operating profit from $530 million - $550 million to $543 million - $563 million; (ii) adjusted EPS from $0.96 - $1.01 to $0.97 - $1.03; and (iii) adjusted operating margin from 10.9% - 11.1% to 10.9% - 11.2%.  For the fourth quarter of 2021, the Company stated that it expected (i) adjusted operating profit of $166 million - $186 million, (ii) adjusted EPS of $0.24 - $0.30; and (iii) adjusted operating margin of 12% - 12.9%.

161.    The statements in paragraphs 159 and 160 from the October 27, 2021 press release were materially false and misleading and omitted material facts.  As Vertiv and the Officer Defendants would admit only a few months later, in reality, the Company was neither "meaningfully" increasing its pricing response nor successfully mitigating supply chain issues at this time.  Rather, as Defendants admitted at the end of the Class Period, in truth, the Company "***wasn't set up to drive a lot of price***"—such that it was in fact "***generally underpric[ing]***" deals and routinely "***giv[ing] away the pricing that [we] were getting through discounting***." Furthermore, Defendant Johnson admitted that the Company did not even have the ability to raise prices in response to inflation at this time, as it had only just begun in 2022 to make the critical "change" of "putting escalators in [the Company's contracts] if commodities" prices went up that "wasn't in all of our contracts prior."  This was confirmed by FE-1, FE-2, and FE-5, who indicated that Vertiv had in truth built its large backlog through sales with long lead times to large enterprise customers that, far from allowing Vertiv to raise prices to offsets costs, in fact locked in discounted prices at very low margins.

162.    Vertiv also released an investor presentation on October 27, 2021, which further falsely confirmed that Vertiv's pricing initiatives were ongoing: "***Prior pricing guidance intact with additional actions being implemented in the fourth quarter and into 2022***."   The presentation also included a slide showing the "Full year 2021 inflation and pricing evolution," which claimed that the Company's "***pricing actions***," including "***list price increases, discount and rebate reductions, pass through commodity pricing and pricing recovery on outbound freight***," would yield no less than $55 million in offset of inflationary costs.  The slide is reproduced below:



Full year 2021 inflation and pricing evolution
*$Millions favorable / (unfavorable) vs. prior year*

| | February Guidance (adj. OP = $575M) | April Guidance (adj. OP = $595M) | July Guidance (adj. OP = $600M) | September Guidance (adj. OP = $540M) | October Guidance (adj. OP = $540M)[1] |
|---|---|---|---|---|---|
| Material and freight inflation | ($20) | ($45) | ($110) | ($130) | ($155) |
| Pricing actions | 15 | 25 | 65 | 55 | 55 |
| Net material and freight inflation | ($5) | ($20) | ($45) | ($75) | ($100) |

- Reflects the year-over-year change in contribution margin attributable to material & freight inflation and pricing actions
- Material and freight inflation includes market impacts (higher commodity prices, freight rates, etc.) as well as premiums paid for spot-buys and expedited shipments due to parts availability challenges
- Pricing includes items such as list price increases, discount and rebate reductions, pass through commodity pricing and pricing recovery on outbound freight
- Excludes impact of acquired and divested businesses

(1) Base Vertiv adjusted operating profit guidance excluding impact of M&A.  Total adjusted operating profit guidance including impact from M&A is $551M.

◆ VERTIV.                                                                                                                         19

163.    The statements in paragraph 162 were materially false and misleading and omitted material facts.  In reality, and as Vertiv and the Officer Defendants would later admit, they had not actually implemented "pricing actions" to offset inflation.  To the contrary, the Company had in fact been "generally underpric[ing]" deals and "giv[ing] away the pricing that [we] were getting through discounting" because Vertiv's culture actually "wasn't set up to drive a lot of price."  In fact, Defendant Johnson later admitted that the Company did not even have the ability to raise prices in response to inflation, as it had only just begun to make the critical "change" of "putting

escalators in [the Company's contracts] if commodities" prices went up that "wasn't in all of our contracts prior." Indeed, multiple FEs confirmed that Vertiv had built its large backlog by entering into long-term contracts with enterprise customers that locked in discounted prices at very low margins—such that the Company had no ability to raise pricing at all even if costs later significantly increased.

164.    During the earnings call also held on October 27, 2021, Defendants made a series of misstatements designed to unequivocally confirm to investors that the Company would fully "recapture" rising supply and inflationary costs through its aggressive pricing efforts.

165.    For example, Defendant Johnson stated that the Company was "dealing . . . with supply chain and inflationary issues," but had "made spot buys so that we can meet our delivery commitments we've made to our customers, and *we have implemented strategies to recapture those costs*." Indeed, Johnson "*assure[d]*" investors that "*our robust pricing actions and what we are doing now . . . will be positive in price based on what we're executing on*"—and that even if inflation got "potentially worse," Vertiv was "*making sure that our pricing actions now and going forward cover that*." Johnson confirmed that "*[f]rom a pricing standpoint, we are in line with our prior guidance we provided for Q4*."

166.    Then, in response to an analyst's question about "how much price is in the backlog," Defendant Johnson stated that "*I can assure you going forward with our robust pricing actions and what we are doing now and [what] we'll be doing in 2022 that we will be positive in price based on what we're executing on*." To provide even more reassurance, Defendant Johnson further asserted that "*[w]e're even assuming that it could get potentially worse and we're making sure that our pricing actions now and going forward cover that*."

167.     Defendant Fallon further confirmed that the Company was "*certainly encouraged with what we're seeing in the pricing environment here in the fourth quarter*"—to the extent that, beyond just "covering" inflation, *the Company in fact expected its pricing efforts to result in a "tailwind" with "a floor" that would be "in the $5 million to $10 million range*." Fallon further asserted that because the Company planned to "*be much more aggressive*" with pricing efforts because its pricing plans "*anticipat[ed] that inflation will continue to accelerate*," Defendants were in fact "*anticipat[ing] a much more significant dollar tailwind*" than the "floor" of $5 to $10 million.

168.     The statements in paragraphs 164 to 167 were false and misleading and omitted material information.  As Vertiv and the Officer Defendants would admit only a few months later, in reality, the Company was neither taking any "robust pricing actions" nor successfully offsetting "spot buys" to ease supply chain issues.  Rather, as Defendants admitted at the end of the Class Period, in truth, the Company "*wasn't set up to drive a lot of price*"—such that it was in fact "*generally underpric[ing]*" deals and routinely "*giv[ing] away the pricing that [we] were getting through discounting*."  Furthermore, Defendant Johnson admitted that the Company did not even have the ability to raise prices in response to inflation at this time, as it had only just begun in 2022 to make the critical "change" of "putting escalators in [the Company's contracts] if commodities" prices went up that "wasn't in all of our contracts prior."  Indeed, as FE-1, FE-2, and FE-5 all confirmed, Vertiv had in truth built its large backlog through sales with long lead times to large enterprise customers that, far from allowing Vertiv to raise prices to offsets costs, in fact locked in discounted prices at very low margins.

