MBMDVERC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE VERTIV HOLDINGS CO.
SECURITIES LITIGATION

                                        22 Civ 03572

                                        Conference
------------------------------x
                                        New York, N.Y.
                                        November 22, 2022
                                        1:00 p.m.

Before:

                    HON. GREGORY H. WOODS,

                                        District Judge

                        APPEARANCES

JAMES A. HARROD
CAITLIN BOZMAN
KYLA GRANT
      Attorneys for Plaintiffs.

AUDRA J. SOLOWAY
DAVID FRIEDMAN
      Attorneys for Vertiv Defendants.

J. CHRISTIAN WORD
RYAN M. SCHACHNE
      Attorneys for Selling Shareholder Defendants.

ADAM M. HARRIS
      Attorney for Underwriter Defendants.

(Case called; appearances noted)

THE COURT:  Let me begin with a few brief instructions I'd like the parties to follow in this conference.  At the outset, please remember this is a public proceeding.  Any member of the public or press is welcome to dial in to this conference.  I'm not presently monitoring whether third parties are monitoring the conference.  I'd just like you to keep in mind that that is possible.

Second, please keep your phones on mute at all times, except when you are intentionally speaking to me or to the representative of a party.  And we heard a little bit of a clicking of a keyboard as people were beginning to appear, so please keep your phones on mute even if you don't think that there's background noise whereever you may be.

Next, please state your name each time that you speak during the conference, and please do that regardless of whether or not you've spoken previously.  It will help our court reporter.

Fourth, please abide by instructions from our court reporter that are designed to help her do her job.

And, finally, I'm ordering that there be no recording or rebroadcast of all or any portion of today's conference.

So, counsel, with that out of the way, let's turn to the substance of today's proceeding.  I scheduled this as a

pre-motion conference with respect to the proposed motion to dismiss the amended complaint. I've reviewed both the letter requesting leave to file this motion, as well as the response that was filed on the docket yesterday. It still can be helpful to hear from the parties about the grounds for the proposed motion and the expected argument as we set a schedule for motion practice, so let me begin with counsel for defendants.

What's the basis for the proposed motion? If there's anything that you'd like to highlight or emphasize from your letter or to expand upon it, you have leave to do so. Please go ahead.

MS. SOLOWAY: Thank you, your Honor. This is Audra Soloway.

I know your Honor has read the letter, so I'll keep this fairly brief. Now, I think outside of the letters, we think the context of what happened here is particularly important, so I'm just going to -- I'm going to pause on that for a moment, your Honor.

As your Honor knows, Vertiv was dealing, as all companies were, during 2021, with increased inflation, and this case concerns, your Honor, a series of projections that it made throughout that year, projections about how its cost would increase and projections about whether it would be able to offset those increases through either price increases or other

measures that it might be able to take.  And so, you know, we think the trajectory here of the path through 2021 is particularly important context for the plaintiffs' claims.

And just to give your Honor some sense of that, if we take ourselves back in time to February of 2021, before inflation really began to take off, Vertiv was already estimating that it would be negatively impacted, you know, on the order of 20 million dollars in increased costs in 2021. And it was already acknowledging that it didn't believe it would be able to fully offset that by passing price increases off to its customers.

So just to sort of orient us in time, in February of 2021, Vertiv already is saying, we think we have 20 million in excess costs, only 15 million of which will be able to use -- will be able to offset inflation.  And then, your Honor, I'm sure you recall what happened in 2021, supply chain issues really became exacerbated, prices sored, and projections of inflation really turned out not to be accurate as the issues got more and more severe, including various material costs and freight costs that ramped up.

So if you look at the disclosures, what happened across 2021, Vertiv was disclosing it was taking pricing actions to try to offset costs, but it only disclosed any such offset would only be partial, and also disclosed there would be lags in the ability to pass along costs, because you can't

capture that, you know, price immediately upon cost increasing.

And then of course, your Honor, as you know, there's this massive surge of inflation in the fourth quarter of 2021 when commodities and shipping costs skyrocketed, and what ended up happening over the course of a year is that Vertiv is hit with about 180 million excess costs and inflation nine times what it was predicting at the beginning of the year, and half of that came in the fourth quarter alone.  And so, your Honor, we think that context is really important to understand.

