**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

*In re Vertiv Holdings Co Securities Litigation*

No. 1:22-cv-03572-GHW-OTW

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................. 4

A.   Before the Class Period, Vertiv Expressly Warns Investors About Risks of Supply Chain Disruptions and Its Ability to Pass Through Costs........................................................................................4

B.   Vertiv Began Implementing New Pricing Initiatives in 2019 and 2020..........................................................................................6

C.   Vertiv Announces 2021 Guidance in February 2021 .............................7

D.   After 1Q 2021, Vertiv Adjusts Guidance to Account for Additional Inflation.....................................................................................7

E.   After 2Q 2021, Vertiv Revised Its Estimate of Full-Year Inflation Upwards .....................................................................................8

F.   During 3Q 2021, Vertiv Reduces Guidance .........................................9

G.   After 3Q 2021, Vertiv Raises Guidance Slightly to Account for Acquisition................................................................................10

H.   VPE Holdings, LLC Sells Shares in Secondary Offering.......................10

I.   In 4Q 2021, Vertiv Continues to Ramp Up Pricing Actions ...................10

J.   Vertiv Misses 4Q 2021 Guidance ...................................................11

K.   Officer Defendants Sell No Shares of Vertiv During the Class Period.......................................................................................13

L.   Plaintiffs' Complaint....................................................................13

ARGUMENT ...................................................................................... 14

I.   The PLSRA and Rule 9(b) Impose Heightened Pleading Requirements ........................ 14

II.   The Court Should Dismiss the Section 10(b) Claims Because Plaintiffs Do Not Allege Actionable Misstatements or Omissions ................................... 15

A.   Statements About Pre-Class-Period Pricing Actions............................16

B.   Defendants' Statements About Ongoing Pricing Actions in 2021 .......17

1.   Statements That Vertiv Was Implementing Pricing Actions...................17

2.   Statement About Escalation Clauses .......................................20

   3.  Statement About Controlling Discounts ....................................................23

   4.  Statement About Preplanning with Suppliers ...........................................24

   5.  Statement About Pricing Tools.................................................................25

  C. Guidance, Projections, and Opinion Statements About Inflation
    and Pricing ...........................................................................................................26

  D. Statements About Post-Class-Period Pricing Recovery .........................................30

  E. Non-Actionable Forward-Looking Statements........................................................31

  F. Statements of Non-Actionable Puffery ...................................................................34

III. The Court Should Dismiss the Section 10(b) Claims Because Plaintiffs Do Not
  Adequately Allege a Strong Inference of Scienter .............................................................. 35

  A. Plaintiffs' Motive and Opportunity Allegations Are Inadequate............................36

  B. Plaintiffs' Allegations of Conscious Misbehavior or Recklessness
    Are Insufficient .....................................................................................................37

IV. Plaintiffs Do Not Adequately Allege Violations of Sections 11 and 12(a)(2) ................. 41

CONCLUSION.................................................................................................................................. 44

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arfa* v. *Mecox Lane Ltd.*,
  2012 WL 697155 (S.D.N.Y. Mar. 5, 2012) ........................................................41

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).........................................................................5, 35, 44

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
  2013 WL 6504801 (S.D.N.Y. Dec. 11, 2013) ....................................................26

*Bldg. Trades Pension Fund of W. Pennsylvania* v. *Insperity, Inc.*,
  2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ......................................................29

*In re Century Aluminum Co. Sec. Litig.*,
  749 F. Supp. 2d 964 (N.D. Cal. 2010) ...............................................................11

*City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................37

*City of Birmingham Firemen's & Policemen's Supp. Pension Sys.* v. *Ryanair
  Holdings plc*,
  2020 WL 2834857 (S.D.N.Y. June 1, 2020) .......................................................38

*City of Coral Springs Police Officers' Ret. Plan* v. *Farfetch Ltd.*,
  565 F. Supp. 3d 478 (S.D.N.Y. 2021)..................................................................41

*Constr. Laborers Pension Tr. for S. California* v. *CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020)............................................................42, 43

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ....................................................18

*In re Crude Oil Commodity Futures Litig.*,
  913 F. Supp. 2d 41 (S.D.N.Y. 2012)...................................................................11

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009).................................................................................35

*In re Duane Reade Inc. Sec. Litig.*,
  2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)...................................................17

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...........................................................................35, 36

*Employees Ret. Sys. of City of Providence* v. *Embraer S.A.*,
2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) ........................................................................18

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015) ..................................................................26, 34

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
352 F. Supp. 2d 429 (S.D.N.Y. 2005)..................................................................................37

*Frankfurt-Tr. Inv. Luxemburg AG* v. *United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018)..............................................................................22, 39

*Friedman* v. *Endo Int'l PLC*,
2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) .........................................................................34

*Gissin* v. *Endres*,
739 F. Supp. 2d 488 (S.D.N.Y. 2010).................................................................................31

*Glaser* v. *The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................................................39, 40

*Greco* v. *Qudian Inc.*,
2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022).............................................................. *passim*

*Harris* v. *AmTrust Fin. Servs., Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015).................................................................................15

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021)......................................................................22

*Janus Cap. Grp., Inc.* v. *First Derivative Traders*,
564 U.S. 135 (2011)...........................................................................................................35

*In re Lehman Brothers Mortgage-Backed Sec. Litig.*,
650 F.3d 167 (2d Cir. 2011)...............................................................................................44

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Exp. Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010)..................................................................................40

*Lopez* v. *Ctpartners Exec. Search Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016)...............................................................................31, 32

*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011)............................................................................................................26

*In re MBIA, Inc., Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010).................................................................................15

*McCauley* v. *City of Chicago*,
    671 F.3d 611 (7th Cir. 2011) ........................................................................................14

*In re Nevsun Res. Ltd.*,
    2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013) ..........................................................34

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)........................................................................32

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..................................................................20, 31, 40, 43

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)..............................................................................................3, 27

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)........................................................................................17

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund* v. *Arbitron Inc.*, 741 F. Supp. 2d 474 (S.D.N.Y. 2010) ...............................................................37

*In re PXRE Group, Ltd., Sec. Litig.*,
    600 F. Supp. 2d 536 (S.D.N.Y. 2009)........................................................................37

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)..........................................................................15, 26, 41

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)..........................................................................32

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007)........................................................................20

*Sinay* v. *CNOOC Ltd.*
    2013 WL 1890291 (S.D.N.Y. May 6, 2013) ..............................................................40

*Slayton* v. *Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)........................................................................................32

*In re Sofamor Danek Grp., Inc.*,
    123 F.3d 394 (6th Cir. 1997) ......................................................................................18

*Stadnick* v. *Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)..........................................................................................43

*In re Stemline Therapeutics, Inc. Sec. Litig.*,
    313 F. Supp. 3d 543 (S.D.N.Y. 2018)........................................................................42

*In re Syntex Corp. Sec. Litig.*,
    855 F. Supp. 1086 (N.D. Cal. 1994) ....................................................................30

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................14, 15, 35

*Tongue* v. *Sanofi*,
    816 F.3d 199 (2d Cir. 2016)..............................................................................27

*In re Wells Fargo & Co. Sec. Litig.*,
    2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) ...................................................44

## Statutes

15 U.S.C. § 78u-4(b)(1) ........................................................................................1, 15

15 U.S.C. § 78u-4(b)(2)(a) .........................................................................................35

15 U.S.C. § 78u-5(c)(1)(B) .........................................................................................38

## Other Authorities

Fed. R. Civ. P. 9 .............................................................................................15, 35, 1

Vertiv Holdings Co ("Vertiv"), Rob Johnson, David Fallon, Gary Niederpruem (collectively, "Officer Defendants"), David Cote, Joseph van Dokkum, Roger Fradin, Jacob Kotzubei, Matthew Louie, Edward L. Monser, Steven S. Reinemund, Robin L. Washington (collectively, "Director Defendants"), J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Citigroup Global Markets Inc. (collectively, "Underwriter Defendants"), VPE Holdings, LLC, Vertiv JV Holdings LLC, PE Vertiv Holdings LLC, Platinum Equity, LLC, Platinum Equity Investment Holdings, LLC, Platinum Equity Investment Holdings Manager, LLC, Platinum Equity InvestCo, L.P., Platinum Equity Investment Holdings IC (Cayman), LLC, Platinum InvestCo (Cayman), LLC, Platinum Equity Investment Holdings III, LLC, and Platinum Equity Investment Holdings Manager III, LLC (collectively, "Platinum Equity Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Consolidated Complaint ("Complaint" or "AC") under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

Vertiv produces and services critical equipment for data centers, communication networks, and other commercial and industrial customers globally.  In 2021, like many others, Vertiv's business was negatively impacted by unprecedented inflation and supply chain breakdowns arising out of the COVID-19 pandemic.  Vertiv—also like many others—failed to predict this precipitous surge in costs.  While Vertiv raised prices throughout 2021 to partially offset the higher costs, it transparently disclosed that it did not expect to recoup all of these costs.  Ultimately, Vertiv underestimated inflation and supply chain breakdowns, particularly at the end of the year.  Vertiv missed its own previously issued guidance, and Plaintiffs, who are Vertiv shareholders, quickly filed classic "fraud-by-hindsight" claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against Vertiv and the Officer Defendants, and under Sections 11, 12(a)(2),

and 15 of the Securities Act of 1933 against Vertiv, Johnson, Fallon, the Director Defendants, the Underwriter Defendants, and the Platinum Equity Defendants.

Recognizing that fraud claims cannot be pleaded from missed guidance, much less unprecedented inflation and supply chain crises, Plaintiffs strain to characterize the Complaint as challenging factual misrepresentations about Vertiv's pricing response.  Plaintiffs thus allege that Vertiv made false statements about its ability to increase prices to offset rising costs (referred to as "getting price").  But Vertiv made no false statements about its pricing response—to the contrary, it repeatedly warned from the beginning that it would ***not*** be able to offset projected inflation with price increases.  From the outset of the putative class period in early 2021, Vertiv forecast that inflation would negatively impact its margins in 2021 (originally estimated at $20 million), and that Vertiv would not fully offset those predicted increases (estimating only $15 million in additional pricing).  Vertiv also disclosed that its pricing actions operated on a "lag"—meaning that it would take multiple quarters to implement pricing actions to respond to inflation.

Then, over the course of 2021, inflation rose far more than Vertiv had estimated, as supply chains snarled and commodity and shipping costs soared.  Vertiv repeatedly revised its inflation estimates upwards, providing quarterly forecasts of full-year inflation and offsetting projected price increases.  There is no dispute that Vertiv did, in fact, ramp up its pricing response by "getting price" from customers in 2021—obtaining ***$53 million*** in additional price, far more than its initial estimate of $15 million.  But Vertiv's pricing response could not match inflation, which surged to unpredicted levels and ultimately caused $188 million in additional costs—over nine times what Vertiv had estimated at the outset of 2021, with nearly ***half*** of that in 4Q 2021 alone.

Against this backdrop, Plaintiffs' claims suffer from multiple defects, each an independent basis for dismissal:  ***First***, all of Plaintiffs' claims fail because the Complaint does not allege

falsity.  To the extent that Plaintiffs challenge statements of existing fact to claim that Vertiv was not taking the pricing actions it said it was, Plaintiffs rely on (i) post-Class-Period statements (purported "admissions") that are plainly consistent with the challenged statements (*e.g.*, it is entirely consistent for Vertiv to disclose that customer contracts "sometimes" had clauses allowing Vertiv to pass on cost increases, and later disclose that Vertiv was adding such clauses to new contracts) and (ii) anonymous-witness allegations that do not satisfy the relevant pleading standards and cannot alter the undisputed "hard" fact that Vertiv actually achieved $53 million in increased pricing in 2021.

