**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Vertiv Holdings Co Securities Litigation* | Case No. 1:22-cv-3572-GHW-OTW |
| | **CLASS ACTION** |
| | **ORAL ARGUMENT REQUESTED** |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................... 1

II. STATEMENT OF FACTS ..................................................................................... 4

  A. Vertiv's Stock Price Climbs As Defendants Consistently Misrepresent The Company's Pricing Capabilities ................................................................ 4

  B. Despite Increasing Inflation, Vertiv Raises Guidance Shortly Before The SPO And Continues Making False Statements Into The Fourth Quarter .............. 7

  C. The Truth Fully Emerges ............................................................................ 8

  D. Defendants' Subsequent Admissions Further Confirm Their Fraud .................... 11

III. ARGUMENT ........................................................................................................ 12

  A. The AC Adequately Pleads Material Misstatements And Omissions ................. 12

    1. Defendants Misled Investors About Vertiv's 2021 Pricing Actions ........ 13

      a. Rather Than Implementing "Robust Pricing Actions," In Reality, Defendants Were Doing The Exact Opposite ................ 13

      b. The Detailed And Reliable Accounts Of Numerous Former Employees Corroborate Defendants' Admissions ....................... 15

      c. Vertiv's $53 Million In Price Increases Is A Red Herring .......... 17

      d. Contrary To Defendants' Representations, Virtually None Of The Contracts In Vertiv's Backlog Had Escalation Clauses ...................................................................................... 20

      e. While Assuring Investors That Vertiv Was Being "Judicious" And "Controlling" With Regard To Discounting, In Reality, Vertiv Took Virtually No Steps To Control Discounts .................................................... 21

      f. Vertiv Was Not Preplanning With Its Suppliers ........................... 23

      g. Far From "Sophisticated," The Undisclosed Reality Was That Vertiv's Pricing Tools Were A "Total Disaster" .................. 24

    2. Defendants Misled Investors To Believe That Vertiv's Pricing Actions Were Robust Enough To Drive Pricing Recovery Into 2022 .......................................................................................... 24

3.      The Misstatements Are Not Opinion Statements And Are
        Actionable ......................................................................................... 25

        a.      Misrepresentations Of Present Or Historical Fact Are
                Actionable ....................................................................... 25

        b.      Opinion Statements with False Supporting Facts Are
                Actionable ....................................................................... 26

        c.      Opinion Statements With Material Omissions Are
                Actionable ....................................................................... 28

4.      Defendants' Misstatements Are Not Protected By The Safe Harbor ....... 29

        a.      Defendants' Representations Of Present Fact Are Not
                Protected Under The Safe Harbor ................................... 30

        b.      Defendants' Misstatements Were Not Accompanied By
                Meaningful Cautionary Language ................................... 33

        c.      Defendants Had Actual Knowledge That The Alleged
                Misstatement Were False ................................................ 34

5.      The Alleged Misstatements Are Not Puffery And Are Actionable .......... 35

B.      The AC Raises A Strong And Compelling Inference Of Scienter ........................ 37

C.      The AC States Claims Under The Securities Act ................................................. 44

        1.      Defendants Misled Investors About The Risk of Fixed-Price Terms ....... 45

        2.      Defendants Concede That The Disclosures In The Offering
                Materials Were Misleading As Of The Date Of The SPO ........................ 46

        3.      Defendants Incorrectly And Improperly Dispute Whether The
                Backlog Risks Had Materialized ............................................................... 47

        4.      Plaintiffs Adequately Allege Liability Under Section 15 ......................... 48

IV.     CONCLUSION ................................................................................................................. 50

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*,
  2021 WL 4481215 (S.D.N.Y. Sept. 30, 2021) .......................................................................13

*Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*,
  2020 WL 3318029 (S.D.N.Y. June 18, 2020) .......................................................................46

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) .......................................................................36

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) .....................................................................................49

*Bishins v. CleanSpark, Inc.*,
  2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ...........................................................................33

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
  2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) .......................................................................34

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  866 F. Supp. 2d 223 (S.D.N.Y. 2012) ...................................................................................35

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013) ...................................................................................44

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ..................................................................31, 33

*Doe v. Uber Techs., Inc.*,
  551 F. Supp. 3d 341 (S.D.N.Y. 2021) ...................................................................................36

*DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*,
  413 F. Supp. 3d 187 (S.D.N.Y. 2019) ..............................................................................13, 49

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ..................................................................................................44

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017) ...................................................................................36

*Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*,
  987 F. Supp. 2d 369 (S.D.N.Y. 2013) ...................................................................................48

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  352 F. Supp. 2d 429 (S.D.N.Y. 2005) ...................................................................................44

*Francisco v. Abengoa, S.A.*,
    559 F. Supp. 3d 286 (S.D.N.Y. 2021)..................................................................49, 50

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)..................................................................39, 40

*FrontFour Cap. Grp. LLC v. Taube*,
    2019 WL 1313408 (Del. Ch. Mar. 11, 2019)...........................................................43

*Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*,
    675 F.3d 1047 (7th Cir. 2012) ..................................................................................50

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) ........................................................................44

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000).....................................................................................46

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)......................................................................38

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009)......................................................................44

*In re Glob. Brokerage, Inc.*,
    2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019) .........................................................26

*Gordon v. Tencent Music Ent. Grp.*,
    2021 WL 9183821 (E.D.N.Y. Mar. 31, 2021)..........................................................45

*Gruber v. Gilbertson*,
    2022 WL 4232834 (S.D.N.Y. Sept. 14, 2022)..........................................................50

*In re Henry Schein, Inc. Sec. Litig.*,
    2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) .........................................................29

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983).................................................................................................44

*In re IAC/InterActiveCorp Sec. Litig.*,
    695 F. Supp. 2d 109 (S.D.N.Y. 2010)......................................................................45

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
    236 F. Supp. 3d 824 (S.D.N.Y. 2017).......................................................................28

*In re Interpublic Sec. Litig.*,
    2003 WL 21250682 (S.D.N.Y. May 29, 2003) ........................................................44

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)....................................................................................29

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
   2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020)...................................................................37, 43

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)....................................................................................47

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)...................................................................................................21

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)....................................................................................43

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 F. App'x 10 (2d Cir. 2011) .................................................................................15, 36, 42

*In re NIO, Inc. Sec. Litig.*,
   2021 WL 3566300 (E.D.N.Y. Aug. 12, 2021)..................................................................16, 50

*Noto v. 22nd Century Grp., Inc.*,
   2023 WL 122305 (W.D.N.Y. Jan. 6, 2023).............................................................................16

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)....................................................................................16, 36, 37

*Nutriband, Inc. v. Kalmar*,
   2020 WL 4059657 (E.D.N.Y. July 20, 2020)..........................................................................27

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)......................................................................................42

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)........................................................................................... *passim*

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
   432 F. Supp. 3d 131 (D. Conn. 2019).....................................................................................43

*Patriot Exploration, LLC v. SandRidge Energy, Inc.*,
   951 F. Supp. 2d 331 (D. Conn. 2013).....................................................................................34

*Pearlstein v. Blackberry Ltd.*,
   2018 WL 1444401 (S.D.N.Y. Mar. 19, 2018) .......................................................................27

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund* v. *Arbitron Inc.*,
   741 F. Supp. 2d 474 (S.D.N.Y. 2010).....................................................................................44

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................................34

*In re Regeneron Pharms., Inc. Sec. Litig.*,
2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)...........................................................30

*Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)..............................................................38, 41

*Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010)................................................................................30

*Robertson v. Strassner*,
32 F. Supp. 2d 443 (S.D. Tex. 1998), *overruled on other grounds*, *Southland*
*Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004)..................................44

*In re Romeo Power Inc. Sec. Litig.*,
2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022) ......................................................35

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)..................................................................................38

*Setzer v. Omega Healthcare Invs., Inc.*,
968 F.3d 204 (2d Cir. 2020)..........................................................................17, 24

*Sgalambo v. McKenzie*,
739 F. Supp. 2d 453 (S.D.N.Y. 2010)..................................................................30

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)...................................................12, 26

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................................ *passim*

*In re Stemline Therapeutics, Inc. Sec. Litig.*,
313 F. Supp. 3d 543 (S.D.N.Y. 2018)..................................................................47

*Strougo v. Barclays PLC*,
105 F. Supp. 3d 330 (S.D.N.Y. 2015)..................................................................38

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021)................................................................................12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007).............................................................................37, 42, 43

*In re Top Tankers, Inc. Sec. Litig.*,
528 F. Supp. 2d 408 (S.D.N.Y. 2007)..................................................................40

*In re Tufin Software Techs. Ltd. Sec. Litig.*,
2022 WL 596861 (S.D.N.Y. Feb. 25, 2022)................................................................16, 19, 49

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ...............................................................................50

*In re Vale S.A. Sec. Litig.*,
2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ....................................................................33

*In re Vale S.A. Secs. Litig.*,
2020 WL 2610979 (E.D.N.Y. May 20, 2020) .....................................................................21

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005).................................................................................48

*Van Dongen v. CNinsure Inc.*,
951 F. Supp. 2d 457 (S.D.N.Y. 2013).................................................................................17

*In re Vivendi Universal, S.A.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003).................................................................................29

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011).................................................................................15

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)...............................................................................................29

*Wang v. Cloopen Grp. Holding Ltd.*,
2023 WL 2534599 (S.D.N.Y. Mar. 16, 2023) ....................................................................34

*In re Wells Fargo & Co. Sec. Litig.*,
2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)............................................................. *passim*

*Williamson v. Cox Commc'ns, Inc.*,
2006 WL 1586375 (Del. Ch. June 5, 2006).......................................................................43

*Wilson v. LSB Indus., Inc.*,
2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ......................................................................29

*Yannes v. SCWorx Corp.*,
2021 WL 2555437 (S.D.N.Y. June 21, 2021) ........................................................38, 39, 42

**STATUTES AND RULES**

15 U.S.C. § 77k(a) ................................................................................................44, 47, 49

15 U.S.C. § 77l................................................................................................................44, 49

15 U.S.C. § 77z–2(c)(1)(B)(ii)...............................................................................................29

17 C.F.R. § 230.430B(f)(2)................................................................................................48

17 C.F.R. § 240.10b–5(b) .........................................................................................13, 23

Fed. R. Civ. P. 8(a) ...........................................................................................................45

Fed. R. Civ. P. 9(b) .....................................................................................................44, 45

## I.  **INTRODUCTION**[1]

Throughout the Class Period, the single most critical issue facing Vertiv was inflation. In particular, investors' "big focus" was whether the Company could sufficiently increase the prices of its products to offset rapidly rising costs. To appease investor concerns in this regard, on each and every earnings call during the Class Period, Defendants repeatedly and specifically assured the market that that Vertiv had the "*pricing muscle*" to "*get price*," to "*pass[] price along*" to its customers, and that it was "*able to go forward [and] price things at that higher cost rate*."

Significantly, to make this point crystal clear, Defendants told investors that they had already implemented numerous "*robust pricing actions*" and emphasized that Vertiv was being "*much more judicious*" with its "*discount levels*," to the point that it was "*controlling the discounts that our own salespeople are able to have*." Further, Defendants asserted that Vertiv's over $2 billion backlog—representing the majority of the Company's Class Period revenue from contractual sales booked in the past at already low margins—would not hinder its ability to offset inflation through pricing actions because Vertiv had "*material clauses*" allowing it to "*institute[] surcharges*" as costs increased. Defendants even went so far as to tout that they *personally* monitored inflation and pricing metrics "*8 days a week*." On the strength of these misrepresentations, Vertiv's stock price skyrocketed over 37%, reaching a Class Period high of $28.59 per share on September 2, 2021.

Defendants' statements were completely false. On February 23, 2022, Vertiv shocked the market by announcing devastatingly poor results that management directly attributed to the

---

[1] Unless otherwise noted all capitalized terms have the meanings ascribed to them in the Amended Consolidated Complaint (ECF No. 25) ("AC"); "¶__" are references to the AC. Defendants' Memorandum of Law In Support of Their Motion To Dismiss (ECF No. 54) is referred to as "MTD," and the Platinum Equity Defendants' Memorandum of Law In Support of Their Motion to Dismiss (ECF No. 56) is referred to as "Platinum MTD." "DX" refers to the Exhibits to the Declaration of Audra J. Soloway (ECF No. 55) filed with the MTD.

Company's ***inability*** to capture inflation through pricing actions. In a series of shocking admissions that directly contradicted Defendants' repeated Class Period assurances about Vertiv's ability to "get price," Defendants now admitted the exact opposite—that Vertiv "***didn't and wasn't set up to drive a lot of price***," was "***never aggressive with pricing***," and in reality was plagued by an embedded "***culture***" of "***generally underpric[ing]***" contracts. Indeed, rather than being "judicious" and "controlling" with Vertiv's discounting, Defendants now admitted that the Company had "***los[t] price through discounting***," and that it had been "***giv[ing] away the pricing that we were getting through discounting***." Moreover, rather than having "material clauses" enabling Vertiv to retroactively "institute surcharges" on its $2 billion backlog, Defendants now admitted that this provision "***wasn't in all of [Vertiv's] contracts prior***," and that those contracts in fact had locked-in discounted pricing. And while Defendants had assured investors just four months earlier that Vertiv's ability to "get price" was so successful that "now and going forward" it would "cover" even "potentially worse" inflation, Defendants now made clear that the opposite was true: that Vertiv's condition had lasted for the entire Class Period, as the Company "***got behind on the inflation recovery curve with insufficient price and stayed there all year***."

