**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
:
:
:
IN RE VERTIV HOLDINGS CO SECURITIES        :        22-CV-3572 (GHW) (OTW)
LITIGATION,                                :
:        **REPORT & RECOMMENDATION TO THE**
:        **HONORABLE GREGORY H. WOODS**
:
:
:
:
-----------------------------------------------------------x

**ONA T. WANG, United States Magistrate Judge:**

I.    **Introduction**

Plaintiffs, investors in Vertiv Holdings Co. ("Vertiv"), bring this putative class action

under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"),

15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and

Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"),

15 U.S.C. §§ 77k, 77o. Plaintiffs Louisiana Sheriffs' Pension & Relief Fund, Orlando Police

Pension Fund, City of Plantation General Employees Retirement System, Riviera Beach

Municipal Firefighters' Pension Trust Fund, and City of Riviera Beach General Employees'

Retirement System (collectively, "Plaintiffs") allege causes of action against Defendants Vertiv,

three of Vertiv's officers (collectively, the "Officer Defendants"),[1] eight of Vertiv's directors

(collectively, the "Director Defendants"),[2] three underwriters of Vertiv's secondary public

---

[1] Robert Johnson, Vertiv's Chief Executive Officer; David Fallon, Vertiv's Chief Financial Officer; and Gary Niederpruem, Vertiv's Chief Strategy and Development Officer.

[2] David Cote; Joseph van Dokkum; Roger Fradin; Jacob Kotzubei; Matthew Louie; Edward L. Monser; Steven S. Reinemund; and Robin L. Washington.

offering (the "SPO") (collectively, the "Underwriter Defendants"),[3] and a collection of entities affiliated with Platinum Equity, LLC, the alleged owner of Vertiv (collectively, the "Platinum Equity Defendants").[4]

The Amended Consolidated Complaint alleges claims on behalf of all investors that purchased shares of Vertiv's Class A common stock (1) between February 24, 2021, and February 22, 2022 (the "Class Period"). The Defendants now move to dismiss the Amended Consolidated Complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6). For the following reasons, the motion to dismiss should be **granted in part and denied in part**.

II.   **Background**

Unless otherwise noted, the following facts are taken from the Amended Consolidated Complaint (ECF 25) and are accepted as true for purposes of the motion to dismiss.

**A.   Vertiv Prior to 2021**

Vertiv produces and services critical digital infrastructure and data centers for large enterprise customers. (ECF 25 at ¶ 4). In 2016, Platinum Equity, a private equity firm, acquired Network Power and rebranded it as "Vertiv." (ECF 25 at ¶ 38). Historically, Vertiv made most of its revenue from long-term contracts. *Id.* Because these contracts often took several months to complete, Vertiv carried a significant "backlog" amounting to as much as $3.2 billion in 2021. *Id.* Vertiv also historically operated on thin profit margins. (ECF 25 at ¶ 39).

---

[3] J.P. Morgan Securities LLC; Goldman Sachs & Co. LLC; and Citigroup Global Markets Inc.

[4] VPE Holdings, LLC; Vertiv JV Holdings LLC; and PE Vertiv Holdings LLC; Platinum Equity, LLC; Platinum Equity Investment Holdings, LLC; Platinum Equity Investment Holdings Manager, LLC; Platinum Equity InvestCo, L.P.; Platinum Equity Investment Holdings IC (Cayman), LLC; Platinum InvestCo (Cayman), LLC; Platinum Equity Investment Holdings III, LLC; and Platinum Equity Investment Holdings Manager III, LLC.

### B. Vertiv Announces Pricing Initiatives

In February 2020, Vertiv went public and the company's CEO, Robert Johnson, announced a "margin expansion" plan to increase the company's profit margins through pricing initiatives. (ECF 25 at ¶¶ 39-40). Initially, these initiatives were successful. But by the beginning of 2021, analysts began to question whether the margin expansion plan was still viable in the face of the continuing effects the COVID-19 pandemic. (ECF 25 at ¶ 43). These effects including manufacturing shut-downs, travel restrictions, and inflated costs for raw materials, critical component parts, and freight. *Id.*

On February 24, 2021, Vertiv issued an earnings release predicting that the company would achieve adjusted operating profit of $565 to $585 million, 68% higher than Vertiv's adjusted operating profit the prior year. (ECF 25 at ¶¶ 44-45, 115). On the same day, on Vertiv's earnings call, the Officer Defendants attempted to assuage investor concerns about inflation by assuring them that Vertiv's pricing initiatives would partially offset inflationary pressures. *Id.*

### C. Vertiv Reassures Investors That Pricing Will Keep Pace with Inflation

On April 28, 2021, Vertiv announced that the company was increasing its adjusted operating profit guidance upwards to $585-$605 million, $20 million higher than its previous guidance. (ECF 25 at ¶ 124). Vertiv specifically said that it had factored in higher commodity and freight costs in its revised guidance. *Id.* In a company presentation, Vertiv warned of "increased costs for materials and logistics" but said that the company was "[m]anaging the disruptions" through "pricing actions around the globe to partially pass through the increased costs." (ECF 25 at ¶ 125).

