# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Vertiv Holdings Co Securities Litigation* | No. 1:22-cv-03572-GHW-OTW<br><br>**ORAL ARGUMENT REQUESTED** |

## DEFENDANTS' OBJECTION TO REPORT AND RECOMMENDATION
## TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................ 4

      A.    Before the Class Period, Vertiv Expressly Warns Investors About Risks of Supply Chain Disruptions and Its Ability to Pass Through Costs ...........................4

      B.    Vertiv Began Implementing New Pricing Initiatives in 2019 and 2020.................6

      C.    Vertiv Announces 2021 Guidance in February 2021 .............................................6

      D.    After Q1 2021, Vertiv Adjusts Guidance to Account for Additional Inflation.................................................................................................................6

      E.    At a May 2021 Investor Conference, Vertiv Reiterates Its Q1 2021 Guidance ................................................................................................................8

      F.    After Q2 2021, Vertiv Revised Its Estimate of Full-Year Inflation Upwards ................................................................................................................8

      G.    During Q3 2021, Vertiv Reduces Guidance .........................................................9

      H.    After Q3 2021, Vertiv Raises Guidance Slightly to Account for Acquisition.........................................................................................................10

      I.    VPE Holdings, LLC Sells Shares in Secondary Offering....................................10

      J.    In Q4 2021, Vertiv Continues to Ramp Up Pricing Actions ...............................11

      K.    Vertiv Misses Q4 2021 Guidance.......................................................................11

      L.    Officer Defendants Sell No Shares of Vertiv During the Class Period ................13

      M.    Plaintiffs' Complaint...........................................................................................13

ARGUMENT ................................................................................................................ 14

I.      The PSLRA and Rule 9(b) Impose Heightened Pleading Requirements ......................... 14

II.      The Alleged Misstatements Addressed in the R&R Are Not Actionable......................... 14

      A.    Statements About Escalation Clauses.................................................................14

      B.    Statements About Discounts ................................................................................19

      C.    Statements About Raising List Prices..................................................................21

III.      The Remaining Alleged Misstatements Should Be Addressed and Claims Based on Them Dismissed.......................................................................................................... 22

      A.    Statements That Vertiv Was Implementing Pricing Actions...............................23

      B.    Statement About Preplanning with Suppliers .....................................................26

      C.    Statement About Pricing Tools............................................................................26

      D.    Statements About Pre- and Post-Class Pricing Actions.......................................27

IV.      Many of the Statements Are Non-Actionable Opinions................................................... 28

V.      Many of the Statements Are Non-Actionable Forward-Looking Statements................... 31

VI.     Many of the Statements Are Non-Actionable Puffery...................................................... 33

VII.    Plaintiffs' Allegations Fail to Support a Strong Inference of Scienter ........................... 34

      A.      The R&R Correctly Finds Plaintiffs Fail to Allege Motive and
             Opportunity .........................................................................................................35

      B.      Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness.......................36

      C.      The Most Cogent and Compelling Inference Does Not Support Fraud.................41

CONCLUSION.............................................................................................................................. 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ariba, Inc. Sec. Litig.*,
2005 WL 608278 (N.D. Cal. Mar. 16, 2005)..............................................................40

*In re AT&T/DirecTV Now Sec. Litig.*,
2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020), *aff'd*, 2022 WL 17587853 (2d
Cir. Dec. 13, 2022)....................................................................................................17

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)....................................................................................4, 34

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
2013 WL 6504801 (S.D.N.Y. Dec. 11, 2013) ..........................................................29

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014)................................................................................37, 41

*In re Coty Inc. Sec. Litig.*,
2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ..........................................................18

*In re Crude Oil Commodity Futures Litig.*,
913 F. Supp. 2d 41 (S.D.N.Y. 2012).........................................................................12

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009)................................................................................35, 36

*In re Duane Reade Inc. Sec. Litig.*,
2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)........................................................28

*ECA & Local 134 IBEW Joint Pens. Trust of Chicago* v. *J.P. Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..............................................................35, 36, 41, 42

*Emps. Ret. Sys. of City of Providence* v. *Embraer S.A.*,
2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) ..........................................................24

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
2015 WL 4931357 (S.D.N.Y. Aug. 19)........................................29, 30, 33, 34

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
352 F. Supp. 2d 429 (S.D.N.Y. 2005)........................................................................35

*Frankfurt-Tr. Inv. Luxemburg AG* v. *United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd*, 779 F. App'x 69 (2d Cir. 2019)................18, 40

*Friedman* v. *Endo Int'l PLC*,
   2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) ...............................................................................34

*Gissin* v. *Endres*,
   739 F. Supp. 2d 488 (S.D.N.Y. 2010)..............................................................................31, 33

*Greco* v. *Qudian Inc.*,
   2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022).......................................................14, 23, 29, 35

*Harris* v. *AmTrust Fin. Servs.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016)..........................14

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
   2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021).........................................................................18

*Inter-Loc. Pension Fund GCC/IBT* v. *Gen. Elec. Co.*,
   445 F. App'x 368 (2d Cir. 2011) .............................................................................................39

*Iowa Pub. Emps. Ret. Sys.* v. *MF Glob., Ltd.*,
   620 F.3d 137 (2d Cir. 2010)....................................................................................................32

*Jackson* v. *Abernathy*,
   960 F.3d 94 (2d Cir. 2020)......................................................................................................40

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Exp. Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)..................39, 42

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014)........................................................................................26

*Maloney* v. *Ollie's Bargain Outlet Holdings, Inc.*,
   518 F. Supp. 3d 772 (S.D.N.Y. 2021)......................................................................................39

*In re Nevsun Res. Ltd.*,
   2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013)..........................................................................34

*Novak* v. *Kasaks*,
   216 F.3d 300 (2d Cir. 2000)........................................................................................22, 38, 39

*Ok. Firefighters Pension & Ret. Sys.* v. *Ixia*,
   2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ........................................................................18

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015).........................................................................................................29, 31

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)....................................................................................................28

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund* v. *Arbitron Inc.*,
741 F. Supp 2d 474 (S.D.N.Y. 2010)..................................................................................35

*Plymouth Cnty. Ret. Ass'n* v. *Array Tech., Inc.*,
2023 WL 3569068 (S.D.N.Y. May 19, 2023) .............................................. *passim*

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y.), *aff'd*, 357 F. App'x 393 (2d Cir. 2009).........................36, 42

*Ramzan* v. *GDS Holdings Limited*,
2020 WL 1689772 (S.D.N.Y. Apr. 7, 2020)........................................................................39

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd*, 816 F.3d 199 (2d Cir. 2016)..............................32

*Sinay* v. *CNOOC Ltd.*,
2013 WL 1890291 (S.D.N.Y. May 6, 2013), *aff'd*, 554 F. App'x 40 (2d Cir. 2014) .....................................................................................................40

*Steinberg* v. *Ericsson LM Tel. Co.*,
2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ....................................................................17

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).....................................................................................................14, 37

*Tongue* v. *Sanofi*,
816 F.3d 199 (2d Cir. 2016)............................................................................................29

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022)......................................................................31

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)................................................................................41

*In re Wells Fargo & Co. Sec. Litig.*,
2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)................................................................23, 42

*Wochos* v. *Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ........................................................................................30

*Yourish* v. *Cal. Amplifier*,
191 F.3d 983 (9th Cir. 1999) ..........................................................................................21

*Zucco Partners, LLC* v. *Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ..........................................................................................17

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A)...................................................................................................34

15 U.S.C. § 78u-5(c)(1)(B) ...................................................................................................36

**Other Authorities**

Rule 9(b) ...................................................................................................1, 14, 23, 35

Rule 12(b)(6)....................................................................................................................1

Sometimes, CAMBRIDGE DICTIONARY,
   https://dictionary.cambridge.org/us/dictionary/english/ ..........................................15

Vertiv Holdings Co ("Vertiv"), Rob Johnson, David Fallon, and Gary Niederpruem ("Officer Defendants," and together, "Defendants"[1]), submit this memorandum in support of their Objections to the portions of Magistrate Judge Wang's November 6, 2023 Report & Recommendation ("R&R") recommending denial of Defendants' Motion to Dismiss the Amended Consolidated Complaint ("Complaint" or "AC") under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

This case asserts fraud by hindsight. In 2021, Vertiv, a supplier of data center equipment and services, underestimated surging inflation and supply chain breakdowns—as did much of the world. But Vertiv's disclosed projections at all times warned that Vertiv would be ***unable*** to recoup surging costs by increasing prices. In early 2021, Vertiv projected $20 million of full-year inflation, and forecast that it would be able to offset some ($15 million) of that inflation by increasing prices. However, as 2021 went on, inflation accelerated, and Vertiv revised its inflation projections upward. While Vertiv disclosed that it was ramping up pricing actions to partially offset rising costs, it was clear that the gaps between inflation and increased price recovery were increasing. By the end of Q3 2021, Vertiv forecast $155 million in increased costs for the year, and warned that it projected to recover only $55 million of that with increased pricing. Vertiv nearly met that pricing projection (achieving $53 million of $55 million), but inflation soared in Q4, spiking by another 60%. So, while Vertiv nearly met its pricing forecast, because it underestimated the inflation side of the equation, it missed its Q4 guidance.

Plaintiffs sued shortly thereafter. Plaintiffs' theory is that Vertiv falsely assured investors

---

[1] The remaining defendants named in the AC are named only on Plaintiffs' claims under the Securities Act of 1933. The R&R recommended dismissal of the Securities Act claims, and after conferral with Plaintiffs, Defendants understand Plaintiffs are not objecting to the dismissal of the Securities Act claims. Accordingly, this Objection will not address the Securities Act claims.

it was instituting pricing actions to offset all inflation, while purportedly not taking any pricing actions. But this claim is demonstrably wrong on the face of the Complaint: Vertiv **never** assured investors its pricing actions would offset all inflation. To the contrary, throughout the year, Vertiv disclosed how much inflation it projected for 2021, and disclosed the widening gap between projected inflation and expected offsets from pricing increases. As set forth in the below table, Vertiv transparently and repeatedly disclosed that its pricing actions **would not suffice** to recoup increasing costs. Moreover, Plaintiffs' claim that Vertiv did not take pricing actions—which is insufficiently pleaded, in any event—is belied by Vertiv's disclosures showing that Vertiv did successfully increase prices (*i.e.*, "get price"). In FY 2021, Vertiv's pricing actions recovered $53 million—*over 3x* its initial forecast of $15 million, and far higher than in prior years.

| | Full-Year Forecasts | | | | | |
|---|---|---|---|---|---|---|
| | **Feb. 2021** | **April 2021** | **July 2021** | **Sept. 2021** | **Oct. 2021** | **Actual 2021** |
| **Inflation** | $20 million | $45 million | $110 million | $132 million | $155 million | $188 million |
| **Pricing** | $15 million | $25 million | $65 million | $55 million | $55 million | $53 million |

*See also* App. A (graph showing increasing widening between forecasted inflation and pricing over FY 2021). Given these clear disclosures, Plaintiffs are doubly wrong: Vertiv did warn that its pricing actions would not suffice to offset inflation, and Vertiv did take significant pricing actions that met its projections—Vertiv simply underestimated exploding inflation.