**J.     Statements Regarding The Company's November 2021 Offering**

169.     On or about November 4, 2021, VPE Holdings, LLC (an affiliate of Platinum Equity, LLC) ultimately sold 21.925 million shares of Vertiv Class A common stock at $24.8257

per share, reaping over $544 million in net proceeds.  In the Offering, VPE Holdings, LLC reduced its beneficial ownership in the Company by one-third (or 33%), from 15.9% to 10.6%.

170.   The Offering Documents expressly incorporated by reference the Company's "annual, quarterly and current reports" and other filings with the SEC, including all SEC filings under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act that were filed after the May 10, 2021 prospectus.  Accordingly, the false and misleading statements included in the Company's Annual Report on Form 10-K/A for the year ended December 31, 2020 filed with the SEC on April 30, 2021 (¶134) were incorporated by reference in the Offering Materials.  Indeed, the Offering Documents expressly stated that the Company's "previously disclosed risk factors . . . set forth in [the April 20, 2021] Form 10-K/A" were "incorporated herein by reference."

171.   These "risk factors" included in the April 30, 2021 Form 10-K/A continued to be false and misleading for the same reasons as described above in paragraphs 121 and 123.

**K.**   **Statements At The November 16, 2021 Deutsche Bank Industrials Conference**

172.   On November 16, 2021, Defendants Johnson, Fallon, and Niederpruem participated in the Deutsche Bank Industrials Conference.  In response to an analyst's question regarding Vertiv's confidence in its ability to obtain a $5 to $10 million plus tailwind in the fourth quarter resulting from its pricing efforts, Defendant Johnson responded that Vertiv "*had a lot of practice*" increasing its pricing and, as a result, "*as inflation continues to rise . . . we'll continue to take pricing action*" by instituting "*additional price increases*":

> [W]e've talked about price for the last year, 1.5 years, 2 years.  *It's a muscle that we didn't have a few years ago, and it's something prior to all this inflation we were going after*.  We needed to make sure we're getting paid for the innovation, paid for what we do . . . .  *So we actually had a lot of practice* prior to this as we go through it . . . .  *[A]s inflation continues to rise . . . we'll continue to take pricing action*.  So whether we're here in Q4, *we continue to take actions. In some cases, it's monthly. Some cases, it's quarterly, and then working through that with our customers* . . . .  But in general, I feel like we've got all regions engaged . . . .  And I got to say that going into Q1, depending on what we see on the inflationary side

of things[,] *we'll continue to do additional price increases* . . . .  And I think the challenge or the right way to do it is you really got to sit down with your customers and explain to them what's happening . . . .  And our stance has always been we want to be fair, but we want to be fair and recouping what we've lost.

173.    Defendant Niederpruem reinforced that Vertiv's pricing initiatives were showing results.  Niederpruem explained that "in '19 and in '20, the business got somewhere between $20 million and $25 million of price on an annual basis," but "*[i]n Q4 alone, . . . we've already signaled that we will have that much price at least*."  Niederpruem confirmed that "*from an absolute standpoint, we're going to get a year's worth of price just in the fourth quarter*."  Niederpruem underscored his positive statements by claiming that "*[w]e have just about launched additional pricing actions over the last 2 or 3 weeks in every region of the world . . . .  [T]here's definitely more tailwinds with the actions that we've taken just in the last couple of weeks*."

174.    Then, in response to an analyst's question about whether the Company had experienced "any pushback from customers about pushing through additional pricing," Defendant Johnson reassured investors that the Company was "mak[ing] sure we're getting covered" for any higher-cost "spot buys" by successfully passing those costs along to Vertiv's customers.  Specifically, Defendant Johnson represented that "if we have to go out and do spot buys, we're getting smarter about it and saying, '*Hey I can go do a spot buy and we're going to have to pay more.  And if I have to pay more, then I need some more from you.*'"

175.    The statements in paragraphs 172 to 174 above were materially false and misleading and omitted material facts when made.  As Vertiv and the Officer Defendants would admit only a few months later, they were not making any "additional price increases" at this time.  To the contrary, and as Defendants Cote and Johnson would admit at the end of the Class Period, the Company "*wasn't set up to drive a lot of price*"—such that it was in fact "*generally underpric[ing]*" deals and routinely "*giv[ing] away the pricing that [we] were getting through*

*discounting*."  Furthermore, Defendant Johnson admitted that the Company did not even have the ability to raise prices in response to inflation at this time, as it had only just begun in 2022 to make the critical "change" of "putting escalators in [the Company's contracts] if commodities" prices went up that "wasn't in all of our contracts prior."  Indeed, as FE-1, FE-2, and FE-5 all confirmed, Vertiv had in truth built its large backlog through sales with long lead times to large enterprise customers that, far from allowing Vertiv to raise prices to offsets costs, in fact locked in discounted prices at very low margins.

176.    Defendant Niederpruem further affirmed that the Company was making use of "surcharges" to pass costs along to customers, and was actively "***controlling the discounts and multipliers that our own salespeople are able to have***":

> [I]t's fair to say ***that the majority of the price comes from those price increases, just controlling the discounts and multipliers that our own sales people are able to have***.  Their rebate clawbacks, MDF [market development funds, i.e., funds made available to distribution channel partners] co-op [another type of payment to distribution channel partners], maybe we don't spend as much in lieu of getting some price.  There's a number of different levers that we've implemented.  ***List prices is probably the biggest one***, but it's certainly far from not the only one.

177.    Defendant Niederpruem's statements in paragraph 176 were false and misleading and omitted material facts.  As Vertiv and the Officer Defendants would admit only a few months later, rather than "controlling the discounts and multipliers that our own sales people are able to have," the exact opposite was true.  As Defendants admitted at the end of the Class Period, in truth, the Company "***wasn't set up to drive a lot of price***"—such that it was in fact "***generally underpric[ing]***" deals and routinely "***giv[ing] away the pricing that [we] were getting through discounting***."  Indeed, as Defendant Johnson admitted, discounting by Vertiv's sales force was not limited to a few isolated individuals or sales, but was instead a rampant and pervasive practice that was so ingrained in Vertiv's organization that it was part of the Company's "culture."  As Johnson made clear, "culturally," Vertiv's sales force was "afraid to lose orders" throughout 2021,

even if that meant sacrificing price.  Defendant Cote likewise confirmed that the Company's
salesforce "***had a predisposition or a deference to not lose the order***."

178.    Furthermore, Defendant Johnson admitted that the Company did not even have the
ability to raise prices in response to inflation at this time, as it had only just begun in 2022 to make
the critical "change" of "putting escalators in [the Company's contracts] if commodities" prices
went up that "wasn't in all of our contracts prior."  Indeed, as FE-1, FE-2, and FE-5 all confirmed,
Vertiv had in truth built its large backlog through sales with long lead times to large enterprise
customers that, far from allowing Vertiv to raise prices to offsets costs, in fact locked in discounted
prices at very low margins.