And by the way, your Honor, that's all drawn from the complaint and from the documents incorporated into it, to understand the alleged misstatements, your Honor, here, which are largely, you know, statements of optimism, guidance, projections about the ability to grapple with this increasingly terrible inflationary environment.

Now, our first argument, your Honor, as you know from the motion to dismiss, is going to be that there were no false statements for at least three reasons, your Honor:

One, that these statements are largely opinions, and projected that while they may ultimately have turned out to be inaccurate based on subsequent events, are not actually alleged to have not been believed by the makers of the statements at the time.  And, also, because those forward-looking statements are protected under the P.S.L.R.A. safe harbor, because not only were they not made with actual knowledge of falsity but

they're accompanied by significant cautionary language, which is very much tailored here to the risks that actually manifested, your Honor.

And then, you know, when you strip out the statement of opinion and the projections, and you look at the other alleged misstatements, your Honor, there are a handful of what I would call factual allegations that the plaintiff challenged. And we believe when you actually take the defendants' statements in context and you read the full quote and the context that's supplied with them and then look at the allegations that the plaintiffs are making, there will not be a non-conclusory or a factually supported allegation that there was any misstatements.

And just to give you an example, one of the statements the plaintiffs focus on is a purported false statement that contractual escalation clauses can be used to offset increasing inflation and to, quote, get price. But when you actually look at that statement in context, what Vertiv's chief strategy officer actually said is that sometimes those larger contracts have those escalation clauses, and we don't believe anything should be pleaded to the contrary.

And then, your Honor, putting aside lack of falsity, we also believe that the complaint failed to plead a strong inference of fraudulent intent. On the motive issue, we don't think plaintiffs have identified any motive to lie to

shareholders.

They have a theory in the complaint that Vertiv officers were motivated because a minority shareholder was selling during the class period, but that doesn't really make sense. They themselves are not benefiting. There's no explanation why they would take steps to benefit a minority shareholder, much less lie to shareholders in order to do that.

And the rest of the allegations, your Honor, are largely premised on either alleged contemporaneous -- a mismatch, your Honor, between contemporaneous knowledge internally and externally, which we think are unsupported. And in our motion to dismiss, we will explain why we think the CW allegations are not actually inconsistent with the public disclosures.

And then the plaintiffs also rely heavily on what they describe as post class period admissions, where they say, well, you came out after the class period and you admitted to X, Y, and Z, when really put into context again, your Honor, what the company was really saying is that they understand that they missed their projections and they understand that creates credibility issues. But that's far from, you know, admitting that they made false statements at the time or that they offered projections at the time that they didn't actually believe in, which is what the plaintiffs actually need to plead here.

And then, finally, your Honor, the directors and the Platinum Defendants and the underwriters are named on a Securities Act claim which are largely premised on risk disclosures in Vertiv's April 2020 10-K, which was incorporated into the offering materials.  And, your Honor, we will show in our motion that those risk disclosures were not alleged to be false.

In particular, the plaintiffs are focused on a risk disclosure that stated that contracts with large customers could include terms that could have an adverse effect, but we think that the -- read in context, we did clearly disclose that those contracts often require less favorable terms that could result in pricing pressure, and that we did have long-term fixed price contracts that posed substantial risks to the company.

So we think, again, when read in context and with all of the related statements, there is no either misleading statement or omission here.

Thank you, your Honor.

THE COURT:  Good.  Thank you very much.

Let me turn to counsel for plaintiff.  Counsel, this is not oral argument with respect to the motion, but I just had the opportunity to hear from counsel for defendants.  What would you like to tell me about your expected arguments in response to what was mentioned?

MR. HARROD:  Your Honor, this is James Harrod again from Bernstein Litowitz.

I'd like to thank the Court for the opportunity to respond, and I do think that we want to make clear that we have a different view of the case for sure.  We think this is a strong case for violations of the securities laws where the defendants made repeatedly the same kind of statements about actions that they were actually currently taking to preserve the profit margins in their business by increasing prices and resisting discounts.

And as Ms. Soloway pointed out, the statements we believe were completely revealed to be false by February of 2022 when the defendants' own statements made clear that the statements they made previously during the class period were inconsistent with what they had actually done.  In those statements, those revelations that occurred in February of 2022 are corroborated by a number of former employees who were inside the company who indicated that the same things that the defendants then admitted had, in fact, been occurring throughout the class period.