The remainder of the Complaint challenges Vertiv's financial guidance and forecasts of its ability to get price, offset inflation, and mitigate supply chain crises in 2021 and beyond.  These, however, are statements of opinion subject to heightened pleading requirements under *Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), and Plaintiffs fail to plead that Defendants' opinions about Vertiv's ability to partially offset inflation were not sincerely held when made, *i.e.*, *before* they knew how high inflation would rise in 2021. The statements are also forward-looking statements under the PSLRA, and because none of them were made with "actual knowledge" of falsity and because Vertiv repeatedly disclosed the specific risks Plaintiffs claim caused their loss, such as the risk of an inability to offset unexpected cost increases due to Vertiv's "fixed-price" contracts, they are protected under the PSLRA safe harbor. Many statements are also non-actionable generic corporate puffery.

**Second**, the Exchange Act claims fail because the Complaint fails to plead the required strong inference of scienter (*i.e.*, intent to defraud).  The PSLRA requires that the Court weigh the competing inferences and determine whether the inference of fraud is at least as compelling as non-fraudulent inferences.  The Complaint fails this test.  Plaintiffs do not allege any motive or

opportunity to defraud by the Officer Defendants—none of whom are alleged to have financially benefitted from the purported fraud.  Indeed, the Officer Defendants sold no shares and exercised no stock options when Vertiv's stock was allegedly artificially inflated, which ***undermines*** an inference of fraud.  Plaintiffs also fail to plead fraud under a conscious misbehavior or recklessness theory.   The Complaint does not plead that any Officer Defendant had knowledge of contemporaneous information that contradicted his public statements.  And Plaintiffs' reliance on post-Class-Period "admissions" fails because, in context, the Officer Defendants' statements do not contradict their prior representations.

*Third*, the Securities Act claims fail for additional reasons.  The Complaint challenges a few risk disclosures incorporated into the Offering Materials (as defined below) for a November 2021 secondary offering.  But by November 2021 investors were well aware of inflation and supply chain issues, and no reasonable investor would have understood the risk disclosures to misrepresent those risks.  Moreover, Plaintiffs challenge through their Securities Act claims disclosures in Vertiv's 10-K filed months earlier in April 2021 that were incorporated by reference into the Offering Materials, while ignoring that the Offering Materials expressly cautioned that "[f]orward-looking statements included in this prospectus supplement speak only as of the date of this prospectus supplement or *any earlier date specified for such statements*."  This cautionary disclosure squarely disposes of this claim.  And the mere fact that, with the benefit of hindsight, risks become heightened over time does not render risk disclosures misleading under settled law.

## BACKGROUND

### A.     Before the Class Period, Vertiv Expressly Warns Investors About Risks of Supply Chain Disruptions and Its Ability to Pass Through Costs

Vertiv operated as a division of Emerson Electric Co. ("Emerson") until its purchase by

Platinum Equity affiliates in 2016. ¶ 38.[1]  In February 2020, Vertiv went public through a merger with GS Acquisition Holdings Corp.  ¶ 39.  Vertiv published its first 10-K shortly thereafter, cautioning investors about a number of risks directly relevant to the Complaint.

*Supply Chain Risks Could Increase Costs.*  Vertiv disclosed that "[o]ur operations . . . depend on our ability to accurately anticipate both our needs, including raw materials, components, products and services, from third-party suppliers, and such suppliers' ability to timely deliver the quantities and quality required at reasonable prices." Ex. 7 at 17.  Vertiv warned that "[f]ailure to properly manage our supply chain . . . could result in higher costs of production . . . or shortages and delays in production." *Id.*

*Impact of Increased Costs on Fixed-Price Contracts.*  In the same disclosure, Vertiv also disclosed the potential for "volatility in the supply or price of raw materials." *Id.*  Vertiv stated that its "products rely on a variety of raw materials and components, including steel, copper and aluminum and electronic components," and expressly warned that Vertiv may be "*unable to offset unexpected increases in material and component costs with our own price increases* without suffering reduced volumes, revenues or operating income." *Id.* (emphasis added).  Vertiv disclosed in another risk factor that this exposure to "changes in costs . . . of components [and] materials" posed a "substantial risk" to its financial condition because Vertiv had entered, and would continue to enter, into "long-term, fixed-price contracts" with customers. *Id.* at 16.

*Pricing Pressure from Large Customers.*  Vertiv warned it was exposed to "downward pricing pressures" from "large companies" that would "often require more favorable terms and

---

[1] Cites to "¶" are to the AC.  Cites to "Ex. _" are to exhibits to the Declaration of Audra J. Soloway.  In ruling on a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The exhibits cited herein consist of SEC filings, call transcripts, and other documents that were incorporated into the AC by reference.

conditions in [their] contracts," and as Vertiv sought to "sell more products to such customers, [it] may be required to agree to such terms and conditions more frequently." *Id.* at 15.

*Backlog*.  Vertiv warned of risk from its significant "backlog," which is "the value of product and service orders for which [it] ha[d] received a . . . purchase order or . . . commitment and which ha[d] not yet been delivered." *Id.* at 19.  Vertiv "may not realize the revenue [it] expect[s] to generate from [its] backlog or, if realized, may not result in profitable revenue." *Id.*

*Disruption from IT Systems*.  Vertiv disclosed that its "implementation of new information systems and enhancements to current systems" could be "disruptive" to "operations" and harm its financial condition. *Id*. at 17.  If Vertiv was "unable to successfully design and implement these new systems," it "could adversely impact [Vertiv's] ability to . . . accurately record and transfer information, recognize revenue . . . or otherwise run [its] business." *Id.*

Each of these disclosures was also included in materially identical form in Vertiv's 2020 Form 10-K and 2020 Amended Form 10-K, filed March 1 and April 30, 2021, respectively. *See* Exs. 11, 15.  In the latter two filings, Vertiv additionally disclosed that its "business, results of operations, [and] financial position . . . have been and could continue to be adversely affected by the COVID-19 pandemic," and that those effects could be "material and may include . . . disruptions in [its] supply chain." Ex. 11 at 31–32; Ex. 15 at 34.

### B.    Vertiv Began Implementing New Pricing Initiatives in 2019 and 2020

Prior to 2019, Vertiv did not have a record of high profit margins.  ¶¶ 39–40.  Vertiv had "historically kind of convinced itself" that if it was "flat on a pricing perspective"—meaning prices to customers stayed flat—"it was a good year." ¶ 140; *see* Ex. 40 at 8 (analyst noting that "when Emerson owned [Vertiv], they didn't really get much price" and "was somewhat negative"). However, in 2019, Vertiv began new pricing initiatives.  ¶ 40.  The efforts were successful, with Vertiv going from "flat" to increasing prices in 2019 and 2020 to achieve about $25 million and

$15–20 million, respectively, in pricing benefit.  ¶ 140.

### C.    Vertiv Announces 2021 Guidance in February 2021

In early 2021, due in part to "manufacturing shut-downs and travel restrictions caused by the continuing effects of the COVID-19 pandemic," costs for raw materials, critical component parts, and freight began to rise.  ¶ 43.  During this period of increasing uncertainty, on February 24, 2021, Vertiv issued guidance of $565 to $585 million for full-year 2021 adjusted operating profit.  ¶ 115.  Vertiv expressly cautioned that this guidance "could be influenced by changes to . . . supply chain dynamics pursuant to COVID-19."  Ex. 8 at 2.

Vertiv's guidance assumed $20 million in full-year inflation, and $15 million in pricing to partially offset it.  ¶ 130.  Vertiv thus expressly disclosed its expectation that it would be able to offset only a portion of increased costs with increased prices—and that it expected to increase pricing less in 2021 than it had in 2019 or 2020.  During the February 24, 2021 earnings call, Chief Strategy and Development Officer Niederpruem expressed optimism that Vertiv would be able to increase prices in 2021, but perhaps not as much as in prior years given "headwinds coming from commodity and inflationary aspects."  Ex. 9 at 13.  Niederpruem said:  "[W]e feel pretty good about where we sit right now to continue passing price along.  Whether it's going to be in the same range of what we're able to do in '19 or '20, not quite sure just yet . . . ."  *Id.*; ¶ 117.

### D.    After 1Q 2021, Vertiv Adjusts Guidance to Account for Additional Inflation

After 1Q 2021, Vertiv reported earnings, including significant growth in net sales and adjusted operating profit, and increased its full-year guidance.  ¶ 124; Ex. 12 at 1.  However, Vertiv disclosed that it was experiencing "supply chain constraints" and "disruptions," and "seeing some increased costs for materials and logistics."  ¶ 125; Ex. 14 at 5.  Accordingly, it more than doubled its expected full-year impact from inflation, increasing its estimate of 2021 inflation from $20 million to $45 million.  ¶ 130.  Vertiv also disclosed that it was "instituting pricing actions" to

"partially pass through the increased costs," ¶ 125, revising its forecasted pricing increase from $15 million to $25 million, ¶ 130.  This estimated pricing recovery of an additional $10 million was thus dwarfed by the corresponding estimated $25 million increase in full-year inflation.

On the April 28, 2021 earnings call, an analyst asked if there was "some mechanism in the backlog to push through" additional price.  Niederpruem responded that Vertiv was "looking at" mechanisms to increase price on backlog orders, and noted a few potential options, including that—"*sometimes*"—clauses in "larger contracts" would allow Vertiv to increase pricing based on increased materials costs (*i.e.*, "escalation" clauses):

> [B]y no means are we just taking a look at that $2 billion of backlog and saying, well, there's nothing we can do.  It's already in backlog.  So we do have some other mechanisms, ***sometimes in larger contracts that have material clauses in them***.  Certainly, freight is another lever that we can utilize.  That is a real-time mechanism.  There's been times when we've instituted surcharges as well.  So I would say that, yes, it's easier to get price on new orders coming through the door.  But by no means are we going to just discount the $2 billion that we have and say there's nothing we can do there.  We're looking at that, taking action on that as well.  With all that said, I do think price probably continues to ramp throughout the year.

¶ 132 (emphasis added); Ex. 13 at 19.  Vertiv disclosed examples of commodities subject to escalation clauses in contracts during the Class Period.  ¶ 147 ("pass through pricing" for "lead").

Importantly, Vertiv repeatedly warned that its pricing actions would necessarily "lag" behind increasing inflation.  As CFO Fallon explained, "[W]e will see the negative impact from commodity and logistics sooner in our costs, then we do have the ability to pass that through for higher pricing."  ¶ 130; *see also* Ex. 21 at 11 (Niederpruem explaining that "it takes a couple of quarters" to implement pricing in response to increased costs).

### E.     After 2Q 2021, Vertiv Revised Its Estimate of Full-Year Inflation Upwards

On July 28, 2021, Vertiv again reported strong sales and increased the midpoint of full-year adjusted operating profit guidance by $5 million.  ¶ 144.  However, Vertiv expressly caveated that its guidance was based on "current commodity and freight costs."  *Id*.  Vertiv had observed

increasing costs, and now forecast full-year inflation at $110 million, a significant increase from the $45 million estimated in April.  *See* Ex. 22 at 22.  In a press release, Vertiv stated that "[w]hile material inflation and supply-chain challenges continue, we have implemented additional pricing actions . . . to help offset these challenges."  ¶ 144.  Vertiv now estimated "having $65 million of pricing actions for the full year," meaning it still expected to offset only a fraction of the $110 million in expected full-year inflation.  ¶ 149.  Vertiv disclosed specific actions it was taking, including "list price increases, discount and rebate reductions, pass through pricing (lead) and pricing recovery on outbound freight."  ¶ 147.  However, it again disclosed that price recovery "lags inflation."  ¶ 144.  Vertiv's full-year guidance also assumed that the recent surge in inflation would "stabilize" for the remainder of 2021, such that the pricing actions Vertiv was implementing then would—consistent with the disclosed "lag"—take effect by 4Q 2021.  *Id.*; Ex. 22 at 6.