In response to these stunning revelations, the reaction of the market was swift and severe. Vertiv's share price collapsed, falling 37% in a single day and wiping out $2.7 billion in market capitalization, leaving investors, like the Lead Plaintiff pension funds, with massive losses. Analysts uniformly excoriated Defendants for misleading investors about Vertiv's "shockingly bad" financial results, noting that "***management credibility is completely shot***," that they "***cannot defend the results or the guidance***," and that "***[i]n our 17 years of covering industrials, we can't recall a drawdown of this magnitude***." Remarkably, in the face of this widespread criticism, Defendants acknowledged that Vertiv's inability to keep pace with inflation was its own fault,

2

admitting that they were "*ful[ly] responsible*," that they had "*screwed up*," and that they "*absolutely realized we have likely damaged our credibility in 2021*."

Faced with these facts, Defendants ask the Court to accept their premise—purportedly negating falsity—that this action should be dismissed because they claim to have warned investors that Vertiv would recover only a miniscule portion of inflationary costs, and that their only failing was in not accurately predicting the magnitude of inflation. Indeed, Defendants rely heavily on the notion that because Vertiv obtained $53 million in price increases during the Class Period, then they could not have misled investors. This is nonsense. Defendants' argument is fatally undermined by the market's visceral reaction to their disclosures (the 37% stock drop), their own admissions, and the reaction of analysts who excoriated them for their lack of credibility. Indeed, this case is not about whether Defendants could increase pricing at all, but rather whether Defendants had actually implemented the "robust pricing actions" they touted to investors—actions that would supposedly enable Vertiv to "*recover the vast, vast, vast majority*" of inflation, even if it got "*potentially worse*." But they totally failed to do that, capturing just 28% of the cost increases they experienced—a fraction of the 75% they had set out to capture at the beginning of the Class Period. Even Defendants' own brief puts the reality of the situation quite plainly: "Vertiv's pricing response did not—and could not—keep up with inflation," a fact that they deliberately concealed throughout the Class Period. MTD 28.

Defendants' scienter arguments fare no better. There is simply no way to square Defendants' repeated averments on every single earnings and investor call during the Class Period that Vertiv had successfully implemented "robust pricing actions" with Defendants' later admissions that the undisclosed reality was the exact opposite of those pronouncements: that "*[t]he organization didn't and wasn't set up to drive a lot of price*." Similarly, the notion that Defendants

3

were completely in the dark about the single most critical issue facing the Company cannot be reconciled with Defendants' repeated statements during the Class Period touting Vertiv's "sophisticated" tools to monitor inflation and pricing metrics in real time, as well as their assurances that that they ***personally*** reviewed this information "***8 days a week***." These stark discrepancies alone raise a strong, cogent and compelling inference of Defendants' scienter. And Defendants had a motive too: to increase Vertiv's share price just before the November 2021 SPO enabling the Platinum Equity Defendants to liquidate over 20 million Vertiv shares for $544 million. Those shares would have only been worth half of that amount—just $271 million—if sold a few months later, after the truth was revealed in February 2022.

Based on misrepresentations in the Offering Documents for the SPO, Plaintiffs have also adequately alleged claims under the Securities Act for both primary and control person liability.

For all the reasons set forth herein, Defendants' motions should be denied in their entirety.

## II.     **STATEMENT OF FACTS**

### A.     **Vertiv's Stock Price Climbs As Defendants Consistently Misrepresent The Company's Pricing Capabilities**

In the years leading up to the Class Period, Vertiv was a company with strong growth potential, but weak profit margins. ¶39. Accordingly, after Vertiv went public, Defendant Johnson announced that Vertiv would embark upon a "margin expansion" plan by "expanding margins 500 basis points" to "match [the Company's] peers." *Id.* Defendants made clear that the key "lever" to achieving Vertiv's margin expansion plan was "strong execution of purchasing and pricing initiatives." ¶¶40-41. By the start of the Class Period in early 2021, Vertiv faced significant inflationary headwinds, prompting investors to question whether the Company could achieve its margin expansion plan, which was critical to Vertiv's success. ¶43.

To assuage investors' concerns, Defendants repeatedly falsely touted that Vertiv was

4

successfully implementing "robust pricing actions" that would "fully offset" inflation. ¶¶44-46. On February 24, 2021, the first day of the Class Period, Defendants issued extremely aggressive guidance, projecting that in 2021, Vertiv would achieve adjusted operating profit of $565 to $585 million—a staggering 68% increase over the previous year. ¶44. Defendants assured investors that the Company would achieve that goal precisely because of Vertiv's pricing actions. *Id.* To that end, Defendant Johnson assured investors that Vertiv's "*pricing initiatives*" "*continued to yield favorable results*," and were "*foundation[al]*" to "*achiev[ing] the expansion plans we laid out a year ago*." ¶116. During the Company's earnings call, Defendant Niederpruem answered analysts' questions about whether Vertiv could "*offset recent raw material inflation with pricing*" by stating, unequivocally, that the Company would "*certainly be on the plus side of that equation*" in 2021 because it was able to "*continue passing price along*" to its customers. ¶117.

Thereafter, on each and every earnings and investor call during the Class Period, Defendants continued to tout—and misrepresent—Vertiv's pricing capabilities. Time after time, analysts asked Defendants about their ability to manage inflation, and time after time, Defendants assured investors that Vertiv had "*fully implemented*" "*robust pricing actions*," including "*rais[ing] list prices appropriately*," "*controlling the discounts that [] salespeople*" could offer to clients, and using "*material clauses*" to "*institute[] surcharges*" on contracts in Vertiv's "$2 billion [backlog]." ¶¶52, 61, 64-65, 132. Defendants also falsely assured investors that Vertiv was effectively managing inflation on the cost side through "*sophisticated*" "*AI and [] pricing tools*" that supposedly provided employees with accurate, real-time cost information, and by "*preplanning with [] suppliers*" to avoid costly "spot buys" for "critical components." ¶¶152, 179. Indeed, Defendants spoke so often about their successful pricing actions that it became their mantra—that because of Defendants' "robust pricing actions," Vertiv was successfully "*getting*

*price*," that Vertiv had the "***pricing muscle***" to "***get price***," to "***pass[] price along***" to its customers, and that it was "***able to go forward [and] price things at that higher cost rate***." ¶¶117, 128, 138.

Defendants connected these purported "robust pricing actions" to Vertiv's ability to manage inflation. Defendants stated that "by the time we get to Q4, we will have ***pricing that fully offset[s] inflationary costs***," and that Vertiv "actually look[ed] at [inflation] strategically as a way to get additional price." ¶46. Similarly, Defendant Niederpruem stated that he had been monitoring Vertiv's pricing response in real time, ***"8 days a week,"*** and thus was "really, really confident that ***we will be able to recover the vast, vast, vast majority of any inflationary stuff.***" ¶49.

Analysts fully credited these statements, explicitly attributing their confidence in Vertiv to Defendants' purported "pricing actions." Evercore noted that Vertiv was "executing rather well given the ongoing supply chain and component challenges," and credited Defendants' assurances that inflationary "headwinds [would] be offset by pricing that . . . is sticking fairly well with customers." ¶50. Similarly, Citi highlighted Vertiv's "price realization through its $2.3 [billion] record backlog," and Deutsche Bank noted that Vertiv "is having greater success with new pricing mechanisms, aided by 'big data' and AI." ¶50. In turn, Vertiv's stock price soared by over 37%, reaching a Class Period high of $28.59 per share on September 2, 2021. *Id.*

On September 8, 2021, Defendants reduced Vertiv's projected 2021 adjusted operating income by 10%, from $600 million to $540 million. ¶52. Defendants attributed the reduction to "supply challenges" that required the Company to pay "elevated prices" for critical components acquired through costly "spot buys." *Id.* However, as Cowen noted, this cut to the Company's guidance came "as a surprise given [that] Vertiv [had] addressed supply constraints when it reported 2Q21 earnings just five weeks" earlier. ¶53. These disclosures caused Vertiv's stock price to fall approximately 11%. *Id.*

Instead of disclosing the full truth, Defendants falsely assured investors that the issue had been resolved, and continued to misrepresent that Vertiv's pricing actions *were offsetting* inflation, with Defendant Johnson further assuring investors that "*[o]ur pricing has continued to ramp*," and that "*[w]e continue to drive pricing*." ¶54. Defendant Niederpruem similarly stated that "you can see the *pricing ramping every quarter, every month as we track this*." ¶54.

**B.      Despite Increasing Inflation, Vertiv Raises Guidance Shortly Before The SPO And Continues Making False Statements Into The Fourth Quarter**

On October 27, 2021—just five days before announcing an upcoming secondary public offering (the "SPO")—Vertiv suddenly reversed course from its September guidance cut and *raised* the Company's 2021 adjusted operating income guidance by $13 million. ¶55. During Vertiv's third quarter earnings call, Defendants continued to emphasize that they had adopted pricing actions that would offset inflation, claiming that "*pricing actions now and going forward*" would "*cover*" inflation even if it got "*potentially worse*," and further that they were "*certainly encouraged with what we're seeing in the pricing environment here in the fourth quarter*." ¶55. These worked, as Vertiv's stock price increased over 6% on November 1, 2021, and analysts specifically credited Defendants' "confidence" around "improving price realization" and "price increases," while observing that these disclosures "calmed fears of 'another shoe to drop.'" ¶56.

On November 1, 2021, Defendant VPE Holdings, an affiliate of Defendant Platinum Equity and Vertiv's largest shareholder, sold more than 20 million shares of Vertiv common stock through the SPO. ¶57. VPE Holdings reaped a staggering *$544 million in proceeds* from the SPO. ¶57.

As late as November 16, 2021—more than halfway through the fourth quarter—Defendants continued to claim that the Company's pricing actions would not only offset inflation, but would result in "definitely more tailwinds." ¶¶172-73. Defendant Niederpruem attributed these "tailwinds" to "additional pricing actions" that the Company purportedly had launched "over the

7

last 2 or 3 weeks." ¶58. Niederpruem also again made clear that Vertiv had achieved these benefits *without discounting*, noting that Vertiv had implemented "*price increases*" by raising "*list prices*" and "*controlling the discounts and multipliers that our own sales people are able to have*." ¶176.

### C.    The Truth Fully Emerges

On February 23, 2022, Defendants stunned investors by announcing that Vertiv had missed its fourth quarter guidance issued just a few months earlier by $*72 million—43% below* the lower-end of the Company's fourth quarter guidance range—and had missed projected annual adjusted operating income by *$82 million*. ¶59. In the ensuing earnings call, Defendants acknowledged that the massive shortfall was entirely attributable to the fact that Vertiv had *not* implemented the pricing actions that they had repeatedly touted to investors, and made a series of extraordinary admissions that directly contradicted Defendants' prior public statements.

*First,* and significantly, Defendants made crystal clear that Vertiv's abysmal financial results were not due to external market forces, but to Defendants' own failure to implement the pricing actions they publicly touted to investors. Defendant Johnson, for instance, stated that Vertiv's management was "*full[y] responsible*" for the guidance miss and had "*screwed up*" by "*underpricing the market in 2021*" and failing to recapture inflationary costs. ¶66. Defendants further acknowledged that they "*realize[d]—absolutely realized we have likely damaged some of our credibility in 2021*, notably with the quality of our external guidance." *Id.*

*Second,* Defendant Johnson explicitly admitted that—in stark contrast to Defendants' repeated assurances that Vertiv had implemented "robust pricing actions" that would "cover" inflation—in reality, "*the [Vertiv] organization . . . didn't and wasn't set up to drive a lot of price*." ¶61. Johnson also disclosed that, rather than raising prices to manage inflation, Vertiv had in fact been "*generally underpric[ing]*" its contracts, and Defendant Cote admitted that, as a result, the Company had "*got behind on the inflation recovery curve with insufficient price and stayed*

8

*there all year*." ¶62. Indeed, Johnson conceded that Vertiv had just begun to "act[] decisively *late last year and early this year [2022]* with aggressive price actions." ¶59.

Defendants' admissions on pricing are confirmed and corroborated by the remarkably detailed accounts from of several high-ranking former Vertiv employees (FEs)—including former Vice Presidents and Senior Account Executives—with direct knowledge of the Company's pricing practices. ¶¶82-112. FEs unequivocally confirmed that contrary to Defendants' representations, "*[t]hey were not issuing price increases in 2021*." ¶¶82-92, 98-99. FE-3—the former V.P. of Field Sales until July 2022, who also attended internal meetings with Defendants Johnson and Fallon where sales, margins and profitability were discussed—confirmed that Vertiv "*[did] not get[] ahead of it in regards to raising price to offset inflation*." ¶¶88-89. FE-1, the former V.P. of Channel Strategies for the Americas who participated in internal meetings with Defendant Johnson and other senior management, confirmed that underpricing was regularly discussed. ¶84. FE-1 said that "*Rob Johnson agreed to do [underpriced] deals without price increases. These exceptions were being approved and their [February 2023] quarterly miss was all self-inflicted*." *Id.*

*Third,* Defendants admitted that, contrary to their representations that Vertiv was actively "controlling the discounts that our own salespeople are able to have," the exact opposite was true: namely, the Company had been "*discount[ing] to build backlog*"—a practice that was so pervasive it was part of the Company's "*culture*." ¶187. Indeed, Johnson explicitly admitted that Vertiv had "*los[t] price through discounting*" and had been routinely "*[g]iving away the pricing that we were getting through discounting*." ¶64. Defendant Cote confirmed that Vertiv regularly "underprice[d]" because it "*had a predisposition or a deference to not lose the order*." *Id.* Johnson further admitted that, due to the "cultural" nature of the problem, Vertiv now had to make "*behavioral changes . . . across the world*" to require "*authority and approval*" for discounts. *Id.*

9

*Fourth,* Defendants admitted that, contrary to their earlier statements that Vertiv leveraged "material clauses" in contracts to retroactively "institute surcharges," the vast majority of contracts in Vertiv's $2 billion backlog contained no such clauses and had locked-in discounted pricing. Indeed, Defendant Johnson admitted that Vertiv had only *recently* made the "change" of adding "escalator" provisions to its contracts so the Company could recoup increased commodity costs— a provision that "***wasn't in all of [Vertiv's] contracts prior***." ¶63. Johnson later admitted that, contrary to Defendants' Class Period assurances that Vertiv was "by no means going to just discount the $2 billion" backlog, in reality, the Company "***didn't get a lot of pricing on the backlog that we had[,] [t]hat was part of our problem. We had to burn through that***." ¶78.