Also on April 28, 2021, in its 1Q21 earnings call, Defendant Fallon said that the company had increased its estimate of 2021 inflation from $20 million to $45 million, but had also forecasted a pricing increase from $15 million to $25 million. (ECF 25 at ¶ 130). Defendant Johnson, in response to an analyst question about offsetting increased material costs, said:

> When we've had times before where freight costs have gone up like they have been, we've been able to institute surcharges. . . . Our customers are pretty good about working with us and going through that. Certainly, we're able to go forward price things at that higher costs rate. And we're able to get that. So we feel good. . . . But no, we've got a pretty good process now in our ability to drive prices through with our customers on a global scale.

ECF 25 at ¶¶ 128-29. On the same earnings call, Defendant Niederpruem said that Vertiv was looking into the mechanisms to get additional revenue from "backlog" orders. Specifically, Niederpreum identified escalation clauses that would allow Vertiv to increase pricing to account for increased costs of materials:

> So we do have some other mechanisms, sometimes in larger contracts that have material clauses in them. Certainly, freight is another level that we can utilize. That is a real-time mechanism. There's been times when we've instituted surcharges as well. So I would say that, yes, it's easier to get price on new orders coming through the door. But by no means are we going to just discount the $2 billion [revenue blacklog] that we have and say there's nothing we can do there.

ECF 25 at ¶ 132. Fallon cautioned that "there's generally a lag" between the impacts of inflation and the effect of new pricing measures, "[s]o we will see the negative impact from commodity and logistics sooner in our costs, then we do have the ability to pass that through for higher pricing." (ECF 25 at ¶ 130).

At a May 26, 2021 investor conference, Defendant Niederpruem told investors that he and Defendant Fallon were reviewing "pricing and the commodity stuff . . . 8 days a week at this point in time" to "make sure that we're doing all the right things." (ECF 25 at ¶ 49). This review process, Defendant Neiderpruem said, included "monthly reviews" with "very real-time

updates" that led company leadership to feel "really, really confident that we will be able to recover the vast, vast, vast majority of any inflationary stuff." *Id.*

### D.  Vertiv Predicts That Pricing will Fully Offset Inflation In Q4

On July 28, 2021, on its 2Q21 earnings call, Vertiv announced another increase of its adjusted operating profit guidance to $600 million. (ECF 25 at ¶ 144). This guidance once again purported to incorporate the negative impacts of inflation and the effect of pricing measures, "which typically lags inflation." *Id.* Vertiv forecasted full-year inflation at $110 million, more than double its April estimate, and estimated $65 million in full-year pricing actions, also more than double its April estimate. *Id.* A company presentation predicted that Vertiv's "[p]ricing actions in place to recover market based commodity and freight inflation and premiums for spot buys of electronic parts" would "fully offset inflation in Q4 and provide tailwind." (ECF 25 at ¶ 147). Vertiv's second quarter 2021 earnings presentation listed further pricing measures "such as list price increases, discount and rebate reductions, pass through pricing (lead) and pricing recovery on outbound freight." *Id.*

On September 8, 2021, Vertiv reduced its full-year adjusted operating profit guidance by $60 million, a 10% reduction. (ECF 25 at ¶ 156). Vertiv attributed this revision to "supply chain challenges" that were "trending worse than expected, with critical part shortages driving the need for additional sport buys." (ECF 25 at ¶ 156; ECF 54 at 9). Along with its reduction in adjusted operating profit guidance, Vertiv revised its estimate of full-year inflation upwards by $22 million, and revised its full-year pricing benefit downwards by $10 million. Vertiv officers nevertheless continued to express confidence in the company's pricing measures, but predicted that pricing would continue to lag behind inflation. During a conference call on September 8,

2021, Defendant Niederpruem told investors that pricing measures were "sticking" and the question was "not really can we get price. It's just more of a timing issue than anything." (ECF 25 at ¶ 157). Defendant Johnson also told investors that "pricing has continued to ramp" and the company was "continu[ing] to drive pricing." (ECF 25 at ¶ 54). Following the September 8, 2021 announcement, Vertiv's stock price fell approximately 11%. (ECF 25 at ¶ 53).