In the R&R, Magistrate Judge Wang recommended ruling that seven of the dozens of alleged misstatements in the Complaint were sufficiently pled, and denying dismissal of the Exchange Act claims on that basis. The R&R, however, ignored the above context for Vertiv's statements, and thus read into the statements assurances that were never made.

*Falsity***:** The R&R recommends finding falsity pleaded as to two categories of statements: (i) statements about "escalation clauses" that pass through rising costs to large customers; and (ii)

statements about raising list prices and controlling discounts. The R&R finds Plaintiffs sufficiently pled that these statements were misleading because Defendants represented that these actions (invoking escalation clauses and controlling discounts) would "significantly offset inflation." R&R 18. But Defendants never said that. Rather, they noted escalation clauses and discount controls as among the available mechanisms for increasing prices—which Vertiv demonstrably did—but repeatedly disclosed that all of its pricing actions together would offset only a fraction of inflation. The R&R ignores this context. The R&R also credits allegations concerning escalation clauses and discount practices that rely upon (i) anonymous witnesses who were not in position to know whether or to what extent Vertiv implemented these pricing actions in 2021; and (ii) post-Class-Period statements by Vertiv expressing *hindsight* disappointment with its (unusually high) price increases in light of how bad inflation got. Neither can be read to mean that Vertiv did not take these actions as part of its pricing response in 2021.

The R&R declined to rule on the other categories of challenged misstatements. Those statements suffer from the same defects and any claims based on them should also be dismissed. Moreover, Plaintiffs' claims further fail because many alleged misstatements are non-actionable opinions, forward-looking, and puffery. While the R&R acknowledges that many of the challenged misstatements are contingent on "guidance and projections," it suggests that such guidance and projections are actionable if "based on the asserted fact that Vertiv was actually implementing the pricing actions." R&R 15. But nowhere do Plaintiffs plead with particularity that Vertiv was not implementing the pricing actions, and Vertiv *did* achieve $53 million in increased prices in 2021, which could only be due to the pricing actions Vertiv implemented.

***Scienter***: The R&R recommends that Plaintiffs adequately pleaded a strong inference of scienter (*i.e.*, intent to defraud), but it does not weigh the competing inferences and determine

3

whether the inference of fraud is at least as compelling as non-fraudulent inferences, as the PSLRA requires.  Here, the non-fraudulent inference that Vertiv raised prices but did not predict just how high its costs would soar and how bad supply chain constraints would get—as Vertiv expressly told investors after its guidance miss—is far more compelling.  As the R&R recognizes, Plaintiffs do not allege any motive or opportunity to defraud by Officer Defendants—none of whom are alleged to have financially benefitted from the purported fraud.  And while the R&R endorses a conscious misbehavior theory by finding that Plaintiffs sufficiently allege that Officer Defendants had access to *current* pricing and inflation data, Plaintiffs do not point to data that contradicted Officer Defendants' public statements.  Indeed, Vertiv repeatedly disclosed its increasingly dismal inflation forecasts to investors, and made clear that pricing would not keep up, including due to fixed-price contracts that made it difficult to pass on rising costs to customers.

Transparently disclosing that your prices will not keep up with inflation, and then achieving your disclosed pricing goals while getting hit with more inflation than predicted, is not fraud.

## BACKGROUND

A.    **Before the Class Period, Vertiv Expressly Warns Investors About Risks of Supply Chain Disruptions and Its Ability to Pass Through Costs**

Vertiv went public in February 2020.  ¶ 39.[2]  It published its first 10-K shortly thereafter, cautioning investors about a number of risks directly relevant to the AC.

*Pricing Pressure from Large Customers*.  Vertiv warned it was exposed to "downward pricing pressures" from "large companies" that would "often require more favorable terms and

---

[2] Cites to "¶" are to the AC.  Cites to "Ex. _" are to exhibits to the Declaration of Audra J. Soloway, ECF No. 55, and cites to "Supp. Ex. _" are to exhibits to the Declaration of Audra J. Soloway, ECF No. 67.  In ruling on a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The exhibits cited herein consist of SEC filings, call transcripts, and other documents that were incorporated into the AC by reference.

conditions in [their] contracts," and as Vertiv sought to "sell more products to such customers, [it] may be required to agree to such terms and conditions more frequently."  Ex. 7 at 15.

*Impact of Increased Costs on Fixed-Price Contracts*.  Vertiv also disclosed the potential for "volatility in the supply or price of raw materials."  *Id.* at 17.  It warned that its "products rely on a variety of raw materials and components, including steel, copper and aluminum and electronic components," and that it may be "*unable to offset unexpected increases in material and component costs with our own price increases* without suffering reduced volumes, revenues or operating income."  *Id.*  Vertiv also disclosed that this exposure to "changes in costs . . . of components [and] materials" posed a "substantial risk" to its financial condition because Vertiv had entered, and would continue to enter, into "long-term, fixed-price contracts" with customers.  *Id.* at 16.

*Supply Chain Risks Could Increase Costs*.  Vertiv disclosed that "[o]ur operations . . . depend on our ability to accurately anticipate both our needs, including raw materials, components, products and services, from . . . suppliers, and such suppliers' ability to timely deliver the quantities and quality required at reasonable prices."  *Id.* at 17.  It warned that "[f]ailure to properly manage our supply chain . . . could result in higher costs of production . . . or shortages and delays."  *Id.*

*Disruption from IT Systems*.  Vertiv disclosed that its "implementation of new information systems and enhancements to current systems" could be "disruptive to our operations" and harm its financial condition, and "adversely impact [Vertiv's] ability to . . . accurately record and transfer information, recognize revenue . . . or otherwise run [its] business."  *Id.*

These warnings were also included in Vertiv's 2020 Form 10-K and 2020 Amended Form 10-K, filed March 1 and April 30, 2021, respectively.  *See* Exs. 11, 15.  In the latter two filings, Vertiv additionally disclosed that its "business, results of operations, [and] financial position . . . have been and could continue to be adversely affected" by COVID-19, and that those effects could

be "material and may include . . . disruptions in [its] supply chain."  Ex. 11 at 31–32; Ex. 15 at 34.

**B.      Vertiv Began Implementing New Pricing Initiatives in 2019 and 2020**

Prior to 2019, Vertiv did not have a record of high margins.  ¶¶ 39–40.  Vertiv "historically kind of convinced itself" that if it was "flat on a pricing perspective"—meaning prices to customers stayed flat—"it was a good year."  ¶ 140; *see* Ex. 40 at 8.  However, in 2019, Vertiv began new pricing initiatives.  ¶ 40.  The efforts were successful, with Vertiv going from "flat" to about $25 million and $15–20 million in additional pricing benefit in 2019 and 2020, respectively.  ¶ 140.

**C.      Vertiv Announces 2021 Guidance in February 2021**

In early 2021, due in part to "manufacturing shut-downs and travel restrictions caused by the continuing effects of the COVID-19 pandemic," costs for raw materials, component parts, and freight began to rise.  ¶ 43.  On February 24, 2021, Vertiv issued guidance of $565 to $585 million for full-year 2021 adjusted operating profit.  ¶ 115.  It expressly cautioned that this guidance "could be influenced by changes to . . . supply chain dynamics pursuant to COVID-19."  Ex. 8 at 2.

Vertiv's guidance assumed $20 million in full-year inflation, and $15 million in pricing to partially offset it.  ¶ 130.  Vertiv thus expressly disclosed its expectation that it would be able to offset only a portion of increased costs with increased prices.  During the February 2021 earnings call, Chief Strategy and Development Officer Niederpruem expressed optimism that Vertiv would be able to increase prices in 2021, but perhaps not as much as in prior years given "headwinds coming from commodity and inflationary aspects."  Ex. 9 at 13.  Niederpruem said:  "[W]e feel pretty good about where we sit right now to continue passing price along.  Whether it's going to be in the same range of what we're able to do in '19 or '20, not quite sure just yet . . . ."  *Id.*; ¶ 117.

**D.      After Q1 2021, Vertiv Adjusts Guidance to Account for Additional Inflation**

On April 28, 2021, in reporting Q1 earnings, Vertiv disclosed an anticipated pricing benefit of $25 million but $45 million of inflation.  It explained that it was experiencing "supply chain

6

constraints" and "disruptions," and "seeing some increased costs for materials and logistics." ¶ 125; Ex. 14 at 5. Vertiv thus more than doubled its expected full-year impact from inflation, increasing its estimate of 2021 inflation from $20 million to $45 million. ¶ 130. It also disclosed that it was "instituting pricing actions" to "partially pass through the increased costs," ¶ 125, revising its forecasted pricing increase from $15 million to $25 million, ¶ 130.

On the April 28, 2021 earnings call, an analyst asked if there was "some mechanism in the backlog to push through" additional price. Ex. 13 at 19. Niederpruem responded that it was "easier to get price on new orders" but that Vertiv was "looking at" mechanisms to increase price on backlog orders. Niederpruem then noted a few potential "lever[s]" that Vertiv was "looking [a]t and trying to execute," including that—"*sometimes*"—clauses in "larger contracts" would allow Vertiv to increase pricing based on increased materials costs (*i.e.*, "escalation" clauses):

> *I'd say the answer is mixed and varied*. I mean obviously, it's a little bit easier to get price on new orders. But by no means are we just taking a look at that $2 billion of backlog and saying, well, there's nothing we can do. It's already in backlog. So we do have some other mechanisms, *sometimes in larger contracts that have material clauses in them*. Certainly, freight is another lever that we can utilize. That is a real-time mechanism. There's been times when we've instituted surcharges as well. *So I would say that, yes, it's easier to get price on new orders coming through the door*. But by no means are we going to just discount the $2 billion that we have and say there's nothing we can do there. We're looking at that, taking action on that as well. *With all that said, I do think price probably continues to ramp throughout the year*. . . . I think in general, that pricing will ramp. *But those are the different ways we're looking and trying to execute that pricing and freight scenario*.

*Id*. Niederpruem did not say that escalation clauses would be responsible for any significant—or even any concrete—amount of the $25 million in FY pricing response that Vertiv estimated that day. Vertiv disclosed examples of commodities subject to escalation clauses during the Class Period. ¶ 147 ("pass through pricing" for "lead").

On the same call, CEO Johnson noted that Vertiv had "been able to get price" the past "couple of years," referring to the $15–$25 million in annual benefit Vertiv achieved in 2019-20.

Ex. 13 at 14. Expressly referring to Vertiv's forecast for full-year pricing (then $25 million) that Vertiv "built into our plan," Johnson noted that "we're able to *go forward* price things at that higher cost rate," and that "we've got a pretty good process now in our ability to drive prices." *Id.*

Importantly, Vertiv repeatedly warned that its pricing actions would necessarily "lag" behind increasing inflation. As CFO Fallon explained in April 2021, "[W]e will see the negative impact from commodity and logistics sooner in our costs, then we do have the ability to pass that through for higher pricing." ¶ 130; *see also* Ex. 21 at 11 (Niederpruem explaining in July 2021 that "*it takes a couple of quarters*" to implement pricing in response to increased costs).