179.    Then in response to an analyst's question about how Vertiv was going to reach its
fourth quarter guidance, Defendant Fallon stated that, despite recent supply chain challenges, the
Company had "***really good visibility***" due to its "***preplanning***" and felt "***very comfortable with
the guidance we gave***":

> [T]he step up in the sales side, yes, we've gotten the question ourselves saying, if
> you're participating in a market where supply is constrained and you're able to get
> a certain output in Q3, how can you feel confident that you can increase that output
> if your capacity [is] constrained in 3Q?  And the quick answer there is based on ***the
> planning, the preplanning with the suppliers as it relates to allocations***.  We've
> been in line for a certain amount of allocation in Q4 for quite some time.  And ***we
> have really good visibility to the critical components that will support that higher
> volume to the extent that we feel very comfortable with the guidance we gave***.

180.    The statements in paragraphs 178 and 179 were false and misleading and omitted
material facts.  As Defendant Johnson would admit only a few months later, the Company had not
properly "pre-planned" for supplier decommits, which in fact accounted for half of the Company's
fourth quarter 2021 miss, because Defendants had not taken any of the pricing actions that they
had touted to investors to offset higher-cost "spot buys" or other supply chain challenges.  Indeed,
FE-3 confirmed that, far from adequately preplanning for supply chain issues or properly raising

prices in response to inflation, the Company in fact made no such price increases and was plagued throughout 2021 by increasingly aggressive supplier decommits that Defendants were unable to manage.

## VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER

181.   Numerous facts including those detailed above, considered collectively, demonstrate that Vertiv and the Officer Defendants knew they were making the above-detailed materially false and misleading statements and omissions of material fact, or, at minimum, acted recklessly in making those statements and omissions.  Certain allegations reflecting Vertiv and the Officer Defendants' scienter are summarized below.

182.   ***First,*** Defendants made a plethora of public statements touting Vertiv's "robust" pricing actions throughout the Class Period—and in doing so, made clear to investors that they were fully aware of, and were in fact responsible for, the Company's pricing actions.  Indeed, Defendants were fully aware that their statements were extraordinarily important to investors and analysts throughout the Class Period.  For example, during every earnings call, Defendants made a point of consistently emphasizing the Company's "aggressive" pricing efforts and specifically reassuring investors that these pricing efforts were successfully offsetting rising inflation— including in direct response to numerous analyst inquiries on the matter.  In addition, Defendants participated in numerous investor conferences during which they further emphasized that the Company's pricing actions and purported "control" over the Company's "discount levels" were "fully offsetting" inflation.  For example, Defendants repeatedly represented that they were "getting price," had "kicked off some pretty serious pricing initiatives," and were "making sure that our pricing actions now and going forward" would "cover" inflation even if it got "potentially worse"—such that the Company would "recover the vast, vast, vast majority of any inflationary

stuff."  However, pursuant to Defendants' own admissions at the end of the Class Period (discussed below), all of these statements were unequivocally false.

183.    Significantly, investors heavily relied on Defendants' repeated public statements in this regard, as the Company's stock price surged by over 37% during the Class Period to reach a Class Period high of $28.59 per share.  Moreover, analysts specifically credited Defendants' representations.  For example, a Wolfe Research report commented that it was "[c]onfident that VRT will be able to recapture the cost inflation" through the Company's pricing efforts.  A Citi report stated that Vertiv clearly had "good visibility to the pace of price realization through its $2.3 [billion] backlog."  Finally, a Deutsche Bank report stated that "we were encouraged to hear" that "management is having greater success with new pricing mechanisms" to offset inflation.

184.    Defendants' false public statements repeatedly emphasizing the purported success of the Company's "robust" and "aggressive" pricing efforts—and the market's heavy focus and reliance upon those statements throughout the Class Period—is strongly probative of Defendants' scienter.

185.    **_Second,_** Defendants made a series of striking admissions at the end of the Class Period confirming that contrary to their repeated public statements, they had not taken any of the pricing actions they had touted to investors to offset rising inflationary costs and did not even have the ability to raise prices on the majority of the Company's backlog.  These admissions demonstrate the Officer Defendants' clear knowledge of the falsity of their statements made during the Class Period.

186.    For example, in Vertiv's February 23, 2022 press release issued at the end of the Class Period, Defendants admitted that—despite their repeated representations to investors that they were aggressively raising prices—they had in fact only barely begun to "act[] decisively **_late_**

*last year and early this year* [2022] with aggressive price action."   For example, Defendant

Johnson starkly admitted that, in reality, "*the [Vertiv] organization . . . didn't and wasn't set up*

*to drive a lot of price*."   Johnson further admitted that Vertiv in fact did not even have the ability

to raise prices on the majority of the large contracts comprising Vertiv's over $2 billion backlog

because the Company had only recently added "escalator" provisions to account for rising

commodity costs—a provision that Johnson admitted "*wasn't in all of [Vertiv's] contracts prior*."

Indeed, on August 3, 2022, in response to a an analyst question about Vertiv's pricing recovery,

Defendant Johnson admitted that—contrary to Defendants' prior statements that they had

"material clauses" or other "levers" to retroactively raise prices on the Company's large backlog—

in reality, "*[w]e didn't get a lot of pricing on the backlog that we had[,] [t]hat was part of our*

*problem.*"   Defendant Cote likewise confirmed that not only was the Company unable to raise

prices, but that Vertiv had been "*generally underpric[ing]*" its contracts, and that as a result, the

Company "*got behind on the inflation recovery curve with insufficient price and stayed there all*

*year*."   Indeed, Defendant Fallon admitted after the Class Period on two separate occasions that

because Company was in truth "*tepid to raise price*" and in fact "*never w[as] super aggressive*

*with pricing*," Defendants were "hoping" investors would not ask about pricing efforts during

earnings and conference calls.

      187.   Defendant Johnson also directly admitted that—rather than being "judicious" with

regard to discounting, as Defendants had repeatedly assured investors throughout the Class

Period—in reality, the Company had "*los[t] price through discounting*" as it had been routinely

"*giv[ing] away the pricing that we were getting through discounting*."   Indeed, Johnson revealed

that "culturally," Vertiv's sales force had been "afraid to lose orders," and Defendant Cote likewise

confirmed that the Company "*had a predisposition or a deference to not lose the order*."   This

"predisposition" was so pervasive that, contrary to Defendants' assurances during the Class Period that the Company had been "***controlling the discounts that our own salespeople are able to have***," Vertiv had just barely begun to institute "process changes" to require "higher levels of approval" on discounts—changes that Johnson conceded were necessary to ensure "***that we're not giving price away***" and not "***just discount[ing] to build backlog***."

188.    Defendants' direct and stark admissions that they had access to information that sharply conflicted with their repeated public statements to investors about Vertiv's purportedly "robust" pricing actions and "judicious" control of discounting are highly probative of scienter.