And I want to -- I think the most important thing that I can tell you today, your Honor, is something that really is contextual, and that's that, in our view of the case, it's not about projections or guidance or the defendant saying things about what they expected to happen in the future.  And I'm

going to highlight in a minute some of those particular statements, but you'll see that there's statements of things they say they have done or are currently doing.

They're not about and the case is not about whether or not the defendants were ultimately going to be successful in surfing this massive wave of inflation that occurred.  It's whether or not they said and they conditioned investors properly to the acts they were actually taking at the time they were making the statements.

And so I want to zoom out for one second.  And I'm knowledgeable of the Court's time, but I do think it's important to think about what this case is about and where the company started.  Vertiv became public through a SPAC transaction in 2020.  The sponsor or the person -- the shareholder that sold most of the shares in that transaction was Platinum Equity.  That's the shareholder that defense counsel referred to a moment ago as just an ordinary shareholder.  We don't think that that's the case, and I'll circle back to that point, too.

At the point that they went public, the expansion of the company's profit margins was the primary measurement by which investors and analysts were measuring the success of this company.  And so there was some tension inherent in the company's business at that time that continued throughout the class period that made the margin expansion a focus.

One of these is this idea of the backlog.  Many of the company's what they call enterprise sales are to very large technology companies, Amazon, Google, Facebook, people who are building large data centers, can take a long time for the equipment and supplies to be specified for that project, which are usually bid out through an RFP process, which are largely awarded based on price.  So these contracts that represent, during the 2021 fiscal year, $2 billion of the company's expected revenue, a huge portion of their revenue are bid based on price.  And that backlog, the way that it's described in the complaint is that an RFP is issued, a contract is entered into between Vertiv and the customer, and that contract essentially locks in the price of the goods to be delivered at a later point.

Some of these orders are delivered a year later.  So, basically, you are selling something that was contracted in 2020, based on 2020 prices, based on the price inputs.  Then the cost of the components to the product that you're selling, the freight costs, whatever other ancillary labor costs increase, you're selling that based on the price at the time the contract was entered into.  And so they were locked into those prices.

So with the knowledge of that, and with the knowledge that the company had to expand its margins to be perceived as successful by investors, the investors were constantly

questioned about, what are you doing with margins, what are you doing with pricing.

Defendants, throughout the price period, they were taking actions to capture the increases, to increase their margins, to maintain their margins, and that's how they knew they were going to be evaluated based on that. And so, in our perspective, and let me talk now about the statements, this is not a guidance case, because it's a case about what did the defendant say and what did they do. And so here's some examples, just a few.

The CEO, Mr. Johnson, said on the first day of the class period, February 24th, 2021, that Vertiv had made good progress in achieving significant margin expansion. That's not a forward-looking statement, nor is it an opinion.

On September 8 of 2021, this is more towards the middle of the class period, the same man, Mr. Johnson, the CEO, says, "our pricing has continued to ramp; we continue to drive pricing." Same qualification there. I don't see how that statement could be qualified as forward looking or an opinion.

In October of 2021, there are third quarter earnings press releases saying, our pricing response continues to meaningfully increase each quarter, that's in each quarter of that year. Defendants also said, during the class period, that they were not discounting.

So obviously your margin is a function of your price

and your cost, but also your price can be affected if you discount prices, and, historically, Vertiv apparently had a practice of using discounting to basically increase the volume of its sales at lower margins.

So in response to those questions, Mr. Niederpruem said -- he's one of the defendants.  He's I think the vice president of Global Strategy -- in May of 2021, that Vertiv controlled its pricing by being much more judicious with discount levels.

The same man said in November of 2021, controlling discounts and multipliers, that's a way of measuring discounts off of list price that our own salespeople are able to have.

And, finally, and this is I think a statement that defense counsel just mentioned, there's a statement about their ability to escalate prices in these long-term -- in these contracts that represent the revenue that's going to come off the backlog.  And what the statement says -- I'm going to read a little bit longer portion of it, because I do think the context is important and I do think it bears out our view of the statement being false.  And what it says is "but by no means we're just taking a look at the $2 billion of backlog and saying, well, there's nothing we can do.  It's already in backlog.  So we do have some other mechanisms, sometimes in larger contracts that have material clauses in them.  Certainly freight is another method that we can utilize.  This is a

realtime mechanism."