### F.    During 3Q 2021, Vertiv Reduces Guidance

On September 8, 2021, based on worsening supply constraints, Vertiv reduced its guidance for full-year adjusted operating profit by $60 million.  ¶ 52.  It explained that "[d]espite continued strong market demand, supply chain challenges described in our prior communications are trending worse than expected, with critical part shortages driving the need for additional spot buys. In some cases, the company cannot procure critical parts at any price . . . ."  Ex. 23 at 3.  On a call that day, CEO Johnson stated that the market had "tighten[ed] up significantly," with Vertiv paying higher prices for supplies, and that Vertiv was seeing "suppliers de-commit" as unavailability increased.  Ex. 24 at 5, 12.  Given these trends, Vertiv increased its estimate of full-year inflation by another $22 million.  Ex. 25 at 7.  Johnson explained that the supply disruption would cause Vertiv's pricing response to lag further:  "[B]ecause of the way some of the shipments and timing occur, it looks like we'll capture more of the pricing in 2022 than in 2021."  Ex. 24 at 5.  Vertiv reduced its forecast full-year pricing benefit from $65 million to $55 million.  Ex. 25 at 7.

### G.       After 3Q 2021, Vertiv Raises Guidance Slightly to Account for Acquisition

On October 27, 2021, Vertiv announced 3Q 2021 earnings, disclosing that "[s]upply chain issues have continued to accelerate in the third quarter and no improvement is expected in the fourth quarter."  ¶ 159.  Vertiv increased its adjusted operating profit guidance slightly, by $13 million, to incorporate the impacts of a recent acquisition.  Ex. 26 at 2.  The guidance was expressly based on the "expectation that supply chain headwinds continue at current levels for the remainder of the year."  *Id.*  Vertiv maintained its full-year pricing estimate of $55 million, but increased its full-year inflation estimate from ~$130 to $155 million.  Ex. 28 at 19.

### H.       VPE Holdings, LLC Sells Shares in Secondary Offering

On November 4, 2021, Platinum affiliate VPE Holdings, LLC closed a sale of over 20 million shares of Vertiv stock at just under $25 per share, resulting in it owning approximately 10.6% of Vertiv's common stock (the "SPO").  ¶ 169.  On November 3, 2021, Vertiv filed a prospectus supplement for the SPO on Form 424B1 (the "Prospectus"), which formed part of the Registration Statement (collectively, the "Offering Materials").  ¶ 250.  The Offering Materials incorporated by reference Vertiv's April 30, 2021 Amended 10-K and the risk factors discussed above, while cautioning that "[f]orward-looking statements included in this prospectus supplement speak only as of the date of this prospectus supplement *or any earlier date specified for such statements*."  Ex. 29 at S-v (emphasis added).  Vertiv and the Officer Defendants sold no shares in and received no proceeds from the offering.  *Id.* at S-3; ¶ 57.

### I.       In 4Q 2021, Vertiv Continues to Ramp Up Pricing Actions

At a November 16, 2021 conference, Niederpruem echoed Vertiv's prior disclosures and stated that Vertiv had underestimated how persistent and strong inflation would be, and that, "in hindsight, we probably should have been a little bit more aggressive early in the year in coming out with price increase."  Ex. 30 at 4.  He explained that the "majority of the price comes from list

price increases," although he listed various "other points in the system," including, among other things, "controlling the discounts." *Id.* at 6.  As another example of pricing actions, Johnson explained that Vertiv was introducing escalation clauses into more contracts, but it was difficult: "Nobody's just rolling over and giving us a price, it's something we have to work through, price escalations for future price and contracts where we haven't had them on commodities." *Id.* at 5; *see id.* at 4 (referencing 2-3 year Master Supply Agreements with fixed prices).  At the same conference, Fallon noted that he believed that Vertiv could achieve its sales guidance based on its "pre-planning with the suppliers as it relates to allocations." *Id.* at 7.

### J.      Vertiv Misses 4Q 2021 Guidance

On February 23, 2022, Vertiv announced earnings for 4Q 2021.  Sales had (again) grown significantly, but Vertiv's adjusted operating profit was "negatively impacted by accelerating inflation headwinds and continued supply chain constraints," causing Vertiv to miss its 4Q 2021 adjusted operating profit guidance midpoint by $72 million. Ex. 36 at 1; ¶ 59.  In Q4 2021 alone, inflation had an *$88 million* negative impact on margins, Ex. 38 at 7, or ~60% higher than the impact of inflation in 3Q 2021, Ex. 28 at 7.  Vertiv disclosed that "[i]nflation accelerated in Q4 including significant spending on spot buys and premium freight to protect customer deliveries." Ex. 38 at 9.  As Vertiv explained, while it received $28 million of additional pricing in 4Q 2021 alone, more than it had received *annually* in 2019 or 2020, that was still "not enough to offset increasing inflation." Ex. 36 at 1.[2]

---

[2] Material and freight inflation, and the intensity and speed with which it occurred, is reflected in charts tracking steel, copper, aluminum, and freight prices, to which Vertiv had disclosed it was significantly exposed. *Supra* p. 5.  Steel, copper, and aluminum prices, as reflected in Bureau of Labor Statistics and London Metals Exchange prices, all followed a similar pattern:  beginning to rise in 2020 and increasing significantly in 2021, and reaching peaks (or one of multiple peaks) in 4Q 2021.  *See* Exs. 32–34.  Freight costs, as reflected in the Global Container Freight Index, also increased rapidly throughout 2021: by late 2021, freight rates had increased nearly ten-fold over prior years.  *See* Ex. 35; *see also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 52 (S.D.N.Y. 2012) ("Court can take judicial notice of publicized commodities prices on a motion to dismiss."); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 980 (N.D. Cal. 2010) (taking judicial notice of LME prices).

For the full year 2021, inflation had a negative $188 million impact on Vertiv, although it was able to recover $53 million with pricing. Ex. 38 at 10. Consistent with Vertiv's prior disclosures, Johnson summed up the issue: "We started the first half strongly, but supply chain challenges and inflationary headwinds quickly put pressure on our operational and financial performance in the second half – notably in the fourth quarter. We consistently underestimated inflation and supply chain constraints for both timing and degree, which dictated a tepid 2021 pricing response." Ex. 36 at 1. The below chart of Vertiv's publicly disclosed inflation and pricing forecasts shows that, while Vertiv never forecast fully offsetting inflation, Vertiv's pricing greatly exceeded its initial pricing estimate even as Vertiv underestimated inflation.

| | Full-Year Forecasts | | | | Actual |
|---|---|---|---|---|---|
| | Feb. 2021 | April 2021 | July 2021 | Oct. 2021 | |
| **Inflation** | $20 million | $45 million | $110 million | $155 million | $188 million |
| **Pricing** | $15 million | $25 million | $65 million | $55 million | $53 million |

On the February 2022 earnings call, Johnson said Vertiv "screwed up" because it "significantly underestimated the magnitude of the material and freight inflation in the fourth quarter forecast," and this "underestimation of costs also contributed to our underpricing in the market in 2021"—"[j]ust when we thought we had budgeted enough price, inflation got worse." Ex. 37 at 4, 6. Director Cote noted that management was "disappointed and embarrassed" with the guidance miss, and Fallon explained that they "realized we have likely damaged some of our credibility . . . with the quality of our external guidance." ¶ 66.

Vertiv management explained that one of their "lesson[s]" from 2021 was that they were able to generate sales on higher prices than anticipated. Ex. 37 at 11. Cote noted that Vertiv had "historically" underestimated the value of its products, but the prior year had shown it could get paid more for its innovation. Ex. 37 at 20–21. Johnson likewise stated that Vertiv "wasn't set up

to drive a lot of price," so "culturally losing orders was something that we had to overcome." *Id.* at 13. Executives also discussed changes that had been implemented in recent months, including instituting "even tighter control" over discounting authority and increasingly "putting escalators" in customer contracts, that "[weren't] in all of [Vertiv's] contracts prior." *Id.* at 12, 17.

### K.    Officer Defendants Sell No Shares of Vertiv During the Class Period

During the Class Period, none of the Officer Defendants sold any shares of Vertiv stock. Exs. 4, 5, 6. Nor did they exercise any options, including those that had already vested. *Id.*[3]

### L.    Plaintiffs' Complaint

Plaintiffs assert claims on behalf of all investors that purchased shares of Vertiv's Class A common stock (a) between February 24, 2021, and February 22, 2022; and/or (b) in or traceable to the SPO. Plaintiffs allege claims under Section 10(b) of the Exchange Act and Rule 10b-5 against Vertiv and the Officer Defendants, and under Section 20(a) of the Exchange Act against the Officer Defendants. Plaintiffs also allege claims under Section 11 of the Securities Act against Vertiv, Johnson, Fallon, the Director Defendants, and the Underwriter Defendants, Section 12(a)(2) of the Securities Act against the Underwriter Defendants, and Section 15 of the Securities Act against Johnson, Fallon, the Director Defendants, and the Platinum Equity Defendants. Plaintiffs' fraud theory is that, throughout the Class Period, Defendants' statements about Vertiv's pricing and its anticipated 2021 performance were false because Vertiv was not taking—and was unable to take—pricing actions to try to offset inflation. ¶ 80. Plaintiffs rely on what they refer to as post-Class-Period "admissions," as well as allegations attributed to six former Vertiv employees ("FEs"), all but one of whom left before 4Q 2021, the period at the heart of the claims.

*Pricing Actions*. Without disputing that Vertiv increased its pricing by $53 million in 2021,

---

[3] Officer Defendants' holdings slightly decreased because they were subject to tax withholding transactions on the vesting of restricted stock units governed by terms preexisting the Class Period. Ex. 4 at 3; Ex. 5 at 3; Ex. 6 at 3.

Plaintiffs incongruously allege that Vertiv's statements about its pricing response were false because Vertiv was supposedly "not issuing price increases in 2021." ¶ 91.

*Escalation Clauses*. Plaintiffs challenge Niederpruem's April 2021 statement that, as one mechanism for increasing price, Vertiv "sometimes in larger contracts" had "material clauses" that could pass on price—contending that Vertiv "did not have the ability to raise prices" for "larger enterprise contracts." ¶¶ 93, 132. Plaintiffs rely on allegations from FEs who are not alleged to have worked with "larger enterprise" clients, ¶¶ 94, 96, and post-Class-Period statements that Vertiv was adding escalation clauses to more contracts, ¶¶ 63, 75.

*Discounting*. Plaintiffs allege that statements that Vertiv became more "judicious with" and was "controlling" discounts were false because Vertiv was continuing to resort to discounting, ¶¶ 136, 177, without alleging that Vertiv did not impose more control over discounts in 2021.

*Supply Chain Preplanning*. Plaintiffs allege that, despite Fallon's statement that Vertiv had "preplanned" with suppliers, it was "plagued by increasingly aggressive supplier decommits." ¶ 100. Plaintiffs also cite FE statements that Vertiv was put on "credit holds" by certain vendors, but do not allege how that impacted Vertiv's reported results. ¶¶ 103–104.

*Pricing Tools*. Plaintiffs allege that while Johnson stated in July 2021 that Vertiv had "pricing tools" to assist salespeople in pricing, Vertiv in mid-2021 "botched the implementation of [its] new [Configure, Price, Quote ("CPQ")] system." ¶ 105. According to an FE, sales reps would sometimes have to use the "legacy system" to enter pricing information. ¶ 109.