These admissions are also confirmed by former employees. Several FEs confirmed that Vertiv "***had an inability to transfer [] price costs to [its] customers***" for the larger enterprise contracts in its backlog. ¶¶83, 93-97. According to FE-1, once an order was set for a large deal, pricing was locked in and as a result, "***the contract terms were not good for Vertiv***." ¶94. FE-2 likewise noted that "***[t]here was no mechanism to increase prices in those contracts, you had to eat it***." ¶96. FE-2 confirmed that Defendants deliberately took this approach to inflate Vertiv's stock price, stating: "***It was all slash and burn to get the stock price up as high as you can. That is why they went out and targeted all of those large customers***." ¶95. Additionally, FE-6, former VP of Sales at Vertiv, recalled that despite major competitors raising prices in mid-2020 and throughout 2021, she was informed that ***Vertiv was not going to raise prices and wanted to seize the opportunity to gain market share***. FE-6 stated that as a result, Vertiv ended up with a huge backlog that was "***off the charts significantly and also off the charts unprofitable***." ¶97.

In direct response to these disclosures, Vertiv's share price plummeted, falling ***37%*** from $19.57 to $12.38 per share—representing a ***$2.7 billion decline*** in its market capitalization. ¶67.

Analysts excoriated Vertiv's management. Deutsche Bank described the earnings miss as "***especially frustrating*** in the midst of what we would characterize as constructive management commentary at conferences throughout the quarter, even into December." ¶69. Deutsche Bank described the Company's "***[s]hockingly bad***" results as "***a management credibility issue***." ¶69. Cowen called Defendants' "***credibility [into] question***," emphasizing that "[e]vidently," "the price actions [Vertiv] took late in the third quarter" were not enough to "keep up with inflation during the fourth quarter." ¶70. Wolfe Research lamented that "***[i]n our 17 years of covering industrials, we can't recall a drawdown of this magnitude***," concluding that "management credibility" was "***completely shot***" due to the "wide" gap between "the guide given in early-Nov." ¶71.

### D.        Defendants' Subsequent Admissions Further Confirm Their Fraud

After the Class Period, Defendants repeatedly confirmed the falsity of their prior statements. For instance, on February 24, 2022, the day after the Class Period ended, Defendant Johnson acknowledged that, until the end of 2021, Vertiv's "mantra" had been to "grow, grow," and "***take share [under] any contribution margins***"—i.e., to do deals irrespective of low profit margins. ¶73. Johnson admitted that rather than being "judicious" and "controlling" with its discounting policies during the Class Period, in reality, Vertiv did not start to "drive more systems and more processes" to cut back on discounting until mere weeks before the end of the Class Period. Indeed, throughout 2021, Vertiv's salespeople "***had a lot more freedom to discount in a price range***," and often used that freedom because they were "***very afraid to lose a deal***." ¶73.

Similarly, in March 2022, Defendant Fallon—in contrast to Defendants' repeated representations about the Company's purported ability to "get price"—acknowledged that Vertiv had, in fact, just started to "look at price as a strategic lever" and had been "***tepid to raise price***" in 2021. ¶74. Fallon recounted that in 2021, "any time we talk[ed] about long-term margin goals, we would put price on the list, ***but it was probably fourth or fifth and maybe hoping that we***

11

*wouldn't get to that when talking to investors*." *Id.* In May 2022, during a Goldman Sachs interview, Fallon again confirmed that Defendants had no basis whatsoever to tout Vertiv's purported pricing actions, admitting that Vertiv was "*never aggressive with pricing*." ¶77.

In March 2022, Defendant Niederpruem confirmed that only "*now*"—i.e., after the Class Period ended—were "*material escalation clauses*" included in "*some*" of the larger contracts in Vertiv's backlog, which was a change that the Company implemented specifically so that it wouldn't "*get caught in the same situation again*." ¶75. Niederpruem also confirmed that Vertiv's compensation for salespeople had incentivized volume over price, reporting that "*in '21 probably only about 1/3 of [Vertiv's] active sales force had, in their sales incentive plan, something to do with price or margin*," and for most, "*the more orders, the higher your commission*." ¶76.

## III.    ARGUMENT

"Even under the [PSLRA], which establishes heightened pleading requirements for securities fraud claims, the usual rules for determining motions to dismiss pertain: the well-pleaded allegations of the complaint are deemed true and all reasonable inferences are drawn in favor of the pleader." *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *10 (S.D.N.Y. Nov. 26, 2018).[2] Plaintiffs "need not prove their entire case within the confines of the complaint." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021).

Defendants contest the AC's sufficiency only as to (i) material misstatements or omissions, (ii) scienter, and (iii) control person liability. Each challenge fails.

### A.    The AC Adequately Pleads Material Misstatements And Omissions[3]

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" *or* "omit[ting] to

---

[2] In any cited authority, unless otherwise noted, all emphasis is added, and internal citations and quotes are omitted.

[3] Attached as Exhibit A to the accompanying Declaration of James A. Harrod is a table responding generally to the "statement-by-statement" arguments in DX 1-2. *See* MTD 16 n. 5. The arguments in DX 3—that certain cautionary language renders purportedly forward-looking statements inactionable—are addressed fully below, in §III.A.4.b.

state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *7 (S.D.N.Y. June 16, 2020) (Woods, J.). "[W]hether a reasonable investor, in the exercise of due care, would have received a false impression from a statement requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts [and] is therefore generally a question of fact for the jury"—not for resolution on a motion to dismiss. *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 210 (S.D.N.Y. 2019) (Woods, J.).

### 1. Defendants Misled Investors About Vertiv's 2021 Pricing Actions

#### a. Rather Than Implementing "Robust Pricing Actions," In Reality, Defendants Were Doing The Exact Opposite

Defendants' false and misleading statements about pricing actions that Vertiv purportedly implemented—but which did not actually take place—are the heart of this case.[4] As inflation increased at the beginning of the Class Period in 2021, investors were laser-focused on whether Vertiv could offset inflationary costs with price increases. To assuage investors' concerns, Defendants repeatedly represented that Vertiv was "getting price" to offset inflation by instituting "robust pricing actions," "passing price along" to its customers, and "controlling the discounts and multipliers that our own salespeople are able to have." ¶¶125, 127, 150, 157, 173. These statements

---

[4] Defendants' "fraud-by-hindsight" argument (MTD 19) is a red herring that misconstrues the theory of the case, because it is not that Defendants "fail[ed] to adequately [predict and offset higher costs from inflation and supply chain breakdowns], but rather that Defendant[s] affirmatively represented that [they were] implementing certain [pricing actions to offset costs] while simultaneously failing to do so." *In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*, 2021 WL 4481215, at *29 (S.D.N.Y. Sept. 30, 2021). Indeed, "Defendant[s'] failure to predict the COVID-19 pandemic is unrelated to [Plaintiffs'] actual allegations, which are that Defendant[s] improperly concealed [their complete failure to increase prices whatsoever] that left [Vertiv] severely exposed to an increase in [inflation-related] volatility – an allegation that is sustained regardless of the materialization of any tail risk. That Defendant[s] failed to predict how that volatility actually materialized is immaterial." *Id.* at *31 (citing cases).

13

misled investors to believe that Vertiv was successfully capturing inflation through price increases when the opposite was true: as Defendants admitted at the end of the Class Period, Vertiv "didn't and wasn't set up to drive a lot of price," had been "generally underpric[ing]" its contracts, was "never aggressive with pricing," and had a Company-wide "culture" of "giv[ing] away the pricing that we were getting through discounting." ¶¶60-67, 77, 126.

Defendants' attempts to discredit these powerful admissions ring hollow. Defendants' primary argument is that these admissions pertained to Vertiv's "historical practices over years" and had nothing to do with 2021, but this is nonsense. MTD 18. When Defendant Johnson admitted that Vertiv "didn't and wasn't set up to drive a lot of price," it was in direct response to an analyst question asking Johnson to describe the "big cultural changes" the Company had been forced to make "*in the scope of [the last] two months*" (i.e., in 2022) to address the pricing issues that had persisted *for the entire Class Period*. DX 37 at 13. Similarly, Defendant Cote's admission that Vertiv had been "generally underpric[ing]" its contracts directly pertained to Cote's earlier admission that Vertiv's financial miss was due to a longstanding "cultural issue" Defendants had only barely begun to rectify through "*a significant amount of change that's occurred over the last 60 days*." *Id.* Indeed, *all* of Defendants' admissions—taken in context, as Defendants urge— plainly concerned the reasons for Vertiv's abysmal financial miss *in 2021*, which was analysts' and the market's key focus at the time. As Defendant Cote starkly admitted, Vertiv's management was "*disappointed and embarrassed*" because "*[w]e got behind on the inflation recovery curve with insufficient price and stayed there all year*." ¶¶62, 66.

While Defendants contend that these were not admissions but merely reflect "taking responsibility for a forecasting miss," that is not what they said. MTD 39-40. Such unequivocal admissions of fault would not have occurred if, as Defendants now suggest, Vertiv had merely

14

underestimated inflation. Similarly, Defendants would not have said that they "absolutely realized" they had "*damaged . . . our credibility in 2021*" simply because they failed to predict inflation. ¶66. And clearly, Defendants would not have been "embarrassed" or made the numerous admissions they made about their failure to implement the "robust pricing actions" they had previously touted, had they merely failed to keep up with industry-wide inflation.[5]

> b.    *The Detailed And Reliable Accounts Of Numerous Former Employees Corroborate Defendants' Admissions*

The accounts of numerous former Vertiv employees further confirm that Defendants' Class Period representations were materially false and misleading. FE-1 reported that "the pressure to sell was so great that we had *an inability to transfer* those price costs [i.e., increased shipping costs] to our customers," and that as of March 2021, there had been *no discussion at all* of raising prices to keep up with inflation. ¶83. FE-2 confirmed that Vertiv's prices did *not* increase in 2021, despite the fact that Vertiv's competitors raised prices by 5% to 15%. ¶86. FE-3 recounted that, contrary to Defendants' express representations, Vertiv "made an error in not getting ahead of it in regards to raising price to offset inflation." ¶88.[6] FE-5 confirmed that Vertiv did not institute "price increases in 2021," in part, because it did *not have any mechanism to do so after an order*

---

[5] Defendants argue that their statements concerning pricing actions that pre-dated the Class Period—such as Defendant Johnson's statement that pre-Class Period initiatives had "continued to yield favorable results" throughout 2021 and would enable Vertiv to "*continue* passing price along" to achieve "positive price" in 2021 (*see* ¶¶115-17, 128, 130, 136, 140, 172)—are not actionable. MTD 16-17. Defendants are wrong. It is axiomatic that materially false or misleading statements of "past or present" fact are actionable. *See*, *e.g.*, *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts."). These statements were about Vertiv's *past actions*—specifically, about pricing actions that Vertiv had purportedly *already implemented* in 2020 that formed the baseline for price increases in 2021—and they were false because, as Defendants eventually admitted, Vertiv was "*never aggressive with pricing*," and it "*didn't and wasn't set up to drive a lot of price*." ¶¶61, 77.

[6] Defendants attempt to discredit this allegation, arguing that FE-3 "mean[t] Vertiv made a *forecasting* error in not 'getting ahead' of inflation, not that it had taken *no actions* to raise price." MTD 19. Defendants' proffered interpretation of FE-3's statement, which was made during a conversation in which Defendants did not take part, is highly speculative and irrelevant at the pleading stage, where the Court "draws all reasonable inferences in Plaintiff's favor." *E.g.*, *Noto v. 22nd Century Grp., Inc.*, 2023 WL 122305, at *1, *5 (W.D.N.Y. Jan. 6, 2023).

*was placed*, and that Vertiv did not change its discounting practices in 2021. ¶91. These consistent and detailed accounts corroborate Defendants' post-Class Period admissions. ¶¶59-66, 72-79.