On October 27, 2021, Vertiv announced its third quarter 2021 earnings, and increased its adjusted operating profit guidance upwards by $13 million. (ECF 25 at ¶ 159). In its press release, Vertiv again expressed confidence in its pricing response which "continues to meaningfully increase sequentially each quarter," and "anticipate[d] another sequential increase in the fourth quarter." *Id.* Vertiv also said that "[c]ost containment actions" had been "accelerated" to guard against impacts of further supply chain disruptions. *Id.* On the earnings call, the Officer Defendants told investors that the company "was making sure that our pricing actions now and going forward" would "cover" even "potentially worse" inflation, and that they were "certainly encouraged with what we're seeing in the pricing environment here in the fourth quarter." (ECF 25 at ¶ 55). Vertiv's stock rose by 6% per share from September 10, 2021 to November 1, 2021. (ECF 25 at ¶ 56).

### E.  Vertiv Holds a Secondary Public Offering

On November 4, 2021, Vertiv held an SPO in which it sold over 20 million shares of Vertiv stock, reducing its share of Vertiv's common stock to 10.6%. (ECF 25 at ¶¶ 57, 169). The SPO was underwritten by J.P. Morgan Securities LLC; Goldman Sachs & Co. LLC; and Citigroup Global Markets Inc. (ECF 25 at ¶¶ 242-46). VPE Holdings made $544 million in proceeds from the SPO. (ECF 25 at ¶ 57). On November 3, 2021, Vertiv had filed a prospectus supplement for

the SPO on Form 424B1 (the "Prospectus") as part of its Registration Statement (collectively, the "Offering Materials"). (ECF 25 at ¶ 250). The Offering Materials incorporated by reference Vertiv's April 30, 2021 Amended 10-K. (ECF 25 at ¶ 170).

At a November 16, 2021 investor conference, Defendant Niederpruem told attendees that the company had "just about launched additional pricing actions over the last 2 or 3 weeks in every region of the world. . . . [T]here's definitely more tailwinds with the actions that we've taken just in the last couple of weeks." (ECF 25 at ¶ 173). Defendant Johnson responded to an analyst's question about customer pushback by saying that the company was "getting smarter about" covering additional costs for "spot buys" of materials and passing along increased costs to customers. (ECF 25 at ¶ 174). Defendant Niederpruem added that the company was carrying out this strategy through "list price increases" and by "controlling the discounts and multipliers that our own salespeople are able to have." (ECF 25 at ¶ 176).

### F.  Vertiv's Q4 2021 Earnings Fall Short of Guidance

On February 23, 2022, Vertiv announced its fourth quarter 2021 earnings. (ECF 25 at ¶ 59). The company announced that it had missed its fourth quarter guidance by $72 million, and its projected annual adjusted operating income guidance by $82 million. (ECF 25 at ¶ 59).

Vertiv's press release attributed this shortfall to a "tepid 2021 pricing response" to inflation that had "underpric[ed] the market in 2021." (ECF 25 at ¶ 59). In the company's fourth quarter earnings call, Defendant Johnson said the company organization "didn't and wasn't set up to drive a lot of price," and dramatically increasing pricing would require "overcom[ing]" a cultural aversion to losing orders. (ECF 25 at ¶ 61). Because of Vertiv's longstanding "predisposition or a deference to not lose the order," Defendant Cote said, Vertiv "got behind

on the inflation recovery curve with insufficient price and stayed there all year." (ECF 25 at ¶ 62). Defendant Johnson also acknowledged that the company had only recently started adding escalation clauses to its contracts to account for commodity price increases, and those provisions were not "in all of Vertiv's contracts prior." (ECF 25 at ¶ 63). As a result, Defendant Johnson said, Vertiv "didn't get a lot of pricing on the backlog that we had[,] [t]hat was part of our problem." (ECF 25 at ¶ 78).

Additionally, Defendant Johnson told investors that the company's salesforce had "give[n] away the pricing that we were getting through discounting," and the company had begun instituting top-down changes to address this "over the last 60, 90 days." (ECF 25 at ¶ 64). The Officer Defendants took responsibility for the error in forecasting, with Defendant Fallon acknowledging that their "credibility was harmed as it related to forecasting" and that they were "embarrassed" by the company's "unimpressive" performance. (ECF 25 at ¶ 66).

Following the release of Vertiv's fourth quarter 2021 earnings, the company's share price fell 37% in a single day, representing a $2.7 billion decline in market capitalization. (ECF 25 at ¶ 67).

III.   **Analysis**

    **A. Standard of Review**

For the purposes of deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept all allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is

legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). If the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face," the complaint should not be dismissed. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A claim under Section 10(b) of the Exchange Act must meet the pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA, 15 U.S.C. § 78u–4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *ATSI*, 493 F.3d at 99.

When considering a motion to dismiss, the Court may consider documents attached to or referenced in the complaint, and documents that the plaintiff either possessed or knew about and relied on in bringing the lawsuit. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). The Court can take judicial notice of public disclosures that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991).