### E.      At a May 2021 Investor Conference, Vertiv Reiterates Its Q1 2021 Guidance

On May 26, 2021, Niederpruem expressed confidence in offsetting rising costs, expressly citing to Vertiv's Q1 guidance, which estimated $25 million in pricing and $45 million in inflation:

> So we have 2 years of demonstrated track record of getting positive price. When you look at this year, in our Q1 report, we had a Q1 presentation. We had there was about $25 million of headwinds and $10 million is going to be offset by price. . . that $10 million clearly is the floor . . . And I am **sitting here right now**, I am really, really confident that we will be able to recover the vast, vast, vast majority of any inflationary stuff. Now some of it . . . **there's a lead lag there** . . . even if we miss it by a quarter or so offset this year, that will turn into a nice tailwind for us **as we go into next year**.

Ex. 17 at 13. He declined to offer "anything different than what we guided to already." *Id.*

### F.      After Q2 2021, Vertiv Revised Its Estimate of Full-Year Inflation Upwards

On July 28, 2021, Vertiv again reported strong sales and increased full-year adjusted operating profit guidance by $5 million. ¶ 144; *see* ¶ 124. However, Vertiv caveated that its guidance was based on "*current* commodity and freight costs." *Id.* (emphasis added). Vertiv had observed increasing costs, and now forecast full-year inflation at $110 million, a significant increase from the $45 million estimated in April. Ex. 22 at 22. Vertiv stated that "[w]hile material inflation and supply-chain challenges continue, we have implemented additional pricing actions . . . to help offset these challenges." ¶ 144. Vertiv now estimated "having $65 million of pricing

8

actions for the full year," meaning it still expected to offset only a fraction of the $110 million in expected full-year inflation. ¶ 149. Vertiv disclosed actions it was taking, including "list price increases, discount and rebate reductions, pass through pricing (lead) and pricing recovery on outbound freight." ¶ 147. However, it again disclosed that price recovery "lags inflation." ¶ 144.

Vertiv's guidance also assumed that the recent surge in inflation would "stabilize" for the remainder of 2021, and that Vertiv's "pricing plan"—consistent with the disclosed "lag"—would be "fully implemented" by Q4. Ex. 22 at 6. Vertiv disclosed that it anticipated fully offsetting inflation *within* Q4. *Id.* (forecasted inflation and pricing offset each other in Q4 2021); *see* Ex. 20 at 1 ("We expect pricing to ramp-up . . . and to completely offset . . . inflation *within* the fourth quarter" (emphasis added)). Vertiv thus forecast that inflation would stop rising, and that by Q4 2021, its pricing actions would catch up and offset *that quarter's* inflation, but warned investors that it still forecast "$45 million net inflation headwinds" for FY2021. Ex. 21 at 8.

### G.    During Q3 2021, Vertiv Reduces Guidance

On September 8, 2021, based on worsening supply constraints, Vertiv reduced its guidance for full-year adjusted operating profit by $60 million. ¶ 52. It explained that "[d]espite continued strong market demand, supply chain challenges described in our prior communications are trending worse than expected, with critical part shortages driving the need for additional spot buys. In some cases, the company cannot procure critical parts at any price." Ex. 23 at 3. On a call that day, Johnson stated that the market had "tighten[ed] up significantly," with Vertiv paying higher prices for supplies, and that Vertiv was seeing "suppliers de-commit" as unavailability increased. Ex. 24 at 5, 12. Given these trends, Vertiv increased its estimate of full-year inflation by another $22 million. Ex. 25 at 7. Johnson explained that the supply disruption would cause Vertiv's pricing response to lag further: "[B]ecause of the way some of the shipments and timing occur, it looks like we'll capture more of the pricing in 2022 than in 2021." Ex. 24 at 5. Vertiv thus reduced

9

its forecast full-year pricing benefit from $65 million to $55 million.  Ex. 25 at 7.

### H.    After Q3 2021, Vertiv Raises Guidance Slightly to Account for Acquisition

On October 27, 2021, Vertiv announced Q3 earnings, warning that "[s]upply chain issues have continued to accelerate in the third quarter and no improvement is expected in the fourth quarter."  ¶ 159.  Vertiv increased its adjusted operating profit guidance slightly, by $13 million, to account for a recent acquisition.  Ex. 26 at 2.  The guidance was based on the "expectation that supply chain headwinds continue at *current levels* for the remainder of the year."  *Id.*  Vertiv maintained its full-year pricing estimate of $55 million, but increased its full-year inflation estimate from ~$130 to $155 million.  Ex. 28 at 19.  For Q4 2021 specifically, Vertiv forecast $55 million in inflation against $30 million in pricing.  *Id.* at 10.  On a call that day, Johnson disclosed that Vertiv was "dealing, like others, with supply chain and inflationary issues," and that "[p]ricing always lagged cost by a few quarters, *and that's exactly what we're seeing now*.  However, we believe . . . pricing will be a tailwind *in 2022*."  Ex. 27 at 5.  In response to a question about what he was expecting *for 2022*, he elaborated that "going forward with our robust pricing actions and what we are doing now and we'll be doing in 2022 that we will be positive in price . . . [we] under forecasted inflation . . . We're even assuming that it could get potentially worse . . . and we're making sure that our pricing actions now and going forward cover that."  *Id.* at 9.  Fallon likewise stated that Vertiv was "encouraged with what we're seeing in the pricing environment here in the fourth quarter," which he anticipated would create a pricing "tailwind" in 2022, while reiterating the forecast that inflation would outpace pricing in Q4 2021 by $25 million.  *Id.* at 11.

### I.    VPE Holdings, LLC Sells Shares in Secondary Offering

On November 4, 2021, an affiliate of Vertiv shareholder Platinum Equity (VPE Holdings, LLC) sold over 20 million shares of Vertiv stock at just under $25 per share, resulting in it owning approximately 10.6% of Vertiv's common stock (the "SPO").  ¶ 169.  Vertiv and the Officer

Defendants sold no shares in and received no proceeds from the offering.  Ex. 29 at S-3.

### J.    In Q4 2021, Vertiv Continues to Ramp Up Pricing Actions

At a November 16, 2021 conference, Niederpruem echoed Vertiv's prior disclosures and stated that Vertiv had underestimated how persistent and strong inflation would be, and that, "in hindsight we probably should have been a little bit more aggressive early in the year in coming out with price increase."  Ex. 30 at 4.  He explained that the "majority of the price comes from list price increases," although he listed various "other points in the system," including, among other things, "controlling the discounts."  *Id.* at 6.  As another example of pricing actions, Johnson explained that Vertiv was introducing escalation clauses into more contracts, but it was difficult: "Nobody's just rolling over and giving us a price, it's something we have to work through, price escalations for future price and contracts where we haven't had them on commodities."  *Id.* at 5.  At the same conference, Fallon noted that he believed that Vertiv could achieve its sales guidance based on its "pre-planning with the suppliers as it relates to allocations."  *Id.* at 7.

### K.    Vertiv Misses Q4 2021 Guidance

On February 23, 2022, Vertiv announced earnings for Q4 2021.  While sales had (again) grown significantly, Vertiv's adjusted operating profit was "negatively impacted by accelerating inflation headwinds and continued supply chain constraints," causing Vertiv to miss its Q4 adjusted operating profit guidance midpoint by $72 million.  Ex. 36 at 1; ¶ 59.  In Q4 alone, inflation had an *$88 million* negative impact on margins, Ex. 38 at 7, or ~60% higher than the impact of inflation in Q3 and 60% higher than Vertiv forecast for Q4.  Ex. 28 at 7, 10 (Q3 earnings presentation showing $55 million in inflation in Q3 and $55 million forecast for Q4).  Vertiv disclosed that "[i]nflation accelerated in Q4 including significant spending on spot buys and premium freight to protect customer deliveries."  Ex. 38 at 9.  While Vertiv received $28 million of additional pricing in Q4 2021 alone, more than it had received *annually* in 2019 or 2020, that

was still "not enough to offset increasing inflation."  Ex. 36 at 1.

Material and freight inflation, and the intensity and speed with which it occurred in late 2021, is reflected in charts tracking steel, copper, aluminum, and freight prices, to which Vertiv had disclosed it was significantly exposed.  *Supra* p. 5.  Steel, copper, and aluminum prices, as reflected in BLS and LME prices, all followed a similar pattern:  starting to rise in 2020, accelerating in 2021, and reaching peaks (or one of multiple peaks) in Q4 2021.  *See* Exs. 32–34. Freight costs, as reflected in the Global Container Freight Index, also increased rapidly in 2021: by late 2021, freight rates had increased nearly *ten-fold* over prior years.  *See* Ex. 35; *see also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 52 (S.D.N.Y. 2012) ("Court can take judicial notice of publicized commodities prices on a motion to dismiss.").

Vertiv's earnings presentation broke out the cause of the Q4 guidance miss:  While "price realization" was "$28M vs. Q4 guidance of $30M," "material and freight inflation" was $36M higher than Q4 guidance.  Ex. 38 at 9.  In other words, Vertiv's pricing guidance was right on the mark, but inflation came in far higher than anticipated.  For the full year, inflation had a negative $188 million impact on Vertiv, although it was able to recover $53 million with pricing.  *Id.* at 10.

On the earnings call, consistent with Vertiv's prior disclosures, Johnson summed up the issue: "We started the first half strongly, but supply chain challenges and inflationary headwinds quickly put pressure on our operational and financial performance in the second half – notably in the fourth quarter.  We consistently underestimated inflation and supply chain constraints for both timing and degree, which dictated a tepid 2021 pricing response." Ex. 36 at 1.  Johnson said Vertiv "screwed up" because it "significantly underestimated the magnitude of the material and freight inflation in the fourth quarter forecast," and this "underestimation of costs also contributed to our underpricing in the market in 2021"—"[j]ust when we thought we had budgeted enough price,

12

inflation got worse." Ex. 37 at 5–6.

Vertiv leadership explained that one of their "lesson[s]" from 2021 was that they were able to generate sales on higher prices than anticipated. Ex. 37 at 11. In hindsight, it was not enough: As Johnson put it, Vertiv "wasn't set up to drive a lot of price," so "culturally losing orders was something that we had to overcome." *Id.* at 13. Executives thus discussed changes that had been implemented in recent months to drive more "aggressive" pricing in response to the surprising inflation surge, including instituting "even tighter control" over discounting authority and increasingly "putting escalators" in customer contracts, that "[weren't] in all of [Vertiv's] contracts prior." *Id.* at 5, 12, 17. As Niederpruem put it, the issue was not that Vertiv failed to implement pricing actions, but rather that, *in retrospect*, they were not aggressive enough: "I think we proved that we could get price [in 2021], it's just that we did not raise pricing enough because there's some lack of visibility on *how much worse inflation was going to be*." Ex. 40 at 8.

### L.    Officer Defendants Sell No Shares of Vertiv During the Class Period

During the Class Period, none of the Officer Defendants sold any shares of Vertiv stock. Exs. 4, 5, 6. Nor did they exercise any options, including those that had already vested. *Id.*[3] Johnson increased his holdings of Vertiv shares in his 401(k) in November 2021. Ex. 5 at 4.

### M.    Plaintiffs' Complaint

Plaintiffs assert claims on behalf of all investors that purchased shares of Vertiv's Class A common stock between February 24, 2021, and February 22, 2022. As relevant here, Plaintiffs bring claims under Section 10(b) of the Exchange Act and Rule 10b-5 against Vertiv and Officer Defendants, and under Section 20(a) of the Exchange Act against Officer Defendants. Plaintiffs' theory is that, throughout the Class Period, Defendants' statements about pricing were false

---

[3] Officer Defendants' holdings slightly decreased because they were subject to tax withholding transactions on the vesting of restricted stock units governed by terms preexisting the Class Period. Ex. 4 at 3; Ex. 5 at 3; Ex. 6 at 3.

because Vertiv was not taking pricing actions to offset inflation.  ¶ 80.