189.    ***Third***, rather than blaming any external factors for the Company's disastrous 2021 fourth quarter and year-end results, Defendants instead acknowledged that they were "fully responsible," admitting that they had "screwed up" and severely "damaged" their own credibility. Specifically, Defendant Johnson directly confirmed at the end of the Class period that, despite Defendants' consistent public statements about how Vertiv was "getting price"—which Defendants used as their chief justification for raising the Company's guidance twice despite increasing inflationary headwinds—Defendants were in fact "***full[y] responsible***" for the guidance miss because they had "***screwed up***" by "underpricing the market in 2021" and utterly failing to take any of the pricing actions they had spent a year touting to investors. Indeed, Defendant Fallon acknowledged that "***we realize—absolutely realized we have likely damaged some of our credibility in 2021, notably with the quality of our external guidance***"—necessitating that the Company now "be fully transparent" with investors. Defendants' blatant acknowledgement of their own culpability and damaged credibility further gives rise to a strong inference of scienter.

190.    ***Fourth***, Defendants proclaimed that they personally reviewed pricing and cost data in real time—"8 days a week"—thus confirming their direct and detailed knowledge of

information contradicting their public statements at the time they were made. For example, Defendant Niederpruem assured investors—in direct response to an analyst question about whether Vertiv could "cover[] the inflation you're seeing"—that he and CFO Defendant Fallon "*review[ed] pricing and the commodity stuff . . . 8 days a week at this point in time*" to "*make sure that we're doing all the right things*."  Defendant Niederpruem further proclaimed and specifically assured investors that, as a result of Defendants' close monitoring, they were "*really, really confident that we will be able to recover the vast, vast, vast majority of any inflationary stuff*."  However, in reality and as Defendants would later admit, the Company was habitually underpricing its products and thus utterly failing to cover inflationary costs.  Defendants' own confirmation of their personal monitoring of detailed information that directly contradicted their public statements is highly probative of scienter.

191.    ***Fifth***, numerous accounts of former Vertiv employees confirm that Defendants personally reviewed pricing data, directly approved of the Company's discounting practices, had full knowledge of the fact that the Company's contracts with larger enterprise customers comprising the majority of its backlog did not allow for any price increases and were aware of and personally managing Vertiv's supply chain problems.  For example, FE-1 stated that senior management was fully "aware" of rising inflationary costs "since we had an analysis on the impact on the pricing of copper and components in terms of costs" that began at the start of the pandemic. FE-1 participated in Monthly and Quarterly Business Meetings ("MBRs" and "QBRs") during which the Company's practice of underpricing was discussed, in addition to overall margin and profitability information.  FE-1 stated that if pricing exceptions on large deals were made, those had to be approved by John Hewitt, President of the Americas, who reported directly to Defendant Johnson, or by Defendant Johnson himself.  As FE-1 recalled, "***Rob Johnson agreed to do these***

*deals without price increases.  These exceptions were being approved and their recent quarterly miss was all self-inflicted*."

192.    FE-3 described how sales, pricing, and margins were reported and directly tracked by executive management through "Power BI Reports."  Power BI Reports were updated daily and were available on a daily, weekly, and monthly basis.  FE-3 stated that Defendants Johnson and Fallon had access to the Power BI Reports.  "We could get reports as frequently as we wanted them."  In addition, FE-3 attended MBR and QBR meetings with Defendants Johnson and Fallon where these metrics were discussed.

193.    FE-3 further described how Defendant Johnson and former President of the Americas, John Hewitt, were directly involved in aggressively attempting to manage supply-challenges throughout Class Period as a result of the Company's key suppliers aggressively decommitting throughout 2021.  According to FE-3, this resulted in "crisis meetings all over," and in the Company's executive management—including Defendant Johnson and Hewitt—desperately attempting to find other sources of key components.

194.    Finally, FE-4 explained that the Company's serious issues with its new CPQ system were immediately escalated to John Hewitt, former President of the Americas who reported directly to Defendant Johnson.  FE-4 stated: "Hewitt knew and he may have been the fall guy.  *We had All-Hands Meetings where it was discussed and they tried to calm the crowd*."

195.    *Sixth*, according to Defendants' own representations, Vertiv's pricing efforts were a key "lever" for the Company to be able to achieve its margin expansion plan, which the market viewed as critical to Vertiv's success as a publicly-traded company.  Defendants' awareness of the critical importance of the success of Vertiv's pricing efforts to the market is further probative of their scienter.

196.    ***Seventh***, analysts' extraordinary commentary excoriating Defendants' credibility lends further support to an inference of scienter.  *See* ¶¶ 68-71.  For example, Deutsche Bank noted that "***this is becoming a management credibility issue***" due to the "***magnitude of VRT's adj. operating profit miss***."  Deutsche Bank concluded that, in light of Defendants' February 23, 2022 admissions, "***we cannot defend the results or the guidance***" and that "***it will take time for VRT to regain credibility***"—particularly considering Defendants' "***constructive management commentary and conferences throughout the quarter, even into December.***"  Cowen's report similarly concluded that Vertiv's management's "***credibility [was] in question***"—especially since Defendants had "shared that the price actions [Vertiv] took late in the third quarter would not only keep up with inflation during the fourth quarter, but also deliver meaningful tailwind throughout 2022, providing the investment community with a sense that [Vertiv] was in control of pricing conditions."  Wolfe Research similarly concluded that "***management credibility is completely shot***" due to the "wide" "miss vs. the guide given in early-Nov."  Defendants' severe loss of credibility with the market as a result of their strong and repeated misrepresentations is further indicative of their scienter.

197.    ***Eighth***, the Officer Defendants were highly motivated to conceal the Company's problems in order to enable Platinum Equity, the Company's controlling stockholder, to sell over $544 million of Vertiv stock in the SPO at an artificially inflated price before the full extent of the problems with Vertiv's pricing and supply chain was revealed to investors.  Indeed, after the Company's stock price fell by over 12% in response to Defendants' September 8, 2021 revelation of supply chain challenges and as the SPO approached, Defendants went out of their way to issue a series of misstatements designed to strongly reassure investors about the ability of the Company's pricing actions to effectively offset inflation.  For example, mere days before the SPO,

Defendants represented that the Company's "robust pricing actions" would "cover" inflation even if it got "potentially worse"—and went so far as to re-raise the Company's annual guidance at that time. Defendants' strong false reassurances about the effectiveness of Vertiv's pricing actions leading up to the SPO are highly probative of their scienter.

## IX.   LOSS CAUSATION

198.   During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive investors. This artificially inflated the price of Vertiv shares and operated as a fraud or deceit on the Class. Later, including on September 8 and 9, 2021, and February 23, 2022, when Defendants' prior misrepresentations and fraudulent conduct were partially and fully disclosed to the market, respectively, the price of Vertiv shares fell precipitously, and in a statistically significant amount, when factoring in the effect of peer and market movements, as the prior artificial inflation was dissipated. As a result of their purchases of Vertiv shares during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## X.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

199.   Vertiv's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period do not shield those statements from liability.

200.   Defendants are also liable for any false or misleading forward-looking statements pleaded in this Complaint because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized or approved by an executive officer of Vertiv who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made,

nor were any of the projections or forecasts made by Defendants expressly related to, or stated to

be dependent on, those historic or present tense statements when made.