What I'm going to talk about in a minute, your Honor, is there was no meaningful ability and there was no meaning action taken to actually increase prices on any of these contracts. So even within its contracts that they are saying there are some clauses, not all of the contracts have them, we don't think that that statement can be read as not misleading at all.

So now I want to talk a little bit about what was actually happening in the class period. Regarding prices, and this all comes out in February -- on February 23rd of '22 when they announced their fourth quarter results for that year. It's a miss on the earnings side, and the stock falls by 37 percent in one day. That's a very, very large decline in stock price in one day, because the market was completely shocked by the outcome of this. And the analysts are always watching what's happening in the economy. They see inflation and had an expectation based on what the defendant said about what the company would do and what its earnings look like.

And what the defendant said, and what I'm about to talk about, makes clear that what the defendant said during the class period was completely different than what they revealed beginning in February of 2022. Regarding not raising prices, the CEO Johnson admitted that the Vertiv organization probably -- not probably. The organization didn't and wasn't

set up to drive a lot of price.  He said that Vertiv only had a tepid 2021 pricing response.

The CFO in May said, we were never aggressive with pricing.  And these statements are corroborated by former employees.  FE-2 cited in the complaint is a former sales engineer, then became a customer, is a current customer of Vertiv, said that Vertiv did not increase prices in 2021.  FE-5 said Vertiv did not increase prices in 2021.

Regarding discounts, Mr. Johnson, the CEO, said, we lost price in discounting, we were giving away the pricing that we were getting through discounting.  So he's saying, we didn't not discount.  We, in fact, did discount, which is not what we said, during the class period.

The executive chairman, Mr. Cote, said on February 23rd, he got involved in the press release and the earnings call that day.  He said that Vertiv, during 2021, got behind the inflation recovery curve with insufficient prices and stayed there all year.  They stayed there all year.

This is corroborated by, again, FE-2 said, again, based on his experience in purchasing, that he was able to get 35 percent off list price discounts during 2021, and he also got discounts for cash payments.

Regarding the allegations about the backlog, about being locked into the prices on the deal, the CEO said in February of 2021, we have changed by putting escalators in

there, meaning the contracts.  It wasn't in all our contracts prior.  Mr. Niederpruem said, we are now putting escalation clauses in some contracts.

And defendants made the point in their letter that the allegation that the contracts weren't able to be escalated is supported only by one former employee and isn't really supported by admissions, is actually not true.  There's -- two different former employees say basically the same thing.  FE-1, who is a vice president, who reported to the president of the American division, and that person reported to the CEO, Mr. Johnson, said that the RFPs for the orders in the backlog, the largest customers were picked on price, and that when the contracts were signed, the prices were locked in.  That's in paragraph 94 of our compliant.

FE-2 similarly said that Vertiv bore the risk of any changes in the cost of production that occurred between the order placement and manufacturing.  That is our allegation, and we see no meaningful way to interpret these statements to be consistent with the idea that they were actually escalating any prices on these contracts.

And those statements that I read earlier from Mr. Niederpruem are clearly misleading.  And just to make a point about the 33 Act, the Securities Act claim that defense counsel talked about, because that relates to these risk disclosures, we believe for the very same reason that those

risk disclosures were misleading throughout the class period, because the risk of not being able to increase prices on sales that were contracted that were in the backlog was a problem that existed and had materialized at all times during the class period.

Your Honor, I don't want to belabor the point about inflation or about the contextual allegations, but we do feel very strongly that this is not a case about guidance, it's not a case about projection. It's about the actual real world actions the defendant is taking, or said they were taking which they didn't take. A couple of these are just about slander.

To start with, we think this is a case where the complaint, based on the totality of the allegations, clearly shows that the defendants spoke with knowledge. They -- you know, we allege they received reports. There's a lot of details about what types of reports they received. There are monthly and quarterly business review meetings where former employees put Mr. Johnson as reviewing things like margin and price at those meetings that are supported by their ability to pull data from systems to obtain that information in realtime.

It's also consistent with the three officer defendants' consistent, repeated statements about the subjects of pricing, margins and discounts. They said -- they talked about these issues repeatedly throughout the class period. Analysts asked them about it, and they respond in detail. And

so they either made those statements knowing what they were talking about, meaning they knew what the actual pricing actions and margins were at the company, or they made those statements recklessly, because they spoke about them in such detail.