## ARGUMENT

## I.   The PLSRA and Rule 9(b) Impose Heightened Pleading Requirements

The PSLRA imposes the "most stringent pleading requirement in American civil law." *McCauley* v. *City of Chicago*, 671 F.3d 611, 625 (7th Cir. 2011) (Hamilton, J., dissenting in part); *see Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Securities fraud claims

"must satisfy two layers of heightened pleading requirements: first, a complaint alleging securities fraud must satisfy Rule 9(b) of the Federal Rules . . . , and, second, private securities fraud class actions must satisfy the pleading requirements set forth in [the] PSLRA." *Harris* v. *AmTrust Fin. Servs.*, 135 F. Supp. 3d 155, 169 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016). Rule 9(b) requires plaintiffs to plead "'the circumstances constituting fraud . . . with particularity.'" *Tellabs*, 551 U.S. at 319 (quoting Fed. R. Civ. P. 9(b)). Under Rule 9(b), "the complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Greco* v. *Qudian Inc.*, 2022 WL 4226022, at *6 (S.D.N.Y. Sept. 13, 2022) (quoting *ATSI*, 493 F.3d at 99) (Woods, J.). The PSRLA likewise requires plaintiffs to specify "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs must "'do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so.'" *Greco*, 2022 WL 4226022, at *6 (quoting *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

## II.  The Court Should Dismiss the Section 10(b) Claims Because Plaintiffs Do Not Allege Actionable Misstatements or Omissions

Section 10(b) liability requires the "existence of material misstatements or omissions of fact." *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 578 (S.D.N.Y. 2010). Plaintiffs' core claim is that Vertiv falsely represented it would be "able to raise prices to keep up with inflation and supply chain problems" in 2021, and when Vertiv did not, it missed its 2021 guidance. ¶¶ 9–10. That is necessarily a challenge to Vertiv's projections of pricing and inflation for 2021. However, Plaintiffs assert that their suit is based on statements about pricing actions Vertiv "either already had taken or w[as] presently taking," which they claim it did not in fact take. Dkt. No. 39

15

at 2.[4]  To the extent the AC does cite such statements, they are not actionable, either because they reference actions that Plaintiffs nowhere claim were not taken, or because Plaintiffs do not allege particularized facts contradicting the statements.  The AC otherwise challenges opinion and forward-looking statements related to Vertiv's forecasting, and Plaintiffs do not satisfy the requisite heightened pleading standards for either category of statement.

### A.      Statements About Pre-Class-Period Pricing Actions

The AC challenges several backward-looking statements concerning Vertiv's pricing initiatives *prior to the Class Period.  See* ¶¶ 115–117, 128, 130, 136, 140, 172.[5]  For example, Plaintiffs challenge Johnson's statements in Vertiv's 4Q 2020 disclosures that "[w]e have made good progress in achieving significant margin expansion," and that "our pricing initiatives have continued to yield favorable results."  ¶¶ 115–116; Ex. 8 at 1, Ex. 9 at 1.  They similarly challenge Johnson's April 2021 statement that Vertiv had "been able to get price the last year, couple of years," and Niederpruem's May 2021 statement that Vertiv "kicked off some pretty serious pricing initiatives several years ago."  ¶¶ 128, 136; Ex. 17 at 12–13.  Plaintiffs plead no facts suggesting that these statements describing prior pricing recoveries were inaccurate.  Notwithstanding a history of "flat" pricing, in 2019 and 2020, Vertiv had made progress in achieving "margin expansion," generating a pricing benefit of ~$25 million and ~$15–20 million, respectively.  *Supra* pp. 6–7.  Plaintiffs do not allege that these reported pricing recoveries were not achieved.  And Plaintiffs cannot rely on statements about Vertiv's pricing *prior to 2021* to suggest that it misled

---

[4] Because Defendants were surprised by Plaintiffs' framing of the AC considering the number of allegations challenging, entirely or in part, forward-looking guidance and financial projections, and in connection with Judge Woods's encouragement at the pre-motion conference that the parties meet and confer to clarify whether any such allegations could be withdrawn, Defendants asked Plaintiffs whether they would seek to amend to withdraw such allegations or would like to meet and confer on the issue, but Plaintiffs declined to do so.  *See* Ex. 42.

[5] In light of Judge Woods's guidance in *Greco* on the required "statement-by-statement" analysis and need to "identify the cautionary language that accompanied each statement," 2022 WL 4226022, at *13 n.3, and Judge Woods' similar guidance at the pre-motion conference (Dkt. No. 45), we enclose tables listing the arguments applicable to each alleged misstatement and the cautionary language accompanying each forward-looking statement.  Exs. 1, 2, 3.

investors as to its projected pricing in 2021. *See In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) ("disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future").

Any claims based on these alleged misstatements must independently be dismissed because Plaintiffs fail to plead that they caused their alleged loss. Plaintiffs do not allege that Vertiv disclosed new information on *pre-2021* pricing, and because a corrective disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged," Plaintiffs fail to plead loss causation. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).

## B.   Defendants' Statements About Ongoing Pricing Actions in 2021

Plaintiffs next challenge certain statements concerning ongoing pricing actions, including pricing updates, escalation clauses in Vertiv's contracts, controls over discounting, planning with suppliers, and the use of pricing tools. None are alleged with factual particularity to be false.

### 1.   *Statements That Vertiv Was Implementing Pricing Actions*

Plaintiffs challenge a number of general statements about Vertiv's pricing response in 2021. *See, e.g.*, ¶ 125 (Vertiv stating in April 2021 that it was "[i]nstituting pricing actions around the globe to partially pass through the increased costs"); ¶ 127 (Vertiv was "taking actions to offset the increased costs"); ¶ 150 (statement in July 2021 that "[p]ricing actions were actually underway at the beginning of Q2"); ¶ 173 (statement in November 2021 that Vertiv had "launched additional pricing actions over the last 2 or 3 weeks in every region"). Plaintiffs assert that these statements are false because Vertiv "had not implemented 'additional pricing actions,'" ¶ 146, "had no 'pricing actions' 'underway'" and was "not making any 'additional price increases'" until 2022, ¶¶ 151, 175, and "did not even have the ability to raise prices in response to inflation," ¶ 178. But these conclusory allegations cannot be squared with the facts in the AC.

Vertiv's full-year financial results, incorporated into the AC, establish that ***Vertiv obtained***

***$53 million in additional pricing in 2021***.  Ex. 38 at 10.  Plaintiffs do not dispute this figure.  The additional pricing Vertiv obtained in 2021 was thus over three times higher than Vertiv expected when it issued its guidance in February.  ¶ 130.  These are "'hard' numbers, the accuracy of which has never been challenged by the plaintiffs," and it thus "must [be] take[n] as true that" Vertiv took pricing actions in 2021.  *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 (6th Cir. 1997).[6]

Plaintiffs rely on statements after the Class Period to plead that Vertiv was not taking pricing actions, such as statements that Vertiv "wasn't set up to drive a lot of price" or that Vertiv "historically" had been at risk of "generally underpric[ing]" orders.  *See, e.g.*, ¶ 151; *see also* Ex. 37 at 13, 20–21.  Most of Plaintiffs' post-Class-Period "admissions" are, in context, plainly describing Vertiv's historical practice over years.  *Compare* ¶ 73 *with* Ex. 39 at 3–4 (under private equity ownership prior to 2020, "pricing wasn't traditionally a backbone muscle that this company has had"); ¶ 74 *with* Ex. 40 at 11 (Vertiv "probably a little trepid to raise price" after Emerson carve-out in 2016).  These were not "admissions"; indeed, Vertiv disclosed during the Class Period that it "historically" was not focused on price.  ¶ 140.

To the extent that Defendants specifically commented on 2021, Plaintiffs point to the "tepid 2021 pricing response" referenced in Vertiv's February 2022 press release and suggest that Vertiv admitted that it "had only barely begun to 'act[] decisively late last year and early this year [2022].'"  ¶ 59.  But, again in context, the release made clear that Vertiv viewed its pricing response as "tepid" and its earlier pricing actions as insufficiently decisive only because inflation turned out to be far higher than anticipated:  "*We consistently underestimated inflation and supply chain*

---

[6] *See also, e.g.*, *Employees Ret. Sys. of City of Providence* v. *Embraer S.A.*, 2018 WL 1725574, at *7 (S.D.N.Y. Mar. 30, 2018) ("Because . . . Plaintiff does not dispute that the [defendant's] financial statements were (literally) accurate, the statements or omissions concerning [its] financial statements are not actionable."); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *9 (S.D.N.Y. Mar. 29, 2016) (allegations that statements of global growth were false belied by failure to allege that reported increase in global revenue was false).

*constraints for both timing and degree*, which dictated a tepid 2021 pricing response.  *We learned a hard lesson from our slow response in 2021*, and we acted decisively late last year and early this year with aggressive price actions."  Ex. 36 at 1 (emphases added).  As Johnson explained in 2022, Vertiv salespeople believed they were raising prices aggressively; the problem was that inflation significantly exceeded estimates:  "The costs got ahead of our pricing.  And when people thought . . . hey, we're doing a lot of price, no, we've got to do a lot more because here's where our cost is."  Ex. 39 at 4.  Of course, Vertiv's hindsight disappointment does not support a theory that it took no pricing actions.

Plaintiffs also cite FEs to echo their allegations that Vertiv did not increase prices.  A former VP of Field Sales in Americas allegedly "confirmed that Vertiv did not raise pricing in response to inflation in 2021."  ¶ 88.  But what the FE actually said is "[w]e made an error in not getting ahead of it in regards to raising price to offset inflation," *id.*, meaning Vertiv made a *forecasting* error in not "getting ahead" of inflation, not that it had taken *no actions* to raise price.  Plaintiffs also rely on another FE who allegedly stated "[t]hey were not issuing price increases in 2021," ¶ 91, but the AC concedes that this FE was a low-level employee who sold certain products within a "150-square-mile territory" for one "division," ¶ 90 n.8, and thus does not plead how this FE could know that Vertiv, globally and for every product, was not raising prices.  Similarly, a former VP of Channel Strategies for the Americas is alleged to have stated that "there had been no discussion at all of raising prices to customers" "as of the time [he] left the Company in March 2021."  ¶ 83.  This FE left Vertiv very early in the Class Period, and, again, no facts are alleged as to how this FE would know there had been no discussion—by anyone—about raising prices, including outside of the "two tier channels" in the U.S for which he was allegedly responsible.  *See* ¶ 83 n.5.  Such FE allegations must be rejected under the PSLRA, which requires confidential

sources to be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak* v. *Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

In any event, these conclusory FE assertions cannot be squared with the undisputed fact that Vertiv obtained $53 million in pricing benefit in 2021. *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (heightened PSLRA pleading requirements not satisfied where CW "merely parrots the conclusory allegations contained in the complaint"). As the AC concedes, Vertiv had *many different mechanisms* to increase pricing, including "list price increases, discount and rebate reductions, pass through pricing (lead)," ¶ 147, "surcharges, freight increases, . . . [and] rebate clawback," Ex. 30 at 6. The AC does not discuss most of these actions, *much less allege that Vertiv was not engaged in them*. For example, Vertiv disclosed that increased list prices—headline prices—were responsible for the "majority" of its pricing increase. *Id*. But Plaintiffs allege no particularized facts suggesting that Vertiv did not increase at least some list prices. Their only allegation referencing "list prices" is a conclusory assertion that list prices were "not increased during 2021," attributed to a junior employee who left in May 2019 to become a customer. ¶¶ 85 n.6, 86. The AC does not explain how this FE could possibly know whether Vertiv increased list prices on any products in any regions in 2021.[7]

2.   *Statement About Escalation Clauses*

Plaintiffs next mischaracterize an April 2021 statement from Niederpruem by suggesting that he said Vertiv's pricing actions would rely significantly on "material clauses" (*i.e.,* escalation clauses) in "contracts with major customers" that would allow Vertiv to "retroactively rais[e]

---

[7] Plaintiffs similarly allege that a July 2021 statement that Vertiv "got price" on orders in Q2 that would ship in "Q3, Q4, Q1," ¶ 150, and September 2021 statements that "pricing has continued to ramp," and that "you can see the pricing ramping every quarter," ¶ 157, were false. But they do not dispute that pricing *did* ramp every quarter. *See, e.g.*, Ex. 22 at 6; Ex. 28 at 7; Ex. 38 at 7.

prices" on its backlog.  ¶ 6.  But Niederpruem merely stated that, while getting price on backlog orders was more difficult than on new orders, Vertiv was not giving up, and that one mechanism for getting price on backlog orders was that "*sometimes*" in "larger contracts" Vertiv would have "material clauses."  Ex. 13 at 19 (emphasis added).  The plain meaning of the statement—that "sometimes" "larger contracts" have such clauses—is that such clauses appeared in larger contracts "on some occasions but not always or often."  *Sometimes*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/sometimes (last visited Jan. 19, 2023).