While Defendants unpersuasively challenge the FE allegations based on the employees' tenure and positions within the Company (MTD 19-20), courts in the Second Circuit allow plaintiffs to rely on FE statements "so long as '[the unnamed sources] are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). The AC describes the FEs' "positions and/or job responsibilities . . . sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *In re NIO, Inc. Sec. Litig.,* 2021 WL 3566300, at *7 (E.D.N.Y. Aug. 12, 2021); *see* ¶¶83, 85, 88, 90, 97, 103. Not only are these descriptions sufficient, but Defendants' *own admissions* "corroborate [the FEs'] statements," so here, "the requirement of a description of the source's job is loosened." *Id.*

Defendants nevertheless ask the Court to disregard the AC's well-pled FE allegations simply because certain FEs were "low-level," worked in a specific region or business, or left Vertiv prior to the end of the Class Period. Nothing in the AC, however, suggests that Vertiv's practice of generally underpricing deals was "specific to [the FEs'] respective regional areas" or "isolated to a certain time period." *In re Tufin Software Techs. Ltd. Sec. Litig.*, 2022 WL 596861, at *8 (S.D.N.Y. Feb. 25, 2022) (Woods, J.) (crediting allegations about the company's sales cycle from "confidential witnesses [who] worked in Tufin's sales divisions"). To the contrary, Defendants' own statements make clear that Vertiv's pricing initiatives were implemented uniformly around the globe, *see, e.g.*, ¶45 (stating that Vertiv was "driv[ing] prices through with our customers *on a global scale*"); ¶125 (stating that Vertiv was "[i]nstituting pricing actions *around the globe*"), and "were *never* aggressive" until months after the Class Period, ¶77. Defendants' remaining

16

arguments attack the truth of the FEs' allegations, and thus raise factual questions that cannot be resolved. *Van Dongen v. CNinsure Inc.,* 951 F. Supp. 2d 457, 471 (S.D.N.Y. 2013) (a "motion to dismiss is not the proper vehicle to test the credibility of witnesses").

> c.      *Vertiv's $53 Million In Price Increases Is A Red Herring*

In the face of their own extraordinary admissions and the detailed accounts of numerous FEs, Defendants' primary argument is a red herring: that their Class Period statements were purportedly true simply because "Vertiv obtained $53 million in additional pricing in 2021." MTD 17-18. Defendants' argument wholly fails.

*First,* this case is not about whether Vertiv was able to obtain *some* additional pricing, but whether the Company in fact had implemented the pricing actions that Defendants repeatedly and publicly touted, which would purportedly allow Vertiv to "*recover the vast, vast, vast majority*" of inflation. ¶49. Indeed, it is impossible to credit Defendants' argument that they were completely truthful, when Vertiv's stock price collapsed by 37% upon disclosure of their vaunted $53 million in price actions, their own stark admissions, and the reaction of analysts, who uniformly excoriated Defendants for their complete lack of candor, stating that management's "*credibility [was] completely shot*" because they had misleadingly "*provid[ed] the investment community with a sense that [Vertiv] was in control of pricing conditions*." ¶¶70-71, 196. Clearly, had Defendants been fully transparent and truthful about Vertiv's price actions during the Class Period, they would not have made the admissions discussed above and investors' reaction to this disclosure would have been far more positive, both of which confirm that they "gave a false impression" of Vertiv's ability to recover costs through price increases. *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 (2d Cir. 2020).

*Second*, Defendants claim that Vertiv's pricing forecasts fully warned investors that the Company would be able to offset only a small fraction of projected inflation. Not so. In reality,

Defendants instead repeatedly emphasized to investors throughout the Class Period that these pricing estimates were merely a "floor" that did not reflect Vertiv's actual "robust" ability to raise prices to offset inflation. Specifically, in May 2021, Defendant Niederpruem stated that the Company's pricing forecast "*clearly is the floor*," with "*more upside and more runway on that number*"; that he and Defendant Fallon were reviewing pricing "8 days a week"; and that he was "*really, really confident that we will be able to recover the vast, vast, vast majority of any inflationary stuff*." ¶136. Similarly, in July 2021—when Defendants now projected $110 million in annual inflation (an increase of over 50% from the prior quarter)—Defendant Johnson firmly told investors that "*by the time we get to Q4, we will have pricing that fully offset[s] inflationary costs*." ¶149; *see* ¶143. Even as late as October 27, 2021—just a few months before the truth would be revealed, and at a time when Defendants projected $155 million in annual inflation—they asserted that, even "*assuming that [inflation] could get potentially worse*," Vertiv's "robust" pricing actions "now and going forward" would "*cover that*," and even provide a "tailwind" at "the end of the fourth quarter" with a "floor" of $5-10 million. ¶¶165-67.

Recognizing that these statements defeat any argument that Defendants' pricing projections somehow absolve them of liability, Defendants now try to claim that when they made repeated statements averring that their pricing actions would "fully offset" inflation, they supposedly limited their remarks to offsetting inflation in the fourth quarter only. MTD 29. That is not what Defendants said. Rather, as set forth above, Defendants repeatedly asserted throughout the Class Period that Vertiv would "fully offset" annual inflation *"by the time we get to Q4,"* and nowhere qualified those statements as being limited to the fourth quarter only. ¶149. Indeed, any such interpretation is not only a fact question not appropriate for resolution at this stage, it makes no sense. At no point during the Class Period did Defendants ever report, discuss or disclose

18

forecasts for inflation or pricing on a quarterly basis. To the contrary, every time Defendants spoke about projected pricing offsetting inflation, it was always on an ***annual*** basis.[7]

Significantly, Defendants' own admissions—and the chart that they include in their motion (MTD 12)—further establishes the falsity of these statements. Defendants assert that of the $53 million they obtained for pricing in 2021, $28 million occurred during the fourth quarter of 2021— meaning that for the first three quarters of 2021, ***Defendants obtained a miniscule $25 million in additional pricing***. MTD 11. Not only does this cold, hard fact prove that the statements Defendants made throughout 2021 about their "robust pricing actions" allowing them to "get price" were utterly false, but it also establishes that Defendants had no basis whatsoever to claim that they would ***ever*** come close to offsetting inflation. Indeed, in July 2021, Defendants projected annual inflation costs to be $110 million—yet told investors that they would "fully offset" those increases "by the time we get to Q4" even though at that time they had obtained less than $20 million in pricing. The notion that Defendants would somehow obtain at least an additional ***$90 million*** in pricing by the fourth quarter, when they knew that the organization "didn't and wasn't set up to drive a lot of price," is nonsense.

*Finally*, Defendants' claim that their pricing forecasts fully warned investors that Vertiv would recover "only a fraction" of projected inflation (MTD 9) is belied by the fact that Defendants' forecasts instead consistently maintained that ***Vertiv would recover the vast majority***

---

[7] Defendants also claim that their October 27, 2021 statements that their pricing actions "now" would "cover" even "potentially worse" inflation—and thus result in a "tailwind"—pertained to 2022 only and not to the fourth quarter. MTD 30-31. Again, Defendants distort the facts. In reality, Defendants' statements were in response to an analyst questioning whether the Company's pricing was going to "double" *in Q4 versus Q3* in light of increasing inflation, and if that was possible based on "how much price is in [the] backlog." DX 27 at 9. In his response, Defendant Johnson specifically stated that while Vertiv had not received "the pricing level necessary to offset inflation in previous quarters," the Company's pricing actions "now" and "going forward" —i.e., ***the fourth quarter***—would "cover" even "potentially worse" inflation. Defendant Fallon, responding to the same question, further confirmed that even in a "do-nothing scenario"—*i.e.*, if the Company did nothing more to raise prices—the Company "expect[ed]" a "tailwind" with a "floor" of $5 to $10 million "***at the end of the fourth quarter***." *Id.* at 9.

19

*of inflationary costs*—between approximately 60-75% (what Defendants repeatedly described as a "floor")—in every full-year forecast until *after the first corrective disclosure*. However, as Defendants revealed at the end of the Class Period, due to their failure to implement "robust pricing actions" they had touted, they fell far short of this amount, *recovering only 28% of inflation*.

| | Full-Year Forecasts | | | | | Actual |
|---|---|---|---|---|---|---|
| | **Feb. 2021** | **Apr. 2021** | **July 2021** | <u>Sept. 2021 corrective</u> | **Oct. 2021** | |
| Price Recovery % | 75% | 56% | 59% | | 36% | 28% |

        d.       *Contrary To Defendants' Representations, Virtually None Of The Contracts In Vertiv's Backlog Had Escalation Clauses*

Defendants specifically assured investors that Vertiv had "levers" including "material clauses" (i.e., escalators) to increase price for orders in the Company's $2 billion backlog, and that "*by no means are we just taking a look at that $2 billion of backlog and saying, well, there's nothing we can do*." ¶¶132-33; Ex. A. These representations were critical because most of the Company's revenue came from its "backlog," and were materially misleading in light of the undisclosed fact that most orders in the "backlog" had locked in pricing that Vertiv *could not* increase. As Defendant Johnson directly admitted at the end of the Class Period, in reality, Vertiv's larger contracts were devoid of any "material escalation clauses," such that the Company's "problem" was that "*we didn't get a lot of pricing on the backlog that we had[]*" and "*had to burn through that*"—which was exactly what Niederpruem had assured investors Vertiv would *not* have to do. ¶78. Multiple FEs likewise confirmed that Defendants had no basis to make these representations to investors, stating that "[t]here was no mechanism to increase prices in those contracts" in the backlog, such that the Company "had to eat" the cost—making the backlog "*off the charts unprofitable*." ¶¶96-97; *see also* ¶¶93-95; *supra*, §III.A.1.b.

Defendants argue that Niederpruem's statement that Vertiv "sometimes" had "material clauses" in "larger contracts" was true. MTD 21. However, Defendant Niederpruem himself

20

admitted in March 2022 that *it was only "now" (in March 2022)* that there were "material escalation clauses" in *"some"* of Vertiv's larger contracts, so "*that way, we don't get caught in the same situation again*." ¶75. Indeed, Niederpruem's statement was misleading because it omitted the fact that the overwhelming majority of these contracts did *not* include escalation clauses, and even if *some* contracts did have such clauses, they did not meaningfully contribute to Vertiv's ability to "get price." Niederpruem nevertheless falsely touted these purported clauses as a "lever" that Vertiv could use to avoid having to "just discount the $2 billion" backlog—discounting that was *already* occurring and was locked in by contractual terms. ¶¶47, 132. Placed in context, Niederpruem's statement "lull[ed] [investors] into a false sense of security" as to Vertiv's ability to recoup inflationary costs through its backlog. *In re Vale S.A. Secs. Litig.*, 2020 WL 2610979, at *14 (E.D.N.Y. May 20, 2020).

Defendants' argument also disregards the requirement that even literally true disclosures must be "complete and accurate"—"literal truth of an isolated statement is insufficient." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). As the case law makes clear, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id.* Omissions that create "an incomplete and misleading picture" are actionable. *Vale*, 2020 WL 2610979, at *15.

        e.        *While Assuring Investors That Vertiv Was Being "Judicious" And "Controlling" With Regard To Discounting, In Reality, Vertiv Took Virtually No Steps To Control Discounts*

Throughout the Class Period, Defendants misled investors to believe that Vertiv had become "much more judicious" with "multipliers" and "discount levels," to the point that even as late as November 2021, Defendant Niederpruem claimed that Vertiv was achieving pricing gains by "controlling the discounts and multipliers that our own sales people are able to have." ¶¶137, 177. These statements were unequivocally false. As Defendants explicitly admitted at the end of the Class Period, far from being "judicious" or "controlling" regarding discounts, in reality,

discounting was so rampant and pervasive at Vertiv that the Company had a "*culture*" of "*los[ing] price through discounting*" and routinely "*giv[ing] away the pricing we were getting through discounting*." ¶¶46, 64-65. While Defendants again spin these damning admissions as relating only to prior years and not 2021, this is plainly wrong (MTD 24)—as evidenced by the fact that when Johnson made these admissions, he also admitted that Defendants' plan to change this embedded "cultural" practice had only barely "*implemented over the last 60, 90 days*." ¶65.

Defendants' rampant discounting practices were also confirmed by numerous first-hand FE accounts. For example, FE-1 stated that she personally attended meetings with Defendant Johnson during which Johnson personally approved of the Company's discounting—such that Vertiv's financial miss at the end of the Class Period was "self-inflicted." FE-2 reported that Vertiv sold to major accounts at "*dirt cheap*" prices that were routinely discounted *up to 65%*. ¶¶85-87. FE-5 also recounted that Vertiv's policy manual expressly authorized salespeople to discount list prices by up to 45% without any higher-level approval—*through at least September 2021*. ¶90. Contrary to Defendants' arguments, these detailed and consistent accounts of Vertiv's rampant discounting practices support a strong inference of the falsity of Defendants' statements.

Finally, Defendants assert that Niederpruem's statements were not false because they were "vague" and "merely suggest[ed]" that "Vertiv had become more judicious with discounting," and curiously attempt to minimize the impact of these statements by arguing that they were merely "*third* on a list of 'other points in the system' to obtain additional pricing." MTD 23. Defendants' argument again ignores reality. Indeed, in May 2021, Niederpruem made his discounting representations in *direct response* to an analyst question about the *specific actions* Vertiv was taking to "cover the inflation that you're seeing," and in November 2021, Niederpruem himself stated that "*the majority of the price* comes from those price increases, *just controlling the*

22

*discounts and multipliers that our own sales people are able to have*." ¶176. These statements were not "vague" or mere "suggestions," but instead concrete representations of the specific actions Vertiv claimed it was taking to offset inflationary headwinds.

### f.     Vertiv Was Not Preplanning With Its Suppliers

Defendants also misled investors by misrepresenting Vertiv's coordination with its suppliers, which exacerbated the Company's costs, forcing it to resort to extraordinary measures like "spot buys" to fulfill needed components at exorbitant prices. ¶142. On November 16, 2021—i.e., halfway through Q4—Defendant Fallon reaffirmed Vertiv's fourth quarter guidance on the basis that Vertiv had "really good visibility to the critical components" for Vertiv's products due to its "preplanning with the suppliers." ¶179. This was false. As FE-3 reported, Vertiv's "key suppliers" began to decommit at the beginning of the pandemic, and supplier decommits escalated throughout 2021—by "the second half of 2021," the decommits "*got really serious* . . . *and that was when the wheels really fell off of the cart*" resulting in "*crisis meetings all over*." ¶101.