"[W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). All that is required is that "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* Here, Plaintiffs have sufficiently described their confidential sources with sufficient particularity for the Court to consider their accounts alongside the other facts pled in the complaint.

B. **Exchange Act and Securities Act Claims**

The Complaint alleges violations of the following on behalf of all investors that purchased shares of Vertiv's Class A common stock (1) during the Class Period; and/or (2) in or traceable to the SPO: Section 10(b) of the Exchange Act and Rule 10b-5 against Vertiv and Officer Defendants; Section 20(a) of the Exchange Act against the Officer Defendants; Section 11 of the Securities Act against Vertiv, Johnson, Fallon, the Director Defendants, and the Underwriter Defendants; Section 12(a)(2) of the Securities Act against the Underwriter Defendants; and Section 15 of the Securities Act against Johnson, Fallon, the Director Defendants, the Selling Shareholder Defendants, and the Platinum Defendants.

1. **Section 10(b) of the Exchange Act and Rule 10b-5 against Vertiv and Officer Defendants: Materials Misstatements and Omissions**

Exchange Act Section 10(b) and SEC Rule 10b–5 prohibit fraudulent activities in connection with the purchase or sale of securities, whether or not those securities are registered.

Section 10(b) of the Exchange Act, as effectuated by Rule 10b–5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . .  in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. A successful Rule 10b–5 claim requires the plaintiff to allege that the defendants (1) in connection with the purchase or sale of a security (2) made a materially false statement *or* omitted a material fact, (3) with scienter, and (4) that the plaintiff's reliance on the defendants' action caused injury to the plaintiff. *Ganino v. Citizens Utils. Co*., 228 F.3d 154, 161 (2d Cir. 2000); *see also In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 10 (S.D.N.Y. 2016).

When a plaintiff alleges " 'a statement or omission that a reasonable investor would have considered significant in making investment decisions,' " such a misstatement or omission is material. *Litwin v. Blackstone Grp. L.P.*, 634 F.3d 706, 716–17 (2d Cir. 2011), cert. denied, 132 S.Ct. 242 (2011); *see also, e.g., Carpenters Pension Trust Fund v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014); *ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009); *Caiola v. City Bank, N.A.,* 295 F.3d 312, 329 (2d Cir. 2002) ("[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." (quotations omitted)).

An omission is actionable "only when the [defendant] is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig*., 9 F.3d 259, 267 (2d Cir. 1993); *accord, e.g., Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013); *City of Roseville Emps. Ret. Sys. v.*

11

*Energy Solutions Inc.*, 814 F.Supp.2d 395, 410 (S.D.N.Y. 2011). Although Rule 10b–5 imposes no

affirmative duty to disclose all material, non-public information, "once a party chooses to

speak, it has a 'duty to be both accurate and complete.' " *Plumbers' Union Local No. 12 Pension*

*Fund v. Swiss Reinsurance Co.*, 753 F.Supp.2d 166, 180 (S.D.N.Y. 2010) (quoting *Caiola v.*

*Citibank, N.A.,* 295 F.3d 312, 331 (2d Cir. 2002)).

In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575

U.S. 175 (2015), the Supreme Court held that statements of opinion are subject to heightened

pleading requirements. Statements of opinion, even when later proven to be false, are

generally not actionable unless either " 'the speaker did not hold the belief she professed' or

'the supporting fact she supplied were untrue.' " *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir.

2016) (quoting *Omnicare*, 575 U.S. at 186). *Omnicare* also held that "opinions, though sincerely

held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits

information whose omission makes the statement misleading to a reasonable investor." *Id.*

A statement may also not be actionable if it falls under the PSLRA safe harbor provision

for forward-looking statements and the judicial "bespeaks caution" doctrine. "A forward-

looking statement accompanied by sufficient cautionary language is not actionable because no

reasonable investor could have found the statement materially misleading." I*owa Pub.*

*Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010); *see also* 15 U.S.C. § 77z–

2. However, neither the PSLRA nor the bespeaks caution doctrine protect misstatements or

omissions of present or historical fact. 15 U.S.C. § 77z–2(c)(1)(B)(ii); *see, e.g., Iowa Pub. Emps.*

*Ret. Sys. v. MF Global, Ltd*., 620 F.3d 137, 142, 144 (2d Cir. 2010); *Rombach v. Chang*, 355 F.3d

164, 173 (2d Cir. 2004) ("The doctrine of bespeaks caution provides no protection to someone

who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.") (internal quotations omitted). Additionally, "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.' "*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 206 (2d Cir. 2009)). Similarly to the "bespeaks caution" doctrine, puffery does not encompass statements that "a reasonable investor could rely on [ ] as reflective of the true state of affairs at the Company." *See In re Eletrobras Sec. Litig.*, 245 F.Supp.3d 450, 463 (S.D.N.Y. 2017).