## ARGUMENT

### I.      The PSLRA and Rule 9(b) Impose Heightened Pleading Requirements

Securities fraud claims "must satisfy two layers of heightened pleading requirements": Rule 9(b) and the PSLRA.  *Harris* v. *AmTrust Fin. Servs.*, 135 F. Supp. 3d 155, 169 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016); *see Greco* v. *Qudian Inc.*, 2022 WL 4226022, at *6 (S.D.N.Y. Sept. 13, 2022) (Woods, J.).[4]  Rule 9(b) requires plaintiffs to plead "the circumstances constituting fraud . . . with particularity."  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  Under Rule 9(b), "the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Greco*, 2022 WL 4226022, at *6.  The PSLRA likewise requires that plaintiffs "do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so."  *Id*.

### II.     The Alleged Misstatements Addressed in the R&R Are Not Actionable

The R&R recommends that seven statements meet the pleading standards of Rule 9(b) and the PSLRA.  While the R&R does not identify the statements, it notes two categories:  "1) statements about escalation clauses in large contracts and 2) statements about raising list prices and controlling discounts."  R&R 15.  Defendants believe the seven statements are two statements concerning escalation clauses (or "pass-through pricing") (¶¶ 132, 147), two statements related to discounts (¶¶ 136, 176), and three statements relating to list prices (¶¶ 147, 174, 176).

#### A.      Statements About Escalation Clauses

The R&R focuses on Niederpruem's April 2021 statement that "sometimes" in "larger

---

[4] Unless otherwise noted, all emphasis is added and internal citations and quotes are omitted in any cited authority.

contracts" Vertiv had escalation clauses, finding it "misleading to a reasonable investor."  R&R 16–17.  The R&R acknowledges that the AC does not allege that none of Vertiv's larger contracts had escalation clauses, but nonetheless finds that the "statement created the false impression that escalation clauses . . . could bring enough revenue to considerably offset the majority of inflation."  *Id.* at 17.  That finding misreads both Niederpruem's statement and surrounding context.

Nowhere does Niederpruem's statement suggest that escalation clauses would play any "considerabl[e]," or even any concrete, role in increasing prices.  As the R&R itself notes, the statement at most suggested that it was one of the mechanisms Vertiv was "looking into" (R&R 16), to increase prices on prior orders in the backlog.  When asked how Vertiv's backlog played into the "pricing equation," Niederpruem noted the "answer is mixed and varied," acknowledged that getting price on backlog orders was more difficult, noted that, among other mechanisms, "sometimes" larger contracts had escalation clauses, and that was one of the "different ways" that Vertiv was "*looking and trying to execute* that pricing . . . scenario."  Ex. 13 at 19.  Niederpruem also warned investors that he expected pricing would "ramp" as 2021 progressed.  *Id.*

The plain meaning of the statement that "sometimes" "larger contracts" had escalation clauses is that they appeared in larger contracts "*on some occasions but not always or often.*"  Sometimes, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/sometimes (last visited Dec. 7, 2023).  Plaintiffs do not plead otherwise here.  *Plymouth County Retirement Association* v. *Array Technologies, Inc.*, 2023 WL 3569068 (S.D.N.Y. May 19, 2023) ("*Array*"), another case that involved alleged misstatements about a company's ability to pass on rising supply chain costs, is instructive.  There, like Vertiv, Array warned that its margins could be impacted if the costs of raw materials increased.  *Id.* at *12; *see* Ex. 7 at 16–17.  And there, like here, Array explained it had escalation clauses, *id.* at *12, but did not assure they would be used

15

to generate any concrete amount of price; rather, Array had the "ability" and "option . . . to go back into the market" and would "look at it on a case by case basis." 2023 WL 3569068, at *13. The Court rejected any argument that these statements could stand for the proposition "that Array misled investors by suggesting that Array's ability to pass on costs was a guarantee" as "meritless. . . . [T]he challenged statements make[] clear that the ability to pass on costs was only an option and one that would be evaluated only on a case by case basis." *Id.* Here, too, Niederpruem never suggested that escalation clauses provided any guarantee of getting price.

The R&R also ignores the context of his statement. Vertiv repeatedly disclosed before and during the Class Period that it pursued "long-term, fixed-price contracts" with customers, which posed "substantial risks" should there be "changes in costs . . . of components [or] materials," and that it in particular faced "downward pricing pressures" from "large companies." Ex. 7 at 15, 16. And in April 2021, at the time of Niederpruem's statement, Vertiv projected that, taking into account all pricing actions, it would offset *only $25 million of the $45 million* forecasted inflation for 2021. *Supra* pp. 6–7. No reasonable investor could interpret Niederpruem's reference to escalation clauses (one of the "different ways" Vertiv was "*looking [at] and trying to*" execute price increases on the backlog) to mean that escalation clauses would, as the R&R says, "considerably offset the majority of inflation."

Like the AC, the R&R attempts to contrast Niederpruem's statement with certain post-Class-Period statements and FE allegations, but neither conflict with his statement or render it misleading. The R&R quotes a portion of Niederpruem's March 2022 statement that Vertiv was adding escalation clauses to "Master Service Agreements" with larger customers as they expired. R&R 16; Ex. 40 at 12–13. But his statement that Vertiv was adding such clauses to one type of contract with larger customers "[s]o that way, we don't get caught in the same situation again,"

16

R&R 16, is fully consistent with Vertiv "sometimes" having had these clauses in larger contracts in April 2021. While Johnson likewise noted that such clauses were not "in *all* of [Vertiv's] contracts prior," ¶ 63, that meant they *were* in some. That Vertiv wished, with benefit of hindsight, that it had negotiated escalation clauses in *more* contracts is understandable, but it is not fraud.

The R&R also cites the allegations of FE-1 and FE-6 about Vertiv's "larger enterprise contracts, such as those for Facebook, Google, Microsoft, and other hyperscale data centers." ¶ 94. But neither FE-1 nor FE-6 (nor any other FE) is alleged to have worked with these "enterprise" customers or had exposure to their contracts. To the contrary, FE-1 (who left Vertiv in March 2021, one month into the Class Period), and FE-6 both worked in the "Channel" division—which sold to "*third-party distributors*," not end users like Facebook. ¶ 83 n.5; ¶ 97 n.9; *see* Ex. 15 at 8 (listing "channel partners" as "distributors, I.T. resellers, value-added retailers and original equipment manufacturers"); *id.* at 44 (distinguishing "Enterprise" and "Channel" customers).[5] These FEs are not alleged to have negotiated or even reviewed the contracts with large enterprise users, and no basis for their broad knowledge of those contracts is alleged. *See Steinberg* v. *Ericsson LM Tel. Co.*, 2008 WL 5170640, at *6 (S.D.N.Y. Dec. 10, 2008) (rejecting CW assertions regarding contracts where CWs were "not shown to have direct knowledge of" such contracts). Likewise, while FE-6 alleges that Vertiv's backlog was "off the charts unprofitable," the AC provides no basis for such a "sweeping and conclusory" claim by a Sales VP in the Channel division—and Vertiv actually reported *significant profits* in 2021. Ex. 38 at 7; *see In re AT&T/DirecTV Now Sec. Litig.*, 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) (rejecting CW allegations of unprofitability where no facts alleged to support his access to and review of

---

[5] The AC also cites to conclusory allegations from FE-2, a former low-level employee who left Vertiv in 2019, almost two years before the Class Period, and is also not alleged to have worked with enterprise accounts. ¶ 85 n.6; *see Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (discounting allegations from CWs "not employed by [defendant] during the time period in question").

17

"nationwide cost and profit data"), *aff'd*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022). The AC accordingly does not allege any facts to establish these FEs' personal "knowledge on the issues . . . as to which, according to the [AC], they have opined," and the allegations are insufficiently reliable. *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at *17 (S.D.N.Y. Sept. 22, 2021); *see also Frankfurt-Tr. Inv. Luxemburg AG* v. *United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (rejecting allegations from CWs in one unit not alleged to have insight into other units), *aff'd*, 779 F. App'x 69 (2d Cir. 2019).

Even if credited, the FE allegations are fully consistent with Niederpruem's statement. FE-1 does not specifically allege that Vertiv's contracts with enterprise customers did not "sometimes" have escalation clauses for materials. ¶ 94. Likewise, whether Vertiv had a backlog that was "unprofitable," R&R 16 (citing ¶ 97), says nothing about whether Vertiv's contracts "sometimes" had such clauses. Niederpruem said nothing about backlog profitability. And while FE-6 alleged that her manager "informed her" at an unknown time "that Vertiv was not going to raise prices, and that instead, [it] wanted to seize the opportunity to gain market share," *id.*, this double-hearsay is not only insufficiently reliable, it sheds no light on whether Vertiv's contracts sometimes had escalation clauses in April 2021. That it was conveyed to FE-6 that Vertiv was "not going to raise prices" is irrelevant given the undisputed fact that Vertiv *did* raise prices by $53 million in 2021. *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *9 (S.D.N.Y. Mar. 29, 2016) (allegations that statements of global growth were false belied by failure to allege that reported increase in global revenue was false); *Ok. Firefighters Pension & Ret. Sys.* v. *Ixia*, 2015 WL 1775221, at *22 (C.D. Cal. Apr. 14, 2015) (allegations "render[ed] implausible" by unchallenged SEC filings).

The R&R acknowledges that Vertiv achieved "$53 million in additional pricing over the cour[se] of 2021," but it discounts this key fact because this pricing "would not have come close

18

to offsetting [Vertiv's] inflation predictions in the second half of 2021." R&R 16 n.7. But Vertiv repeatedly, publicly predicted during the Class Period that it would **not** offset inflation. *See supra* p. 2 (table showing widening gap between pricing response and inflation). By concluding that investors were left with a "false impression" that Vertiv would "considerably offset the majority of inflation" with escalation clauses, the R&R ignores the very public disclosures on which Plaintiffs rely, and faults Vertiv for something that was never said or even suggested. In fact, Vertiv *achieved* the price increases that it forecast, belying the notion that its statements were false.

The R&R also appears to (implicitly) recommend that a July 2021 statement that Vertiv's "Pricing includes items such as . . . pass through pricing (lead)" is sufficiently pled as false or misleading. ¶ 147; *see* R&R 17 (citing ¶ 147). But the AC does not contain—and the R&R does not cite—any allegations that Vertiv did not have clauses in contracts that permitted it to pass through pricing on lead. "Lead" appears nowhere in the AC. And Johnson himself noted that orders booked in 2021 had provisions permitting "pass through pricing," "including . . . of things such as batteries and freights." Ex. 41 at 6. No falsity is pled as to this statement.

## B.    Statements About Discounts

The R&R also identified statements about discounting as sufficiently pled, but it again read into the two statements assurances Vertiv never made and in fact transparently warned against:

- *First*, on May 26, 2021, Niederpruem noted that it was raising list prices that had helped Vertiv achieve price increases in 2019 and 2020. He then stated that "[a]fter that, you need to become much more judicious with your . . . discount levels," and indicated that Vertiv had improved in this regard in the past two years. ¶ 136; Ex. 17 at 13.