## XI.   PRESUMPTION OF RELIANCE

201.    At all relevant times, the market for Vertiv shares was an efficient market for the

following reasons, among others:

   (a)    Vertiv shares met the requirements for listing, and were listed and actively
          traded on the NYSE, a highly efficient and automated market;

   (b)    As a regulated issuer, Vertiv filed periodic public reports with the SEC and
          the NYSE;

   (c)    Vertiv regularly and publicly communicated with investors via established
          market communication mechanisms, including through regular
          disseminations of press releases on the national circuits of major newswire
          services and through other wide-ranging public disclosures, such as
          communications with the financial press and other similar reporting services;
          and

   (d)    Vertiv was followed by several securities analysts employed by major
          brokerage firm who wrote reports that were distributed to the sales forces
          and certain customers of their respective brokerage firms.  Each of these
          reports was publicly available and entered the public marketplace.

202.    As a result of the foregoing, the market for Vertiv shares promptly digested current

information regarding Vertiv from all publicly available sources and reflected that information in

the price of Vertiv Class A common stock.  Under these circumstances, all purchasers of Vertiv

Class A common stock during the Class Period suffered similar injury through their purchase of

Vertiv Class A common stock at artificially inflated prices, and the presumption of reliance

applies.

203.    A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are grounded on Defendants' material omissions.  Because this action

involves Defendants' failure to disclose material adverse information regarding Vertiv's business

operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of pricing visibility and effective sales practices for the Company's margins and profitability, that requirement is satisfied here.

## XII.   EXCHANGE ACT COUNTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against Vertiv and the Officer Defendants**

204.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully stated in this Count.

205.    During the Class Period, Vertiv and the Officer Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did (a) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged in this Complaint; and (b) cause Lead Plaintiffs and other members of the Class to purchase Vertiv shares at artificially inflated prices.

206.    Vertiv and the Officer Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Vertiv shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

207.    Vertiv and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged

and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

208.    During the Class Period, Vertiv and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

209.    Vertiv and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this Complaint, or recklessly disregarded the true facts that were available to them.  Vertiv and the Officer Defendants engaged in this misconduct to conceal Vertiv's true condition from the investing public and to support the artificially inflated prices of the Company's shares.

210.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vertiv shares.  Lead Plaintiffs and the Class would not have purchased the Company's shares at the prices they paid, or at all, had they been aware that the market prices for Vertiv shares had been artificially inflated by these Defendants' fraudulent course of conduct.

211.    As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's shares during the Class Period.

212.    By virtue of the foregoing, Vertiv and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**
**Against the Officer Defendants**

213.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully stated in this Count.

214.    The Officer Defendants acted as controlling persons of Vertiv within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Vertiv, the Officer Defendants had the power and ability to control the actions of Vertiv and its employees.  By reason of such conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

**SECURITIES ACT CLAIMS**
**(Sections XIII through XIV)**

**XIII.   VIOLATIONS OF THE SECURITIES ACT**

215.    Plaintiffs specifically disavow any allegations or averments of fraud in connection with the claims pleaded under the Securities Act.

216.    As set forth in the Certifications previously filed with the Court, Lead Plaintiffs Riviera Beach and Riviera Beach Fire purchased Vertiv shares in the SPO and were damaged as a result of those purchases.

**A.     The Securities Act Defendants**

217.    In addition to Defendants Vertiv, Johnson, and Fallon, both of whom signed the Registration Statement for the SPO, the following Defendants are liable to Lead Plaintiffs and the Class under the Securities Act for the material misstatements and omissions in the Offering Materials for the SPO.

90

### 1.   Director Defendants

218.   Defendant David Cote ("Cote") is, and was at all relevant times, Executive Chairman of the Board of Directors of Vertiv and has served in that role since February 7, 2020. Defendant Cote "work[s] very closely" with Defendant Johnson and the Vertiv leadership team. In 2018, Cote partnered with Goldman Sachs to launch a SPAC (GSAH) that combined with Vertiv in 2020.  According to Defendant Johnson, Vertiv being able to go public was "possible" thanks to "Dave Cote and Goldman Sachs, and Platinum Equity's support over the past few years." Defendant Cote was CEO, President and Secretary, and chairman of the board of directors for GSAH. Prior to that, he was executive chairman of the board at Honeywell until April 23, 2018.  Cote also served as chairman and CEO of Honeywell from July 2002 to March 2017.

219.   Defendant Cote signed the Registration Statement for the SPO and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

220.   Defendant Joseph van Dokkum ("van Dokkum") is, and was at all relevant times, a Director of Vertiv, serving as a Director since February 7, 2020.  From 2009 to 2019, he was an operating partner with Kleiner Perkins, where Defendant Johnson previously was also an operating partner.

221.   Defendant van Dokkum signed the Registration Statement for the SPO and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

222.   Defendant Roger Fradin ("Fradin") is, and was at all relevant times, a Director of Vertiv, serving as a Director since February 7, 2020.  From June 2018 until February 2020, Fradin served with Defendant Cote as one of GSAH's directors.  Fradin joined Honeywell in 2000 and

served in in various executive roles there, including as president and CEO of the Honeywell's Automation and Control Solutions business, and vice chairman, until his retirement in 2017.

223.    Defendant Fradin signed the Registration Statement for the SPO and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

224.    Defendant Jacob Kotzubei ("Kotzubei") is, and was at all relevant times, a Director of Vertiv, serving as a Director since February 7, 2020.  Defendant Kotzubei is also, and was at all relevant times, a partner of Defendant Platinum Equity, LLC, joining Platinum Equity in 2002. Kotzubei serves as a director or manager of a number of Platinum Equity's portfolio companies. Prior to joining Platinum Equity in 2002, Kotzubei worked for 4.5 years in Goldman Sachs' Investment Banking Division.

225.    Defendant Kotzubei signed the Registration Statement for the SPO and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

226.    Defendant Matthew Louie ("Louie") is, and was at all relevant times, a Director of Vertiv, serving as a Director since February 7, 2020.  Defendant Louie is also, and was at all relevant times, a managing director of Defendant Platinum Equity, LLC, joining Platinum Equity in 2008.  Louie serves as a director or manager of a number of Platinum Equity's portfolio companies.

227.    Defendant Louie signed the Registration Statement for the SPO and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

228.     Defendant Edward L. Monser ("Monser") is, and was at all relevant times, a Director of Vertiv, serving as a director since February 7, 2020.  From 2010 to 2018, Monser served as president of Emerson, where he had more than 30 years of experience in senior operational positions and played a key role in its globalization.  Platinum Equity acquired the Emerson Network Power business from Emerson, which was rebranded as Vertiv.  From 2001 to 2015, he was a member of Emerson's Office of the Chief Executive and served as its Chief Operating Officer.  Monser was selected to serve on Vertiv's board due to his experience in key positions at Emerson when what is now Vertiv was part of that company.