And then, you know, we also have allegations of motive. Defense counsel spoke about that. You know, I mentioned earlier, Platinum Equity basically controlled the company prior to the IPO in 2020. Platinum Equity re-alleged the control person of the company -- Platinum Equity appointed two depositions, the CEO and the CFO -- and Mr. Niederpruem's depositions. So the idea that -- and through the action that these defendants laid out chronologically in the complaint, including an increase in guidance the company issued in October of 2021, just weeks before the second public offering through which Platinum Equity sold shares to the public at $25 a share, Platinum Equity benefited from that increase in price that was supported by the other defendants' false statements about the subjects of this complaint throughout the class period.

In February of 2022, at the end of the class period, Vertiv shares were selling for roughly half of the price that they were sold in the secondary public offering by Platinum Equity just months earlier. So I think that that's an important juxtaposition to think about the timing of that and who the defendants -- who appointed them to their positions,

and that was Platinum Equity. And so we think that there is a motive allegation there that is recognized under the law.

And, your Honor, I'll stop there. I've gone on for a while. I'll be happy to answer any questions you have, and I do appreciate the time. And we, of course, look forward to briefing the motion to dismiss.

THE COURT: Good. Thank you.

MR. HARROD: My pleasure.

THE COURT: Counsel, before we turn to setting a schedule, I'll turn back to counsel for defendants.

Ms. Soloway, or anyone else, would you like to make any comments in response before we turn to setting a schedule for briefing this measure?

MS. SOLOWAY: Yes, your Honor. This is Audra Soloway.

I will not test your Honor's patience by going through all of that other than just to make a couple of observations, and say that we'll take the rest of it on in the motion, your Honor.

You know, a couple of the statements that my colleagues on the plaintiffs' side just cited are sort of exemplary of the problem with this complaint. I mean, for example, they called out the statements that we made good progress, you know, on margin enhancements or getting price. That's a reference to early in the class period. It's talking about the prior year.

Another example that they -- that the plaintiffs had called out is, you know, pricing continued to ramp. Well, every reference that the complaint makes to pricing continuing to ramp is true. They do continue to ramp up their ability to get pricing and, in fact, they go from being able -- you know, saying that, we think we can get back 15 of the 20 million that we think we're going to lose due to inflation to actually getting over 55 million. They just can't keep up with the inflation that continues to increase throughout the year.

I am surprised, frankly, to hear that this isn't a case about guidance, because the hundred page long complaint contains dozens of alleged misstatements, many of which are statements about guidance. So I'll try to focus our motion to dismiss on the other statements, since it seems that the case is not about guidance, but the alleged factual inaccuracies here, your Honor, are just not accurate.

When we say that sometimes we have escalation clauses that allow us to increase pricing over time, none of the confidential witnesses can refute that. It is true it has never been restated, and none of the confidential witnesses say that we had no such contract.

And similarly, your Honor, at the end of the class period, when we talk about what happened through the year and why we were unsuccessful in being able to pass along these inflationary costs into pricing, yes, we did say things like

that we got behind the curve.  As inflation ramped, we were unable to keep up with it.  And, yes, the company was dissatisfied with that, but that does not mean at the time the company expressed forecasts or optimism about being able to keep up with inflation, that those statements were false when made.

So, your Honor, I won't belabor the point.  We'll take it on in the motion to dismiss.  But there are neither statements of guidance or projected nor factual inaccuracies about the steps that Vertiv was actually taking to try to drive price and see what they could do to make up the lost headwind from the inflation.

THE COURT:  Good.  Thank you very much.  That's helpful.

So let's take up the schedule for briefing, and I also want to talk about page limits.  I'll say at the outset that I think it's clear that my default page limits won't work here, so I would invite any views from the parties about an appropriate page limit for briefing here.

Counsel for defendants, I'll turn to you, Ms. Soloway.  When would you propose to file your motion?

MS. SOLOWAY:  Thank you, your Honor.  This is Audra Soloway again.

We were hoping your Honor would allow us until January 20 to file the motion to dismiss.  I recognize that

that's a lot of time, your Honor.  It's in part driven by some plans that I have to be out of the country for a couple of weeks in December, and it's also because we'd like to have enough time to coordinate not just with our own clients but also with counsel for the underwriters and Platinum defendants, and try to reduce any unnecessary duplication of arguments across the briefing.