The AC lacks any particularized allegations that Vertiv did not have escalation clauses "on some occasions but not always or often."  The AC itself establishes that Vertiv disclosed during the Class Period that it had "pass-through" clauses in contracts for products including "lead," ¶ 147, which Plaintiffs nowhere dispute.  Johnson later made clear that Vertiv *had* used "pass-through pricing" on orders booked in 2021, "including . . . of things such as batteries and freights." Ex. 41 at 6.  Niederpruem *never represented* that Vertiv *always* or even *usually* had such clauses in larger contracts.  To the contrary, Vertiv disclosed before and during the Class Period that it had "long-term, fixed-price contracts" with customers, which posed "substantial risks" should there be "changes in costs . . . of components [or] materials," and that it in particular faced "downward pricing pressures" from "large companies."  Ex. 15 at 16–17.  Vertiv further disclosed during the Class Period that getting price on existing contracts was difficult and it would need to implement "price escalations" for "contracts where we haven't had them."  Ex. 30 at 5.  Nor did Niederpruem suggest such clauses would account for any set amount of pricing in 2021.

While Plaintiffs point to post-Class-Period statements indicating that Vertiv began negotiating escalation clauses into more contracts in late 2021, none are inconsistent with Niederpruem's April 2021 statement.  Plaintiffs cite statements by Niederpruem and Johnson that

reflect that such clauses were not in "all" of Vertiv's "contracts prior," and that Vertiv was changing the terms of certain contracts to include such provisions.  Ex. 37 at 17; Ex. 40 at 12–13. But those statements are fully consistent with Vertiv "sometimes" having had these clauses in larger contracts in April 2021.

Plaintiffs also compile vague FE allegations to claim that Vertiv had no ability to pass-through increased costs on existing large enterprise contracts, but these allegations are (i) attributed to FEs who are not alleged to have been in positions to know the facts underlying their allegations and (ii) fully consistent with Vertiv's disclosures anyway.  *First*, while Plaintiffs cite three FEs to claim that Vertiv in 2021 lacked escalation clauses on "larger enterprise contracts, such as those for Facebook, Google, Microsoft, and other hyperscale data centers," ¶ 94, *not a single FE is alleged to have worked with large enterprise accounts.*  These allegations are attributed to FE-1, FE-2, and FE-6.  FE-1 and FE-6 worked in the "Channel" division—which sold to *distributors*, not end users like Facebook.   ¶ 83 n.5; ¶ 97 n.9; Ex. 15 at 8 (listing "channel partners" as "distributors, I.T. resellers, value-added retailers and original equipment manufacturers"); *id.* at 44 (distinguishing "Enterprise" and "Channel" customers).  FE-2, a former low-level employee, left Vertiv in 2019, almost two years before the Class Period, and is also not alleged to have worked with enterprise accounts.  ¶ 85 n.6; *see Frankfurt-Tr. Inv. Luxemburg AG* v. *United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (disregarding allegations attributed to FEs in one unit who were not alleged to have insight into other units); *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at *17 (S.D.N.Y. Sept. 22, 2021) (statements from FEs who left company months before class period not given weight during class period).  Plaintiffs have not alleged any facts to establish these FEs' "knowledge on the issues . . . as to which, according to the [AC], they have opined."  *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at *17.

*Second*, even if the FEs *were* in positions to have knowledge of the allegations attributed to them, none contradict Defendants' statements. For example, Plaintiffs allege that FE-3 stated that "once an order was set" on an RFP with a large enterprise customer, "Vertiv had no ability to raise pricing on these orders," ¶ 94, but nowhere allege that FE-3 said that such restrictions applied to *all* terms of *all* "large contracts." The FE allegations are consistent with a statement that "*sometimes*" Vertiv's "large contracts" had escalation clauses and cannot support a fraud claim.

### 3. *Statement About Controlling Discounts*

Plaintiffs also challenge as false two statements about Vertiv being more judicious with discounting. *First*, at a May 26, 2021 conference, Niederpreum noted that it was list prices that helped Vertiv achieve price increases in 2019 and 2020. He then stated that "[a]fter that, you need to become much more judicious with your . . . discount levels," and indicated that Vertiv had improved in this regard in the past two years. ¶ 136; Ex. 17 at 13. But this statement merely suggests—in a vague way—that as of April 2021, Vertiv had become more judicious with discounting than it had been in prior years—a fact that Plaintiffs nowhere suggest was false.

*Second*, Plaintiffs rely on a November 16, 2021 statement from Niederpruem, in which he said that increasing list prices was responsible for the "majority" of Vertiv's pricing response, and "controlling the discounts and multipliers" was *third* on a list of "other points in the system" to obtain additional pricing. Ex. 30 at 6. But Plaintiffs do not allege that Vertiv did not take any actions to further control discounts and multipliers during 2021.

Instead, Plaintiffs again rely on post-Class-Period statements and conclusory FE allegations, none of which are contrary to what Niederpruem said. Plaintiffs stress that on the 4Q 2021 earnings call, Johnson and Cote discussed Vertiv "historically" underestimating its products' value and not being "set up to drive a lot of price." ¶ 118; Ex. 37 at 13. But these statements do

not suggest that Vertiv did not take actions to control discounting in 2021.  In fact, in a post-Class-Period quote that Plaintiffs tellingly omit, ¶ 73, Johnson explained that Vertiv *had* been driving its salesforce to increase pricing in 2021, but even as its salesforce thought they were "doing a lot of price" in 2021, they ended up falling short because Vertiv "got behind on what we thought inflation was going to be."  Ex. 39 at 3–4.  Numerous other post-Class-Period statements that Plaintiffs cherry-pick similarly refer to Vertiv underpricing products historically, including years before the Class Period, and suggest that Vertiv indeed became more adept at increasing prices in 2021.  *See, e.g.*, ¶ 74; Ex. 40 at 8–9, 11.  That—after the Class Period and unprecedented inflation—Vertiv believed that "even tighter control" over discounting was warranted, Ex. 38 at 12, does not mean that it did not take steps to impose such control in 2021.

Plaintiffs' FE allegations concerning discounting practices in 2021 (*see* ¶¶ 86, 91) are conclusory at best.  The only support provided for the statement by FE-2, who, again, left Vertiv in 2019, that Vertiv was continuing to offer substantial discounts in 2021, is that she placed two orders as a customer and received discounts on them.  ¶¶ 86–87.  Similarly, FE-5 is alleged to have stated that Vertiv "had the exact same discounting practices" throughout 2021, ¶ 91, but is also alleged to have worked in the "Channel" division in a single "150-square-mile territory," ¶ 90 n.8.  The AC provides no basis as to how either FE would have any knowledge of whether discounting—in any product, in any region—was subject to additional controls in 2021.

4.     *Statement About Preplanning with Suppliers*

Plaintiffs challenge as false Fallon's November 2021 statement that he was comfortable with Vertiv's 4Q 2021 sales guidance based in part on "pre-planning with the suppliers as it relates to allocations."  ¶ 179.  In support, they allege that Vertiv ultimately suffered "supplier decommits" in 4Q 2021, including an FE allegation that certain decommits got "really serious in the second

half of 2021."  ¶ 101.  But there is no inconsistency here:  That supplier decommits became more "aggressive," ¶ 100, does not suggest that Vertiv did not "pre-plan[]" with suppliers.  And during the Class Period, Vertiv expressly warned about supplier "de-commit[s]," Ex. 24 at 12, and transparently disclosed the significant difficulties it was having timely receiving supplies, including paying premiums for spot buys[8] and expedited shipments, and not getting supplies at any price.  *See, e.g.*, Ex. 22 at 22; Ex. 24 at 4–5.  No false statement is pleaded on this issue.

Plaintiffs also cite allegations by FEs that certain suppliers put Vertiv on "credit hold" for components because Vertiv had not timely paid them, ¶¶ 103–104, but nowhere point to any statement that was rendered materially false or misleading by the omission of these alleged facts. Plaintiffs nowhere allege the duration or impact of these alleged holds, nor do they suggest that they led in any way to Vertiv's 4Q 2021 guidance miss.  Indeed, neither FE who alleges that Vertiv was dealing with credit holds was even at Vertiv in 4Q 2021.  *See* ¶¶ 85 n.6, 103 n.10.

### 5.   *Statement About Pricing Tools*

Plaintiffs claim that a July 2021 statement by Johnson that Vertiv had in the past "instituted . . . pricing tools that allow our salespeople to understand when we lose at what price and when we win" was misleading because Vertiv had allegedly "botched the implementation of its CPQ"— a system that helps sellers quote products to customers.  ¶¶ 152, 155.  Plaintiffs claim that the implementation frustrated employees and delayed processing of orders.  *See* ¶¶ 106–112.  They, however, do not allege that the "pricing tool[]" Johnson referenced was CPQ, nor do they allege how the alleged CPQ issues rendered any statements false, or how, if at all, those issues impacted Vertiv's pricing.  Indeed, the AC concedes that sales reps did not need to get pricing information

---

[8] Plaintiffs cite statements that Vertiv "implemented strategies" to recapture costs for "spot buys" made to ease supply constraints, ¶¶ 149, 165, 174, but nowhere plead these statements were false.  Vertiv disclosed it used freight surcharges as one mechanism to recover price, *supra* pp. 8, 20, and Plaintiffs nowhere allege that it did not do so.

from CPQ, ¶ 109, and alleges "sales, pricing, and margins" information was in fact "updated daily and . . . available on a daily, weekly, and monthly basis," ¶ 192.  While Plaintiffs allege that Fallon admitted that Vertiv lacked "visibility for a period of time" into costs in 4Q 2021, ¶ 155, Ex. 37 at 13, Johnson's reference to "pricing tools" predated 4Q 2021, and was not rendered "false when made," *Rombach*, 355 F.3d at 172, by any subsequent, temporary visibility issues.[9]

### C.    Guidance, Projections, and Opinion Statements About Inflation and Pricing

The remainder of the AC challenges classic forward-looking projections and opinions on Vertiv's financial guidance and ability to obtain price, offset inflation, and mitigate supply constraints, all based on Vertiv's contemporaneous understanding of inflationary and supply-chain conditions.  *See* ¶¶ 115–117, 124–125, 127–128, 130, 132, 136, 138, 140, 142–145, 147, 149–150, 152–153, 157, 159–160, 162, 165–167, 172–173, 174, 176, 179; *see also In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *17 (S.D.N.Y. Aug. 19) ("expressions of defendants' expectations for future growth . . . are statements of opinion"), *adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 2013 WL 6504801, at *16 (S.D.N.Y. Dec. 11, 2013) (prediction of future performance is opinion).