While Defendants argue that the fact "[t]hat supplier decommits became more 'aggressive' does not suggest that Vertiv did not 'pre-plan[]' with suppliers" (MTD 25), this argument misses the mark. Even if Defendants did *some* preplanning with suppliers, it nevertheless was misleading for Fallon to tout Vertiv's "preplanning" *without also disclosing* the increasingly aggressive supplier decommits that Vertiv experienced throughout 2021.[8] Fallon's statement "gave a false impression," *Setzer*, 968 F.3d at 214, that Vertiv's relationships with suppliers would enable the Company to obtain "the critical components [necessary to] support that higher volume." ¶179. Indeed, as Defendants admitted when announcing Vertiv's dismal Q4 results, supplier decommits

---

[8] Defendants argue that the "allegations by FEs that certain suppliers put Vertiv on 'credit hold' for components" do not demonstrate falsity. MTD 25. Suppliers not shipping to Vertiv because of credit holds clearly make the identified statements misleading, as Vertiv's undisclosed issues with suppliers were "material fact[s] necessary in order to make [Fallon's] statements . . . not misleading." 17 C.F.R. § 240.10b–5(b).

on critical components were ***not*** properly managed and, in truth, accounted for half (i.e., approximately $18 million) of the Company's Q4 miss. ¶180.

> g.      *Far From "Sophisticated," The Undisclosed Reality Was That Vertiv's Pricing Tools Were A "Total Disaster"*

Defendants misled investors about Vertiv's "pricing tools," which, unbeknownst to investors at the time, did not have accurate pricing information and severely hampered Vertiv's pricing capabilities. When asked about Vertiv's pricing, Defendant Johnson falsely stated that Vertiv employed "sophisticated" methods, including "AI" and "pricing tools" to ensure that its pricing was profitable. ¶¶45, 152. In reality, Vertiv had botched the implementation of its internal pricing system, CPQ, and as a result, Vertiv's sales personnel did not have accurate information about material costs, and thus fundamentally lacked the ability to increase prices to account for inflation. ¶¶81, 105-12, 155.[9] FE-1 described CPQ as a "***total disaster***," and explained that because CPQ did not integrate well with Vertiv's other systems, the Company's pricing was inaccurate and required manual inputs. ¶107. FE-5 similarly reported that CPQ provided inaccurate information to Vertiv sales representatives, who relied on the system to price products. ¶109.

> 2.      **Defendants Misled Investors To Believe That Vertiv's Pricing Actions Were Robust Enough To Drive Pricing Recovery Into 2022**

Throughout the Class Period, Defendants also falsely assured investors that Vertiv's 2021 pricing actions were "robust" enough to drive price increases in 2022, when, in fact, such actions were anemic and incapable of offsetting inflation. For instance, Defendant Johnson told investors, "[w]e continue to drive pricing," and "we feel good about our pricing process, getting price in the market and continue as inflationary measures impact us." ¶157. Similarly, just months prior to the

---

[9] Defendants argue that the AC "doe[s] not allege that the 'pricing tool[]' Johnson referenced was CPQ." MTD 25. Not so. FE-5 confirmed that CPQ was the "new ERP system" implemented in 2021. ¶109. Moreover, neither Defendants nor any former employee indicated that Vertiv botched the implementation *of any system other than CPQ during 2021*, so the only reasonable inference is that CPQ was the "pricing tool" that Defendant Johnson referenced.

24

end of the Class Period, during an October 27, 2021 earnings call, Johnson stated, "***I can assure you going forward with our robust pricing actions and what we are doing now and [what] we'll be doing in 2022 that we will be positive in price based on what we're executing on***." ¶166.

Contrary to Defendants' argument that these statements are "non-actionable opinions" that "refer to expectations of Vertiv's pricing recovery in 2022," these statements mischaracterized Vertiv's ***then-present*** pricing actions as "robust" enough to "drive" sustainable price increases. But as Defendants later starkly admitted, the exact opposite was true: rather than "driving pricing," Vertiv in fact "***didn't and wasn't set up to drive a lot of price***" as the Company "***w[as] never aggressive with pricing***." ¶¶77, 118. Defendants' statements in ¶¶157 and 166-67 are thus actionable because these statements misled investors about Vertiv's ***present and ongoing*** pricing actions.

### 3. The Misstatements Are Not Opinion Statements And Are Actionable

#### a. *Misrepresentations Of Present Or Historical Fact Are Actionable*

Defendants assert that many of the contested statements are "classic forward-looking projections and opinions on Vertiv's financial guidance and ability to obtain price, offset inflation, and mitigate supply constraints." MTD 26 (referencing ¶¶115-17, 124-25, 127-28, 130, 132, 136, 138, 140, 142-45, 147, 149-50, 152-53, 157, 159-60, 162, 165-67, 172-73, 174, 176, 179). However, a statement is only an opinion if it is expressly stated as such. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-85 (2015).

Here, the vast majority of the statements Defendants seek to characterize as opinions are actually statements of present or historical fact, and do not represent uncertainty or belief. Defendants tacitly concede this point by failing to provide any argument or explanation as to how most of these statements, which are not opinions on their face, should be treated as such, including statements in: ¶¶115-16, 124-25, 127-28, 130, 132, 142, 144-45, 147, 150, 152-53, 157, 172, 174,

176, and 179. *See* Ex. A. For example, on Vertiv's Q1 2021 earnings call, Defendant Johnson expressly assured investors of Vertiv's current ability to drive prices by representing that the Company already had the systems and processes in place to take price actions "through . . . customers on a global scale." ¶128 (after analysts asked how Vertiv was "trying to offset" extra inflation costs, Defendant Johnson said the Company had already "been able to get price the last year, couple of years" and so "[c]ertainly . . . able to go forward [and] price things at that higher cost rate"); *see also* ¶125 (presentation told investors that Vertiv was "[m]anaging the [cost] disruptions" by "[i]mplementing" and "[i]nstituting and pricing actions around the globe"). Contrary to Defendants' assertion, an act "done or existing" or "happening" is a fact, not an opinion. *In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at *10 n.2 (S.D.N.Y. Mar. 28, 2019) (quoting *Omnicare*, 575 U.S. at 182). As a result, "[s]uch affirmative statements are not the expression of a belief, but characterizations of the Company's actual business practice." *Id.*

      b.  *Opinion Statements with False Supporting Facts Are Actionable*

To the extent any of the AC's alleged false statements were to be considered opinions, they are also actionable under *Omnicare* where: (1) "the speaker did not hold the belief she professed"; (2) "the supporting fact[s] she supplied were untrue"; or (3) the speaker omits information that was "necessary to make the statements therein not misleading." *Omnicare*, 575 U.S. at 179-87. Here, given the AC's "robust factual matter, reports of confidential former employees, and other corroborative information and third-party accounts," the AC adequately alleges that Defendants' misstatements are actionable. *Signet Jewelers*, 2018 WL 6167889, at *14 (finding subjective falsity); *Pearlstein v. Blackberry Ltd.*, 2018 WL 1444401, at *3 (S.D.N.Y. Mar. 19, 2018) (*Omnicare* satisfied where statements contradicted data that defendants had received and "had access to").

Defendants contend that certain statements (¶¶143, 149) are not actionable because

26

"Plaintiffs do not allege that the[] speakers did not believe *at the time* … that Vertiv would be able to successfully offset a large portion" of inflation in 2021. MTD 28-29 (¶¶136, 138, 140). However, Defendants' purported opinions on future inflation cannot cure false factual statements about Vertiv's then-current pricing actions that were simply not true. ¶127. While Defendants represented that they were "controlling the discounts and multipliers that our own sales people are able to have," and that Vertiv had "material clauses" in larger contracts" to institute "surcharges," the stark reality (to which Defendants later admitted) was that the Company had a "culture" of "giv[ing] away the pricing we were getting through discounting" and Vertiv's "larger contracts" did not have any such clauses. ¶¶131-32; *see supra* §II.C-D. Far from immaterial or speculative opinions, these and other similar factual statements were concrete misrepresentations about Vertiv's purported then-present actions to manage rising inflation—the single most important issue facing the Company at that time.

However, even assuming *arguendo* that these statements should be treated as opinions, such statements are actionable because they are still "accompanied by untrue supporting facts." *See e.g., Nutriband, Inc. v. Kalmar,* 2020 WL 4059657, at \*9 (E.D.N.Y. July 20, 2020); *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at \*14 (S.D.N.Y. Sept. 30, 2021) (Woods, J.). Here, Defendants relied on numerous explicit statements of fact regarding Vertiv's then-current pricing actions to support their purported 'opinions.' Such statements are actionable because, as the AC alleges, the underlying factual foundation for these statements was false. *See, e.g., In re Salix Pharms.*, Ltd., 2016 WL 1629341, at \*12 n.10 (S.D.N.Y. Apr. 22, 2016) (opinions actionable when "predicated upon untrue supporting statements of fact regarding current inventory levels"); *see also* ¶150 (on a July 28, 2021 earnings call, an analyst directly asked: "Are these [pricing] actions ***already made to the customers?***" Defendant Johnson responded that they were ***already***

27

"*underway*"). Fatally undermining Defendants' argument, they later *admitted* that such pricing actions were *never* implemented, rendering any supposed 'opinion' actionable. *See* Ex. A.

>   c.   *Opinion Statements With Material Omissions Are Actionable*

Finally, as this Court has explained, even "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 833 (S.D.N.Y. 2017); *see also Omnicare*, 575 U.S. at 188-89 (A reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.").

As discussed herein, Defendants made a multitude of representations about "robust pricing actions" that Vertiv was taking to "get price"—while at no time ever disclosing the highly material fact that, in reality, Vertiv "didn't and wasn't set up to drive a lot of price," was "generally underpric[ing]" its contracts, and had a Company-wide "culture" of routinely "giv[ing] up the pricing we were getting through discounting." Similar statements, contradicted by reality, were made concerning the Company's ability manage the costs in it supply chain. As multiple former employees confirmed, not only did Defendants have "access to" this contradictory information (¶¶89, 188, 192; *see* Ex. A) but they: (i) directly approved of the Company's discounting practices, (ii) had full knowledge that contracts on the backlog deals had locked-in discounted prices and did not allow for any price increases, and (iii) managed Vertiv's severe supply chain problems. ¶191.

Defendants therefore understood that these omitted facts would directly "conflict with what a reasonable investor would take from" their assurances. *See Omnicare*, 575 U.S. at 194; *Wells Fargo*, 2021 WL 4482102, at *14 ("Based on that context, Lead Plaintiffs have adequately pleaded that [the Defendant's] opinions are actionable because they omitted facts that conflicted with his statements"). And so, even if "considered opinions, because the statements did not include

28

disclosure of Defendants' allegedly [contradictory] behavior, they are actionable." *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *14 (E.D.N.Y. Sept. 27, 2019).[10]

### 4.      Defendants' Misstatements Are Not Protected By The Safe Harbor

Defendants incorrectly contend that "[m]any of the challenged statements" are forward-looking statements protected by the PSLRA safe harbor and the Second Circuit's "bespeaks caution" doctrine. MTD 31 (¶¶115-17, 124-28, 130, 132, 136, 138, 140, 142-47, 149-53, 157, 159-60, 162, 165-67, 172-73, 179). However, neither the safe harbor nor the bespeaks caution doctrine can protect misstatements of present or historical fact. *Id.*; *see* 15 U.S.C. § 77z–2(c)(1)(B)(ii); *In re Vivendi Universal, S.A.,* 381 F. Supp. 2d 158, 183 (S.D.N.Y. 2003) ("By definition, the safe-harbor provision applies to protect only 'forward looking' statements, and not to misrepresentations of historical or current facts."). Similarly, neither doctrine covers "present representations" that are "embedded within statements that [a defendant] deems forward-looking." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016).

Further, courts "in this circuit have consistently held that neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions." *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017) (holding that the safe harbor was inapplicable because "the complaint plausibly alleges a material omission based on defendants' failure to disclose that no detailed engineering analysis had been performed to support their cost projections"); *see Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) ("bespeaks caution does

---

[10] Defendants argue that several of the statements they categorize as opinions are not actionable when considered "in context." MTD 27-29. This appears to be a back-door truth on the market argument that is legally unfounded and, for the reasons discussed above, factually incorrect. *See, e.g.*, *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (rejecting truth-on-the-market defense because even if prior disclosures "raised some concern in the market about . . . such information was counteracted by [Defendants'] contemporaneous statements" to the contrary). Similarly, the "context" Defendants submit as curative, omits the materials facts and information discussed in the foregoing sections concerning Vertiv's failure and inability to raise prices or control discounts.

not apply" to "omission of present fact"). Accordingly, because the safe harbor is available only for *affirmative* statements, Defendants do not—and could not—contend that forward-looking statements prevent liability from their material omissions, including those that rendered their affirmative statements misleading. *See, e.g.*, ¶129 (Defendants failed to disclose that (1) Vertiv was still "giv[ing] away price" due to ingrained "culture" of discounting and (2) the vast majority of Vertiv's "backlog" deals were "locked in [with] discounted prices at very low margins.").