 Because materiality is a mixed question of law and fact, a complaint may not be dismissed on the ground that the alleged misstatements or omissions are not material "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d at 197 (quotations omitted).

Plaintiffs allege that Defendants made material misstatements concerning Vertiv's ability to offset inflation with new pricing initiatives. In support of their Exchange Act claims, Plaintiffs contrast statements made by Vertiv and the Officer Defendants highlighting Vertiv's ability to "get price" with statements made by former employees ("FE's") and post-Class Period statements made by Defendants about Vertiv's pricing response. Plaintiffs contrast Defendants' statements that Vertiv was instituting "robust pricing actions" and "controlling the discounts and multipliers that our own salespeople are able to have" with Defendants' post-Class Period

admissions that Vertiv "wasn't set up to drive a lot of price" and had a "culture" of "giv[ing] away the pricing that [Vertiv was] getting through discounting." Plaintiffs also contrast Defendants' statements about the existence of escalation clauses in some larger contracts with statements made by former employees that virtually no large contracts during the Class Period contained such clauses.[5] Plaintiffs argue Defendants' statements were misleading because they "misled investors to believe that Vertiv was successfully capturing inflation through price increases" when that was not the case. (ECF 59 at 14).

Defendants argue that none of the statements Plaintiffs point to are actionable misstatements or omissions because Plaintiffs do not sufficiently allege that Vertiv was not taking the pricing actions it says it was. Defendants also argue that Vertiv's financial guidance and forecasts are statements of opinion subject to heightened pleading requirements under *Omnicare*, and that Defendants' statements about Vertiv's capability to partially offset inflation through price increases were sincerely held when made. Those statements proved inaccurate, Defendants argue, not because the facts underlying them were untrue, but because inflation increased more quickly and dramatically than they and most other firms anticipated. In the alternative, Defendants argue that these statements are forward-looking statements that fall under the PSLRA safe harbor and the Second Circuit's "bespeaks caution" doctrine, or fall under the umbrella of non-actionable puffery.

---

[5] The former Vertiv employees ("FE's") are described in the complaint as follows: FE-1 is the former Vice President of Channel Strategies for the Americas from January 2018 until March 2021 (ECF 25 at ¶ 83 n.5).; FE-2 is a former Senior Account Manager and current customer of Vertiv who left the company in May 2019 (ECF 25 at ¶ 85 n.6).; FE-3 is a former Vice President of Field Sales from May 2020 until July 2022 (ECF 25 at ¶ 88 n.7); and FE-5 is a former Account Executive who worked at Emerson/Vertiv from December 2019 until September 2021 ((ECF 25 at ¶ 90 n.8).

Defendants' statements that Vertiv was instituting pricing actions that could offset the "vast, vast, vast majority of any inflationary stuff", although framed in forward-looking language, were based on communications about present fact. That is, Vertiv's guidance and projections were based on the asserted fact that Vertiv was actually implementing the pricing actions Defendants said they were implementing. Accordingly, Defendants' statements are not protected by *Omnicare*, the PSLRA, or the bespeaks caution doctrine insofar as they misled investors about what action Vertiv was taken at the time the statements were made. *See In re Regeneron Pharms., Inc. Sec. Litig.*, 03-CV-3111, 2005 WL 225288 at *13 (S.D.N.Y. Feb. 1, 2005) ("Statements that might arguably have some forward-looking aspect are unprotected by the PSLRA safe harbor provision to the extent that they are premised on representations of present fact."). For similar reasons, to the extent these statements misrepresented existing facts about the state of pricing actions being taken at the company, they are not immaterial puffery. *See Novak*, 216 F.3d at 315.

Seven of the statements Plaintiffs identify meet the standard of Federal Rule of Civil Procedure 9(b) and the PSLRA to survive a motion to dismiss. These statements fall into two categories: 1) statements about escalation clauses in large contracts and 2) statements about raising list prices and controlling discounts.[6]

---

[6] Plaintiffs identify a number of other statements about general pricing initiatives, preplanning with suppliers, and the use of advanced pricing tools that they allege were materially misleading at the time they were made. Because the seven statements discussed *infra* meet the standard to move past the motion to dismiss stage to discovery, I have not reached the other statements which may not, on their own, clear the Rule 9(b) bar to survive a motion to dismiss.

a.  **Escalation clauses**

Plaintiffs contrast Defendant Niederpruem's statements that Vertiv was looking into the mechanisms to get additional revenue from "backlog" orders through the use of escalation clauses in some "larger contracts" with his post-Class Period statement that the firm was "now" beginning to include escalation clauses in "some" larger contracts so "that way, we don't get caught in the same situation again." (ECF 25 at ¶¶ 132-33, 147).