- *Second*, on November 16, 2021, Niederpruem stated that "controlling the discounts" was one of a "number of different levers" that Vertiv was implementing, although it was not responsible for the "majority of the price" it was obtaining. ¶ 176;[6] Ex. 30 at 6.

---

[6] The AC misquotes this statement to suggest that Niederpruem suggested that the "majority" of price came from "controlling the discounts"; but he actually stated that "the majority of the price comes from list price increases," and controlling discounts was third on a list of "other points in the system" that Vertiv implemented. Ex. 30 at 6.

19

While the R&R refers to these statements as "Defendants' statements that they were controlling discounting sufficiently to significantly offset inflation," R&R 18, neither statement said that. The May 2021 statement merely suggests that Vertiv had in recent years become more judicious with discounts than in prior years—a fact nowhere alleged to be false. Moreover, at that time, Vertiv was forecasting only $45 million in inflation in 2021. But inflation *in Q4 alone* ended up nearly twice that figure. The November 2021 statement likewise only conveyed that Vertiv did implement some controls over discounts as one of multiple "levers" in its pricing response, but Plaintiffs do not allege that Vertiv did not take any actions to further control discounts during 2021, or that those controls were not responsible for at least some of the $53 million in pricing achieved.

The R&R seeks to contrast FE allegations with Vertiv's statements, but the FE allegations are insufficiently reliable and, in any event, consistent with the challenged statements. The R&R notes FE-5's allegation that management distributed manuals that permitted salespeople to sell at a 45% discount without higher-level approval, and that lower discounts were generally approved. R&R 18. This tells us nothing about whether Vertiv implemented additional controls over discounting, which is all that Niederpruem's statements conveyed. And no basis is provided for why FE-5, a low-level employee alleged to have sold certain products in one city-sized territory, ¶ 90 n.8, would know anything about global discounting practices (which the AC does not allege were uniform). Likewise, while the R&R cites FE-1 for the general assertion that Johnson approved unspecified deals at unspecified times without price increases (R&R 17; *see* ¶ 84), that says nothing about company-wide Class-Period discounting. FE-1 left Vertiv in March 2021, ¶ 83 n.5, months before Niederpruem stated in November 2021 that Vertiv had implemented additional controls to achieve price in 2021, and therefore could not possibly opine on that subject.

The other FE allegations related to discounting cited in the AC fare no better. While FE-2

20

alleged that Vertiv sold to major accounts at "dirt cheap prices," FE-2 left Vertiv in **May 2019**, ¶ 85 & n.6, and Vertiv's discounts prior to 2021 are irrelevant. Further, as a customer, FE-2 placed only two orders in 2021, and received discounts significantly smaller than those she alleged Vertiv offered before she left in 2019—corroborating more controlled discounting. *See* ¶¶ 85–87.

The AC also relies on certain post-Class Period statements concerning Vertiv "historically" underestimating its products' value and not being "set up to drive a lot of price." ¶ 118; Ex. 37 at 13. Yet not one of the statements admits that Vertiv did not implement additional controls over discounting in 2021. While Johnson noted in February 2022 that Vertiv increased the authority needed to sign off on discounts in the last "60, 90 days" so that "we don't give away the pricing that we were getting through discounting," ¶ 64, he made clear that what Vertiv was "institut[ing] over the last 60, 90 days" was "*even tighter control*," Ex. 37 at 12. This is entirely consistent with the November 16 statement about controlling discounts. As Vertiv explained, 2021 was a "really good learning for all of us in the business that we've got a lot more capacity for price than we ever realized." Ex. 37 at 21. Johnson explained that Vertiv *had* been driving its salesforce to increase pricing in 2021, but even as its salesforce thought they were "doing a lot of price" in 2021, they ended up falling short because Vertiv "got behind on what we thought inflation was going to be." Ex. 39 at 3–4. As Niederpruem summed up, "I think we proved that we could get price [in 2021], it's just that we did not raise pricing enough because there's some lack of visibility on how much worse inflation was going to be." Ex. 40 at 8. That Vertiv, based on where inflation ended up after Q4, may have wished it reduced discounting further, is not fraud. *Yourish* v. *Cal. Amplifier*, 191 F.3d 983, 996–97 (9th Cir. 1999) ("[I]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood.").

## C. Statements About Raising List Prices

To the extent the R&R recommends that certain statements about "raising list prices" are

sufficiently alleged to be false or misleading (R&R 17), the only allegations referencing list prices identified are July and November 2021 statements that Vertiv was raising list prices as part of its strategy (R&R 5, 7 (citing ¶¶ 147, 174, 176)). But the AC nowhere alleges that Vertiv did not raise list prices in 2021. The FE allegations cited by the R&R do not allege that either. R&R 17.

**FE-1:** FE-1 alleges that the sales team complained that they could not increase prices because their customers would not accept it, and that "as of the time" he left Vertiv, "there had been no discussion at all of raising prices." But FE-1 left Vertiv in "March 2021," ¶ 83, a month ***before*** Vertiv disclosed in April 2021 that it was "instituting" pricing actions to "partially offset these new headwinds," ¶ 125. Further, the AC pleads no basis for FE-1, a regional VP responsible for "two tier channels" in the U.S., ¶ 83 n.5, to know there had been no discussion—by anyone— about raising prices anywhere. *See Novak* v. *Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (CW allegations must "support the probability that [CW] would possess the information alleged").

**FE-3:** The R&R relies on FE-3's statement that Vertiv "did not raise prices to keep pace with inflated costs." R&R 17. But Vertiv never suggested it would raise prices to "keep pace" with inflation. To the contrary, throughout 2021, Vertiv transparently disclosed it would be able only to "partially offset" rising costs and that its pricing response would lag inflation. *Supra* p. 2; *see* App. A. By its last 2021 forecast, Vertiv predicted it would recover ***only 36% of inflation*** in 2021. *Id.* The FE allegations are thus entirely consistent with Vertiv's disclosures.[7]

## III. The Remaining Alleged Misstatements Should Be Addressed and Claims Based on Them Dismissed

The R&R declined to address the other alleged misstatements in the AC about "general pricing initiatives, preplanning with suppliers, and the use of advanced pricing tools." *See* R&R

---

[7] The only FE allegation specifically referencing "list prices" is the assertion that they were "not increased during 2021," attributed to FE-2, a junior employee who left in 2019, and thus had no basis for the allegation. ¶¶ 85 n.6, 86.

15 n.6 ("Because the seven statements discussed *infra* meet the standard to move past the motion to dismiss stage to discovery, I have not reached the other statements which may not, on their own, clear the Rule 9(b) bar to survive a motion to dismiss."). These alleged misstatements should also be dismissed, as Defendants' Motion explained. *See* Mot. (ECF No. 54) at 15–34; *see also* App. B (updated chart of alleged Exchange Act misstatements organized by category).

This Court has consistently found that analysis of each challenged statement under Section 10(b) is required at the motion to dismiss stage. *See, e.g.*, *Greco*, 2022 WL 42226022, at \*11, 13, 17 (recognizing that "analysis of each of the specific, stand-alone statements is required" and that "the Court must analyze each of the challenged statements"); *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at \*12 (S.D.N.Y. Sept. 30, 2021) (explaining that "[t]he Court will walk through each [alleged misstatement] in chronological order"). Indeed, this Court suggested statement-by-statement briefing on the Exchange Act claims during the pre-motion conference. And, even if the Motion is not granted in its entirety, a definitive ruling as to each statement is essential to determine the scope of any future discovery and any motion for class certification.

### A. Statements That Vertiv Was Implementing Pricing Actions

The AC challenges general statements about Vertiv undertaking pricing actions in 2021. *See, e.g.*, ¶ 125 (Vertiv stating in April 2021 that it was "[i]nstituting pricing actions around the globe to partially pass through the increased costs"); ¶ 127 (Vertiv was "taking actions to offset the increased costs"); ¶ 150 (statement in July 2021 that "[p]ricing actions were actually underway at the beginning of Q2"); ¶ 173 (statement in November 2021 that Vertiv had "launched additional pricing actions over the last 2 or 3 weeks in every region"). Plaintiffs originally alleged that these statements were false because Vertiv "had not implemented 'additional pricing actions,'" ¶ 146, "had no 'pricing actions' . . . 'underway'" and was "not making any 'additional price increases,'"

¶¶ 151, 175, and "did not even have the ability to raise prices in response to inflation," ¶ 178.

But in their Opposition, Plaintiffs conceded that Vertiv obtained $53 million in additional pricing in 2021, Opp. (ECF No. 59) 17, and thus plainly took pricing actions. Plaintiffs thus cannot base a claim on a purported absence of pricing actions. *See, e.g.*, *Emps. Ret. Sys. of City of Providence* v. *Embraer S.A.*, 2018 WL 1725574, at *7 (S.D.N.Y. Mar. 30, 2018) ("Because . . . Plaintiff does not dispute that the [defendant's] financial statements were (literally) accurate, the statements or omissions concerning [its] financial statements are not actionable.").

Plaintiffs then pivoted to arguing that Vertiv's historic pricing increase was a "red herring" because Vertiv assured investors it would be able to "fully offset" inflation in 2021. Opp. 17–20. But Vertiv said the opposite, and Plaintiffs' arguments ignore Defendants' actual statements:

*First*, Plaintiffs cited a May 2021 opinion statement by Niederpruem that Vertiv predicted it would recover the "vast majority" of inflation and that Vertiv's pricing forecast was the "floor." Opp. 18–19. But at the time of that statement, Vertiv's forecast (which Niederpruem cited) was that Vertiv would recover $25 million of anticipated $45 million of full-year inflation. Ex. 13 at 17; Ex. 17 at 13. And Niederpruem was right: Vertiv obtained *more than 2x* the forecast pricing "floor." It simply failed to offset the $188 million in inflation—*more than 4x* Vertiv's forecast.

*Second*, Plaintiffs argued that Johnson promised on July 28, 2021, that Vertiv would "fully offset" inflation in 2021. Opp. 18–19. Johnson did not say this. He actually said: "by the time we get to Q4, we will have pricing that fully offset[s] inflationary costs." Ex. 21 at 6. Johnson made a projection about Q4, not FY2021. He referred listeners (*see id.*) to a chart on "slide 6" of Vertiv's accompanying presentation, which forecast that pricing and inflation would offset *within* Q4 2021. Ex. 22 at 6. Far from suggesting Vertiv would "fully offset" *full-year* inflation, the slide forecast $110 million in full-year inflation but only $65 million in full-year pricing. *Id.*

24

*Third*, Plaintiffs argued that Johnson stated on October 27, 2021, that Vertiv would "cover" inflation *in 2021* even if it was "potentially worse" than the $155 million Vertiv forecast at that time. Another fiction. What Vertiv actually disclosed that day was that it expected to *offset only $55 million* of that $155 million in 2021. Ex. 28 at 19. Vertiv also disclosed that day that it anticipated inflation would exceed pricing by $25 million in Q4 2021. Ex. 28 at 10; Ex. 27 at 11. The quote on which Plaintiffs rely responded to a question about "*next year*," *i.e.*, *2022*. Ex. 27 at 9. And Johnson was right: in 2022, Vertiv's pricing exceeded inflation. *See* Supp. Ex. 1 at 9, 28.