229.     Defendant Monser signed the Registration Statement for the SPO and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

230.     Defendant Steven S. Reinemund ("Reinemund") is, and was at all relevant times, a Director of Vertiv, serving as a director since February 7, 2020.  From June 2018 until the February 2020, Reinemund served as one of GSAH's directors.

231.     Defendant Reinemund signed the Registration Statement for the SPO and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

232.     Defendant Robin L. Washington ("Washington") is, and was at all relevant times, a Director of Vertiv.  Defendant Washington serves on various boards as a director, including at Honeywell.

233.     Defendant Washington signed the Registration Statement for the SPO and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials.

234.    Defendants Johnson, Fallon, Cote, van Dokkum, Fradin, Kotzubei, Louie, Monser, Reinemund, and Washington are collectively referred to in this Complaint as the "Offering Defendants."  Each of the Offering Defendants signed the Registration Statement.  The Offering Defendants, because of their positions with Vertiv, possessed the power and authority to control the contents of the Offering Materials.

### 2.    Selling Shareholder Defendants

235.    Defendant VPE Holdings, LLC ("VPE Holdings") is incorporated in the state of Delaware and sold the shares offered in the SPO.  The business address of VPE Holdings is 360 North Crescent Drive, South Building, Beverly Hills, California.

236.    The owners and beneficiaries of VPE Holdings are Vertiv JV Holdings LLC ("JV Holdings") and PE Vertiv Holdings LLC ("PE Holdings" and, together with JV Holdings, the "Holding Defendants").

237.    Defendant JV Holdings is incorporated in the state of Delaware and is the majority owner of VPE Holdings.  The business address of JV Holdings is 360 North Crescent Drive, South Building, Beverly Hills, California.

238.    Defendant PE Holdings is incorporated in the state of Delaware and is a majority owner of JV Holdings.[11]  The business address of PE Holdings is 360 North Crescent Drive, South Building, Beverly Hills, California.

239.    Defendant Platinum Equity, LLC is a Los Angeles, California-based investment manager and private equity firm, with offices in this District at 52 Vanderbilt Avenue, New York, New York.  Platinum Equity, LLC and its affiliated funds are the listed owners and beneficiaries

---

[11] Vertiv JV Holdings, LLC owns a majority of the outstanding equity interests of VPE Holdings, LLC, and PE Vertiv Holdings, LLC owns a majority of the outstanding interests of Vertiv JV Holdings, LLC, and, accordingly, each may be deemed to beneficially own the shares owned directly by VPE Holdings, LLC.

of the Holding Defendants.  As alleged in this Complaint, Platinum Equity, LLC, and its affiliated funds—including the following entities: Platinum Equity Investment Holdings, LLC; Platinum Equity Investment Holdings Manager, LLC; Platinum Equity InvestCo, L.P.; Platinum Equity Investment Holdings IC (Cayman), LLC; Platinum InvestCo (Cayman), LLC; Platinum Equity Investment Holdings III, LLC; and Platinum Equity Investment Holdings Manager III, LLC (collectively, "Platinum Equity")—had the power to control, and did control Vertiv, throughout the Class Period.

240.    Accordingly, as a result of their indirect ownership and control of VPE Holdings and the Holding Defendants, Platinum Equity may be deemed to beneficially own the shares that are owned directly by VPE Holdings.

241.    Defendants VPE Holdings, the Holding Defendants, and Platinum Equity are collectively referred to in this Complaint as the "Selling Shareholders."  The Selling Shareholders controlled Vertiv before, during, and after the SPO.

### 3.    Underwriter Defendants

242.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter and joint book-running manager of the SPO.  As an underwriter of the SPO, J.P. Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials (defined below).   J.P. Morgan is headquartered in this District at 383 Madison Avenue, New York, New York.

243.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter and joint book-running manager of the SPO.  Goldman Sachs has a history with Vertiv that includes acting as lead placement agent and exclusive financial advisor to GSAH in connection with the business combination of GSAH and Vertiv.  Goldman Sachs is headquartered in this District at 200 West Street, New York, New York.

244.    As an underwriter of the SPO, Goldman Sachs was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials (defined below).

245.    Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter of the SPO.  As an underwriter of the SPO, Citigroup was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials (defined below).  Citigroup is headquartered in this District at 388 Greenwich Street, New York, New York.

246.    Defendants J.P. Morgan, Goldman Sachs, and Citigroup are collectively referred to in this Complaint as the "Underwriter Defendants."  The Underwriter Defendants all have executive offices and/or are headquartered in this District.

**B.      Vertiv And The Secondary Public Offering**

247.    Based in Columbus, Ohio, Vertiv designs, manufactures, and services critical digital infrastructure technologies and life cycle services for data centers, communication networks, and commercial and industrial environments.  Vertiv's offerings include power management products, thermal management products, integrated rack systems, modular solutions, and management systems for monitoring and controlling digital infrastructure that are integral to the technologies used for various services.

248.    The Company was established in 2016 after Platinum Equity acquired Emerson Electric Co.'s network-power division for $4 billion and rebranded it as "Vertiv."

249.    On February 7, 2020, Vertiv went public through a merger with GS Acquisition Holdings Corp., a special purpose acquisition company ("SPAC").  Upon the closing of the transaction, Platinum Equity held approximately 38% of the outstanding common stock of Vertiv.

250.    On or around November 4, 2021, Vertiv conducted the SPO pursuant to a registration statement that the Company initially filed on February 7, 2020, and that was declared effective by the SEC on February 7, 2020, and subsequently amended on Form S-3, which was declared effective by the SEC on May 10, 2021 (the "Registration Statement").   On November 3, 2021, Vertiv filed a prospectus for the SPO on Form 424B1 (the "Prospectus"), which formed part of the Registration Statement (collectively, the "Offering Materials").   The Registration Statement was signed by the Offering Defendants.   By means of the Offering Materials, VPE Holdings offered and sold 21.925 million shares of Vertiv Class A common stock at $24.8257 per share, resulting in over $544 million in net proceeds.

### C.    Platinum Equity Controlled Vertiv At The Time Of The SPO

251.    Platinum Equity controlled Vertiv through its substantial stock ownership, Board representation, and contractual control rights at the time of the SPO.   At the beginning of the Class Period, Platinum Equity owned 38% of Vertiv's outstanding common stock.   After selling some stock before the SPO, Platinum Equity owned 15.9% of the outstanding common stock at the time of the SPO, in which it sold 5.3% of the outstanding stock, and its Board representation and contractual control rights continued after the SPO when it owned 10.6% of the outstanding common stock.   Vertiv's Form 10-K for 2021, filed on March 1, 2022, described Platinum Equity's post-SPO control:

> **The Vertiv Stockholder [i.e., Platinum Equity] has significant influence over us.**
>
> As long as the Vertiv Stockholder owns or controls a significant percentage of our outstanding voting power, it will have the ability to significantly influence all corporate actions requiring stockholder approval, including the election and removal of directors and the size of our Board, any amendment to our Second Amended and Restated Certificate of Incorporation ("Certificate of Incorporation") or Bylaws (the "Bylaws" and, together with the Certificate of Incorporation, the "Organizational Documents"), or the approval of any merger or other significant corporate transaction, including a sale of substantially all of our assets. . . .   As of February 22, 2022, and pursuant to the Stockholders Agreement entered into by

97

and among the Company, the Sponsor Members and the Vertiv Stockholder, the Vertiv Stockholder will have the right to nominate up to two directors to our Board.