So we would appreciate January 20th, your Honor.

THE COURT:  Good.  Thank you.

Have you given any thought to the appropriate page limit for motions from the defense?

MS. SOLOWAY:  So I agree with your Honor's inclination that we're probably going to need some extra pages above the default.  What I would propose to do is actually ask for what I actually need.  So unless your Honor prefers to address this now, we can submit a motion once we have written the motion and know what we need.  And I'm sure the plaintiffs will work with us on that.

THE COURT:  Thank you.  That's fine.

Let me turn to counsel for plaintiffs.  Counsel, assuming that the motion itself is filed by the 20th of January, when would you propose to file any opposition?

MR. HARROD:  Your Honor, this is James Harrod again of Bernstein Litowitz.

I think we would like the same amount of time that the

defendants have.  By my token, it's around 60 days from today, which would bring us to somewhere around the middle or latter half of March.  I would like to, if I could, confer with my co-counsel about a particular date, but we would want a similar amount of time.

I have some other obligations in March that I'm sure we could work around, but I just want to make sure I give a date that I can stick with.  And I'm not sure if that's something we could submit to the Court by letter or stipulation of defendants after this case?

THE COURT:  That's fine.  Thank you.

So I'm happy to give a relatively extended period of time for completion of briefing here.  Counsel, assuming that I grant plaintiffs' request, Counsel for defendants, when would you -- or how much time would you think that you would need to file any reply?

MS. SOLOWAY:  Your Honor, we'd like 30 days, if we can, to file a reply.

THE COURT:  That's fine.

So I'll set a briefing schedule that will have the motion -- any motion by any defendant due no later than January 20, 2023; any opposition due no later than 60 days following the date of service of the motion; and any reply will be due no later than 30 days following the date of service of any opposition.

Please do write me closer to the date on which the motion will be submitted with proposals regarding page limits.

One brief comment about the presentation of the parties' arguments. As you know, I will ultimately need to evaluate each of the statements that is alleged to be actionable here, so I will ask that you attempt, to the extent that you can, for each of the relevant statements, to explain why it is or is not an adequate basis for cause of action here.

I say this because oftentimes briefing in this area from the defense will discuss statements in a generalized way, leaving me to scrutinize each of the statements to determine what argument bucket it falls to. The more assistance that you can provide to me with respect to each of the statements, the more helpful it will be. But what the format for that would be or whether you pick up this request at all is really entirely up to you.

And to the extent that the plaintiffs are disclaiming guidance-related statements as the basis for their claims in a formal way, I'd encourage the parties to meet and confer about that question. It may focus the briefing and limit the nature of the disputes that the parties need to take up in the submissions to the Court.

So I think that's all I have to take up here. Thank you very much for the comments here about the anticipated motion. The context is helpful for me in thinking about the

motion, so I appreciate the time that you spent to prepare.

Anything else that any party would like to raise with the Court before we adjourn?

Let me start with counsel for plaintiff.  Counsel?

MR. HARROD:  Your Honor, James Harrod again.

Maybe I should qualify my statements.  I don't think the case is about guidance.  I don't think it's about forward-looking statements.  I think that there are probably statements that we allege -- in fact, I know that there are statements we allege to be false that are part of statements that concern the subject guidance obviously.  That's a big part of what public companies like Vertiv talk about in their communications with investors.

So I don't want there to be any -- anything I said to be misconstrued as a blanket disavowal of statements and guidance in connection with providing guidance, but I think it will be very clear in our motion to dismiss.  And I think our statements are very clear that the statements we allege to be false are not of a forward-looking nature.

THE COURT:  Thank you, Mr. Harrod.

Counsel for Vertiv and related defendants, anything else from you?

MS. SOLOWAY:  Your Honor, nothing further from -- this is Audra Soloway.  Nothing further from me.

THE COURT:  Thank you.

Counsel for the Underwriter Defendants?

MR. HARRIS:  This is Adam Harris, your Honor, for the underwriters.  Thank you for the Court's time.

THE COURT:  Thank you.

Anything from the Platinum Defendants?

MR. WORD:  Thank you, your Honor.  This is Christian Word at Latham & Watkins.  I have nothing further either.

THE COURT:  Thank you very much.  This proceeding is adjourned.

(Adjourned)