Opinion statements are actionable only in narrow circumstances.  In order for a statement of opinion to give rise to a claim for securities fraud, plaintiffs must plead facts that, if true, are sufficient to show either (1) that "'the speaker did not hold the belief she professed' or 'the supporting fact[s] she supplied were untrue,'" or (2) for "opinions, though sincerely held and otherwise true as a matter of fact, . . . [that] the speaker omit[ted] information whose omission

---

[9] Johnson's reference to pricing tools also did not create an obligation to disclose all information regarding such tools, even if that information was material.  Section 10(b) does "not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011).  Rather, "[d]isclosure is required . . . only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  *Id.* (internal quotation marks omitted).

ma[de] the statement misleading to a reasonable investor." *Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 575 U.S. at 186).  And "[i]t is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *Greco*, 2022 WL 4226022, at *9 (internal quotation marks omitted).  For omission claims, plaintiffs must "identify particular (and material) facts going to the basis for the [speaker's] opinion," and explain how their omission rendered the opinion misleading.  *Omnicare*, 575 U.S. at 194.  As the Supreme Court has noted, "[t]hat is no small task"; a plaintiff must show in a non-conclusory way exactly what material fact had been omitted.  *Id.*

*Omnicare* also instructs that the "reasonable investor understands a statement of opinion in its full context."  575 U.S. at 190.  "[T]he analysis of whether [the challenged] opinion is misleading must address the statement's context" and "must take account of whatever facts [Defendants] did provide about [the subject matter of the challenged statement]."  *Id.* at 196–97.  While that context is largely stripped from the AC, it is critical here:

- **No History of Increasing Prices:**  Vertiv "historically" considered even a "flat" pricing year to be a "good year," but it developed some pricing acumen in 2019 and 2020—obtaining $25 and $15–20 million in pricing, respectively.  *See supra* pp. 6–7.

- **Vertiv Forecast Offsetting Only a Fraction of the Limited Inflation It Predicted:**  In February 2021, Vertiv estimated that, for full year 2021, it would be impacted by $20 million in inflation and would offset only $15 million of this with pricing.  *See supra* pp. 7, 12.

- **Pricing Ramped In 2021, But Inflation Ramped Faster:**  Vertiv's pricing ramped each quarter of 2021, but inflation rose more than predicted.  Vertiv incurred $188 million in inflation in 2021, far more than the $20 million it forecast when the year began.  *Supra* p. 12.

- **Vertiv's Pricing Response Lagged Inflation:**  By obtaining $53 million in pricing in 2021, Vertiv blew away its initial pricing estimate for 2021 of $15 million.  But because, as Vertiv disclosed, its pricing response acted on a "lag," and inflation was higher than predicted every quarter, Vertiv's pricing response did not—and could not—keep up with inflation.

Throughout the AC, Plaintiffs ignore this context, and challenge statements about Vertiv's ability to offset inflation with additional pricing that were premised on Vertiv's disclosed,

contemporaneous understanding of what inflation would be, which Vertiv, along with much of the world, underestimated.  None of these statements are actionable either as opinions that were not sincerely held or opinions that were rendered misleading by the omission of a material fact.

*February 2021*.   For example, Plaintiffs challenge Niederpruem's statements on the February 2021 earnings call that "*our expectation* is that for '21, we will have positive price" and "we feel pretty good about where we sit *right now* to continue passing price along."   ¶ 117 (emphases added).   These opinion statements referencing Niederpruem's "expectation" and "feel[ing]" were based in Vertiv's forecast that there would only be about $20 million in full-year inflation and $15 million in pricing to offset it, *see* ¶ 130.  In fact, Niederpruem cautioned that he was not even sure whether Vertiv would be able to achieve the ~$15–$25 million in pricing achieved in 2019/2020.  Ex. 9 at 13.  Plaintiffs nowhere allege that Niederpruem did not subjectively believe these opinions.  And, as an objective matter, Vertiv did achieve "positive price" in 2021, raising prices far more than it had in 2019 and 2020.

*April – June 2021*.  Plaintiffs emphasize that Niederpruem stated during a May 2021 conference, "sitting here *right now*, I am really, really confident that we will be able to recover the vast, vast, vast majority of any inflationary stuff," ¶ 136 (emphasis added), and that Fallon stated on an April 2021 earnings call that "[w]e have developed that pricing muscle to offset periods of inflation like we're seeing *right now*," ¶ 138 (emphasis added).  But Plaintiffs do not allege that these speakers did not believe *at the time*, based on their then-understanding of what inflation would be in 2021, that Vertiv would be able to successfully offset a large portion of it.

In fact, Vertiv expressly disclosed that at this time its full-year inflation forecast was $45 million, of which it forecast recovering only $25 million—meaning investors could not possibly have understood Vertiv was raising prices sufficient to fully offset inflation.  ¶ 130.  Further, the

guidance was expressly based on its assumption that "[s]upply challenges [were] driving some incremental *short-term* commodity and freight headwinds." Ex. 14 at 13; ¶ 125 (emphasis added). That these headwinds were not short-term, but would increase and last throughout 2021, was not known at the time of these statements. *See Bldg. Trades Pension Fund of W. Pennsylvania* v. *Insperity, Inc.*, 2022 WL 784017, at *14 (S.D.N.Y. Mar. 15, 2022) ("[W]hile defendants may have been mistaken about whether large claims would continue, it is not a securities fraud for defendants to have reasonably concluded that higher health care costs were anomalous.").[10]

*July 2021*.  Plaintiffs similarly challenge Vertiv's July 2021 statement that it "expect[ed] pricing to ramp-up as we progress through 2021 and to completely offset gross material and freight inflation within the fourth quarter," ¶ 143, and Johnson's July 2021 prediction that "by the time we get to Q4, we will have pricing that fully offset inflationary costs," ¶ 149.  To be clear, these opinion statements predicted that the impact of inflation in 4Q 2021 would be offset by increased prices *only within that quarter* (as Vertiv's prior pricing actions took effect on a lag).  At this time, Vertiv was still forecasting that *full-year* inflation would greatly outpace Vertiv's pricing recovery for the year.  *See* Ex. 22 at 22 (2021 forecast of $110 million inflation and $65 million pricing). And these predictions expressly assumed that "headwinds" would "stabilize," meaning inflation would remain at the same level for the rest of 2021.  *Id.* at 6.  In hindsight, inflation did not "stabilize"—it accelerated significantly, with prices rising sharply in 4Q 2021.  *See supra* pp. 11.

*October 2021*.  Plaintiffs also challenge several opinion statements related to Vertiv's 3Q 2021 earnings announcement.  *See* ¶¶ 159, 160, 162, 165, 166, 167.  But these statements all suffer from the same infirmities—they are opinion statements about Vertiv's ability to meet guidance

---

[10] Plaintiffs cite Fallon's opinion statement in June 2021 that "I think what we've learned over the last 3 to 5 months is that we probably have more pricing power than we had previously thought," ¶ 140, but do not allege that—in June 2021—Vertiv had not raised pricing more than Fallon thought it could given its historical approach to pricing.

and obtain pricing, and Plaintiffs do not plead they were not sincerely believed or that any material facts underlying these statements were omitted.  Again, Vertiv's guidance was expressly based on the "expectation that supply chain headwinds continue at *current levels* for the remainder of the year," Ex. 26 at 2 (emphasis added), which did not happen.  At the time of these statements, Vertiv anticipated about $55 million in 4Q 2021 inflation.  *See* Ex. 28 at 10; Ex. 27 at 14.  Inflation in 4Q 2021 was ultimately $88 million.  *See* Ex. 38 at 7.  Further, while Plaintiffs make much of Vertiv modestly raising guidance in 3Q 2021 (*see* ¶¶ 159–160), the raise *was not related to pricing*, but to include impacts from a recent acquisition and divestiture.  Ex. 26 at 2.

*November 2021*.  While Plaintiffs challenge Niederpruem's prediction at a conference that "we're going to get a year's worth of price just in the fourth quarter," ¶ 173, they have not alleged that this projection was either objectively false or not sincerely believed.  Vertiv achieved $15–20 and $25 million annually in pricing in the two prior years and was predicting that it would achieve more than that in 4Q 2021 alone.  *Id.*  In fact, Vertiv achieved pricing of $28 million in 4Q 2021, meaning Vertiv *did* obtain a "year's worth of price" and Niederpruem's projection was met.  *See* Ex. 38 at 7.  This defeats a fraud claim.  *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1094 (N.D. Cal. 1994) (no claim where "predictions proved to be accurate"), *aff'd*, 95 F.3d 922 (9th Cir. 1996).  Plaintiffs also do not plead that Niederpruem did not honestly believe this (actually achieved) projection was achievable.

### D.    Statements About Post-Class-Period Pricing Recovery

Plaintiffs also cite statements of optimism and projections that, in addition to being non-actionable opinions, refer to expectations of Vertiv's pricing recovery *in 2022* and therefore are not alleged to be false for that independent reason.  For example, Plaintiffs challenge statements on the October 2021 earnings call that "we will be positive in price based on what we're executing on"; that Vertiv was "assuming" inflation could "get potentially worse" and "making sure that our

pricing actions now and going forward cover that"; and that Vertiv was "encouraged with what we're seeing" and "anticipat[ing]" a modest pricing "tailwind."  ¶¶ 166–167.  These statements were made in response to a request for more "color on what you're thinking about *for next year*"— i.e., 2022—in terms of pricing.  Ex. 27 at 9 (emphasis added).  Plaintiffs have nowhere alleged that these speakers did not sincerely believe these statements about 2022 when they spoke in October 2021.  Plaintiffs likewise challenge Johnson's opinion statement on a September 2021 call that "we feel good about our pricing process, getting price in the market and continue as inflationary measures impact us," ¶ 157, but the statement was in response to a question about pricing exceeding costs in 2022, not 2021, *see* Ex. 24 at 11, and Plaintiffs nowhere allege that Johnson did not believe Vertiv would get price in 2022.  And, as with the statements about pre-2021 pricing, Plaintiffs allege no loss caused by disclosures about pricing in 2022.

### E.   Non-Actionable Forward-Looking Statements

Many of the challenged statements are also protected by the PSLRA safe harbor for forward-looking statements and the bespeaks caution doctrine.  Vertiv's guidance, as well as Defendants' statements reaffirming that guidance, predictions of future pricing and inflation, and predictions of Vertiv's ability to offset future inflation—were all forward-looking.  *See* ¶¶ 115–117, 124–128, 130, 132, 136, 138, 140, 142–147, 149–153, 157, 159–160, 162, 165–167, 172–173, 179.  Forward-looking statements "speak predictively about the future," or address "plans and objectives of management for future operations" or "future economic performance."  *Gissin* v. *Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) (internal quotation marks omitted); *accord Lopez* v. *Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 39 (S.D.N.Y. 2016).  The PSLRA protects such statements because "[c]orporate officials need not be clairvoyant" and "allegations that defendants should have anticipated future events . . . do not suffice."  *Novak*, 216 F.3d at 309.

Forward-looking statements are not actionable under the PSLRA when they are "identified

and accompanied by meaningful cautionary language *or* [are] immaterial *or* the plaintiff fails to prove that [they were] made with actual knowledge that [they were] false or misleading." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 529 (S.D.N.Y. 2015), *aff'd*, 816 F.3d 199 (2d Cir. 2016) (internal quotation marks omitted). "Because the statute is written in the disjunctive, statements are protected by the safe harbor if they satisfy any one of these three categories." *Id.* at 530. The "bespeaks caution" doctrine also protects forward-looking statements accompanied by language warning of, or directly related to, the risk that brings about the alleged loss. *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 401 (S.D.N.Y. 2006).

Plaintiffs have not alleged that the forward-looking statements in the AC were made with "actual knowledge" that they were false or misleading, *see infra* pp. 34–41, and for that reason alone the PSLRA safe harbor applies to bar claims based on these statements.

As a separate basis for applying the safe harbor, as well as the bespeaks caution doctrine, the statements were accompanied by meaningful cautionary language. *See* Ex. 3. "To qualify as 'meaningful,' cautionary language must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Lopez*, 173 F. Supp. 3d at 39 (some internal quotation marks omitted).