### a.   Defendants' Representations Of Present Fact Are Not Protected Under The Safe Harbor

Defendants' statements, "taken in light of the overall context in which they were made, are not subject to the PSLRA safe harbor for forward-looking statements because they . . . incorporated misleading representations of present fact." *Salix*, 2016 WL 1629341. Under the safe harbor, "any 'allegedly false statement [that] has both a forward-looking aspect and an aspect that encompasses a representation of present fact'" is actionable. *Id.*; *see also Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 & n.147 (S.D.N.Y. 2010). Such statements on current actions are not made forward-looking just because they are "mixed" with future projections. *See, e.g.*, *MF Glob.*, 620 F.3d at 144 (holding that "statements or omissions as to the operations in place (and present intentions as to future operations) are not" protected, including those that "communicate . . . the measures taken"); *In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005) ("Statements that might arguably have some forward-looking aspect are unprotected by the PSLRA safe harbor provision to the extent that they are premised on representations of present fact.").

Accordingly, statements about a company's current or prior operations are actionable representations of present or historical fact even if they also concern future expectations. For example, in *Salix Pharmaceuticals*, the court held that statements "predict[ing] future inventory

30

levels" were actionable because they also "encompass[ed] representations of present fact." 2016 WL 1629341, at *10.[11] There, the Salix Defendants described their forward-looking "expectation that wholesaler inventory" levels "would return to 'typical' levels by the end of the following quarter." *Id.* In context, those statements also made representations about Salix's "current inventory levels" because the Defendants also purportedly "expected revenue to rise in the following quarter as" the inventories returned "to more typical levels." *Id.* The Court found such misstatements misleading, "particularly in light of" the historical context: analysts had "repeatedly questioned" Defendants about inventory levels and never received a clear answer. *Id.* In truth, "as Defendants later revealed, it would take several years to return wholesaler inventory" level to "typical" levels. *Id.*

Similarly, here, when analysts repeatedly asked about Vertiv's pricing guidance, Defendants emphasized that inflation was "***being tracked and managed and closely monitored***" (¶127) and, despite challenges, the Vertiv had "***really good visibility***" due to its "***preplanning.***" (¶179). Even further, Defendants told investors they personally reviewed current pricing and cost data "***8 days a week.***" ¶190. As in *Salix*, these assurances to boost investor confidence made Defendants' other statements even more misleading, and if the Individual Defendants "did not have such knowledge" on pricing and inflation, then these statements were themselves "materially misleading." *See Salix*, 2016 WL 1629341, at *10 (holding responses to analyst questions actionable in light of Defendants' assurance that that they had "visibility in the inventories," which

---

[11] *See also City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *13 (S.D.N.Y. Mar. 25, 2013) ("In isolation, Aeropostale's earnings projections fall within the definition of a forward-looking statement under the PSLRA . . . . But these statements are accompanied by statements that the projections and outlook incorporate the effect of clearing through the inventory, sometimes even within the same sentence. Such statements imply that the earnings projections accurately reflect the sales and inventory problems that Defendants were aware of at the time the statements were made, demonstrating that the statements are not solely forward-looking, but instead incorporate a present fact whose accuracy could be determined at the time the statements were made.").

31

"led investors to believe that Defendants' future projections were based on accurate knowledge of current inventory levels").

Further, as described above, Defendants' supporting statements were themselves false. *See supra* §III.A. Defendants repeatedly told investors that supply chain issues, while persistent, had been and would continue to be effectively resolved through ongoing and increasing price actions. *See, e.g.,* ¶147 (in a July 28, 2021 presentation, Defendants told investors that Vertiv had specific "*[p]ricing actions in place*" that would "*fully offset inflation in Q4 and provide tailwind*."); ¶149 (during a July 28, 2021 conference call, Defendant Johnson told investors that the Company had already *"implemented strategies to recapture*" increased costs and that by continuing to increase pricing, Vertiv would "*have pricing that fully offset inflationary costs*" in Q4 2021). These statements, including multiple explicit *assurances of actions already taken*, represented that Vertiv had the present capacity to "get price"—not forward-looking optimism about potential results. *See e.g.,* ¶157 (on a September 8, 2021 conference call, Defendant Niederpruem assured investors that Vertiv was actively raising its prices and "*[s]o it's not really* [a question of] *can we get price.* It's just more of a timing issue than anything."); ¶166 (on an October 27, 2021 conference call, Defendant Johnson told investors: "*I can assure you* going forward with our robust pricing actions *and what we are doing now* and [what] we'll be doing in 2022 that we will be *positive in price based on what we're executing on*.").

Such statements are not forward-looking because their "accuracy" in describing Vertiv's current ability to increase prices are facts that could "be determined at the time [the statements] were made." *See Aeropostale*, 2013 WL 1197755, at *4-6 (statements that defendants were aware of a problem, had "taken steps to rectify" it, were "appropriately attacking" it, and had "taken the necessary steps" are not "forward-looking"); *Wells Fargo*, 2021 WL 4482102, at *18 (statements

describing "current or past progress" like "*we're in the midst* of implementing that" and "*we're continuing* to actively work and implement the new risk management framework" were actionable).

>   b.   *Defendants' Misstatements Were Not Accompanied By Meaningful Cautionary Language*

Even if Defendants' misstatements could be considered forward-looking, none of those statements were accompanied by meaningful cautionary language and are therefore actionable. MTD 32; DX 3. As an initial matter, "[b]oth the bespeaks caution doctrine and the PSLRA safe harbor require that the forward-looking statements be 'accompanied by' the cautionary language" within the same document. *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at \*25 (S.D.N.Y. Mar. 23, 2017) (Woods, J.) (holding that where forward-looking statements are "found in entirely different, unrelated documents" they are "not 'accompanied by' the purported cautionary language"). Accordingly, the language that Defendants rely on within various SEC filings does not accompany statements made on earnings calls or in completely separate materials. *See* DX 3; MTD 32 ("Vertiv's press releases, presentations, and earnings calls all referred to Vertiv's risk factors in its SEC filings, including the risk factors disclosed in its Form 10-K.").

Regardless, the risk warnings upon which Defendants rely are wholly insufficient because to be meaningful, "[c]autionary language must *expressly warn* of or *directly relate to the risk* that brought about Plaintiffs' loss, it must convey substantive information, and it must not be boilerplate." *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at \*9 (S.D.N.Y. Jan. 5, 2023); *see also In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (cautionary language must "precisely address" the substance of the specific statements at issue). Here, to 'expressly warn' investors of the true risk, Defendants would have needed to disclose that, contrary to their representations, the numerous price actions that they touted during the Class Period were

33

not being implemented at all. *See e.g.*, *Wells Fargo*, 2021 WL 4482102, at \*16 ("[A]lthough investors were informed at the outset of that call that management's expectations could differ from reality, investors were given no information that would assist them in understanding just how unreasonable and divorced from reality [Defendant's] projection was, based on the facts identified by Lead Plaintiffs.").

Indeed, Vertiv's general warning that "a portion" of their "customer base" is large companies that often "require more favorable terms and conditions" utterly failed to disclose that the "surcharges" that Defendants claimed they could impose pursuant to "material clauses" in Vertiv's contracts ***could not even be implemented*** with respect to the overwhelming majority of the Company's $2 billion backlog. *See supra* §II.C-D. Defendants' "inclusion of general cautionary language regarding a prediction [does] not excuse the alleged failure to reveal known material, adverse facts." *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2020 WL 1950783, at \*9 (E.D.N.Y. Apr. 22, 2020); *Patriot Exploration, LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 357 (D. Conn. 2013) (safe harbor does not apply where projections for future profitability were based on data that defendants "knew, or should have known" was misleading). Because these risks had already materialized, Defendants' warnings were, at best, irrelevant. *See Wang v. Cloopen Grp. Holding Ltd.*, 2023 WL 2534599, at \*10 (S.D.N.Y. Mar. 16, 2023) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

    *c.*  *Defendants Had Actual Knowledge That The Alleged Misstatement Were False*

Finally, even under the safe harbor, a forward-looking statement is actionable where, as here, Plaintiffs allege specific factual support that defendants lacked a reasonable basis for their belief. *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 3701095, at \*3 (S.D.N.Y. Aug. 25, 2022).

Here, Defendants not only knew they had not obtained the pricing sufficient to offset increasing inflation—having obtained only $25 million in pricing as late as the third quarter of 2021, while projected inflation had already exceeded $150 million—they also knew that they were locked into discounted pricing in Vertiv's $2 billion backlog comprising the majority of the Company's revenue, with no ability to raise prices, and an embedded "culture" of "giv[ing] away the pricing that we were getting through discounting." Thus, even treated as forward-looking, the statements are actionable because Plaintiffs allege sufficient facts to infer Defendants' knowledge of the truth—they did not (and could not) enact the price actions they repeatedly touted.

### 5.    The Alleged Misstatements Are Not Puffery And Are Actionable

Defendants also argue that "[m]any statements that Plaintiffs challenge are generic expressions of optimism that are immaterial as a matter of law." MTD 34. This is nonsense. As an initial matter, the issue of materiality, particularly under the circumstances present here, is inappropriate to be resolved at the pleading stage. *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.* ("*Bricklayers*"), 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) (materiality determinations inappropriate at the pleading stage because they "entail delicate, fact-intensive assessments that are more properly left to the jury").

Moreover, Vertiv's ability to increase pricing was unquestionably the single most critical issue facing the Company during the Class Period, as evidenced by the fact that Defendants repeatedly spoke about—and analysts consistently asked about—this issue on every single earnings and investor call during the Class Period. In this context, such statements cannot be immaterial puffery. *See e.g.*, *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (finding statements "made repeatedly in an effort to reassure the investing [public]" actionable because "a reasonable investor could rely on them as reflective of the true state of affairs at the Company"); *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 368 (S.D.N.Y. 2021) ("Whether a

35

representation is 'mere puffery' depends, in part, on the context in which it is made."); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019) ("Courts have found that when a company makes repeated representations on the same topic, even where those representation would otherwise be puffery, the repetition itself communicates to investors what 'matters [are] particularly important,' and 'those statements may become material to investors.'").

Indeed, numerous analysts expressly relied on Defendants' statements. *See, e.g.*, ¶183 (Deutsche Bank "encouraged to hear" that "management is having greater success with new pricing mechanisms to offset inflation," while Citi believed that Vertiv had "good visibility to the pace of price realization through its $2.3 [billion] backlog."). And following Defendants' February 23, 2022, admissions, analysts noted that the extreme disparity from Vertiv's prior representations created a severe "***management credibility issue***"—especially considering Defendants' "commentary and conferences throughout the quarter," which had falsely "***provid[ed] the investment community with a sense that [Vertiv] was in control of pricing conditions***." ¶196.[12]

Moreover, courts will not insulate even relatively general positive statements from liability if they are "misrepresentations of existing facts." *Novak*, 216 F.3d at 315. Here, Defendants attempt to describe "generalized positive statements that could not be relied upon by reasonable investors" by omitting the asserted factual basis: Vertiv's purportedly ongoing price actions. MTD 34. Defendants told investors that they were "well positioned for the second half of 2021" precisely because "***growth programs, pricing programs and margin improvement initiatives***" were purportedly "***already underway***." ¶142; *see* ¶116 (The "foundation [Defendants] established

---

[12] "[M]ateriality is satisfied as to the misstatements at issue" considering (1) Defendants' "concealment of the company's failure to meet analysts' expectations," (2) "the significance of" price actions "to the company's operations and profitability," and (3) "the precipitous decrease in share price that occurred after" Defendants "disclosed the true state" of Vertiv's price actions. *See Celestica*, 455 F. App'x at 16 ("These qualitative factors are sufficient to support an inference at this stage that" the matters at issue were "relevant to investors' investment decisions, defeating defendants' immateriality argument.")

and the trajectory" which gave them "confidence" in their expansion plans was attributed to Vertiv's ongoing "*pricing initiatives*."). These statements were explicitly connected to multiple concrete facts concerning Defendants' actions, and therefore, are not puffery. *See supra* §III.A.3.

**B.     The AC Raises A Strong And Compelling Inference Of Scienter**

A complaint pleads scienter by alleging facts that give rise to a strong inference of "conscious misbehavior *or* recklessness." *Novak*, 216 F.3d at 307. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007) (emphasis in original). The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 2020 WL 1989424, at *13 (S.D.N.Y. Apr. 26, 2020) (Woods, J.) (citing *Tellabs*, 551 U.S. at 324). "[A] tie on scienter goes to the plaintiff." *Skiadas*, 2020 WL 3268495, at *10. Here, the AC sets forth detailed factual allegations that establish a strong inference of Defendants' scienter.

*First*, the Officer Defendants repeatedly asserted to investors on each and every earnings and investor call during the Class Period—including in direct response to numerous analyst questions—that Vertiv's "robust" and "aggressive" pricing would "fully offset" even "potentially worse" inflation, such that Vertiv would "recover the vast, vast, vast majority of any inflationary stuff." ¶¶49, 136-37, 165-67, 182-84, 190. It defies credulity to believe that the Officer Defendants did not know the truth about the Company's pricing actions (or utter lack thereof) when they consistently spoke about this subject to investors. Defendants' repeated representations support a strong inference that they either knew the undisclosed facts contradicting their public statements, or recklessly failed to investigate whether those statements were true. *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (scienter where defendant "held himself out to the

37

public as intimately knowledgeable about [the subject of the misrepresentations]"); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (scienter where defendant "regularly made detailed reports" to investors about quality of loan portfolio indicating that he "must have educated himself" on the topic); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 369-72 (S.D.N.Y. 2012) ("The specificity of [defendants'] statements regarding [the relevant subject] is strong circumstantial evidence that [defendants] were receiving some form of specific information on [the subject].").