Plaintiffs also contrast Defendant Niederpruem's statements with the accounts of multiple former Vertiv employees. FE-1 also stated that Vertiv's large enterprise contracts, which comprised between 85% and 90% of Vertiv's business, contained no mechanisms to raise prices after the contracts were signed. And FE-6, a former Vice President of Sales through September 2021, stated that Vertiv's backlog was "off the charts unprofitable" and that she was told by her manager that Vertiv was not raising prices, but rather attempting to gain market share relative to their competitors.

Defendants argue that statements to the effect that long-term contracts "sometimes" had escalation clauses is strictly true because "sometimes" does not mean "always." Defendants point to the fact that Plaintiffs do not allege that *none* of their contracts had escalation clauses, and that Plaintiffs' "anonymous-witness allegations" cannot overcome the "hard" fact that Vertiv did obtain an additional $53 million in pricing in 2021.[7]

---

[7] Even taking this "hard fact" into account, Vertiv's $53 million in additional pricing over the court of 2021 would not have come close to offsetting its inflation predictions in the second half of 2021. In July 2021, Vertiv forecast $110 million in additional material and freight inflation costs; in September 2021, that figure was revised upwards to $130 million; and in October 2021, that figure was revised upwards to $155 million. (ECF 25 at ¶ 162).

Defendants' arguments are unavailing at this stage in the litigation. If even 1% of Vertiv's contracts contained escalation clauses, it would be technically true that the firm's contracts "sometimes" contained escalation clauses. But in the full context of when and where the statement was made – i.e., at an investor conference in response to questions about whether Vertiv was capable of raising prices on existing contracts to substantially offset inflation – Plaintiffs have sufficiently shown that these statements were misleading to a reasonable investor. Defendant Niederpruem's statement created the false impression that escalation clauses to pass through the cost of materials could bring enough revenue to considerably offset the majority of inflation. *See Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *7 (S.D.N.Y. June 16, 2020) ("A statement is misleading if a reasonable investor would have received a false impression from the statement.").

### b. Discounting and raising list prices

Plaintiffs also contrast Defendants' statements to investors about controlling discounting and raising list prices with the accounts of several former Vertiv employees.[8] *See supra* n.5. FE-1 stated that "the pressure to sell was so great that we had an inability to transfer those price costs [from inflation] to our customers," that there had been no internal discussion of raising prices as of March 2021, and recalled Defendant Johnson personally approving entering deals without price increases. FE-3 stated that Defendants Johnson and Fallon had access to frequently-updated orders, sales, margins, and profitability data and did not raise prices to keep pace with inflated costs. FE-5 stated that executive management reviewed and distributed policy manuals that permitted salespeople to sell at a 45% discount off list price

---

[8] *See supra* n.5.

without higher-level approval, and that discounts below this level were generally approved by higher-level management.

As to discounting, Defendants argue that the fact Vertiv lost some pricing through discounting does not mean that Vertiv had not reduced discounting. But the accounts of the former employees indicate that Vertiv was giving extensive discounts as a matter of course, both with and without higher-level approval, throughout the Class Period. Taking Plaintiffs' allegations as true, Defendants' statements that they were controlling discounting sufficiently to significantly offset inflation would be misleading to a reasonable investor. Whether and when discounts were freely given during the Class Period are questions of fact that are improper for consideration on a motion to dismiss. *See Van Dongen v. CNinsure Inc.*, 951 F.Supp.2d 457, 471 (S.D.N.Y. 2013).

### 2. Section 10(b) of the Exchange Act and Rule 10b-5 against Vertiv and Officer Defendants: Scienter

As an alternative ground for dismissal, Defendants argue that Plaintiffs have not sufficiently alleged scienter. Scienter is " 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 319 (2007). Under the PSLRA, a complaint must state with particularity facts giving rise to a "strong inference" that the defendant acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2). In *Novak v. Kasaks*, the Second Circuit concluded that the PSLRA "effectively raised the nationwide pleading standard to that previously existing in this circuit." *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 200), cert. denied,531 U.S. 1012 (2000). Previously, the Second Circuit had accepted allegations of "motive and opportunity" or allegations "constituting strong circumstantial evidence of conscious misbehavior or recklessness" as means of demonstrating scienter, and

both methods have been used in this Circuit subsequent to the PSLRA's enactment. *See Stratte McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).

The Second Circuit has further explained that a strong inference of scienter, sufficient to meet the PSLRA's standards, may arise where the complaint alleges that defendants (1) "benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d at 311.

The Supreme Court has held that to qualify as strong, an "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. at 314. In determining whether an inference of scienter can be drawn, the Court should consider "all of the facts alleged, taken collectively . . .  not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 323. " 'Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious [mis]behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.' " *Nandkumar v. AstraZeneca PLC*, No. 22-cv-2704, 2023 WL 3477164, at *3 (2d Cir. May 16, 2023) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)) (alteration in original).