Unable to allege falsity by mischaracterizing Defendants' statements, Plaintiffs again rely on post-Class-Period statements. Most of their post-Class-Period "admissions," in context, describe Vertiv's historical practice over years. *Compare* ¶ 73 *with* Ex. 39 at 3–4 (under private equity ownership prior to 2020, "pricing wasn't traditionally a backbone muscle that this company has had"); ¶ 74 *with* Ex. 40 at 11 (Vertiv "probably a little trepid to raise price" after its carve-out in 2016). These were not "admissions"; indeed, Vertiv disclosed during the Class Period that it "historically" was not focused on price. ¶ 140. And in full, the post-Class-Period statements make clear that Defendants believed Vertiv *was* "getting price" in 2021—only in retrospect, pricing was insufficient as it did not know "how much worse inflation was going to be." *Supra* p. 21.

The only "admissions" were that Vertiv (along with much of the world) underestimated inflation. As Johnson noted, the "screw[] up" was that "[w]e significantly underestimated the magnitude of the material and freight inflation in the fourth quarter forecast," which led to the "guidance miss." Ex. 37 at 5. Fallon likewise stated that "we have likely damaged some of our credibility in 2021" due to the "quality of our external guidance," *id.* at 9, but Vertiv's Q4 guidance was spot-on for its pricing, *see supra* pp. 11–12. Defendants' disappointment about pricing does not mean that Vertiv's pricing actions did not occur and thus does not render the statements

25

*contemporaneously* false. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014).

**B.    Statement About Preplanning with Suppliers**

Plaintiffs challenge as false Fallon's November 2021 statement that he was comfortable with Vertiv's Q4 sales guidance based in part on "pre planning with the suppliers as it relates to allocations." ¶ 179. They allege that Vertiv ultimately suffered "supplier decommits" in Q4. ¶ 101. But there is no inconsistency: That supplier decommits became more "aggressive," ¶ 100, does not suggest that Vertiv did not "pre plan[]" with suppliers. Planning does not guarantee future supply. Plaintiffs admit that Vertiv management "aggressively attempt[ed] to address the[] vendor and supplier challenges" prior to Q4. ¶ 102. And, before Fallon's statement, Vertiv warned investors about increasing supplier "de-commit[s]." Ex. 24 at 12. It transparently disclosed the difficulties it was having receiving supplies, forcing it to pay premiums for spot buys and expedited shipments, Ex. 22 at 22, and its inability to get certain supplies at "any price," Ex. 24 at 4, "with no improvement expected in the fourth quarter," Ex. 28 at 5. At the same conference where Fallon mentioned pre-planning, Johnson warned that whether Vertiv could "get the components" needed from suppliers for Q4 was an open question. Ex. 30 at 9.

**C.    Statement About Pricing Tools**

Plaintiffs claim that a July 2021 statement by Johnson that Vertiv had in the past "instituted . . . pricing tools that allow our salespeople to understand when we lose at what price and when we win" was misleading because Vertiv allegedly "botched the implementation of its CPQ [configure price quote]"—software that helps generate quotes to customers. ¶¶ 152, 155. Plaintiffs claim that CPQ implementation frustrated employees and delayed processing orders. *See* ¶¶ 106–112. But challenges with implementing CPQ—even if true—would not render Johnson's statement that Vertiv had instituted pricing tools false. Moreover, Plaintiffs do not even allege that the "pricing tool[]" Johnson referenced *was* CPQ; the "pricing tools" he referred to were "data

26

analytics," Ex. 21 at 19, and he nowhere mentioned CPQ.  Nor do they allege that the tool to which

Johnson referred was implemented in 2021 (to the contrary, he said it had already been instituted),

or that its implementation was botched.  And even assuming the tool was CPQ, Plaintiffs do not

allege how CPQ impacted Vertiv's pricing recovery.  The AC concedes that sales reps did not need

to get pricing information from CPQ, ¶ 109, and that "sales, pricing, and margins" information

was "updated daily and . . . available on a daily, weekly, and monthly basis," ¶ 192.  In any event,

even crediting Plaintiffs' contention that Vertiv lacked "visibility for a period of time" into costs

in Q4, ¶ 155, Ex. 37 at 13, Johnson's reference to "pricing tools" was made months earlier, and

therefore cannot possibly have been false when made.

### D.    Statements About Pre- and Post-Class Pricing Actions

The AC challenges several statements that are not actionable because they concern Vertiv's

pricing actions before, or its pricing recovery after, the Class Period.  First, Plaintiffs challenge

backward-looking statements concerning Vertiv's pricing actions prior to 2021.  *See* ¶¶ 115–117,

128, 130, 136, 140, 172.  For example, they cite Johnson's statements in Vertiv's Q4 2020

disclosures that "we have made good progress in achieving significant margin expansion," and

that "[o]ur pricing initiatives have continued to yield favorable results."  ¶¶ 115–116; Ex. 8 at 1,

Ex. 9 at 1.  They similarly challenge Johnson's April 2021 statement that Vertiv had "been able to

get price the last . . . couple of years" and instituted surcharges in prior years, and Niederpruem's

May 2021 statement that Vertiv "kicked off some pretty serious pricing initiatives several years

ago."  ¶¶ 128, 136; Ex. 17 at 12–13.  But the AC lacks any allegations that Vertiv did not take

pricing actions that "yield[ed] favorable results" prior to 2021.  The AC itself alleges that

notwithstanding a history of "flat" pricing, in 2019 and 2020, Vertiv made progress in achieving

"margin expansion," generating pricing of $25 million and $15–20 million, respectively.  *Supra*

p. 6.  Plaintiffs do not allege that these reported pricing recoveries were not achieved.  And they

cannot rely on statements about Vertiv's pricing *prior to 2021* to suggest it misled investors as to its projected pricing in 2021. *See In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) ("[D]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.").

Plaintiffs also cite statements that refer to expectations of Vertiv's pricing recovery *in 2022,* but the AC alleges no facts about 2022 pricing. For example, Plaintiffs challenge Johnson's statements on a September 2021 call that "we continue to drive pricing" and "we feel good about our pricing process," ¶ 157, but his statement was in response to a question about pricing exceeding costs in *2022*, not 2021, *see* Ex. 24 at 11. Likewise, Plaintiffs challenge statements on the October 2021 earnings call that "we will be positive in price based on what we're executing on"; that Vertiv was "assuming" inflation could "get potentially worse" and "making sure that our pricing actions now and going forward cover that"; and that Vertiv was "encouraged with what we're seeing" and "anticipat[ing]" a modest pricing "tailwind." ¶¶ 166–167. These statements were made in response to a request for more "color on what you're thinking about *for next year*"—*i.e.*, 2022. Ex. 27 at 9 (emphasis added). Plaintiffs have nowhere alleged that these speakers did not sincerely believe these statements about 2022, and Vertiv was significantly "positive in price" in 2022. Supp. Ex. 1 at 9, 28. These challenged predictions are not fraud.

Claims based on these statements must also be dismissed because Plaintiffs fail to plead that Vertiv issued a corrective disclosure with new information on pre– or post-2021 pricing. Because a corrective disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged," Plaintiffs fail to plead loss causation. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).

## IV.    Many of the Statements Are Non-Actionable Opinions

Many of the challenged statements in the AC are also non-actionable opinions—including

28

portions of statements the R&R found to be actionable.  *See* ¶¶ 132, 136, 147, 174; *see also* ¶¶ 115–117, 124–125, 127–129, 130, 138, 140, 142–145, 149–150, 152–153, 157, 159–160, 162, 165–167, 172–173, 176, 179.  Projections of future results are classic opinions.  *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *17 (S.D.N.Y. Aug. 19) ("expressions of defendants' expectations for future growth . . . are statements of opinion"), *adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 2013 WL 6504801, at *16 (S.D.N.Y. Dec. 11, 2013) (prediction of future performance is opinion).  Opinion statements are subject to heightened pleading requirements.  *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).  Statements of opinion only give rise to a claim for securities fraud where (1) the "speaker did not hold the belief she professed' or 'the supporting fact[s] she supplied were untrue," or (2) where "the speaker omit[ted] information whose omission ma[de] the statement misleading to a reasonable investor."  *Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).  It is "not sufficient . . . to allege that an opinion was an unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events."  *Greco*, 2022 WL 4226022, at *9.  Moreover, the "reasonable investor understands a statement of opinion in its full context," and the Court must "take account of whatever facts [defendants] did provide about [the same subject]."  *Omnicare*, 575 U.S. at 190, 196.

Here, context is key.  At the outset of 2021, Vertiv projected it would obtain $15 million in price in 2021; it revised those estimates upwards, but ***never*** projected its pricing would fully offset inflation.  To the contrary, it repeatedly disclosed it would offset only an increasingly smaller fraction of inflation, and that pricing would "lag" inflation.  *Supra* p. 8.  In 2021, Vertiv obtained ***$53 million in price***.  The reason Vertiv missed its guidance was because ***inflation*** surged in Q4, with $88 million of the $188 million in full-year inflation occurring in that quarter.  *Supra* p. 12.

29

The R&R concludes that statements were not protected by *Omnicare* to the extent they were "based on the asserted fact that Vertiv was actually implementing the pricing actions Defendants said they were implementing." R&R 15. But the AC does not allege that Vertiv was not actually implementing pricing actions, and Vertiv did, in fact, significantly increase pricing in 2021. That Plaintiffs believe Vertiv's opinions were too positive because pricing was ultimately outpaced by inflation is not actionable. *See Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021) (statement about "great progress" only actionable if "making 'no progress at all'").

Additional examples prove the point. Plaintiffs cite as actionable Johnson's November 2021 statement that Vertiv was "getting smarter about" passing increased freight costs of "spot buys" to customers through surcharges. ¶ 174. This statement is not "determinate or verifiable" and constitutes a non-actionable honestly held opinion. *Fairway*, 2015 WL 4931357, at *21. Plaintiffs also cite a list of pricing actions, and Vertiv's inflation and pricing projections, as of July 2021. ¶ 147. The projections are opinions that Plaintiffs do not allege Vertiv did not sincerely believe, nor are the pricing actions pleaded to be misrepresented. In another example, Niederpruem's statements in February 2021 that "*our expectation* is that for 21, we will have positive price" and "*we feel pretty good* about where we sit right now to continue passing pricing along," ¶ 117, must be read alongside Vertiv's contemporaneous projection of $15 million in pricing to offset $20 million in full-year inflation, ¶ 130, and Niederpruem's hedging statement that he was not sure Vertiv could even achieve ~$15–$20 million in pricing. Ex. 9 at 13. His "feel[ing]" and "expectation" were predicated on forecasts about inflation that turned out to be too low, but that does not render them false or misleading when made. *See also* ¶ 136 (Niederpruem "sitting here now" in May 2021 expressing confidence in recovering "vast majority" of inflation, when inflation forecasted to be only $45M). Statements expressing confidence that pricing will

30

help offset projected inflation "are virtually indistinguishable from the future projections of which they are part" and are likewise protected. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *24 (S.D.N.Y. Sept. 2, 2022).