The Vertiv Stockholder's interests may not align with our interests as a company or the interests of our other stockholders. Accordingly, the Vertiv Stockholder could cause us to enter into transactions or agreements of which you would not approve or make decisions with which you would disagree.

252.     Platinum Equity's control rights were embodied in a Stockholders' Agreement that was summarized by the 2021 Form 10-K:

Pursuant to the Stockholders Agreement, the Vertiv Stockholder has the right to nominate up to four directors to our Board of Directors, subject to its ownership percentage of the total outstanding shares of Class A common stock. If the Vertiv Stockholder holds: (i) 30% or greater of the outstanding Class A common stock, it will have the right to nominate four directors (two of which must be independent); (ii) less than 30% but greater than or equal to 20% of the outstanding Class A common stock, it will have the right to nominate three directors (one of which must be independent); (iii) less than 20% but greater than or equal to 10% of the outstanding Class A common stock, it will have the right to nominate two directors; (iv) less than 10% but greater than or equal to 5% of the outstanding Class A common stock, it will have the right to nominate one director; and (v) less than 5% of the outstanding Class A common stock, it will not have the right to nominate any directors. As long as the Vertiv Stockholder has the right to nominate at least one director, the Vertiv Stockholder shall have certain rights to appoint its nominees to committees of the Board of Directors and the Company shall take certain actions to ensure the number of directors serving on the Board of Directors does not exceed nine. In addition, the Stockholders Agreement provides that so long as the Company has any Executive Chairman or Chief Executive Officer as a named executive officer, the Company shall take certain actions to include such Executive Chairman or Chief Executive Officer on the slate of nominees recommended by the Board of Directors for election.

253.     These contractual rights perpetuated Platinum Equity's control over Vertiv before it went public.

254.     Platinum Equity also controlled the SPO and the Offering Materials by exercising its rights under an Amended and Restated Registration Rights Agreement (the "Registration Rights Agreement"), which required Vertiv to register Platinum Equity's Vertiv shares for public offering and sale. The Registration Rights Agreement also gave Platinum Equity the rights to, among other things, require Vertiv to cooperate in underwritten "shelf takedown" offerings of Platinum

Equity's Vertiv shares such as the SPO, select the underwriters for the SPO, and participate in the preparation of the Offering Materials for the SPO.

> **D.   The Offering Materials Contain Untrue Statements Of Material Fact And Omitted Other Facts Necessary To Make The Statements Made Not Misleading**

255.   On April 30, 2021, Vertiv filed an amended annual report on Form 10-K/A ("Amended 10-K"), which was signed by Defendants Johnson, Fallon, and the Director Defendants.  The Amended 10-K was incorporated by reference into the Offering Materials.  The Amended 10-K included purported "risk factors," including with respect to the Company's "backlog."  That risk factor stated that "***we may not realize the revenue we expect to generate from our backlog, or, if realized, may not result in profitable revenue***."

256.   The above purported "risk factor" contains untrue statements of material fact and omitted other facts necessary to make it not misleading because the "risk" of the Company's backlog not yielding "profitable revenue" had already materialized—as Defendant Johnson unequivocally admitted in February 2022, Vertiv "***didn't get a lot of pricing on the backlog that we had***"—"***[t]hat was part of our problem [in 2021].  We had to burn through that***."  Indeed, as Defendant Johnson also then admitted, Vertiv had only just barely begun to make the critical "change" of "putting escalators in [the Company's larger contracts] if commodities" prices go up that "wasn't in all of our contracts prior."

257.   The Amended 10-K also included a "risk factor" stating that the Company's contracts with its "large" customers, "such as communication network and cloud/hyperscale and colocation data center providers," may "***require more favorable terms and conditions in our contracts that could result in downward pricing pressures in our business***."  The risk factor stated that these more favorable contracts "***may include terms that affect [our] . . . ability to recognize***

*revenue, and could have an adverse effect on our business, results of operations and financial condition*."

258.   The above purported "risk factor" contains untrue statements of material fact and omitted other facts necessary to make it not misleading because the "risk" of the Company's contracts with larger customers containing terms that were unfavorable to Vertiv had already resulted in "pricing pressures" on the Company's business.  As Defendants admitted in February 2022, in reality, Vertiv's contracts with larger enterprise customers—which comprised the majority of the Company's backlog—in fact locked Vertiv into discounted prices that Defendants knew would adversely affect Vertiv's margins in light of increasing inflationary costs.  Indeed, Defendant Johnson admitted in February 2022 that the Company's larger contracts did in fact contain unfavorable terms that prevented the Company from offsetting inflationary costs.  As Defendant Johnson stated, Vertiv had only just barely begun (after the SPO) to make the critical "change" of "putting escalators in [the Company's larger contracts] if commodities" prices go up that "wasn't in all of our contracts prior"—and the Company had in fact built its backlog by entering into contracts with large enterprise customers that locked in discounted prices.

259.   The Offering Materials for the SPO that was conducted on or about November 4, 2021 disclosed various purported "risk factors," including "less favorable contractual terms with large customers" and "failure to mitigate risks associated with long-term fixed price contracts."

260.   The above purported "risk factors" contains untrue statements of material fact and omitted other facts necessary to make it not misleading because the "risk" of the Company being impacted "by less favorable contractual terms" and "long-term fixed price contracts" had already materialized—as Defendant Johnson unequivocally admitted in February 2022, Vertiv "***didn't get a lot of pricing on the backlog that we had***"—"***[t]hat was part of our problem [in 2021].  We had***

*to burn through that.*"  At that time Defendant Johnson admitted that Vertiv had only just barely begun to make the critical "change" of "putting escalators in [the Company's larger contracts] if commodities" prices go up that "wasn't in all of our contracts prior."  Further, as the Company conceded in 2022, Vertiv's contracts with larger enterprise customers—which comprised the majority of the Company's backlog—in fact locked Vertiv into discounted prices that Defendants knew would adversely affect Vertiv's margins in light of increasing inflationary costs.  Indeed, Defendant Johnson admitted in February 2022 that the Company's larger contracts did in fact contain unfavorable terms that prevented the Company from offsetting inflationary costs.

## XIV.  SECURITIES ACT COUNTS

### COUNT III

**For Violations of Section 11 of the Securities Act**
**Against Vertiv, the Offering Defendants, and the Underwriter Defendants**

261.    Lead Plaintiffs repeat, incorporate, and reallege the allegations set forth above under Section XIII only, as if fully stated in this Count.  This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and negligence under the Securities Act.  For purposes of asserting this Count, Lead Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

262.    This Count is brought under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Vertiv Class A common stock sold pursuant or traceable to the SPO, and who were damaged thereby.