Here, the statements in question were identified as "forward-looking" and were accompanied by language that expressly warned of the factors that Plaintiffs allege caused their loss. Vertiv's press releases and investor presentations stated that the disclosures may "contain forward-looking statements within the meaning of the [PSLRA]," including "statements regarding the financial position . . . business strategy and plans and objectives of Company management for future operations," and that these "statements constitute projections, forecasts and forward-looking statements, and are not guarantees of performance." *See, e.g.*, Ex. 14 at 2. Vertiv specified that

the "risk factors" that "could cause actual results to differ materially from historical performance included "less favorable contractual terms with large customers; . . . . failure to mitigate risks associated with long-term fixed price contracts; . . . risks associated with the implementation and enhancement of information systems; [and] failure to properly manage Vertiv's supply chain or difficulties with third-party manufacturers." *Id*.  At industry conferences, the Officer Defendants repeatedly referred investors back to their prior guidance and investor presentations.  *See* Ex. 3.

Further, Vertiv's press releases, presentations, and earnings calls all referred to Vertiv's risk factors in its SEC filings, including the risk factors disclosed in its Form 10-K (and Amended Form 10-K), which directly addressed the risks that Plaintiffs allege came to fruition.  *First*, Vertiv expressly disclosed the risks of a failure to "properly manage [its] supply chain," that it was susceptible to the risk of "volatility in the supply or price of raw materials . . . and components," and that it may be "unable to offset unexpected increases in material and component costs with [its] own price increases without suffering reduced . . . operating income." Ex. 11 at 16–17.  Vertiv also disclosed that its "business, results of operations, [and] financial position . . . have been and could continue to be adversely affected by the COVID-19 pandemic," and that those effects may be "material and may include . . . disruptions in [its] supply chain." *Id.* at 31–32.

*Second*, Vertiv disclosed that it had entered into, and intended to continue pursuing, "long-term, fixed-price contracts" with customers, and the "substantial risks" of such contracts included "changes in costs or shortages of components [or] materials," which could have an "adverse effect" on Vertiv's "results of operations and financial condition."  *Id.* at 14.

*Third*, Vertiv disclosed that large customers negotiated more customer-friendly terms in their contracts, which could put "downward pricing pressures" on Vertiv, and that this too "could have an adverse effect on [its] business, results of operations and financial condition."  *Id.*

33

*Fourth*, Vertiv disclosed that implementation of new IT systems could be "disruptive to [its] operations," and could "adversely impact" Vertiv's "ability to process customer orders . . . accurately record and transfer information, . . . or otherwise run [its] business." *Id.* at 16.

Thus, Vertiv cautioned investors—in detailed language—about all the risks that Plaintiffs allege caused their loss: that Vertiv was unable to manage its supply chain in the face of rising materials and component prices or to obtain such materials and components at reasonable prices; that its long-term fixed-price contracts made it unable to offset unexpected increased materials and components costs; that deals with large customers exposed it to pricing pressure; and that its ability to process orders and record information was impacted by the implementation of a new CPQ system. Plaintiffs' claims based on forward-looking statements must be dismissed.

## F.    Statements of Non-Actionable Puffery

Many statements that Plaintiffs challenge are generic expressions of optimism that are immaterial as a matter of law. *See* Ex. 1. "General statements of optimism and puffery are non-actionable under federal securities laws because they are not sufficiently specific that a reasonable investor could rely on them as a guarantee of some concrete fact or outcome." *Greco*, 2022 WL 4226022, at *9 (internal quotation marks omitted). Statements that the "foundation we've established and the trajectory that we are on[] gives me confidence in our ability to achieve the expansion plans we laid out," ¶ 116, that "outlook remains very positive," or that "we are well positioned for the second half of 2021," ¶ 142, are generalized positive statements that could not be relied upon by reasonable investors. *See Friedman* v. *Endo Int'l PLC*, 2018 WL 446189, at *5 (S.D.N.Y. Jan. 16, 2018) (statement that "improved price and volume performance . . . gives us confidence in achieving our full-year guidance" is puffery); *In re Fairway*, 2015 WL 4931357, at *13 (statement that defendants "continue to be very excited about . . . growth prospects" is puffery); *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *8 (S.D.N.Y. Sept. 27, 2013) (statement

that company is "well positioned" non-actionable).

### III.   The Court Should Dismiss the Section 10(b) Claims Because Plaintiffs Do Not Adequately Allege a Strong Inference of Scienter

Plaintiffs' failure adequately to allege scienter is an independent reason to dismiss the Section 10(b) claims.  Scienter means an intent "to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (internal quotation marks omitted).  To plead scienter, Plaintiffs must allege sufficient facts showing "that the defendants had both motive and opportunity to commit the [alleged] fraud," or alternatively, sufficient facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI*, 493 F.3d at 99.  Plaintiffs must also satisfy the PSLRA's heightened pleading requirements, which require them to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(a).  "[T]o qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Tellabs*, 551 U.S. at 309).  Moreover, Rule 9(b) requires that Plaintiffs "plead circumstances providing a factual basis for scienter for *each defendant*; guilt by association is impermissible."  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) (emphasis added).  A statement is actionable only as to its maker.  *Janus Cap. Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011).

Here, there is an inference from the AC that is far more compelling and cogent than Plaintiffs' fraud theory:  Officer Defendants believed that Vertiv's pricing actions would offset some anticipated inflation, but did not correctly predict how much inflation there would be in 2021, especially at year-end.  The undisputed facts are entirely consistent with this theory and inconsistent with Officer Defendants hiding the truth.  Vertiv at all times warned that its price

increases would not offset the forecasted inflation for 2021 and kept updating the market as conditions worsened and costs increased. Although Vertiv missed its guidance for 4Q 2021, that guidance was based on the reasonable—and disclosed—assumption that the worst was over. The far more compelling theory is that Vertiv underestimated inflation, which is not fraud.

### A.   Plaintiffs' Motive and Opportunity Allegations Are Inadequate

To raise a strong inference of scienter through "motive and opportunity," Plaintiffs must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *ECA*, 553 F.3d at 198 (internal quotation marks omitted). They do not come close to doing so.

To the contrary, the AC does not allege that any Officer Defendant profited in any way from the alleged fraud—as none sold stock at a profit during the Class Period. Each sold zero Vertiv shares during the period in which Plaintiffs claim the stock price was inflated (and in fact Johnson *increased* his holdings of Vertiv shares in his 401(k) during the Class Period). *See supra* pp. 13; Ex. 5 at 4. Each left already vested options unexercised during the same period. This lack of pecuniary benefit from the alleged fraud undermines any inference of scienter. *See Greco*, 2022 WL 4226022, at *25 ("[A]s a general matter, the absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders." (internal quotation marks omitted)).

Lacking stock sale allegations, Plaintiffs fall back on several deficient motive theories, each of which has been repeatedly rejected in this Circuit: *First*, Plaintiffs allege that the Officer Defendants made many statements about Vertiv's pricing actions, that pricing was a "key lever" to achieve Vertiv's margin expansion plan, and that analysts credited these statements and the stock price rose during the Class Period. ¶¶ 182–184, 195. But Plaintiffs cannot show "motive" by reference to a motive that is "common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high." *ECA*, 553 F.3d at 198.

Similarly, a motive to show investors that Vertiv was meeting its margin expansion goals cannot support scienter because the "motive to assure that the company completed its announced initiatives [is] common to corporate officers." *City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277, 295 (S.D.N.Y. 2013).

*Second*, Plaintiffs allege that "Officer Defendants were highly motivated to conceal [Vertiv's] problems to enable [VPE Holdings] . . . to sell . . . Vertiv stock in the SPO at an artificially inflated price." ¶ 197. But Plaintiffs do not point to any "concrete and personal" benefit to Officer Defendants from the SPO. Neither the Officer Defendants nor Vertiv received any proceeds from the SPO. Other, non-Section-10(b) Defendants' trading is irrelevant to Officer Defendants' scienter. *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund* v. *Arbitron Inc.*, 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010). The allegation that Officer Defendants had a motive to please Vertiv's alleged "controlling stockholder" is conclusory. ¶ 197. VPE Holdings owned less than 16% of Vertiv's shares prior to the SPO and 10% after, and could appoint only two of nine directors. ¶¶ 57, 251. A small minority of shares and board seats does not "tend to show that [an investor] controlled" a company. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005). Plaintiffs do not explain why Officer Defendants, who possessed large holdings of Vertiv stock but did not sell until after the price dropped, would commit fraud to benefit others and to their own detriment.

### B.   Plaintiffs' Allegations of Conscious Misbehavior or Recklessness Are Insufficient

Lacking motive, Plaintiffs try to plead scienter through allegations of conscious misbehavior or recklessness. "[A]n allegation that a defendant merely 'ought to have known' is not sufficient." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y.), *aff'd*, 357 F. App'x 393 (2d Cir. 2009) (quotation marks omitted). Rather, "Second Circuit cases uniformly

rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their [allegedly] misleading statements." *Id.* at 536 (quotation marks omitted). And to plead scienter for a forward-looking statement, a plaintiff must allege that the statement "was made with actual knowledge" of its falsity. 15 U.S.C. § 78u-5(c)(1)(B). Plaintiffs nowhere allege that any Officer Defendant had such knowledge, or even had specific contradictory information available to him, at the time he made any allegedly misleading statement.

*First*, Plaintiffs improperly use statements by one Officer Defendant—and even non-10(b) Defendants (*e.g.*, Cote)—to impute knowledge of falsity to others. *E.g.*, ¶¶ 186–187. These allegations should be disregarded as the law does not permit scienter by group pleading.

*Second*, Plaintiffs again cite post-Class-Period statements to try to reverse-engineer "knowledge" of falsity by Officer Defendants during the Class Period. But, as discussed, these post-Class-Period statements are consistent with the statements made during the Class Period. Thus, while Plaintiffs note that Johnson referenced "aggressive" pricing action that Vertiv took "late" in 2021, ¶ 186, the insufficiency of actions Vertiv took earlier in 2021—which greatly exceeded Vertiv's original pricing forecast—was only clear after the fact. Plaintiffs cannot plead scienter using Officer Defendants' hindsight characterization of pricing actions as insufficient. *See City of Birmingham Firemen's & Policemen's Supp. Pension Sys.* v. *Ryanair Holdings plc*, 2020 WL 2834857, at *3 n.3 (S.D.N.Y. June 1, 2020) ("Statements indicating a present-sense understanding of a prior state of affairs do not give rise to an inference of scienter.").

Similarly, Johnson's statements that Vertiv "wasn't set up to drive a lot of price," and "didn't get a lot of pricing on the backlog," ¶ 186, were not admissions of contemporaneous falsity as to any statement in 2021. To the contrary, Vertiv executives noted in 2021 that Vertiv was not "historically" focused on pricing, ¶ 140; and as Johnson explained after the Class Period, Vertiv

did take pricing actions in 2021, but even as they thought they were "doing a lot of price," they fell short because Vertiv "got behind on what we thought inflation was going to be," Ex. 39 at 3–4.  And when Vertiv secured higher pricing on its backlog, it did not predict that, by the time it shipped its orders, the pricing it had achieved would be significantly outpaced by inflation.  *See Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 597 (S.D.N.Y. 2011) (to establish scienter based on an alleged admission, "the later, allegedly corrective, statement" should "directly contradict the earlier, allegedly false, statement").

Plaintiffs' other so-called admissions do not advance their scienter theory.  Johnson's statement acknowledging that escalation clauses were not "in all of Vertiv's contracts" was not inconsistent with any statement—and indeed was disclosed—during the Class Period.  *Supra* pp. 21–23.  While Plaintiffs allege that Johnson also admitted that Vertiv had been "routinely 'giv[ing] away the pricing that we were getting through discounting,'" ¶ 187, he did not address the actual impact of discounting on pricing, *see* ¶ 64.  More fundamentally, that Vertiv lost some pricing through discounts does not contradict Johnson's statements during the Class Period—or anyone else's, including Niederpruem's statements indicating that Vertiv had imposed more control over discounts.  Ultimately, none of these so-called admissions are "actual admissions of prior knowledge or reckless conduct," *Frankfurt-Tr. Inv. Luxemburg AG*, 336 F. Supp. 3d at 220.