*Second*, the Officer Defendants emphasized that they personally reviewed pricing and cost data in real time, "***8 days a week***," which Defendant Niederpruem touted as a basis for being "really, really confident that we will be able to recover the vast, vast, vast majority of any inflationary stuff." ¶¶49, 136, 190. These representations—made in direct response to analysts' questions—support a strong inference that these Defendants knew or recklessly disregarded undisclosed facts about Vertiv's inadequate pricing that contradicted their public statements. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) ("access to non-public information contradicting [defendants'] public statements" suffices to plead recklessness); *Wells Fargo*, 2021 WL 4482102, at *27-29 (same); *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *5 (S.D.N.Y. June 21, 2021) (defendant's representations that he personally researched relevant facts support scienter); *Skiadas*, 2020 WL 3268495, at *11 ("access to information that contradicted the challenged statements" supports scienter); *Salix*, 2016 WL 1629341, at *14 (management's assurances to analysts that they monitored relevant information support scienter).

*Third*, Vertiv and the Officer Defendants made a series of extraordinary admissions at the end of the Class Period that flatly contradicted their earlier public statements—including that Vertiv "didn't and wasn't set up to drive a lot of price," that Vertiv had only barely begun to "act[]

38

decisively late last year and early this year" (i.e., 2022) "with aggressive price action" and "controlling the discounts," and that the Company had been "generally underpric[ing]" its contracts and routinely "los[ing] price through discounting." ¶¶186-87; *see also* ¶188. Defendants further admitted that Vertiv did not start "putting escalators" in its largest contracts until the end of the Class Period, such that losing "a lot of pricing on the backlog" was in fact inevitable from the start of the Class Period. ¶¶63, 78, 119, 178, 186, 260. These stark admissions—representing a complete about-face from Defendants' earlier statements—make clear that the Officer Defendants knew or recklessly disregarded that their statements about Vertiv's ability to raise prices in response to inflation were materially false and misleading. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) (finding scienter based on "contemporaneous facts" and "subsequent admissions" showing that representations were false when made).

Defendants incorrectly assert that the AC's scienter allegations detailing Defendants' extensive post-Class-Period admissions "use statements by one Officer Defendant . . . to impute knowledge of falsity to others." MTD 38 (citing ¶¶186-87). Not so. The admissions include a Vertiv press release and statements by Defendants Johnson and Fallon, senior executives whose scienter can be imputed to Vertiv. *See, e.g.*, *Yannes*, 2021 WL 2555437, at \*6 (key officer's scienter is attributable to company). These admissions thus properly plead knowledge of falsity as to Vertiv, Johnson and Fallon.[13]

Defendants also contend that their post-Class-Period admissions are actually "hindsight characterization[s]" that do not support contemporaneous knowledge of falsity, and that Defendants' statements in February 2022 taking "full responsibility" for the poor results simply

---

[13] Contrary to Defendants' suggestion, these allegations do not rely on "scienter by group pleading" because the AC does not suggest that knowledge of falsity should be imputed to Niederpruem based on other Officer Defendants' admissions. As discussed herein, Niederpruem's scienter is based on, among other things, his detailed statements concerning Vertiv's price actions and his review of pricing data "*8 days a week*." ¶¶7, 49, 136, 190.

"express[] contrition for guidance that was ultimately too optimistic" and "are not evidence they had not sincerely believed in that guidance in the first place." MTD 38-39. This argument completely ignores that, apart from the guidance, Defendants' repeated Class Period statements that Vertiv had implemented "robust pricing actions" to "cover" even "potentially worse" inflation were *flatly contradicted* by Defendants' own later admissions at the end of the Class Period. Moreover, Defendants' contentions mischaracterize their admissions and cannot be accepted on a motion to dismiss, where the Court "draw[s] all reasonable inferences in the plaintiff's favor." *E\*Trade*, 712 F. Supp. 2d at 179. In making these admissions, Defendants did not say that they were—as they now claim—"taking responsibility for a forecasting miss." MTD 40. Rather, Defendants explicitly conceded that they had "*screwed up*" and that they "*likely damaged some of our credibility in 2021*," such that they would need to "*be fully transparent*" in the future in order to regain investors' confidence. ¶¶66, 189. Those are not statements that senior officers make when they simply fail to predict something correctly, and these admissions therefore completely undermine Defendants' proposed nonculpable inference—that their only mistake was "not be[ing] clairvoyant." MTD 31; *see In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 417 (S.D.N.Y. 2007) ("factual allegations giving rise to [defendants' proposed innocent] inference must appear on the face of the complaint.").

Indeed, analysts agreed, concluding that "*management credibility [was] completely shot.*" ¶¶14, 71, 196. Defendants contend that the "analyst reactions" are "hindsight-based viewpoint[s]" that do not support an inference of scienter. MTD 40. However, analysts explicitly linked their conclusions regarding management's credibility to Defendants' prior representations about Vertiv's pricing efforts, which had given a false impression of the Company's ability to manage inflation. For example, Cowen wrote that Vertiv's management's "*credibility [was] in question*"

40

because "management shared that the price actions it took" earlier in 2021 would "keep up with inflation," thus "*providing the investment community with a sense that [Vertiv] was in control of pricing conditions*"—but "Vertiv's fourth quarter results suggest otherwise." ¶¶14, 70. Deutsche Bank likewise stated that it would "take time for VRT to regain credibility" in light of the Company's dismal financial results being released "*in the midst of what we would characterize as constructive management commentary at conferences throughout the [fourth] quarter*." ¶69.

*Fourth*, former Vertiv employees confirmed that the Officer Defendants personally reviewed pricing data, approved Vertiv's discounting practices, knew that its larger enterprise contracts comprising the majority of its backlog did not allow price increases, and were aware of its supply-chain problems. ¶¶191-92. FE-1 stated that Defendant "Johnson agreed to do these [large] deals without price increases." ¶191. FE-3 stated that Defendants Johnson and Fallon had access to daily updates of sales, pricing, and margins, and that Johnson participated in frequent "crisis meetings" to respond to key suppliers aggressively decommitting throughout 2021. ¶¶192-94. These detailed allegations demonstrate the Officer Defendants' knowledge of, or at minimum, access to, undisclosed facts contradicting their public statements about pricing. *See Lockheed Martin*, 875 F. Supp. 2d at 369-71 (officers' involvement in negotiating underpriced contracts supports scienter).

Defendants contend that the AC "nowhere allege[s] that any Officer Defendant had such knowledge, or even had specific contradictory information available to him, at the time he made any allegedly misleading statement" (MTD 38), and that "Plaintiffs identify no contemporaneous 'pricing and commodity' data that contradicted Niederpruem's public statements" (*Id.* at 40). These contentions ask this Court to ignore the well-pleaded allegations that the Officer Defendants

41

actually knew or recklessly ignored, undisclosed pricing data contradicting their public statements. *E.g.*, ¶¶7, 49, 136, 190-94. Defendants' contentions cannot prevail on a pleading motion where all reasonable inferences must be drawn in Plaintiffs' favor.

*Fifth*, Defendants' statements about Vertiv's ability to use pricing to offset inflation unquestionably concerned the single most important issue facing the Company during the Class Period—what Defendants themselves called a key "lever" to achieving Vertiv's critical margin expansion plan that was crucial to the Company's overall success. ¶¶40, 74, 132, 140, 152, 195. *Skiadas*, 2020 WL 3268495, at *10 (scienter found where statements involved "the *sin[e] qua non*" for company's "success"). Thus, Defendants' misstatements unquestionably concerned Vertiv's "core operations," which supports a strong and compelling inference of scienter. *See Celestica, Inc.*, 455 F. App'x at 14 & n.3; *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019).

*Sixth*, while a complaint need not include allegations of "motive," *Tellabs*, 551 U.S. at 325, the AC here alleges that the Officer Defendants were motivated to conceal Vertiv's pricing and supply-chain problems during the Class Period in order to artificially inflate its stock price. ¶197. The Selling Shareholders owned nearly 40% of Vertiv at the start of the Class Period, were responsible for Vertiv going public, hired Defendant CEO Johnson, and held two seats on the Company's Board—these Defendants thus controlled Vertiv before, during, and after the SPO. ¶241. The AC alleges that Vertiv and the Officer Defendants' fraud enabled the Selling Shareholders to sell *$544 million* of Vertiv stock at an artificially inflated price. ¶197. Indeed, mere days before the SPO, the Officer Defendants represented that Vertiv's "robust pricing actions" would "cover" inflation even if it got "potentially worse"—and even raised Vertiv's annual guidance despite having lowered it only *weeks* before due to supply chain challenges. *Id.*;

42

*see also* ¶¶17, 55. The nature and timing of these misrepresentations are highly suspicious, and this motive is one of many allegations that, when "taken collectively" with the other allegations summarized above, give rise to a strong inference of scienter. *Tellabs*, 551 U.S. at 323. *Cf. Lickteig*, 2020 WL 1989424, at *13 (motive to understate earnings in order to buy back stock cheaply); *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 169 (D. Conn. 2019) (motive to artificially inflate stock as acquisition currency).

Defendants contend that "the AC does not allege that any Officer Defendant profited in any way from the alleged fraud," noting that these Defendants did not sell Vertiv shares during the Class Period. MTD 36.[14] However, insider stock sales are not dispositive of scienter. *See, e.g.*, *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (finding scienter where defendants **bought** stock during class period); *Skiadas,* 2020 WL 3268495 at *11 (finding scienter without insider sales where Plaintiff "has alleged that Defendants had [] incentive in this case"). Indeed, Defendants admit a complaint pleads motive if it "alleges that Defendants 'benefitted in *some* concrete and personal way,'" which may be "'stock sales by insiders, or *any other pecuniary gain*.'" MTD 36. Here, the Officer Defendants were beholden to the Selling Shareholders and had a motive to facilitate the SPO or be ousted by the Selling Shareholders.[15]

---

[14] Defendants' argument concerning ¶¶182-84 and 195, *see* MTD 36-37, incorrectly assumes that those allegations go to motive. Rather, they go to recklessness. Likewise, the Officer Defendants were motivated to appease Platinum, which appointed them and exercised control over the employment and compensation. A dominant shareholder need not own any specific percentage of the controlled company's stock. In related contexts, courts routinely find control by stockholders with much less than a majority stake. *See, e.g.*, *FrontFour Cap. Grp. LLC v. Taube*, 2019 WL 1313408 (Del. Ch. Mar. 11, 2019) (15%); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375 (Del. Ch. June 5, 2006) (17%).

[15] Plaintiffs do not allege motive based on "the desire for the corporation to appear profitable and the desire to keep stock prices high" or "a motive to show investors that Vertiv was meeting its margin expansion goals." MTD 36-37. Thus, Defendants' reliance on *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), and *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277 (S.D.N.Y. 2013), fails. Nor is there any bright-line rule that "[o]ther, non-Section-10(b) Defendants' trading is irrelevant to Officer Defendants' scienter." MTD 37 (citing *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund* v. *Arbitron Inc.*, 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010)) Such a rule would ignore *Tellabs*' holistic analysis. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1165 (D. Or. 2015) (scienter where CEO "knew and allowed [other] insiders to sell stock during the height of the [fraud]"); *Robertson v. Strassner*, 32 F. Supp. 2d 443,

Under *Tellabs*' holistic standard, the AC sufficiently alleges scienter.

## C.     The AC States Claims Under The Securities Act

To state a claim under Sections 11 and 12(a)(2) of the Securities Act, plaintiffs must plead only that a misleading statement was made.[16] *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983); *In re Interpublic Sec. Litig.*, 2003 WL 21250682, at *8 (S.D.N.Y. May 29, 2003) ("Section 11 is a strict liability statute and does not require proof of fraud."); *see also Rombach*, 355 F.3d at 169 n.4.

Faced with this low standard for pleading Securities Act claims, Defendants wrongly contend that the AC pleads "a unified theory of fraud"—such that the Securities Act claims are purportedly subject to Rule 9(b)'s fraud pleading standard. MTD 41. However, numerous courts have repeatedly held that "nothing in *Rombach* or Rule 9(b) forecloses" Plaintiffs from pleading fraud under Section 10(b) and negligence under Section 11. *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 116 (S.D.N.Y. 2010). The Rule 9(b) pleading standard does not apply if the Court is still able to "figure out which allegations are intended to support which claim." *Gordon v. Tencent Music Ent. Grp.*, 2021 WL 9183821, at *2 n.3 (E.D.N.Y. Mar. 31, 2021).

Here, Plaintiffs repeatedly and "specifically disavow[ed] any allegations or averments of fraud" in connection with the Securities Act claims. ¶215; *see also* ¶261 (expressly excluding and

---

449 (S.D. Tex. 1998) (scienter where public offering was intended to benefit controlling shareholder), *overruled on other grounds*, *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 364 (5th Cir. 2004). Section 20(a) does not govern whether the Officer Defendants had a motive to benefit the Selling Shareholders. Thus, Defendants' reliance on *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005), fails.

[16] Under Section 11, a plaintiff must "show that a registration statement: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading." *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 568 (S.D.N.Y. 2009). "'Liability against the issuer of a security is virtually absolute, even for innocent misstatements,' while '[o]ther defendants bear the burden of demonstrating due diligence.'" *Id.* at 569. Similar standards apply to claims arising under Section 12(a)(2) of the Securities Act for which a plaintiff need only "demonstrate that the [p]rospectus contained an untrue statement of material fact or omitted to state a material fact necessary to make the statements therein not misleading." *In re Giant Interactive Grp.*, 643 F. Supp. 2d at 569.

disclaiming "any allegation that could be construed as alleging fraud or intentional or reckless conduct"). Moreover, "each portion [is] sufficient to stand alone for its respective pleading purposes." *Gordon*, 2021 WL 9183821, at *2 n.3 (holding that Rule 8 applies where "Plaintiff's § 11 claims explicitly disclaim any allegation of fraud, recklessness, or intentional misconduct"). Accordingly, Plaintiffs' Securities Act claims are governed by Rule 8(a)'s notice-pleading standard, which requires only "a short and plain statement of the claim." Fed. R. Civ. P. 8(a). Defendants' arguments in support of dismissal of the Securities Act claims are dependent on application of the fraud pleading standard ("plaintiffs point to no particularized facts" (MTD 42)), and fail completely under the Rule 8 standard.