An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotation omitted); *see also City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372

(S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). In sum, "[t]he inquiry on a motion to dismiss is as follows: 'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?' " *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007) (quoting *Tellabs*, 551 U.S. at 326).

Defendants argue that Plaintiffs have not sufficiently pled scienter because Plaintiffs have not alleged any motive or opportunity to defraud by the Officer Defendants. Defendants point to the fact that none of the Officer Defendants sold shares or exercised stock options at the time Vertiv's stock was allegedly inflated, which weighs against an inference of fraud. Nor, Defendants argue, do Plaintiffs plead conscious misbehavior or recklessness because the Amended Complaint does not plead that any of the Officer Defendants had knowledge of contemporaneous information that contradicted their public statements.

Even if Plaintiffs cannot succeed on a motive and opportunity theory, the circumstantial allegations in Plaintiffs' complaint sufficiently indicate conscious misbehavior on the part of the Defendants. *See Nandkumar*, 2023 WL 3477164, at *3. Defendants' own representations, as well as reports of former employees, strongly indicate that Defendants had up-to-date knowledge of pricing data and were approving large discounts throughout the Class Period. In particular, Defendant Niederpruem represented on May 26, 2021 that executive leadership personally reviewed "pricing and the commodity stuff . . . 8 days a week at this point in time", and company leadership told investors on multiple occasions that Vertiv employed "sophisticated" price-monitoring tools. (ECF 25 at ¶¶ 136, 105)  These statements, when viewed in the full context of the complaint, raise a compelling inference "at least as compelling

20

as any opposing inference of nonfraudulent intent" that the Defendants either had access to facts and information suggesting their statements about Vertiv's pricing response were incorrect, or failed to monitor inflation and pricing metrics they both had a duty to monitor, and that they represented they were monitoring. *See Tellabs*, 551 U.S. at 314; *Novak*, 216 F.3d at 311.

Accordingly, Defendants' motion to dismiss the Section 10(b) and Rule 10b-5 claims should be **denied**.

### 3.   Section 20(a) Claims against the Officer Defendants

Section 20(a) of the Exchange Act imposes liability on individuals or entities that "control[ ] any person liable" under Section 10(b). 15 U.S.C. § 78t(a); *see S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Control may be established by showing that a defendant, directly or indirectly, possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2; *see also, e.g., In re China Valves Tech. Sec. Litig.*, 979 F. Supp 2d 395, 413–14 (S.D.N.Y.2013). Also required for liability under Section 20(a) is "actual involvement in the making of the fraudulent statements by the putatively controlled entity." *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 663 (S.D.N.Y. 2007).

Plaintiffs have made a showing of all three elements of a Section 20(a) claim against the Officer Defendants. First, as set forth above, Plaintiffs have met the prerequisite of adequately pleading an underlying Exchange Act violation. Second, Plaintiffs have shown that each of the Officer Defendants was a "control person." Third, Plaintiffs' complaint sets forth with specificity each Officer Defendant's role in making the statements that are at the heart of Plaintiffs' Exchange Act claims. For the same reasons set forth above in connection with the scienter elements of the Section 10(b) claim, Plaintiffs are able to satisfy the "culpable person" standard.

Accordingly, the Officer Defendants' motion to dismiss the claims for control person liability under Section 20 should be **denied**.

### 4. Section 11 of the Securities Act against Vertiv, Johnson, Fallon, the Director Defendants, and the Underwriter Defendants

Sections 11, 12(a)(2), and 15 of the Securities Act "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). Sections 11 and 12(a)(2) are "Securities Act siblings with roughly parallel elements." *Id.* at 359.  Unlike Section 10(b) claims, however, plaintiffs pleading claims under Sections 11 and 12(a)(2) "need not allege scienter, reliance, or loss causation." *Id.*

Section 11(a) provides that any signatory to a registration statement, director of the issuer of securities, or underwriter with respect to such securities, among others, may be held liable to purchasers of registered securities if the registration statement contained "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). This Section

imposes "a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983); *see In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 618 F. Supp. 2d 311, 321 (S.D.N.Y. 2009). "To establish a prima facie claim under Section 11, a plaintiff need only plead a material misstatement or omission in the registration statement." *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017). Under Section 11, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements," while "[o]ther defendants bear the burden of demonstrating due diligence." *Herman & MacLean*, 459 U.S. at 382.

Plaintiffs challenge several risk disclosures contained in the prospectus supplement and registration statement (collectively, the "Offering Materials") for Vertiv's secondary public offering on November 4, 2021. The Offering Materials incorporated by reference Vertiv's amended Form 10-K/A amended annual report filed on April 30, 2021. One risk factor stated that "we may not realize the revenue we expect to generate from our backlog, or, if realized, may not result in profitable revenue." Another risk factor stated that Vertiv's contracts with its large customers may "require more favorable terms and conditions in our contracts that could result in downward pricing pressures in our business."