For largely the same reasons, Plaintiffs fail to allege actionable omissions. Under *Omnicare*, a plaintiff must "identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person *reading the statement fairly and in context.*" 575 U.S. at 194. "That is no small task": a plaintiff must show in a non-conclusory way exactly what material facts were omitted. *Id.* Here, the purportedly omitted facts—that Vertiv had many fixed-price contracts, was subject to downward pricing pressure from large clients, was exposed to rising costs, and would not be able to offset those rising costs—were ***repeatedly*** disclosed by Defendants, *supra* pp. 2–10. Vertiv emphasized the worsening supply chain and inflation conditions, warned that it would be able to offset less and less of the rising costs, and showed its work by making its projections public. *Id.* While the R&R recognizes it is not enough for "someone [to] warn[] his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away," R&R 13, "[Vertiv] not only advised investors that 'there might be a ditch ahead' to be wary of falling into, but also that [Vertiv] was aware of the ditch's location and was actively trying to manage it." *Array*, 2023 WL 3569068, at *13. Other alleged omissions— *i.e.*, that Vertiv's "culture" "wasn't set up to drive a lot of price,"—were hindsight "learnings," *supra* p. 13. The AC fails to plead the omission of any material fact.

## V.    Many of the Statements Are Non-Actionable Forward-Looking Statements

Many of Defendants' statements are also protected by the PSLRA safe harbor for forward-looking statements and the bespeaks caution doctrine because they "speak predictively about the future." *Gissin* v. *Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010). "[P]lans and objectives of

management for future operations" and statements about "future economic performance," *id.* at 505, 507 n.108, are forward-looking. Such statements are not actionable as long as they are either (a) "identified and accompanied by meaningful cautionary language" *or* (b) "the plaintiff fails to prove that [they were] made with actual knowledge that [they were] false or misleading." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 529 (S.D.N.Y. 2015), *aff'd*, 816 F.3d 199 (2d Cir. 2016).

Here, many of the challenged statements (¶¶ 115, 124, 127, 142, 145, 160, 162) are pure financial forecasts and thus forward-looking. *Array*, 2023 WL 3569068, at *15. Still others were "inherently contingent prediction[s]" of Vertiv's ability to offset future inflation. *Iowa Pub. Emps. Ret. Sys.* v. *MF Glob., Ltd.*, 620 F.3d 137, 143 (2d Cir. 2010), *see* ¶¶ 117, 125, 127–128, 130, 132, 136, 138, 140, 147, 149–153, 157, 159, 165, 167, 172–173, 179. Plaintiffs have not alleged that the forward-looking statements were made with "actual knowledge" that they were false or misleading, *see infra* pp. 36–38, and for that reason alone the safe harbor applies.

All of these statements were also accompanied by meaningful cautionary language. *See* Ex. 3 (listing cautionary language). Vertiv's press releases and investor presentations stated that the disclosures may "contain forward-looking statements within the meaning of the [PSLRA]," and that these "statements constitute projections, forecasts and forward-looking statements, and are not guarantees of performance." *See, e.g.*, Ex. 14 at 2. Vertiv's press releases, presentations, and earnings calls all referred to Vertiv's risk factors in its SEC filings, including the risk factors disclosed in its Form 10-K, which directly addressed the risks that Plaintiffs allege materialized. There, Vertiv expressly disclosed that it was reliant on its suppliers to timely provide supplies, the risks of its failure to "properly manage [its] supply chain," and that it was susceptible to "volatility in the supply or price of raw materials . . . and components." Ex. 11 at 16–17. Vertiv further disclosed that it had entered into "long-term, fixed-price" contracts that exposed it to "substantial

32

risks" of increased costs and the "downward pricing pressures" from large customers, and that it may not be able to "offset unexpected increases in material and component costs with [its] own price increases." *Id.* at 14, 16–17. And Vertiv disclosed that implementing new IT systems could be "disruptive to [its] operations," and "adversely impact" its "ability to process customer orders . . . accurately record and transfer information, . . . or otherwise run [its] business." *Id.* at 16.

These disclosures pointed to the very dangers Plaintiffs insist caused their loss, ¶¶ 5, 197, 260, and were incorporated into the same documents and statements that contained the alleged misstatements. *Fairway*, 2015 WL 4931357, at *17. Indeed, the R&R itself recognizes that the risk factors in Vertiv's filings, such as those that warned of "downward pricing pressures" from unfavorable terms in Vertiv's contracts with "large customers," were the risks that "ultimately did materialize." R&R 23. Like with the opinion statements, the R&R suggests that statements are not forward-looking to the extent they were "based on communications about present fact." R&R 15. But statements that "refer to present circumstances [] as a basis for forecasting future performance" fall squarely within the safe harbor. *Gissin*, 739 F. Supp. 2d at 507 n.108. Statements that Vertiv, based on *current* data, would implement pricing actions to partially offset the *future* inflation Vertiv projected, are consistent with those identified by courts as forward-looking. *Id.* Plaintiffs concede they are not challenging Vertiv's inflation forecasts, Opp. 13 n.4, and "because Plaintiffs do not challenge the [projections] [they] effectively argue only that the defendants' prediction . . . turned out to be wrong . . . [and] such predictions fall squarely within safe harbor." *Gissin*, 739 F. Supp. 2d at 507 n.108.

## VI.    Many of the Statements Are Non-Actionable Puffery

Many statements that Plaintiffs challenge are merely generic expressions of optimism, or puffery, and should be dismissed for that reason, too. *See* App. B. Indeed, courts regularly dismiss securities claims premised on puffery. *See, e.g.*, *Fairway*, 2015 WL 4931357, at *12–13. Here,

statements that the "foundation we've established and the trajectory that we are on[] gives me confidence in our ability to achieve the expansion plans we laid out," ¶ 116, that "outlook remains very positive," or that "we are well positioned for the second half of 2021," ¶ 142, are generalized positive statements. *See Friedman* v. *Endo Int'l PLC*, 2018 WL 446189, at *5 (S.D.N.Y. Jan. 16, 2018) (statement that "improved price and volume performance . . . gives us confidence in achieving our full-year guidance" is puffery); *Fairway*, 2015 WL 4931357, at *13 (statement that defendants "continue to be very excited about . . . growth prospects" is puffery); *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *8 (S.D.N.Y. Sept. 27, 2013) (statement that company is "well positioned" non-actionable). Nor could reasonable investors rely on immaterial statements that Vertiv had "made good progress in achieving significant margin expansion," ¶ 115, and "developed that pricing muscle to offset periods of inflation like we're seeing," ¶ 138. "That [Vertiv] was optimistic about its past ability to [get price] and leverage the [pricing processes] it had built, and continued to develop, merely describes [Vertiv's] business focus and past performance without providing anything like a guarantee as to its invulnerability to commodity risk." *Array*, 2023 WL 3569068, at *10.

## VII.    Plaintiffs' Allegations Fail to Support a Strong Inference of Scienter

Plaintiffs' failure to plead scienter is an independent basis for dismissal. To plead scienter, Plaintiffs must allege sufficient facts showing "that the defendants had both motive and opportunity to commit the [alleged] fraud," or alternatively, sufficient facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Under the PSLRA, Plaintiffs must allege "with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "[T]o qualify as a strong inference, the inference of scienter must be 'more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"

34

*ECA & Local 134 IBEW Joint Pens. Trust of Chicago* v. *J.P. Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  And Rule 9(b) requires that Plaintiffs "plead circumstances providing a factual basis for scienter for *each defendant*; guilt by association is impermissible."  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009).

### A.     The R&R Correctly Finds Plaintiffs Fail to Allege Motive and Opportunity

The R&R correctly declines to adopt Plaintiffs' theory of motive and opportunity.  R&R 20.  To raise a strong inference of scienter through motive and opportunity, they must allege that Defendants "benefitted in some concrete and personal way from the purported fraud."  *ECA*, 553 F.3d at 198.  Officer Defendants sold no stock and exercised no options during the Class Period—to the contrary, one *purchased* shares.  Exs. 4, 5, 6.  Officer Defendants thus suffered *losses* after the Class Period alongside other shareholders.  *See Greco*, 2022 WL 4226022, at *25 (absence of stock sales by insiders is inconsistent with an intent to defraud shareholders).

Unable to show any financial benefit to Officer Defendants, Plaintiffs present the unpersuasive theory that "Officer Defendants were highly motivated to conceal [Vertiv's] problems to enable [Platinum] . . . to sell . . . Vertiv stock in the SPO at an artificially inflated price."  ¶ 197.  But neither Officer Defendants nor Vertiv received any proceeds from Platinum's sales.  *See Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund* v. *Arbitron Inc.*, 741 F. Supp 2d 474, 488 (S.D.N.Y. 2010) (other actors' trading is irrelevant to defendants' scienter).  Nor are there any factual allegations to support Plaintiffs' conclusory assertion that Officer Defendants "had a motive to facilitate the SPO or be ousted" by Platinum.  Opp. 43; ¶ 197.  There are no allegations as to how Platinum *could* "oust" Officer Defendants; Plaintiffs themselves allege that Platinum had only two of nine board seats, 15.9% of Vertiv stock before the SPO, and only 10.6% after.  ¶ 169; *see In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005) (explaining that a small minority of shares and board seats does not "tend to

35

show that [an investor] controlled" a company).  Notably, Judge Marrero rejected these same

motive theories in *Array*, 2023 WL 3569068, at \*16, where plaintiffs alleged executives artificially

inflated the company's share price to help private-equity investors cash out in offerings, while

themselves receiving no pecuniary benefit.  *Id.*  Motive cannot be pled based on this kind of bare

"conspiracy theory." *Id.*

### B.    Plaintiffs Fail to Allege Conscious Misbehavior or Recklessness

Lacking motive, Plaintiffs present—and the R&R accepts—a contrived, alternative theory

of conscious misbehavior or recklessness.  In the absence of motive, the "strength of the

circumstantial allegations" of conscious misbehavior or recklessness "must be correspondingly

greater."  *ECA*, 553 F.3d at 198–99.  "[A]n allegation that a defendant merely 'ought to have

known' is not sufficient."  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y.),

*aff'd*, 357 F. App'x 393 (2d Cir. 2009).  Rather, "Second Circuit cases uniformly rely on

allegations that [1] *specific* contradictory information was available to the defendants [2] *at the

same time* they made their [allegedly] misleading statements."  *Id.* at 536 (emphasis in original).

And to plead scienter for a forward-looking statement, a plaintiff must allege that the statement

"was made with actual knowledge" of its falsity.  15 U.S.C. § 78u-5(c)(1)(B).

1.    *The R&R Errs in Recommending that Allegations of Access to Current Data Plead*
      *Scienter as to Statements Based on Future Projections*

The R&R errs by relying on two statements by Officer Defendants that purportedly support

a conscious-misbehavior theory.  R&R 20–21.  And it further errs by using those two statements

to infer scienter to "company" and "executive leadership."  *Id.*  A factual basis for scienter is

required for *each defendant*.  *DDAVP*, 585 F.3d at 695.