263.    Vertiv is the registrant for the SPO.  The Defendants named in this Count were responsible for the contents and dissemination of the Offering Materials.

264.   As the issuer of the shares, Vertiv is strictly liable to Lead Plaintiffs and the Class for the misstatements and omissions contained in the Offering Materials.

265.   Liability on this Count is predicated on the Offering Defendants' signing of the Registration Statement for the SPO, and the Underwriter Defendants' participation in underwriting the SPO, which was conducted pursuant to the Offering Materials.  The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated in the Offering Materials.

266.   Lead Plaintiffs Riviera Beach and Riviera Beach Fire purchased shares in and/or traceable to the SPO.

267.   The value of Vertiv Class A common stock has declined substantially as a result of Defendants' violations, causing damage to those members of the Class that purchased or otherwise acquired Vertiv Class A common stock in and/or traceable to the SPO.

268.   Less than one year has elapsed since the time that Lead Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were *bona fide* offered to the public.

269.   By reason of the foregoing, the Defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Lead Plaintiffs and the other members of the Class under Section 11(e).

## COUNT IV

**For Violations of Section 12(a)(2) of the Securities Act
Against the Underwriter Defendants**

270.    Lead Plaintiffs repeat, incorporate, and reallege the allegations set forth above under Section XIII only, as if fully stated in this Count.  This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Lead Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

271.    This Count is brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Vertiv Class A common stock in and/or traceable to the SPO, and who were damaged thereby.

272.    The Underwriter Defendants were statutory sellers of Vertiv shares that were registered in the SPO pursuant to the Registration Statement and sold by means of the Offering Materials.  By means of the Offering Materials, the Underwriter Defendants sold millions of Vertiv shares through the SPO to Lead Plaintiffs Riviera Beach and Riviera Beach Fire and members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the stock that was sold in the SPO by means of the materially false and misleading Offering Materials.

273.    The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts, as alleged above.

274.     Less than one year has elapsed since the time that Lead Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were *bona fide* offered to the public.

275.     By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Vertiv Class A common stock in and/or traceable to the SPO, and who were damaged thereby.

### COUNT V

**For Violations of Section 15 of the Securities Act**
**Against the Offering Defendants and the Selling Shareholders**

276.     Lead Plaintiffs repeat, incorporate, and reallege the allegations set forth above under Section XIII only, as if fully stated in this Count.  This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Lead Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

277.     This Count is brought under Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired Vertiv Class A common stock in and/or traceable to the SPO, and who were damaged thereby.

278.     As alleged in Count Three (III) above, Vertiv is strictly liable under Section 11 of the Securities Act for untrue statements and omissions of material fact in the Offering Materials.

279.     The Offering Defendants and Selling Shareholders, by virtue of their positions, voting power, ownership, rights as against Vertiv, and/or specific acts were, at the time of the

wrongs alleged in this Complaint and as alleged in this Count, controlling persons of Vertiv within the meaning of Section 15 of the Securities Act. These Defendants also had the power and influence, and exercised the same, to cause Vertiv to engage in the acts described in this Complaint, including by causing Vertiv to conduct the SPO pursuant to the Offering Materials.

280. By reason of the foregoing, the Defendants named in this Count each were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged in Counts One and Two above, based on their having signed or authorized the signing of the Registration Statement and/or having otherwise participated in the process that allowed the SPO to be successfully completed. The Defendants named in this Count are liable for the aforesaid wrongful conduct and are liable, to the same extent Vertiv is liable under Section 11 of the Securities Act, to members of the Class who purchased or otherwise acquired Vertiv Class A common stock sold pursuant or traceable to the SPO, and who were damaged thereby.

## XV.   CLASS ACTION ALLEGATIONS

281. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired: (a) shares of Vertiv Class A common stock in or traceable to the SPO; and/or (b) shares of Vertiv Class A common stock during the Class Period (the "Class").

282. Excluded from the Class are Defendants and their families, directors, and officers of Vertiv and their families and affiliates.

283. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of February 22, 2022, Vertiv had over 375 million shares of Class A common stock outstanding, owned by hundreds or thousands of investors.

284.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Securities Act and the Exchange Act;

(b)     Whether Defendants omitted and misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the Officer Defendants and the Offering Defendants are liable for the alleged misrepresentations and omissions described in this Complaint;

(e)     With respect to Lead Plaintiffs' claims under the Exchange Act, whether Defendants knew or recklessly disregarded that their statements and omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Vertiv Class A common stock;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

285.     Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

286.     Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.

287.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## XVI.   **PRAYER FOR RELIEF**

288.     WHEREFORE, Lead Plaintiffs pray for judgment as follows:

    (a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

    (b)    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    (c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

    (d)    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XVII.  **JURY DEMAND**

289.    Lead Plaintiffs demand a trial by jury.

Dated: September 16, 2022            Respectfully Submitted,

                                */s/ James A. Harrod*
                                Hannah Ross (hannah@blbglaw.com)
                                James A. Harrod (jim.harrod@blbglaw.com)
                                Jai K. Chandrasekhar (jai@blbglaw.com)
                                Caitlin C. Bozman (caitlin.bozman@blbglaw.com)
                                **BERNSTEIN LITOWITZ BERGER**
                                ** &amp; GROSSMANN LLP**
                                  1251 Avenue of the Americas
                                  New York, NY 10020
                                  Telephone: (212) 554-1400

                                **SAXENA WHITE P.A.**
                                  Maya Saxena (msaxena@saxenawhite.com)
                                  Joseph E. White III (jwhite@saxenawhite.com)
                                  Lester R. Hooker (lhooker@saxenawhite.com)
                                  7777 Glades Road, Suite 300
                                  Boca Raton, FL 33434
                                  Telephone: (561) 394-3399

                                  -and-

                                Steven B. Singer (ssinger@saxenawhite.com)
                                  Kyla Grant (kgrant@saxenawhite.com)
                                  10 Bank Street, 8th Floor
                                  White Plains, New York 10606
                                  Telephone: (914) 437-8551

                                  *Lead Counsel for Lead Plaintiffs and the Class*

**KLAUSNER KAUFMAN JENSEN**
  **& LEVINSON**
Robert D. Klausner (bob@robertdklausner.com)
Stuart A. Kaufman (stu@robertdklausner.com)
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone:  (954) 916-1202

*Additional Counsel for Lead Plaintiffs Louisiana*
*Sheriffs, Orlando Police and Plantation General*

**SUGARMAN SUSSKIND BRASWELL &**
  **HERRERA, P.A.**
Pedro A. Herrera (pherrera@sugarmansusskind.com)
150 Alhambra Circle, Suite 725
Coral Gables, Florida 33134
Telephone: (305) 529-2801

*Additional Counsel for Lead Plaintiff Riviera Beach*

**LORIUM LAW**
Ronald J. Cohen (rcohen@loriumlaw.com)
101 N.E. 3rd Ave., Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 462-8000

*Additional Counsel for Lead Plaintiff Riviera Beach*
*Fire*