*Third*, Plaintiffs cite statements on the February 2022 earnings call by Johnson that he took "full responsibility" for the "guidance miss" and that "we screwed up," and by Fallon that "we realize . . .we have likely damaged some of our credibility in 2021, notably with the quality of our external guidance."  ¶ 189.  But these statements—expressing contrition for guidance that was ultimately too optimistic—are not evidence they had not sincerely believed in that guidance in the first place.  The stronger, more reasonable inference from these statements is that, as senior

executives, they were taking responsibility for a forecasting miss.

*Fourth*, Plaintiffs claim that Officer Defendants had "detailed knowledge of information contradicting their public statements at the time they were made," citing Niederpruem's May 2021 statement that he and Fallon "review pricing and the commodity stuff probably . . . seems like it's 8 days a week at this point." ¶¶ 136, 190. But Plaintiffs identify no contemporaneous "pricing and commodity" data that contradicted Niederpruem's public statements. Vertiv repeatedly disclosed its forecasts of pricing and inflation underlying its guidance. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information," *Novak*, 216 F.3d at 309, and Plaintiffs' allegations do not. For example, Plaintiffs allege that FE-1 said that senior management was fully "aware" of rising costs "since we had an analysis on the impact on the pricing of copper and components" that began at the start of the pandemic, ¶ 191, but FE-1 does not allege that any Officer Defendant had access to this analysis during the Class Period when he made his statements, and does not allege anything in this analysis that contradicts any of Officer Defendants' statements. Plaintiffs have failed to show, as they must, that the "individual defendants actually possessed the knowledge highlighting the falsity of public statements." *Glaser*, 772 F. Supp. 2d at 591.[11]

*Fifth*, Plaintiffs cite analyst reactions to the guidance miss, ¶ 196, but those "hindsight-based viewpoint[s]" are "classically insufficient to support a strong inference of scienter," *Sinay*

---

[11] While FE-1 allegedly "recalled personally attending [quarterly meetings] with Johnson during which the Company's practice of underpricing was discussed," ¶ 84, Plaintiffs provide no detail on when the meetings occurred, what specifically was discussed, and how any purported discussion contradicted any of Johnson's statements. FE-1 joined Vertiv in January 2018 and left March 2021; these meetings could have occurred before the Class Period. Notably, Plaintiffs allege that FE-3, at Vertiv throughout the Class Period, attended quarterly meetings with Johnson and Fallon where "sales, margins, and profitability" were discussed, but not "underpricing." ¶ 89. Plaintiffs do not, however, cite anything Johnson or Fallon learned at any meeting about sales, margins, or profits that contradicted any public statement. *See Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (allegations that CW attended meetings with executives did "not establish what specific contradictory information [executives] received or when they received it"), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).

v. *CNOOC Ltd.*, 2013 WL 1890291, at *8 (S.D.N.Y. May 6, 2013), *aff'd*, 554 F. App'x 40 (2d Cir. 2014).

## IV.     Plaintiffs Do Not Adequately Allege Violations of Sections 11 and 12(a)(2)[12]

To allege a claim under Section 11 or 12(a), a plaintiff must show that a registration statement or prospectus, respectively, "(1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading." *Arfa* v. *Mecox Lane Ltd.*, 2012 WL 697155, at *4 (S.D.N.Y. Mar. 5), *aff'd*, 504 F. App'x 14 (2d Cir. 2012). "[T]he heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud." *Rombach*, 355 F.3d at 171. Although Plaintiffs say they are not alleging fraud with respect to their Securities Act claims, ¶ 215, they "cannot evade the requirements of Rule 9 through artful pleading" and the Court must "consider whether the wording and imputations of the complaint are classically associated with fraud." *City of Coral Springs Police Officers' Ret. Plan* v. *Farfetch Ltd.*, 565 F. Supp. 3d 478, 491 n.3 (S.D.N.Y. 2021) (internal quotation marks omitted). Nearly "[e]very statement that Plaintiffs allege to be false or misleading under the Securities Act they also allege to be false and misleading for the same reasons under the Exchange Act,"[13] and the AC plainly alleges a unified theory of fraud. *Id.* The Securities Act claims are therefore subject to Rule 9(b).

Regardless of whether the Securities Act claims are subject to Rule 9(b)'s heightened pleading standard, they fail for many of the same reasons as the Exchange Act claims, discussed

---

[12] The Section 11 and 12(a)(2) claims are the only claims against the Underwriter Defendants. The Section 15 claims are the only claims against the Platinum Equity Defendants. The Section 11 and 15 claims are the only claims against the Director Defendants.

[13] *Compare* ¶¶ 120, 122, *with* ¶¶ 255, 257. The only exceptions are two risk factors cited in ¶ 259, which are an abbreviated version of a risk factor also challenged under the Exchange Act, ¶ 122, and a risk factor alleged to be false for the same reason as multiple alleged misstatements under the Exchange Act, *see, e.g.*, ¶ 121.

*supra*.  In connection with their Securities Act claims, Plaintiffs challenge a handful of risk disclosures incorporated into the Offering Materials, claiming that each misleadingly omitted that the risks disclosed had already materialized.  None of these disclosures are actionable.

Plaintiffs allege that Vertiv's risk disclosure from Vertiv's Amended 2020 10-K, issued April 30, 2021, and incorporated into the November 4, 2021 Offering Materials, that "we may not realize the revenue we expect to generate from our backlog, or, if realized, may not result in profitable revenue," was misleading.  ¶ 255.  Plaintiffs allege that the Offering Materials omitted that the risk of Vertiv's backlog not yielding "profitable revenue" had already materialized.  ¶ 256.  But the Offering Materials specified that "[f]orward-looking statements included in this prospectus supplement speak only as of the date of this prospectus supplement or *any earlier date specified for such statements*."  Ex. 29 at S-v (emphasis added).  The "date specified" for such statements was that of the 10-K incorporated by reference, April 30, 2021.  Plaintiffs do not allege that the backlog had resulted in unprofitable revenue as of April 30, 2021, the date of the risk disclosure.  *See In re Stemline Therapeutics, Inc. Sec. Litig.*, 313 F. Supp. 3d 543, 548, 550 (S.D.N.Y. 2018) (dismissing claims premised on filings incorporated into prospectus where prospectus "had explicit disclaimers providing ample warnings that the incorporated statements represented facts that had existed at the time the incorporated documents were filed with the SEC").

Moreover, even as of November 3, 2021, the filing date of the Prospectus, Plaintiffs point to no particularized facts to plead that Vertiv's backlog was not yielding "profitable revenue" as of that date.  Indeed, even after missing guidance in 4Q 2021, Vertiv reported significant *positive adjusted operating profits* of $94 million.  Ex. 38 at 7.  At most, Plaintiffs have alleged that the risk of unprofitable revenue in the future had increased, but "[a]n increase in a risk does not mean the risk has already come to pass, such that a disclosure that simply identifies the risk would be

misleading." *Constr. Laborers Pension Tr. for S. Cal.* v. *CBS Corp.*, 433 F. Supp. 3d 515, 538 (S.D.N.Y. 2020).   And, of course, there can be no liability for failing to predict the future with certainty as of the timing of the SPO.   *See Novak,* 216 F.3d at 309.

Plaintiffs also challenge a risk factor, again incorporated into the Offering Materials from the April 2021 10-K, stating that "large companies . . . often require more favorable terms and conditions in our contracts . . . that could result in downward pricing pressures," claiming it was misleading to omit that this risk had already materialized.   ¶¶ 257–258; Ex. 15 at 16.   At the outset, Plaintiffs do not allege any omission, because the risk factor made clear that Vertiv was *already* entering into contracts with large companies with less favorable terms.   There was no obligation to quantify this risk.   *See Constr. Laborers Pension Tr.*, 433 F. Supp. 3d at 538.   Nor did the risk factor become materially misleading because Vertiv faced pressure on pricing as 2021 progressed. By the SPO, Vertiv had already disclosed that it had "long-term, fixed price contracts" with customers that exposed it to changes in the price of its inputs; that "changes in costs . . . of components [and] materials" posed a "substantial risk" to its financial condition, Ex. 11 at 14; that it was exposed to "downward pricing pressures," *id.*; that costs on its inputs had risen significantly for three quarters; that only "sometimes" its contracts with large customers had escalation clauses, ¶ 132; and that "a lot" of its pricing actions would not bear fruit until 2022, Ex. 24 at 11. Accordingly, by the SPO, investors fully understood that, on contracts where it had fixed-price terms, Vertiv was facing pricing pressure given increased costs.   *See Stadnick* v. *Vivint Solar, Inc.*, 861 F.3d 31, 38 (2d Cir. 2017) ("The materiality of an omission must be assessed in light of the total mix of information in the public domain.").[14]

---

[14] Plaintiffs' cursory challenge to risk factors referencing "less favorable contractual terms with large customers" and "failure to mitigate risks associated with long-term fixed price contracts," ¶ 259, fail for the same reason:  Plaintiffs identify no material non-public information that those statements omitted because Vertiv had repeatedly disclosed the

## CONCLUSION[15]

For the above reasons, the Court should dismiss the Complaint with prejudice.

Dated:   New York, New York
         January 20, 2023

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: */s/ Audra J. Soloway*

Audra J. Soloway
David P. Friedman

1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000
asoloway@paulweiss.com
dfriedman@paulweiss.com

*Counsel for Vertiv Holdings Co, Rob Johnson, David Fallon, Gary Niederpruem, David Cote, Joseph van Dokkum, Roger Fradin, Jacob Kotzubei, Matthew Louie, Edward L. Monser, Steven S. Reinemund, and Robin L. Washington*

**LATHAM & WATKINS LLP**

By:   */s/ J. Christian Word*

J. Christian Word

---

impact of significant inflation on its operations and reasonable investors would understand that such inflation would necessarily undercut Vertiv's margins on contracts with less favorable price terms.

[15] Plaintiffs' Section 20(a) claims against Officer Defendants and Section 15 claims against Fallon, Johnson, the Director Defendants, and Platinum Equity Defendants also fail. To plead a "control person" claim under Section 20(a) of the Exchange Act, a plaintiff must plead: (1) a primary violation by the controlled person, (2) control of the primary violator by the controlling person, and (3) that the controlling person was a culpable participant in the alleged fraud in some meaningful sense. *ATSI*, 493 F.3d at 108. Plaintiffs do not plead an underlying Exchange Act claim, and do not allege that Officer Defendants were culpable participants for the same reasons they do not allege scienter. *See In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *29 (S.D.N.Y. Sept. 30, 2021) (Woods, J.). To plead a control person claim under Section 15 of the Securities Act, a plaintiff must establish a primary violation and control of the primary violator. *In re Lehman Brothers Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011). Plaintiffs have not stated a Section 11 or 12(a)(2) claim, and their allegations of "control" as to the Platinum Equity Defendants fail, *see* Platinum Defendants' Mem. of Law in Supp. of Mot. to Dismiss.

555 Eleventh Street, NW
Washington, D.C. 20004
(202) 637-2200
christian.word@lw.com

*Counsel for Platinum Equity Defendants*

**ROPES AND GRAY LLP**


By:   */s/ David B. Hennes*

     David B. Hennes
     Adam M. Harris
     Elena Weissman Davis

1211 Avenue of the Americas
New York, New York 10036
(212) 596-9000
david.hennes@ropesgray.com
adam.harris@ropesgray.com
elena.davis@ropesgray.com

*Counsel for Underwriter Defendants*