The AC clearly identifies Defendants' untrue statements of material fact and adequately explains why they were false and misleading, including the omitted facts necessary to make the statements not misleading. ¶¶255-60. Defendants offer no valid basis for dismissal.

### 1.    Defendants Misled Investors About The Risk of Fixed-Price Terms

Defendants argue that the risk disclosure that Vertiv's contracts with its "large" customers may "require more favorable terms and conditions in our contracts that could result in downward pricing pressures" (¶257), was not misleading because "[t]here was no obligation to quantify this risk" and "investors fully understood that, on contracts where it had fixed-price terms, Vertiv was facing pressure given increased costs." MTD 43. Defendants' argument is plainly at odds with the AC's allegations, which incorporate Defendants' own post-Class Period admissions revealing that the risks concerning "more favorable [contract] terms" resulting in "downward pricing pressure" had already materialized. ¶257. The AC alleges that these larger customer contracts in Vertiv's backlog locked Vertiv into discounted prices in the face of inflation and increasing costs, which Defendant Johnson admitted: "Vertiv had only just barely begun (after the SPO) to make the critical 'change' of 'putting escalators'" in those larger contracts. ¶258. In 2021, Defendants knew

45

that the "downward pricing pressures" were no longer theoretical, and Vertiv's margins would be negatively impacted. *Id.* The risks had already materialized, and the disclosure was misleading.

Defendants next argue that that the misleading disclosure was immaterial by effectively asserting materiality and truth-on-the-market defenses, which cannot prevail at the pleading stage. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (Defendants' claim that the market was already aware is a "truth-on-the-market" defense, which is "intensely fact-specific" and "rarely an appropriate basis" for dismissal). Further, materiality is a "mixed question of law and fact" and "not ordinarily a question appropriate for resolution as a matter of law in a motion to dismiss." *Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, 2020 WL 3318029, at *3 (S.D.N.Y. June 18, 2020); *Litwin*, 634 F.3d at 717-18 (to dismiss on materiality grounds, misstatements must be "so obviously unimportant … that reasonable minds could not differ on the question of their importance"). Importantly, here, Defendants' assertion is plainly at odds with the visceral reaction of the market, the fact that Vertiv's stock price collapsed following Defendants' disclosures of the truth in February 2022, and the uniform outrage expressed by industry analysts. Defendants offer no alternative explanation for those declines or analyst responses.

### 2.     Defendants Concede That The Disclosures In The Offering Materials Were Misleading As Of The Date Of The SPO

As an initial matter, Defendants argue that to be actionable the risk disclosures must have been false and misleading "as of April 30, 2021" (the date the "10-K incorporated by reference" in the Offering Materials was originally filed). MTD 42. Defendants are wrong.

*First*, the AC specifically alleges that the Form 10-K/A, the source of the misleading risk disclosure incorporated by reference in the Offering Materials, was dated April 30, 2021 (¶255) and that it was false for failing to disclose facts available to Defendants concerning, inter alia, their inability to raise prices on sales previously booked that were in the "backlog." ¶256; *see* Ex A.

The AC in no way suggests that the statement became false at some point after April 30, 2021, Defendants simply applied that qualification in their argument, effectively conceding their view that while true on April 30, 2021, the risk disclosures became misleading after that date.

*Second*, given their implicit concession that the risk disclosures in the Offering Materials were misleading as of the November 2021 SPO, Defendants are forced to argue that so long as the documents incorporated by reference into the Offering Materials were not misleading when originally issued (here, as of April 30, 2021), they cannot serve as the basis for a claim under Section 11.[17] But Defendants' assertion that incorporated documents only need to be true as of the date they are originally filed is wrong, makes no sense, would allow issuers to wantonly provide false and outdated disclosures, and the single case they rely on is not persuasive. *See* MTD 42 (citing *In re Stemline Therapeutics, Inc. Sec. Litig.*, 313 F. Supp. 3d 543 (S.D.N.Y. 2018) (indicating that documents incorporated by reference into a registration statement must be true both on the date of their original filing, and on the date the registration is made effective: "The Court has no reason to doubt that the incorporated statements were true at the time the incorporated documents were filed . . . *[n]or* . . . *at the time the Prospectus was filed* with the SEC)).[18]

### 3. Defendants Incorrectly And Improperly Dispute Whether The Backlog Risks Had Materialized

Defendants next argue that the AC does not allege that the risk that Vertiv "may not realize

---

[17] Under Section 11, false or misleading statements "in any part of the registration statement" are actionable, 15 U.S.C. § 77k(a), including a "prospectus supplement." *See e.g.*, *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 491-92 (S.D.N.Y. 2006) (For the "purpose of determining any liability" under the Securities Act, "each supplemental prospectus" shall be considered "to be a new registration statement," and "[i]nformation disclosed in a supplemental prospectus 'shall be deemed to be part of and included in the registration statement.'").

[18] *Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc*., 987 F. Supp. 2d 369, 374 (S.D.N.Y. 2013) ("Under Rule 430B(f)(2), the date the prospectus supplement is first used (or the date the securities to which it relates are first sold) becomes the new 'effective date' of the registration statement for purposes of Section 11 liability 'of the issuer and any underwriter at the time only.' *Id.* at § 230.430B(f)(2). [T]the SEC clarified that 'the filing of a form of prospectus for purposes of updating the registration statement pursuant to Section 10(a)(3) or reflecting fundamental changes in the information in the registration statement' does create a new effective date for directors and signing officers.").

the revenue" expected from their backlog or that it "may not result in profitable revenue" (¶255) had materialized. *See* MTD 42 ("Plaintiffs point to no ***particularized facts*** to plead that Vertiv's backlog was not yielding 'profitable revenue.'"). Defendants' contention is baseless.

The AC ***does*** plausibly and explicitly allege that Vertiv's backlog risks had already materialized. ¶256 ("Defendant Johnson [] admitted . . . Vertiv "'didn't get a lot of pricing on the backlog that we had'" in part, because it "had only just barely begun to make the critical 'change' of 'putting escalators in [the Company's larger contracts]'" at the end of 2021). Defendants effectively assert that the possibility of *any* profitable revenue from Vertiv's backlog deals is sufficient to find that no risk had materialized. However, Plaintiffs allege that Defendants already knew at the time of the SPO that they were unable to materially increase prices on the backlog. After telling investors that the backlog was part of the solution Defendants later confirmed that it was actually part of the "problem" because they "didn't get a lot of pricing" on the backlog deals. ¶256. Regardless of the overall profitability, the backlog's risk had materialized and the facts the AC alleges were not disclosed clearly made that risk disclosure—concerning the overall profitability of the backlog—materially misleading. *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) ("to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit").

### 4. Plaintiffs Adequately Allege Liability Under Section 15[19]

"Section 15 [of the Securities Act] imposes joint and several liability on '[e]very person

---

[19] Because Plaintiffs have adequately alleged primary violations of §10(b), they have also adequately alleged Section 20(a) claims against Defendants Johnson, Fallon, and Niederpruem. *See Wells Fargo*, 2021 WL 4482102, at *30. Plaintiffs have also easily met the culpable participation requirement of "something more than negligence." *Id.* at *29. Each Officer Defendant directly participated in the management of Vertiv's operations, including its public reporting functions, and spoke to investors and securities analysts regularly about Vertiv's purported pricing efforts. The AC thus amply alleges the Officer Defendants' "actual involvement in the making of the fraudulent statements by the putatively controlled entity." *DoubleLine Cap. LP*, 413 F. Supp. 3d at 220.

who, by or through stock ownership, agency, or otherwise . . . controls any person liable under' [Section 11 or 12 of the Securities Act]." *Tufin Software*, 2022 WL 596861, at \*11. Because "Plaintiff[s] ha[ve] adequately plead[] Section 11 [and 12(a)(2)] violations, [they] similarly plead[] a violation of Section 15." *Id.*

The Platinum Defendants nonetheless seek dismissal of the Section 15 claims on the supposed grounds that Plaintiffs have failed to adequately plead control.[20] Platinum MTD 3-5. However, as the Platinum Defendants' own cited authority states, "[d]etermining an individual defendant's liability as a control person is a *fact-intensive inquiry [and] generally should not be resolved on a motion to dismiss*." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 741, 747 (S.D.N.Y. 2015); *see also Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 322-23 (S.D.N.Y. 2021).

Nevertheless, the AC pleads numerous facts evidencing the Platinum Defendants' control. As an initial matter, *there would be no Vertiv without Platinum Equity*. The Company was established in 2016 when Platinum Equity acquired Emerson Network Power and rebranded it as Vertiv, and Platinum Equity played a significant role in Vertiv going public. *See* ¶¶248, 218 (Johnson stated Vertiv going public was "possible" thanks to "Platinum Equity's support over the past few years"). Moreover, Platinum Equity was *Vertiv's largest stockholder by far at the start of the Class Period, owning nearly 40%*—and received an astronomical *$544 million* in proceeds from the SPO.[21] ¶57. While the Platinum Defendants try to minimize their control to nothing more than nominating two directors to Vertiv's nine-person board (¶¶224, 226), this ignores that

---

[20] Defendants do not argue control or culpable participation for Defendants Fallon, Johnson or the Director Defendants (MTD 44, n. 15), and as to those Defendants, they solely dispute whether there has been a primary violation. *Id.*

[21] Defendants' over 50% ownership requirement is incorrect. *See* Platinum MTD 4; *Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1051 (7th Cir. 2012) ("a block of 20% or less may be enough for working control when no one else holds a substantial position"); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 979-80 (N.D. Cal. 2009) (position as largest shareholder sufficient to plead control).

(i) Platinum handpicked Defendant Johnson as Vertiv's CEO in 2016, and it was Johnson who later approved the SPO that enabled Platinum to receive over half a billion dollars in proceeds (¶27); and that (ii) Platinum Equity is expressly identified in Vertiv's SEC filings during the Class Period as having "***the ability to significantly influence all corporate actions requiring stockholder approval, including the election and removal of directors and the size of our Board***"—such that it "***could cause [Vertiv] to enter into transactions or agreements of which [shareholders] would not approve or make decisions with which [shareholders] would disagree***." ¶251. These facts give rise to an inference of Platinum Equity's control. *Gruber v. Gilbertson*, 2022 WL 4232834, at \*13 (S.D.N.Y. Sept. 14, 2022) ("Taken together, a reasonable jury could clearly have come to the conclusion that Reger controlled Dakota Plains in the required sense").[22]

## IV.   CONCLUSION

For all of the reasons set forth above, Defendants' motions to dismiss the AC should be denied in their entirety.

Date: March 31, 2023

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

*/s/ James A. Harrod*
Hannah Ross
(hannah@blbglaw.com)
James A. Harrod
(jim.harrod@blbglaw.com)
Jai K. Chandrasekhar
(jai@blbglaw.com)
Brendan Walden
(brendan.walden@blbglaw.com)

---

[22] The Platinum Defendants' argument (Platinum MTD 6) that the AC fails to plead "culpable participation" misses the mark"[T]he majority of courts in this District have concluded that culpable participation is ***not*** required to state a claim under section 15." *Abengoa*, 559 F. Supp. 3d at 323 ("the majority approach should govern, meaning that Plaintiffs are not required to allege culpable participation – and accordingly, scienter – as part of their claim pursuant to section 15"); *see also In re NIO, Inc.*, 2021 WL 3566300, at \*12 ("This court agrees and holds that Plaintiffs need not allege culpable participation for a Section 15 claim").

1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

Caitlin C. Bozman
(caitlin.bozman@blbglaw.com)
2121 Avenue of the Stars, Ste 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*-and-*

Maya Saxena (msaxena@saxenawhite.com)
Joseph E. White III (jwhite@saxenawhite.com)
Lester R. Hooker (lhooker@saxenawhite.com)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

Steven B. Singer
Kyla Grant
**SAXENA WHITE P.A.**
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel: (914) 437-8551
ssinger@saxenawhite.com
kgrant@saxenawhite.com

*Lead Counsel for Lead Plaintiffs and the Class*

**KLAUSNER KAUFMAN JENSEN
  & LEVINSON**
Robert D. Klausner (bob@robertdklausner.com)
Stuart A. Kaufman (stu@robertdklausner.com)
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202

*Additional Counsel for Lead Plaintiffs Louisiana
Sheriffs, Orlando Police and Plantation General*

**SUGARMAN SUSSKIND BRASWELL &
  HERRERA, P.A.**
Pedro A. Herrera

51

(pherrera@sugarmansusskind.com)
150 Alhambra Circle, Suite 725
Coral Gables, Florida 33134
Telephone: (305) 529-2801

*Additional Counsel for Lead Plaintiff Riviera Beach*

**LORIUM LAW**
Ronald J. Cohen (rcohen@loriumlaw.com)
101 N.E. 3rd Ave., Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 462-8000

*Additional Counsel for Lead Plaintiff Riviera Beach Fire*

52

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered participants on the Notice of Electronic Filing (NEF).

*/s/ James A. Harrod*
James A. Harrod
(jim.harrod@blbglaw.com)