Plaintiffs have not sufficiently alleged that these statements were misleading either at the time the 10-K/A Form was originally filed or at the time of the SPO. Plaintiffs identified particular risk factors that ultimately did materialize; for example, if Vertiv's contracts with large customers were already "result[ing] in downward pricing pressures in [their] business," by definition these disclosures could not have been misleading. To find otherwise would have a

perverse result of holding parties liable for accurately disclosing risks as well as inaccurately

disclosing or failing to disclose risks at all.

Accordingly, Defendants' motion to dismiss the Section 11 claims should be **granted**.

5. **Section 12(a)(2) of the Securities Act against the Underwriter
   Defendants**

Section 12(a)(2) imposes liability upon "any person" who "offers or sells a security ... by

means of a prospectus or oral communication, which includes an untrue statement of a

material fact or omits to state a material fact necessary in order to make the statements, in

light of the circumstances under which they were made, not misleading[.]" 15 U.S.C. § 77l(a)(2);

*see, e.g., NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co*., 693 F.3d 145, 156 (2d Cir.

2012), cert denied, 133 S.Ct. 1624 (2013).

Because the risk disclosures at issue in the SPO were not misleading, Underwriter

Defendants' motion to dismiss the Section 12(a)(2) claims against them should also be **granted**.

6. **Section 15 of the Securities Act against Johnson, Fallon, the Director
   Defendants, and the Platinum Defendants.**

Control under Section 15 entails "the power to direct or cause the direction of the

management and policies of a person, whether through the ownership of voting securities, by

contract, or otherwise.' " 17 C.F.R. § 240.12b–2; *see also, e.g., In re China Valves Tech. Sec.

Litig.*, 979 F.Supp.2d 395, 413–14 (S.D.N.Y. 2013). "Allegations of control under Section 15 are

subject only to notice-pleading requirements, and accordingly survive motions to dismiss 'as

long as it is at least plausible that the plaintiff could develop some set of facts that would pass

muster.' " *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 637 (S.D.N.Y. 2007); *see also, e.g., Ho

v. Duoyon Global Water, Inc*., 887 F.Supp.2d 457, 562 (S.D.N.Y. 2012). Determining control

person liability is a "fact-intensive inquiry [ ] [that] generally should not be resolved on a motion to dismiss." *In re Tronox*, 769 F.Supp.2d at 208.

The Platinum Defendants, Vertiv's alleged owners, argue that Plaintiffs' Section 15 control person claims fail because the amended complaint does not allege an underlying violation of the Securities Act. Because the Court has found that Plaintiffs have not adequately alleged a violation of Section 11, the motion to dismiss should be granted on this ground.[9]

Accordingly, Defendants' motion to dismiss the Section 15 claims against them should be **granted**.

IV. **Conclusion**

For the reasons set forth above, Defendants' motions to dismiss (ECF Nos. 53-54) should be **denied** as to Plaintiffs' Exchange Act claims against Vertiv and the Officer Defendants (Counts I and II), and **granted** as to all other claims (Counts III through V).

---

[9] If Plaintiffs had pled an underlying Section 11 violation, the Platinum Defendants argue that Plaintiffs' Section 15 control person claims against them should fail on the additional grounds that Plaintiffs have not sufficiently pleaded control person liability, and have not included any factual allegations about the Platinum Defendants' actual involvement with Vertiv's alleged misstatements.

Plaintiffs' complaint alleges sufficient facts to plead control, namely that Vertiv was created as a result of Platinum Equity's 2016 acquisition of Vertiv's predecessor, Emerson Network Power; Platinum Equity was key in Vertiv becoming a public company; Platinum Equity was Vertiv's largest stockholder at the start of the Class Period and received approximately $544 million in proceeds from the SPO; and that Vertiv's SEC filings during the Class Period identify Platinum Equity as having "the ability to significantly influence all corporate actions requiring stockholder approval, including the election and removal of directors and the size of [Vertiv's] board." Taken as a whole, the facts in Plaintiffs' complaint give rise to an inference that Platinum Equity had the power to control Vertiv during the Class Period.

The Platinum Defendants' argument also fails on the second ground because "the majority of courts in this District have concluded that culpable participation is *not* required to state a claim under section 15." *Abengoa*, 559 F.Supp.3d at 323.

V.    **Objections**

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to the Honorable Gregory H. Woods, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Woods.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** (*See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983)).

_s/ Ona T. Wang_

Dated: November 6, 2023                                          **Ona T. Wang**
       New York, New York                            United States Magistrate Judge