*First*, the R&R states that "Niederpruem represented on May 26, 2021[,] that executive

leadership personally reviewed 'pricing and the commodity stuff . . . 8 days a week at this point in

36

time.'"   R&R 20 (citing ¶ 136).   The R&R concludes this statement raises an inference that Defendants "either had access to facts and information suggesting their statements about Vertiv's pricing response were incorrect, or failed to monitor inflation and pricing metrics they both had a duty to monitor, and that they represented they were monitoring."   *Id.*   But Niederpruem's statement says only that he and Fallon reviewed "pricing and commodity stuff."   ¶ 136.   And the R&R does not cite what contemporaneous information was known to them that would contradict any particular statement.   As Vertiv repeatedly disclosed during the Class Period, its pricing response would necessarily "lag[] inflation," ¶ 144; *see* ¶ 137, meaning that if inflation rose beyond its projections, Vertiv's pricing—based on those same projections—would offset less of the ultimate inflation than Vertiv had predicted.   By faulting Niederpruem for discussing the ability of pricing to offset projected *future* inflation based on *contemporaneous* data, the R&R faults Niederpruem for not being clairvoyant, but that cannot support scienter.   *See City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 187–88 (2d Cir. 2014).

*Second*, the R&R states that "company leadership told investors on multiple occasions that Vertiv employed 'sophisticated' price-monitoring tools."   R&R 20 (citing ¶ 105).   The sole statement referencing "pricing" tools is by Johnson, and states only that Vertiv had "instituted some AI and really pricing tools that allow our salespeople to understand when we lose at what price and when we win."   ¶ 152.   But again, Vertiv *did* capture the price increases it projected. And statements about tools used to prepare prices based on *current* data convey nothing about Vertiv's ability to offset inflation based on yet-unknown *future* events.

This case thus stands in stark contrast with those cited in the R&R, where courts considered allegations that officers were aware of specific, contemporaneous data that contradicted their statements.   *See Tellabs*, 551 U.S. at 315 (CEO allegedly made statements that demand was

37

"continuing to grow, when, in fact, *demand . . . was waning*," allegedly misrepresented historical results, and allegedly made "overstated revenue projections" given that "*demand . . . was drying up*"); *Novak*, 216 F.3d at 311–12 ("*[D]espite knowledge [that obsolete inventory was currently causing] rising inventory levels*, the defendants made repeated statements to the investment community either offering false reassurances that inventory was under control or giving false explanations for its growth."). Here, the miss by Defendants was on inflation, not pricing, and the AC contains no allegations that Officer Defendants knew of any data that contradicted their public projections of inflation. Indeed, Plaintiffs disclaim challenging the inflation forecasts, Opp. 13 n.4, and Vertiv was entitled to expect—like much of the world did—that inflation would not rise beyond the "short-term" headwinds it forecast. ¶ 125; *see Array*, 2023 WL 3569068, at *16 (belief that rising costs "would eventually normalize" more compelling inference than intent to defraud).

  2.  *Plaintiffs' Other Theories of Conscious Misbehavior Also Fail*

Plaintiffs' remaining conscious misbehavior theories are equally unpersuasive. *First*, Plaintiffs' FE allegations as to each Officer Defendants are paltry:

- As for **<u>Niederpruem</u>**, none of the FEs mention him at all.

- As for **<u>Johnson</u>**, FE-1 remembers "attending [quarterly business review] meetings with . . . Johnson during which . . . underpricing was discussed," and that Johnson agreed to certain deals without price increases. ¶¶ 83–84. But FE-1 left Vertiv in March 2021, ¶ 83, *i.e.*, *before* Vertiv announced it was "instituting pricing actions" to "partially pass through the increased costs" it was seeing in 2021. ¶ 125.[8] Further, FE-1 provides no detail on how any of these undated

---

[8] Notably, Plaintiffs allege that FE-3, at Vertiv throughout the Class Period, attended quarterly meetings with Johnson and Fallon where "sales, margins, and profitability" were discussed, ***but not*** "underpricing." ¶ 89. Similarly, FE-5 also allegedly attended such meetings until September 2021, but alleges only generally that "sales related efforts" were discussed, with no reference to "underpricing," and that Johnson "typically deferred" to others on "forecasting and sales metrics." ¶ 92.

meetings and vague "discussion" contradicted any of Johnson's statements about pricing actions taken in 2021, when Vertiv *beat* its initial pricing forecast. *See Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (allegations that CW attended meetings with executives did not establish specific contradictory information executives received or when they received it), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).

- As for **<u>Fallon</u>** and **<u>Johnson</u>**, FE-3 alleges that they "had access" to reports with data on "[o]rders, sales, margins, and profitability," ¶ 89, but Plaintiffs do not allege "exactly what information was contained in the report[s] or how said information contradicted" any particular statement by Johnson or Fallon, "as is required to show scienter." *Maloney* v. *Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021); *see also Inter-Loc. Pension Fund GCC/IBT* v. *Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (access to "real-time customer and sales information" insufficient). The FE allegations thus plainly fail to allege scienter for any Officer Defendant.

*Second*, Plaintiffs suggest that because Officer Defendants repeatedly spoke about pricing actions, they were aware their statements were false. ¶ 182. This conflates falsity and scienter. "[S]cienter and falsity are two distinct elements," and "[a]ccepting plaintiffs' 'buy one get one free' approach to the law would obviate Section 10(b)'s requirement to allege scienter and Rule 9 and the PSLRA's requirement to plead allegations of fraud with particularity." *Ramzan* v. *GDS Holdings Limited*, 2020 WL 1689772, at *5 (S.D.N.Y. Apr. 7, 2020). Plaintiffs must "specifically identify the reports or statements containing th[e] information" contradicting each Officer Defendant's statements, *Novak*, 216 F.3d at 309, but do not do so.

*Third*, Plaintiffs contend that "a series of extraordinary admissions at the end of the Class Period . . . flatly contradicted [Officer Defendants'] earlier public statements." Opp. 38. But those

statements were not admissions of prior falsity, but rather expressing regret for a forecasting miss. *See supra* p. 21. They were perfectly consistent with the most cogent (and benign) explanation that Officer Defendants implemented pricing actions based on projections of inflation and, unfortunately, their projections were too low. *Id.* That they later spoke "with the benefit of hindsight" is no indication that they "knew at the time [that] there was no reasonable basis for [their] projections." *Frankfurt-Tr. Inv. Luxemburg AG*, 336 F. Supp. 3d at 228.

*Fourth*, Plaintiffs cite post-Class Period analyst reports questioning Vertiv management's credibility, but these are irrelevant to scienter. *See In re Ariba, Inc. Sec. Litig.*, 2005 WL 608278, at *1, *8 (N.D. Cal. Mar. 16, 2005) (no inference of scienter despite analysts "openly question[ing] the credibility of [company] management"); *Sinay* v. *CNOOC Ltd.*, 2013 WL 1890291, at *8 (S.D.N.Y. May 6, 2013) ("[H]indsight-based viewpoint[s]" are "classically insufficient to support a strong inference of scienter"), *aff'd*, 554 F. App'x 40 (2d Cir. 2014). But even if they were relevant, the reports do not reference any false representations by Vertiv or Officer Defendants. *E.g.*, ¶ 69. Instead, the analysts express frustration with the guidance miss. Even the analyst statement that Vertiv provided investors with a "sense that it was in control of pricing conditions" after Q3, ¶ 70, does not imply that—when Officer Defendants made any challenged statements prior to the Q4 inflation spike—they believed they were not in control. And to the extent that same analyst had believed that Vertiv had shared after Q3 that its pricing actions would "keep up with inflation during the fourth quarter," *id.*, he missed that Vertiv had publicly disclosed in reporting Q3 results that it anticipated pricing would *not* keep up with inflation in Q4. *Supra* p. 10.

*Finally*, Plaintiffs argue that Officer Defendants' statements about Vertiv's pricing concern "core operations." Opp. 42. But alleged misstatements regarding even a "key product" are not enough to plead core operations, *Jackson* v. *Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020), and it is

not an "independently sufficient means to plead scienter," *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011). Plaintiffs' invocation of the core-operations theory on the basis that pricing was the "single most important issue facing [Vertiv]," Opp. 42, far exceeds the Second Circuit's narrow treatment of the theory. *See Wachovia*, 753 F. Supp. 2d at 358.

## C.    The Most Cogent and Compelling Inference Does Not Support Fraud

Even if Plaintiffs sufficiently allege a plausible theory of scienter, plausibility alone is not enough. *ECA*, 553 F.3d at 198. Rather, a well-pled, sufficiently strong inference of scienter at the dismissal stage "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. The R&R's scienter analysis, however, does not consider Officer Defendants' opposing nonfraudulent explanation: that they reasonably believed that Vertiv's pricing actions would offset *some* anticipated inflation, as disclosed, but did not correctly predict just how much inflation would spike in Q4.

*First*, Vertiv expressly warned investors, and updated its forecasts, to show that its price increases would *not* offset the forecast inflation for 2021. Why would Defendants *repeatedly* disclose they would be unable to offset inflation if their intent was to deceive investors as to their ability to recover inflation with pricing. *See City of Pontiac*, 752 F.3d at 186 ("[S]pecific disclosures by UBS about its accumulation of mortgage-related securities undercut the inference that defendants knew or recklessly disregarded that their accumulation of the RMBS portfolio was inconsistent with their representations about risk management, much less that they intended to conceal or recklessly concealed that accumulation."). If the fraud was intended, as Plaintiffs argue, to inflate Vertiv's stock price before the November 4, 2021 SPO, it is entirely antithetical to that fraud that Vertiv *lowered its guidance forecasts* significantly in *September 2021*. *See supra* p. 9.

*Second*, as discussed *supra*, no Officer Defendant benefited from the alleged fraud. Beyond simply being less cogent and compelling, allegations of fraud defy commonsense when,

41

as here, they ignore that the alleged perpetrators gained nothing from the scheme.

*Third*, broader context matters. COVID-related inflation and supply-chain constraints wreaked havoc on businesses in sweeping and unpredictable ways. The materials Vertiv disclosed it relied on for its products increased significantly in price, along with shipping costs, in 2021, and all peaked in price in Q4, *supra* p. 12, which Vertiv had understandably not predicted.

Taken together, these undisputed facts are irreconcilable with Plaintiffs' theory. *See Loc. No. 38 Int'l Bhd. Of Elec. Workers Pension Fund*, 724 F. Supp. 2d at 463 ("more compelling inference [was] that [d]efendants' aggressive growth strategy was sideswiped by the collapse of the credit markets"); *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d at 534 (more compelling inference was that defendants failed to "calculate accurately the full extent of losses that were incurred by the unique phenomenon presented by the 2005 hurricane season"). It cannot thus be said that Plaintiffs' theory of scienter is "at least as compelling as any opposing inference of nonfraudulent intent." *ECA*, 553 F.3d at 198.

## CONCLUSION[9]

For the above reasons, the Court should dismiss the Exchange Act claims with prejudice.

Dated: New York, New York
December 8, 2023

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: */s/ Audra J. Soloway*

Audra J. Soloway
David P. Friedman

---

[9] Plaintiffs' Section 20(a) claims against Officer Defendants also fail. Plaintiffs do not plead an underlying Exchange Act claim, and do not allege that Officer Defendants were culpable participants for the same reasons they do not allege scienter. *See In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *29 (Woods, J.).

1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000
asoloway@paulweiss.com
dfriedman@paulweiss.com

*Counsel for Vertiv Holdings Co, Rob Johnson, David Fallon, Gary Niederpruem*