**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Vertiv Holdings Co Securities Litigation* | Case No. 1:22-cv-03572-GHW-OTW |
| | CLASS ACTION |

**LEAD PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTION TO
REPORT AND RECOMMENDATION TO GRANT IN PART AND
<u>DENY IN PART DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ......................................................................................... 1

II.  BACKGROUND ............................................................................................................... 4

    A.   The Complaint's Allegations........................................................................................ 4

        1.   Vertiv's Stock Price Soars As Defendants Repeatedly Reassure Investors That Its "Robust Pricing Actions" Will Recover The "Vast, Vast, Vast Majority" of Rapidly Rising Inflation ............................ 4

        2.   Even After The Truth Began To Emerge, Defendants Continued To Claim Vertiv's "Robust Pricing Actions" Would "Cover" Even "Potentially Worse" Inflation........................................................................ 6

        3.   The Truth Fully Emerges ........................................................................ 7

        4.   High-Ranking Former Employees Confirm Defendants' Admissions ............................................................................................... 9

        5.   Defendants' Post-Class Period Admissions Also Confirm Their Fraud........................................................................................................ 10

    B.   The R&R........................................................................................................................ 10

III. ARGUMENT..................................................................................................................... 15

    A.   The "Clear Error" Standard Of Review Should Apply Where Defendants' Merely Rehash Arguments Already Rejected In The R&R ................................. 15

    B.   Under Any Standard of Review The Complaint Should Be Sustained ................. 17

    C.   The Complaint Adequately Alleges False And Misleading Statements About Vertiv's "Robust Pricing Actions" .................................................................. 17

    D.   The Complaint Adequately Alleges False And Misleading Statements Regarding Vertiv's "Controlling" Of Discounts.......................................................... 21

    E.   The Complaint Adequately Alleges False And Misleading Statements Regarding Vertiv's Use Of Escalation Clauses ........................................................... 22

    F.   The Remaining Statements Are Actionable................................................................. 25

        1.   Defendants' Misrepresentations About Preplanning Were False Or Misleading............................................................................................. 26

        2.   Defendants' Representations About Pricing Tools Were False Or Misleading............................................................................................. 27

3.    Defendants' Arguments As To Statements About Pre- And Post-Class Period Pricing Actions Are Not Persuasive ...................................... 28

G.    Defendants' Statements Are Not Forward-Looking, Inactionable Opinion, or Puffery ............................................................................................... 29

1.    Defendants' Statements Are Not Protected By The PSLRA Safe Harbor ............................................................................................ 29

2.    Defendants' Statements Are Not Opinion .................................................. 31

3.    Defendants' Statements Are Not Puffery .................................................. 32

H.    The Complaint Raises A Strong Inference Of Scienter ........................................ 33

1.    The Complaint Creates A Strong Inference Of "Conscious Misbehavior" ...................................................................................... 33

2.    The Complaint Alleges Scienter Based On Motive and Opportunity ....... 39

3.    Defendants' Proposed Innocent Inference Is Neither Cogent Nor Compelling ...................................................................................... 41

IV.    CONCLUSION .................................................................................................. 42

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Ariba, Inc. Sec. Litig.*,
  2005 WL 608278 (N.D. Cal. Mar. 16, 2005)................................................................. 37

*In re AT&T/DirecTV Now Sec. Litig.*,
  480 F. Supp. 3d 507 (S.D.N.Y. 2020)........................................................................ 25

*Averbach v. Cairo Amman Bank*,
  2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020)............................................................. 16

*Baliga v. Link Motion, Inc.*,
  2022 WL 16707361 (S.D.N.Y. Nov. 4, 2022)............................................................ 15

*Bishins v. CleanSpark, Inc.*,
  2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ................................................................. 30

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  866 F. Supp. 2d 223 (S.D.N.Y. 2012)........................................................................ 33

*Citiline Hldgs., Inc. v. iStar Fin. Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010)........................................................................ 26

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009)....................................................................................... 39

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  2023 WL 2682905 (E.D.N.Y. Mar. 29, 2023)....................................................... 25, 26

*ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)................................................................................... 32, 42

*In re Emergent BioSolutions Inc. Sec. Litig.*,
  2023 WL 5671608 (D. Md. Sept. 1, 2023)................................................................. 26

*Emps. Ret. Sys. of Govt. of Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)....................................................................................... 37

*In re FibroGen, Inc. Sec. Litig.*,
  2022 WL 2793032 (N.D. Cal. July 15, 2022) ............................................................ 36

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  352 F. Supp. 2d 429 (S.D.N.Y. 2005)........................................................................ 41

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018)................................................................... 25, 36

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................................35

*FrontFour Cap. Grp. LLC v. Taube*,
2019 WL 1313408 (Del. Ch. Mar. 11, 2019) ..........................................................................40

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) .......................................................................................41

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012)......................................................................................34

*In re Glob. Brokerage, Inc.*,
2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019)..........................................................................32

*Greco v. Qudian Inc.*,
2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) .........................................................................26

*In re Hebron Tech. Co. Sec. Litig.*,
2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021) .........................................................................25

*Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*,
445 F. App'x 368 (2d Cir. 2011)..............................................................................................38

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020).......................................................................................................38

*Kalnit v. Eichler*,
99 F. Supp. 2d 327 (S.D.N.Y. 2000), *aff'd,* 264 F.3d 131 (2d Cir. 2001)..............................42

*Kapitalforeningen Laegernes Invest v. United Techs. Corp.*,
779 Fed. App'x 69 (2d Cir. 2019).............................................................................................25

*KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*,
528 F. Supp. 3d 192 (S.D.N.Y. 2021)......................................................................................26

*Kendall v. Odonate Theraps., Inc.*,
2021 WL 3406271 (S.D. Cal. Aug. 4, 2021).............................................................................26

*Kumaran v. ADM Investor Servs., Inc.*,
2023 WL 7328136 (S.D.N.Y. Nov. 6, 2023)......................................................................15, 16

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020) ..........................................................................40

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Exp. Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010)......................................................................................38

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008)........................................................................................42

*Maloney III v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021)...........................................................................38

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)..........................................................................................23

*In re MF Glob. Hldgs. Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)......................................................................26, 41

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011)....................................................................28, 33, 34, 38

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..........................................................................................32

*Nutriband, Inc. v. Kalmar*,
  2020 WL 4059657 (E.D.N.Y. July 20, 2020).................................................................32

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)..............................................................................38

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  432 F. Supp. 3d 131 (D. Conn. 2019).............................................................................40

*Pioneer Navigation Ltd. v. Chem. Equip. Labs, Inc.*,
  2020 WL 1031082 (S.D.N.Y. Mar. 3, 2020).............................................................2, 15, 16

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474 (S.D.N.Y. 2010) .............................................................41

*Plymouth Cty. Ret. Assoc. v. Array Techs, Inc.*,
  2023 WL 3569068 (S.D.N.Y. May 19, 2023) .............................................................23, 31

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996)....................................................................................30

*Ramzan v. GDS Holdings Ltd.*,
  2020 WL 1689772 (S.D.N.Y. Apr. 7, 2020) ...................................................................35

*Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012).........................................................................35, 37

*Robertson v. Strassner*,
  32 F. Supp. 2d 443 (S.D. Tex. 1998) ..............................................................................41

*In re Salix Pharma., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ........................................................................ 29

*Setzer v. Omega Healthcare Invs., Inc.*,
  968 F.3d 204 (2d Cir. 2020) .......................................................................................... 27, 28

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ...................................................................... 37

*Sinay v. CNOOC Ltd.*,
  2013 WL 1890291 (S.D.N.Y. May 6, 2013), *aff'd*, 554 Fed. App'x 40 (2d Cir.
  2014) ...................................................................................................................................... 36

*Skiadas v. Acer Therap. Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................................................. 38, 42

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
  365 F.3d 353 (5th Cir. 2004) ............................................................................................... 41

*Steamfitters Local 449 Pension Plan v. AT&T Inc.*,
  2022 WL 17587853 (2d Cir. Dec. 13, 2022) ....................................................................... 25

*Steinberg v. Ericsson LM Tel. Co.*,
  2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ...................................................................... 25

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015) ............................................................................. 34, 35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................... 14, 40, 42

*In re Top Tankers, Inc. Sec. Litig.*,
  528 F. Supp. 2d 408 (S.D.N.Y. 2007) .................................................................................. 36

*In re Tufin Software Techs. Ltd. Sec. Litig.*,
  2022 WL 596861 (S.D.N.Y. Feb. 25, 2022) ........................................................................ 24

*In re Vale S.A. Sec. Litig.*,
  2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ...................................................................... 30

*In re Vale S.A. Secs. Litig.*,
  2020 WL 2610979 (E.D.N.Y. May 20, 2020) ................................................................. 21, 27

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) .................................................................................. 30

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016) .......................... 28

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011)......................................................................38

*In re Wells Fargo & Co. Sec. Litig.*,
   2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) ..................................................26, 32

*Yannes v. SCWorx Corp.*,
   2021 WL 2555437 (S.D.N.Y. June 21, 2021) ........................................................39

STATUTES AND RULES

15 U.S.C. § 78u-5(c)(1)(B)........................................................................................31

17 C.F.R. § 240.10b-5(b)...........................................................................................27

28 U.S.C. § 636(b)(1) ...............................................................................................15

Fed. R. Civ. P. 9(b) ...................................................................................................10

Fed. R. Civ. P. 12(b)(6) .............................................................................................41

Fed. R. Civ. P. 72(b) .................................................................................................15

Lead Plaintiffs respectfully submit this response to Defendants' Objection ("Objection" or "Obj.") (ECF No. 81) to Judge Ona T. Wang's November 6, 2023 Report and Recommendation to the Hon. Gregory H. Woods ("R&R" or "Report") (ECF No. 74).[1]

## I.    PRELIMINARY STATEMENT

After reviewing Plaintiffs' Complaint, over 130 pages of briefs, and over 650 pages of exhibits—Judge Wang issued the thorough, well-reasoned 26-page Report, correctly determining that Plaintiffs adequately pleaded claims arising under the Securities Exchange Act against Vertiv and its most senior executives.  The R&R found that Defendants materially misled investors by repeatedly asserting that Vertiv would offset "the vast, vast, vast majority" of inflationary costs by raising prices, "controlling . . . discounts," and using "material clauses" to retroactively raise prices in its over $2 billion sales backlog.  Indeed, when Defendants shocked the market at the end of the Class Period by announcing that Vertiv missed its fourth quarter guidance by a staggering $73 million, they starkly admitted that the exact opposite was true:  Vertiv "didn't and wasn't set up to drive a lot of price," had an embedded "culture" of "giv[ing] away the pricing we were getting through discounting," and had only barely begun to include "escalation clauses" in the larger contracts its backlog.

Investors were shocked by this news, which sharply contrasted with Defendants' Class Period misrepresentations.  Vertiv's share price fell 37% in one day, wiping out $2.7 billion in

---

[1] Lead Plaintiffs are Louisiana Sheriffs' Pension & Relief Fund, Orlando Police Pension Fund, City of Plantation General Employees Retirement System, Riviera Beach Municipal Firefighters' Pension Trust Fund, and City of Riviera Beach General Employees' Retirement System (collectively, "Plaintiffs").  Defendants are Vertiv Holdings Co. ("Vertiv"), Rob Johnson, David Fallon, and Gary Niederpruem (collectively, "Officer Defendants," and together with Vertiv, "Defendants").  Unless otherwise noted, all capitalized terms have the same meanings as in the Amended Consolidated Complaint (ECF No. 25) ("AC" or "Complaint") or in the R&R.  References to "¶_" are to the AC.  Defendants' Memorandum of Law in Support of Their Motion to Dismiss (ECF No. 54) is referred to as "MTD."  Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss (ECF No. 59) is referred to as "Opp."  Plaintiffs attach as Appendix A, a chart identifying the alleged false statements in the Complaint, how the R&R addressed those statements, and references to the sections of this brief where Plaintiffs have responded to Defendants' various arguments concerning each statement.

market capitalization.  Analysts excoriated Defendants for Vertiv's "[s]hockingly bad" financial results, noting that "management credibility [was] completely shot" due to Defendants' prior misrepresentations about their "robust pricing actions."  Defendants acknowledged that Vertiv's inability to keep pace with inflation was their fault, admitting that they were "ful[ly] responsible" for Vertiv's earnings miss and had "screwed up" because, contrary to their prior representations, Vertiv "got behind on the inflation recovery curve with insufficient price and stayed there all year"—such that Defendants "absolutely realized we have likely damaged our credibility in 2021."

Defendants now object to Judge Wang's R&R—but rather than raise any actual errors in the R&R, Defendants instead recycle arguments that Judge Wang already fully considered and rejected.  However, as this Court and many others in this Circuit have held, such Objection—which "would reduce the magistrate's work to something akin to a meaningless dress rehearsal"—should be subjected to "clear error" and not *de novo* review.  *Pioneer Navigation Ltd. v. Chem. Equip. Labs, Inc.*, 2020 WL 1031082, at *3 (S.D.N.Y. Mar. 3, 2020).  Judge Wang's well-reasoned Report analyzed each of Defendants' arguments they now seek to relitigate, but the R&R contains no clear error—and this alone is fatal to Defendants' Objection.

Even under *de novo* review, Defendants' Objection fails.  Their primary argument is that all of their statements about Vertiv's "robust pricing actions"—including its "controlling" of discounts and use of "escalation clauses"—were true because it obtained $53 million in pricing in 2021, while at the same time "transparently" warning that it "would be unable to recoup surging costs by increasing prices."  Obj. at 1-3.  *First*, Judge Wang already directly addressed—and rightfully rejected—this argument, reasoning that Defendants' $53 million in pricing did not make their statements true because it "would not have come close to offsetting [Vertiv's] inflation predictions," which in the second half of 2021 ranged from $110 million to $155 million.  R&R at

2

16 n.7.  Moreover, Defendants later admitted that they obtained $28 million of that $53 million in the fourth quarter alone.  Thus, for the majority of the Class Period—i.e., during the same time Defendants were repeatedly professing they would recover the "vast, vast, vast majority" of inflation ranging up to a predicted $155 million—Defendants had obtained a miniscule $25 million in pricing, and they knew that Vertiv could not make up the difference, because it "didn't and wasn't set up to drive a lot of price" and had a pervasive "culture" of discounting.

Second, any notion that Defendants "transparently" warned that "pricing would not keep up" with inflation is nonsense, and directly contradicted by their mea culpa at the end of the Class Period that, in reality, Vertiv "didn't and wasn't set up to drive a lot of price" and had a pervasive "culture" of "giv[ing] away the pricing that we were getting through discounting"—and the market's immediate visceral reaction to Defendants' disclosure of the $53 million in pricing, as evidenced by the 37% stock drop and analysts' excoriation of Defendants for their lack of credibility.  Defendants cannot square their argument that they were "transparent" about the disconnect between inflation and pricing with investors' overwhelming surprise upon disclosure of Vertiv's results in February 2022.

Third, Vertiv's purported "transparent" pricing forecasts warning that Vertiv was "unable" to offset inflation are wholly contradicted by Defendants' own repeated averments that the "robust pricing actions" they were implementing would "recover the vast, vast, vast majority" of inflation and "fully offset" it by year-end.  Even as late as October 2021, Defendants asserted that they were "making sure" Vertiv's pricing actions would "cover" even "potentially worse" inflation.  However, as Defendants later admitted, these statements were false because Vertiv never implemented any of those pricing actions.  Rather than raise prices, Vertiv had a "culture" of "giv[ing] away the pricing we were getting through discounting"; and rather than having

3

"escalation clauses" on contracts in the $2 billion backlog, in reality, virtually no such clauses existed.

Defendants similarly claim that the R&R erred in finding scienter because Vertiv achieved $53 million in pricing in 2021 and merely failed to accurately predict inflation. But as the R&R recognized, this case is not about whether Defendants were able to obtain some pricing in 2021, or whether they failed to predict the full extent of rising inflation. R&R at 15. Rather, the crux of Plaintiffs' allegations is that Defendants repeatedly assured investors that they had implemented "robust pricing actions" that would "cover" even "potentially worse" inflation—including by "controlling . . . discounts" and using "escalation clauses"—when, as Defendants later admitted, they had not. Defendants' argument that Plaintiffs fail to point to any contemporaneous data contradicting their statements ignores Defendants' admissions that these "robust pricing actions" were never actually implemented, as well as numerous detailed accounts from high-ranking former Vertiv employees (which were rightfully credited by the R&R) corroborating those admissions.

The Court should overrule Defendants' Objection and sustain Plaintiffs' claims.

## II.    BACKGROUND

### A.    The Complaint's Allegations

#### 1.    Vertiv's Stock Price Soars As Defendants Repeatedly Reassure Investors That Its "Robust Pricing Actions" Will Recover The "Vast, Vast, Vast Majority" of Rapidly Rising Inflation

Prior to going public in February 2020, Vertiv was known as having significantly thinner profit margins than its competitors, causing it to announce a "margin expansion" plan to "match [Vertiv's] peers." ¶¶40-41. However, by the start of the Class Period in 2021, inflation jeopardized this plan, the successful execution of which investors viewed as absolutely critical to Vertiv's success. ¶43. To assuage investors' concerns, Defendants repeatedly asserted that they were implementing "robust pricing actions" that would "fully offset" inflation. ¶¶44-46.

For example, on February 24, 2021, the first day of the Class Period, Defendants stated that Vertiv would achieve adjusted operating profit of $565-$585 million—a staggering 68% increase over the prior year. ¶44. When analysts directly asked about whether this guidance was achievable in light of expected inflationary headwinds—and specifically, whether Vertiv could "offset recent raw material inflation with pricing"—Defendant Niederpruem unequivocally responded that Vertiv would "certainly be on the plus side of that equation" in 2021 with "positive price" because it was able to "continue passing price along" to its customers. ¶117.

Thereafter, on every earnings and investor call—while simultaneously raising Vertiv's already aggressive profit guidance twice, in April and July 2021—Defendants assured investors that Vertiv had "fully implemented" "robust pricing actions" to respond to rising inflation, including by "pass[ing] through increased costs" to its customers and being "much more judicious" with the "discount levels" its salespeople were able to have. ¶¶124-45, 136. Defendants claimed that, as a result, Vertiv was in fact "getting price" and "able to go forward and price things at that higher cost rate," such that the Company would "fully offset inflation in . . . [Q4] and provide a tailwind" through its pricing actions. ¶¶50, 128-29, 147. Even with respect to Vertiv's massive backlog—which consisted mainly of larger long-term contracts and amounted to as much as $3.2 billion during the Class Period—Defendants assured investors they were "taking action" by leveraging "material clauses" that would allow Vertiv to retroactively increase pricing to offset inflation. ¶132.

To provide extra assurance, Defendants told investors that they were personally monitoring the effectiveness of these pricing actions "8 days a week" to "make sure that we're doing all the right things." ¶136. As a result, Defendants proclaimed that they were "really, really confident that we will be able to recover the vast, vast, vast majority of any inflationary stuff." *Id.*

5

On the strength of these representations, Vertiv's stock price soared over 37%, reaching a Class Period high of $28.59 per share on September 2, 2021.  ¶50.

### 2. Even After The Truth Began To Emerge, Defendants Continued To Claim Vertiv's "Robust Pricing Actions" Would "Cover" Even "Potentially Worse" Inflation

On September 8, 2021, Defendants surprised the market by reducing Vertiv's projected profits by 10%.  ¶52.  Defendants attributed the reduction to "supply challenges" that required Vertiv to pay "elevated prices" for critical components through costly "spot buys."  *Id.*  As Cowen noted, this cut to Vertiv's guidance came "as a surprise given [that] Vertiv [had] addressed supply constraints when it reported 2Q21 earnings just five weeks earlier."  ¶53.  In response to these disclosures, Vertiv's stock price fell 11%.  *Id.*

However, rather than fully disclosing the truth—i.e., that Vertiv was unable to raise prices to respond to inflation—Defendants continued to assert that Vertiv's pricing actions were effectively offsetting inflation.  Specifically, Defendant Johnson assured investors that "[w]e continue to drive pricing," and that Vertiv was "getting price in the market" even "as inflationary measures impact us."  ¶157.  Defendant Niederpruem similarly stated that Vertiv's pricing was "ramping every quarter, every month as we track this"—and that "the pricing that [Vertiv was] getting" was "really pretty sticky," such that it was not a question of "can we get price."  *Id.*

Then, on October 27, 2021—well into the fourth quarter, and just five days before announcing a secondary public offering where the former Platinum Equity defendants sold over $544 million worth of Vertiv stock (¶57) (the "SPO")—Defendants suddenly reversed course and raised Vertiv's 2021 adjusted operating income guidance by $13 million, further propping up Vertiv's share price. ¶55.  During Vertiv's third quarter earnings call, Defendants continued to represent that they had instituted "robust pricing actions" that would fully offset inflation, claiming that those actions would "cover" even "potentially worse" inflation.  ¶¶165-66.

Even as late as November 16, 2021—more than halfway through the fourth quarter—Defendants continued to claim that Vertiv's pricing actions would not only offset inflation but result in "definitely more tailwinds."   ¶¶172-73.   Defendant Niederpruem attributed these "tailwinds" to "additional pricing actions" Vertiv purportedly had launched "over the last 2 or 3 weeks"—with the "majority of the price" coming from raising "list prices" and "controlling the discounts and multipliers that our own sales people are able to have." ¶¶173, 176.

### 3.    The Truth Fully Emerges

On February 23, 2022, Defendants stunned investors by announcing that Vertiv had missed its raised fourth-quarter guidance issued just a few months earlier by $72 million—43% below the lower end of its guidance range. ¶59. During the earnings call, Defendants made crystal clear that Vertiv's abysmal financial results were not due to external market forces, but to Defendants' own failure to implement the "robust pricing actions" they had touted to investors for nearly a year. Indeed, Defendant Johnson admitted that Vertiv's management was "full[y] responsible" for the guidance miss and had "screwed up" by "underpricing the market in 2021" and failing to recapture inflationary costs.   ¶66.   Defendants further acknowledged that they "realize[d]—absolutely realized we have likely damaged some of our credibility in 2021." *Id.*

*First*, Johnson explicitly admitted that—in stark contrast to Defendants' repeated assurances that Vertiv previously implemented "robust pricing actions"—in reality, Vertiv "didn't and wasn't set up to drive a lot of price."   ¶61.   Cote further admitted that, rather than raising prices, Vertiv had "generally underpric[ed]" its contracts over the entire Class Period, as the Company "got behind on the inflation recovery curve with insufficient price and stayed there all year." ¶62. As a result, Defendants had only barely just begun to "act[] decisively" by instituting "aggressive price actions" "late last year and early this year [2022]." ¶59.

7

*Second*, Defendants admitted that, contrary to their assertions that Vertiv was "controlling . . . discounts," Vertiv had been "discount[ing] to build backlog"—a practice so pervasive it was Vertiv's "culture." ¶187. Indeed, Johnson admitted that Vertiv had been routinely "giv[ing] away the pricing that we were getting through discounting"—and that, because of the "cultural" nature of the problem, Vertiv now had to make "behavioral changes . . . across the world" to require "authority and approval" for discounts. ¶64. Defendant Cote further confirmed that Vertiv regularly "underprice[d]" because it "had a predisposition or a deference to not lose the order." ¶62.

*Third*, Defendants admitted that, contrary to their earlier statements that Vertiv invoked "material clauses" in larger contracts to retroactively raise prices in response to inflation, the vast majority of these contracts contained no such clauses and instead had locked-in discounted pricing. Specifically, Johnson admitted that Vertiv had only recently made the "change" of adding "escalator" provisions to its contracts to recoup inflationary costs—a provision that "wasn't in all of [Vertiv's] contracts prior." ¶63. Johnson later admitted that, as a result—and contrary to Defendants' prior assurances that Vertiv was "by no means going to just discount the $2 billion backlog—the Company in reality "didn't get a lot of pricing on the backlog that we had[,] [t]hat was part of our problem. We had to burn through that." ¶¶47, 78.

In response to these shocking disclosures, Vertiv's stock collapsed by 37% from $19.57 to $12.38 per share—representing a $2.7 billion decline in its market capitalization. ¶67. Analysts excoriated Defendants, with Deutsche Bank describing Vertiv's "[s]hockingly bad results" as "a management credibility issue" because they came "in the midst of what we would characterize as constructive management commentary at conferences throughout the quarter, even into December." ¶69. Cowen also called Defendants' "credibility [into] question," emphasizing that

"[e]vidently," "the price actions [Vertiv] took late in the third quarter" were not enough to "keep up with inflation during the fourth quarter," as Defendants had represented. ¶70. Wolfe Research lamented that "[i]n our 17 years of covering industrials, we can't recall a drawdown of this magnitude," and concluded that "management credibility" was "completely shot." ¶71.

> **4.    High-Ranking Former Employees Confirm Defendants' Admissions**

Defendants' admissions have been confirmed by detailed accounts of several high-ranking former Vertiv employees (FEs)—including former Vice Presidents and Senior Account Executives—with direct knowledge of Vertiv's pricing practices. ¶¶82-112. For example, FE-3—the former VP of Field Sales at Vertiv until July 2022, who attended internal meetings with Defendants Johnson and Fallon where sales, margins and profitability were discussed—confirmed that Vertiv "[did] not get[] ahead of it in regards to raising price to offset inflation." ¶¶88-89. FE-1, the former VP of Channel Strategies for the Americas who also participated in internal meetings with Defendant Johnson, confirmed that Vertiv "had an inability to transfer those price costs to our customers" because of its strategy of discounting to build backlog—and that Johnson "agreed to do [underpriced] deals without price increases." ¶¶83-84.

These FEs further confirmed that, far from being able to use "material clauses" on Vertiv's over $2 billion backlog to retroactively raise prices, the backlog consisted of large contracts with locked-in discounted pricing. FE-1 stated that, for Vertiv's larger contracts—which comprised 85-90% of the Company's business—"the contract terms were not good for Vertiv" because they included locked-in discounted prices regardless of inflation. ¶94. FE-2, a former Senior Account Manager for Vertiv, similarly stated that "[t]here was no mechanism to increase prices in those contracts, you had to eat it." ¶96. FE-6, a former Vice President of Sales at Vertiv from July 2010 until September 2021, similarly confirmed that Vertiv was saddled with an "off the charts

significant[] and also off the charts unprofitable backlog," as the Company had deliberately failed to raise prices in response to inflation in order to gain market share. ¶97.

### 5. Defendants' Post-Class Period Admissions Also Confirm Their Fraud

After the Class Period, Defendants continued to confirm the falsity of their prior statements. For example, on February 24, 2022, Johnson acknowledged that, throughout 2021, Vertiv's "mantra" was to "take share [under] any contribution margins." ¶73. Thus, in 2021, Vertiv's salespeople in reality "had a lot more freedom to discount in a price range," and often used that freedom because they were "very afraid to lose a deal." *Id.* Similarly, in May 2022, Defendant Fallon confirmed that Defendants had no basis whatsoever to tout Vertiv's pricing actions in 2021, admitting that Vertiv was "never aggressive with pricing." ¶77.

Furthermore, in March 2022, Defendant Niederpruem confirmed that it was only "now"— i.e., after the Class Period—that Vertiv included "material escalation clauses" in "some" of its larger contracts in Vertiv's backlog, which was a change Vertiv had implemented precisely to avoid "get[ting] caught in the same situation again." ¶75.

### B. The R&R

On November 6, 2023, after reviewing the parties' voluminous submissions, Judge Wang issued the 26-page R&R, which sustained Plaintiffs' claims under Section 10(b) of the Exchange Act and dismissed the claims under the Securities Act.[2] Specifically, the R&R determined that statements Defendants made on seven different dates during the Class Period "meet the standard of Federal Rule of Civil Procedure 9(b) and the PSLRA to survive a motion to dismiss." *Id.* at 15. The R&R stated that these statements "fall into two categories," namely: (1) statements about

---

[2] Plaintiffs elected not to challenge the R&R's recommendation that the Securities Act claims be dismissed. However, Defendants have taken the opposite position, arguing that the portion of Judge Wang's opinion dismissing Plaintiffs' Securities Act claims was well reasoned and correct, but that Judge Wang somehow ignored all of Defendants' arguments and committed clear error in the portion of the R&R sustaining Plaintiffs' Exchange Act claims.

"raising list prices and controlling discounts" to offset inflation, and (2) statements about using

"escalation clauses in large contracts" to retroactively raise prices. *Id.* Specifically, and as set

forth in the R&R, these statements include:

1. **February 24, 2021:** Niederpruem's statement, in response to an analyst asking whether Vertiv could "offset recent raw material inflation with pricing," that "[w]e feel pretty good about where we sit right now to continue passing price along" and would "certainly be on the plus side of that equation from where we sit today." ¶¶44, 117; R&R at 3.

2. **April 28, 2021:** Defendants' statements that Vertiv was "[m]anaging the disruptions" caused by inflation through "pricing actions around the globe to partially pass through the increased costs"; "able to go forward and price things at that higher cost rate" with "a pretty good process now in our ability to drive prices through with our customers on a global scale"; and able to invoke "material clauses" in "larger contracts" to retroactively raise prices on the Company's $2 billion backlog. ¶¶124-25, 128-29, 132; R&R 3-4;

3. **May 26, 2021:** Niederpruem's statement that he and Fallon were reviewing "pricing and the commodity stuff . . . 8 days a week" and "really, really confident that we will be able to recover the vast, vast, vast majority of any inflationary stuff." ¶¶49, 136; R&R 4-5;

4. **July 28, 2021:** Vertiv's statement that it had "[p]ricing actions in place to recover market based commodity and freight inflation," would "fully offset inflation in Q4 and provide tailwind," and was implementing "list price increases, discount and rebate reductions, [and] pass through commodity pricing" to offset inflation. ¶147; R&R 5;

5. **September 8, 2021:** Niederpruem's statements that Vertiv's pricing was "ramping every quarter, every month as we track this," and that "the pricing that we are getting" was "really pretty sticky"—such that it was not a question of "we [can] get price"; and Johnson's statements that "[o]ur pricing has continued to ramp," "[w]e continue to drive pricing," and Vertiv was "getting price in the market" even "as inflationary measures impact us." ¶157; R&R 6;

6. **October 27, 2021:** Defendants' statements that Vertiv's pricing response to inflation included "list price increases, discount and rebate reductions, pass through commodity pricing and pricing recovery on outbound freight"; "our pricing response continues to meaningfully increase sequentially each quarter"; and Vertiv "was making sure that our pricing actions now and going forward" would "cover" even "potentially worse" inflation." ¶¶159, 162, 165; R&R 6;

7. **November 16, 2021:** Defendants' statements that Vertiv had "just about launched additional pricing actions over the last two or three weeks in every region of the world"; even when customers pushed back on price increases, Vertiv was able to successfully pass through prices by telling its customers that "if [Vertiv] ha[s] to pay more, then I need some more from you"; and the "majority of the price" Vertiv was using to successfully offset

11

inflation was through "list price increases" and "controlling the discounts and multipliers that our own salespeople are able to have." ¶¶173-74, 176; R&R 7. [3]

In their Objection, Defendants claim that Judge Wang sustained only statements Defendants made on April 28, May 26, July 28, and November 16 (*see* Obj. at 14, stating that the R&R sustained only ¶¶132, 136, 147, 174, and 176). Defendants' argument is wrong and ignores significant portions of Judge Wang's R&R. Indeed, in the R&R, Judge Wang explicitly sustained Defendants' statements that Vertiv was instituting pricing actions that could offset inflation. R&R at 15 (holding that "Defendants' statements that Vertiv was instituting pricing actions that could offset the 'vast, vast, vast majority of any inflationary stuff'" were "not protected by *Omnicare*, the PSLRA, or the bespeaks caution doctrine insofar as they misled investors about what action Vertiv was tak[ing] at the time the statements were made"). Judge Wang further held that such statements were not immaterial puffery: "For similar reasons, to the extent these statements misrepresented existing facts about the state of pricing actions being taken at the company, they are not immaterial puffery." *Id*. Moreover, in addressing these statements, Judge Wang specifically considered— and rejected—Defendants' argument (now recycled in their Objection at 1-3, 21, and 28-32) that these statements purportedly only later "proved inaccurate" when "inflation increased more quickly and dramatically than [Vertiv] and most other firms anticipated." *Id*. at 14.

Judge Wang also expressly considered—and rejected—numerous of Defendants' other arguments that they now raise again in their Objection. *First*, the R&R found that Defendants' pricing and "controlling [] discounting" statements were belied by multiple FE accounts confirming that Vertiv had no ability to pass inflation costs on to its customers, and that Defendants did not raise prices to keep pace with inflation during the Class Period but instead routinely

---

[3] Appendix A hereto includes a statement-by-statement summary of the R&R's conclusions.

authorized significant discounts. R&R at 17. In so doing, the R&R rejected Defendants' argument (repeated in Obj. at 20) that these statements were not false because Plaintiffs purportedly failed to allege that Vertiv had not reduced at least some discounting. Specifically, Judge Wang found that "the accounts of the former employees indicate that Vertiv was giving extensive discounts as a matter of course," causing "Defendants' statements that they were controlling discounting sufficiently to significantly offset inflation" to be "misleading to a reasonable investor." R&R at 18. In making these findings, the R&R further rejected Defendants' argument (raised again in Obj. at 17, 20) that Plaintiffs' FEs were unreliable and not in a position to know the pertinent information, determining that Plaintiffs had described their FEs "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." R&R at 10.

*Second,* the R&R found that Plaintiffs adequately pleaded that Defendants' statements that Vertiv was able to utilize "escalation clauses" to retroactively raise prices on larger contracts were materially false and misleading based on (1) Defendants' post-Class Period admission that they were only "now" beginning to include such clauses in "some" larger contracts; and (2) FE accounts stating that Vertiv's larger contracts in fact did not contain any such clauses. R&R at 16. In reaching this determination, Judge Wang rejected Defendants' argument (raised again in Obj. at 15-16) that the statements were not false because Defendants had merely said that Vertiv's larger contracts only "sometimes" contained escalation clauses. R&R at 17. Specifically, Judge Wang reasoned that "in the full context of when and where the statement was made—i.e., at an investor conference in response to questions about whether Vertiv was capable of raising prices on existing contracts to substantially offset inflation—Plaintiffs have sufficiently shown that these statements were misleading to a reasonable investor." *Id.*

13

*Third*, in sustaining these false statements, Judge Wang also explicitly <u>rejected</u> one of Defendants' chief arguments that they now raise again in their Objection:  namely, that because Vertiv had obtained <u>some</u> additional pricing in 2021, amounting to $53 million, Defendants' statements about implementing "robust pricing actions" to significantly offset inflation were all true.  Obj. at 1-2, 18, 29, 37.  Judge Wang reasoned that "even taking this 'hard fact' into account, Vertiv's $53 million in additional pricing over the course of 2021 would not have come close to offsetting its inflation predictions in the second half of 2021," <u>even if</u> inflation had not purportedly "spiked" above Defendants' inflation forecasts.  R&R at 16 n.7.  Indeed, as Judge Wang noted, Defendants had predicted $110 million in inflation in July 2021, $130 million in September 2021, and $155 million in October 2021—amounts that far exceeded the $53 million in "additional pricing" Vertiv ultimately obtained.  *Id.*  Significantly, <u>$28 million of that amount was not even obtained until the fourth quarter</u> (meaning that, at the same time Defendants were falsely claiming they had implemented pricing actions that would "fully offset" well over $100 million in inflation, they had achieved <u>less than $25 million in pricing</u>).  *Id.*; Opp. at 19.

With respect to scienter, the R&R found that Plaintiffs adequately pleaded Defendants' conscious misbehavior and recklessness based on their "own representations, as well as reports of former employees," which "strongly indicat[ed] that Defendants had up-to-date knowledge of pricing data and were approving large discounts throughout the Class Period" that directly contradicted their statements to investors—including Defendants' proclamations that they were personally reviewing "pricing and the commodity stuff . . . 8 days a week."  R&R at 20.  In so holding, Judge Wang expressly applied the scienter standard outlined in *Tellabs* that Defendants now assert she completely overlooked (Obj. at 41), determining that the facts alleged in the AC "raise a compelling inference 'at least as compelling as any opposing inference of nonfraudulent

14

intent' that the Defendants either had access to facts and information suggesting their statements about Vertiv's pricing response were incorrect, or failed to monitor inflation and pricing metrics they both had a duty to monitor, and that they represented they were monitoring." *Id.* at 20-21.

Based on Judge Wang's thorough analysis of the applicable legal standards, the factual record, and Defendants' arguments, the R&R correctly concluded that "Defendants' motion to dismiss the Section 10(b) and Rule 10b-5 claims should be denied." R&R 21.

## III.   ARGUMENT

### A.   The "Clear Error" Standard Of Review Should Apply Where Defendants' Merely Rehash Arguments Already Rejected In The R&R

Under 28 U.S.C. § 636(b)(1), a district court reviews Objection to a judge's report and recommendations *de novo*. *See also* Fed. R. Civ. P. 72(b). However, as this Court and numerous others in this Circuit have repeatedly held, to the extent that the objecting party "simply reiterates the original arguments, the Court will review the [ judge's recommendation and report] strictly for clear error." *Pioneer Navigation.*, 2020 WL 1031082, at *3; *Kumaran v. ADM Investor Servs., Inc.*, 2023 WL 7328136, at *1 (S.D.N.Y. Nov. 6, 2023) (Woods, J.) (same); *Baliga v. Link Motion, Inc.*, 2022 WL 16707361, at *2 (S.D.N.Y. Nov. 4, 2022) (same). Indeed, "[o]bjections of this sort are frivolous, general and conclusory, and would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Pioneer Navigation*, 2020 WL 1031082, at *3. Moreover, "[t]he purpose of the Federal Magistrates Act was to promote efficiency of the judiciary, not undermine it by allowing parties to relitigate every argument which it presented to the Judge." *Id.*

Defendants' Objection largely consists of near verbatim regurgitation of arguments they unsuccessfully presented to Judge Wang, which she in turn fully considered and rejected. To provide but a few (of many) examples:

- *Compare* Obj. at 2 ("Vertiv did successfully increase prices (*i.e.*, 'get price')" because "[i]n FY 2021, Vertiv's pricing actions recovered $53 million—over 3x its initial forecast of $15

15

million, and far higher than prior years.") *with* MTD at 2 ("There is no dispute that Vertiv did, in fact, ramp up its pricing response by 'getting price' from customers in 2021—obtaining $53 million in additional price, far more than its initial estimate of $15 million.");

- *Compare* Obj. at 15 ("The plain meaning of the statement that 'sometimes' 'larger contracts' had escalation clauses is that they appeared in larger contracts 'on some occasions but not always or often.'") *with* MTD at 21 ("The plain meaning of the statement—that 'sometimes' 'larger contracts' have such clauses—is that such clauses appeared in larger contracts 'on some occasions but not always or often.'");

- *Compare* Obj. at 21 ("The AC also relies on certain post-Class Period statements concerning Vertiv 'historically' underestimating its products' value and not being 'set up to drive a lot of price.' Yet not one of the statements admits that Vertiv did not implement additional controls over discounting in 2021.") *with* MTD at 23-24 ("Plaintiffs stress that on the 4Q 2021 earnings call, Johnson and Cote discussed Vertiv 'historically' underestimating its products' value and not being 'set up to drive a lot of price.' But these statements do not suggest that Vertiv did not take actions to control discounting in 2021."); and

- *Compare* Obj. at 25 ("Most of [Defendants'] post-Class-Period 'admissions,' in context, describe Vertiv's historical practice over years.") *with* MTD at 18 ("Most of [Defendants'] post-Class-Period 'admissions' are, in context, plainly describing Vertiv's historical practice over years.").

Tellingly, Defendants' Objection completely ignores the "clear error" standard and makes no attempt to meet it, because they cannot. *See, e.g.*, *Pioneer Navigation*, 2020 WL 1031082, at *5 (where "large swaths of the Objection" had "simply been cut and pasted verbatim (or nearly so, with the exception of a few words changed and a paragraph or two omitted)," "clear error" review applied); *Averbach v. Cairo Amman Bank*, 2020 WL 1130733, at *1 (S.D.N.Y. Mar. 9, 2020) (Woods, J.) (same). Indeed, "the crux of [Defendants'] Objection" seems to be "that [Judge Wang] 'overlooked' [Defendants'] original arguments," but this is directly belied by the fact that the R&R directly addressed and rejected those arguments. *Kumaran*, 2023 WL 7328136, at *1. Defendants' failure to point to any "clear error" in Judge Wang's thorough and well-reasoned R&R—because there is none—is fatal to their Objection.

16

B.      **Under Any Standard of Review The Complaint Should Be Sustained**

Even if this Court decides to review each of the challenged recommendations in the R&R *de novo*, the Court should find that Judge Wang was correct in determining that Plaintiffs adequately alleged both falsity and scienter for their Exchange Act claims.

C.      **The Complaint Adequately Alleges False And Misleading Statements About Vertiv's "Robust Pricing Actions"**

The R&R correctly determined that Plaintiffs adequately alleged that Defendants' repeated statements that Vertiv was successfully acting to "fully offset" inflation through price increases were materially false and misleading. R&R at 2-7, 13-15, 17-18; ¶¶117, 124-25, 128-29, 147, 157, 173. Indeed, as the R&R found, these statements were directly contradicted by Defendants' post-Class Period admissions that Vertiv "didn't and wasn't set up to drive a lot of price," and was in fact doing the exact opposite: Vertiv had a "culture" of "giv[ing] away" price through discounting. R&R at 14; Opp. at 13-15. The R&R further correctly determined that Defendants' admissions were corroborated by the detailed accounts of high-ranking FEs that Vertiv "had an inability to transfer those price costs [from inflation] to our customers" and Johnson personally "agreed to do deals without price increases." R&R at 17; Opp. at 9, 15-16 (citing, e.g., ¶¶150, 83-90).

Defendants broadly argue that Judge Wang purportedly ignored the "context" that Vertiv obtained $53 million in additional pricing in 2021, which they assert rendered all of their Class Period statements true. Obj. at 1-2, 24-25. This rehashed argument fails. *First*, as set forth above, Judge Wang already explicitly considered and rejected this exact argument. R&R at 16 n.7; *infra* at II.A.B.

*Second*, this argument is wholly contradicted by Defendants' post-Class Period mea culpa that, in truth, Vertiv "didn't and wasn't set up to drive a lot of price," had an embedded "culture" of "giv[ing] away the pricing we were getting through discounting," and had "got behind the

inflation curve with insufficient price and stayed there all year"—such that Defendants had "screwed up" and were forced to take "full responsibility" for the Company's financial shortfall, thereby "damag[ing] our credibility in 2021."[4]  Opp. at 3, 18-19.  This is further confirmed by Vertiv's 37% stock price collapse despite Defendants' $53 million in pricing, and the visceral reaction of analysts, who concluded that management's "credibility [was] completely shot" and uniformly excoriated Defendants for misleading investors.[5]  Opp. at 17 (citing ¶¶70-71).

*Third*, Defendants' claim that Vertiv misled no one because it "transparently and repeatedly" warned through its pricing forecasts that it would be "unable" to offset inflation is unavailing.  Obj. at 1-2, 24.  Not only is this assertion belied by Defendants' repeated Class Period representations that Vertiv would "recover the vast, vast, vast majority" of inflation and "fully offset" it by year-end, but the pricing forecasts Defendants rely on were repeatedly described by Defendants to investors as "<u>clearly . . . the floor</u>" with "<u>more upside and more runway on that number</u>."  Obj. at 8, 24; ¶¶136, 149, 165-67.  Indeed, immediately after calling these pricing forecasts the "floor," Defendants unequivocally averred that Vertiv's pricing actions would offset "the vast, vast, vast majority of inflationary stuff," would "accelerate" and "fully offset" inflation by year-end, would "cover" even "potentially worse" inflation, and would even provide a "tailwind" at "the end of the fourth quarter" with a "floor" of $5-$10 million.  ¶136; R&R at 4-7.[6]

---

[4] Defendants' rehashed assertion that their damning post-Class Period admissions, "in context," "describe[ed] Vertiv's historical practice over years" is nonsense.  Obj. at 25-26.  As the R&R recognized, to the contrary, the relevant "context" shows that rather than referring to "historical practice[s]," Vertiv's failure to drive prices and its routine discounting were instead an embedded "culture" that Vertiv had only begun to address "over the last 60, 90 days" prior to February 2022—meaning that it had persisted throughout the entire Class Period.  R&R at 8; Opp. at 14.  Defendants' assertion asks this Court to draw inferences in their favor, which is inappropriate on a pleading motion.

[5] This easily defeats Defendants' argument that their "only 'admissions' were that Vertiv (along with much of the world) underestimated inflation."  Obj. at 25.  If Vertiv had merely "underestimated inflation" along with "much of the world," it would not make any sense for Defendants to fall on their swords and take "full responsibility" for Vertiv's shortfall and concede that Vertiv "damaged our credibility in 2021."  ¶66.  Analysts and investors closely tracked inflation, and yet they were still shocked following Defendants' February 2022 disclosures.

[6] Defendants wrongly attack the Report's conclusion (R&R at 17) that Defendants' statements are actionable by

18

Defendants also rehash their argument (Reply at 3-4) that Niederpruem's May 2021 statement that Vertiv would recover the "vast, vast, vast majority" of inflation was not false because Vertiv's accompanying forecast predicted that its pricing would recover $25 million of $45 million in predicted inflation (Obj. at 24). But this argument fails again. Even if this "floor" forecast could be considered in a vacuum, rather than negate Niederpruem's statement, it represented that Vertiv would recover the majority of predicted inflation, or 56%—a forecast recovery percentage that increased the following quarter, the exact opposite of the "widening gap" between pricing and inflation Defendants claim they warned of. Obj. at 22.

Indeed, up until the first corrective disclosure in September 2021 (by which time inflation was predicted to be as high as $110 million), Defendants' "floor" forecasts repeatedly represented that Vertiv would recoup the majority of inflation, between 56% and 75%—compared to the 28% of inflation Vertiv's "$53 million" in additional pricing actually recouped. Opp. at 20. Moreover, tellingly, Defendants' main support for their argument that these forecasts "transparently" revealed a "widening gap" between pricing and inflation is Vertiv's "last 2021" forecast, which they assert "transparently" predicted that Vertiv would recoup "only 36% of inflation." Obj. at 22. However, Defendants neglect to mention that this forecast was issued after the truth began to emerge in September 2021, and was similarly coupled with assertions that Vertiv's pricing actions were "accelerat[ing]," would "cover" even "potentially worse" inflation, and would provide a "tailwind" with a $5-10 million "floor." ¶¶159-66.

---

arguing that the Complaint fails to allege that list prices were not raised. Obj. at 21-22. But Defendants' argument fails to account for the R&R's conclusion that there "had been no internal discussion of raising prices as of March 2021." R&R at 17. That conclusion rightly credits the Complaint's FE allegation that Vertiv did not increase list prices during 2021. See ¶¶83-86.

19

| | Full-Year Forecasts | | | | | Actual |
|---|---|---|---|---|---|---|
| | Feb. 2021 | Apr. 2021 | July 2021 | Sept. 2021 corrective | Oct. 2021 | |
| Price Recovery % | 75% | 56% | 59% | | 36% | 28% |

Defendants' other rehashed argument (*see* Reply at 3-4) that Johnson's July 2021 statement that Vertiv would "fully offset" inflation "by the time we get to Q4" was limited to the fourth quarter not only presents a factual question that is inappropriate at this stage but also makes no sense. Aside from the fact that Johnson nowhere qualified his statement in this manner, during the Class Period, Defendants never once discussed, reported, or disclosed any quarterly forecasts for inflation—to the contrary, they only ever discussed it on an annual basis. Opp. at 19. Moreover, this interpretation is belied by the exhibits Defendants cite. "Slide 6" of the presentation Johnson referred to contains no language limiting Johnson's statement to Q4—to the contrary, that slide states that Vertiv's pricing actions would "accelerate in Q3 driving margin recovery," leading to "full [margin] recovery by Q4." DX 22 at 6.

Finally, Defendants' argument that Johnson's October 27, 2021 statements that Vertiv would "cover" even "potentially worse" inflation applied to 2022 and not 2021 is contradicted by what Defendants actually said. Obj. at 25. Defendants' statements were in response to an analyst questioning whether the Company's pricing was going to "double" in Q4 versus Q3 in light of increasing inflation, and if that was possible based on "how much price is in [the] backlog." DX 27 at 9. In response, Johnson said that the Company's pricing actions "now" and "going forward"—i.e., in Q4—would "cover" even "potentially worse" inflation. Defendant Fallon, responding to the same question, further confirmed that even in a "do-nothing scenario"—i.e., if the Company did nothing more to raise prices—the Company "expect[ed]" a "tailwind" with a "floor" of $5 to $10 million "at the end of the fourth quarter." *Id.*

**D.** **The Complaint Adequately Alleges False And Misleading Statements Regarding Vertiv's "Controlling" Of Discounts**

The R&R correctly held that Plaintiffs adequately alleged that Defendants' statements that Vertiv was offsetting inflation by being "much more judicious" with discount levels and "controlling the discounts and multipliers that our own salespeople are able to have"—which sharply contrasted with Defendants' post-Class Period admissions that Vertiv "wasn't set up to drive a lot of price" and had a pervasive "culture" of "giv[ing] away the pricing we were getting through discounting"—were materially false and misleading. R&R at 14, 17-18; ¶¶136, 176.

Defendants claim that Judge Wang erred in this determination because she purportedly "read into" these statements assurances that Vertiv was significantly reducing discounts to offset inflation, when in fact Defendants only meant that they had taken some action "to further control discounts during 2021." Obj. at 20. However, the R&R correctly rejected this argument, finding that even if Vertiv reduced some discounting, FE accounts "indicate that Vertiv was giving extensive discounts as a matter of course"—contrasting sharply with Defendants' assertions "that they were controlling discounting sufficiently to significantly offset inflation." R&R at 18; *In re Vale S.A. Secs. Litig.*, 2020 WL 2610979, at *14 (E.D.N.Y. May 20, 2020) (omissions that create "an incomplete and misleading picture" are actionable).

Moreover, by asserting that Defendants never represented that they would "significantly offset inflation" by controlling discounting, Defendants ignore the relevant context. Niederpruem's May 2021 statement about being "much more judicious" with "discount levels" was made in response to an analyst question about Vertiv's "confidence" that it could "cover the inflation that you're seeing"—followed by Niederpruem's averment that, by being "much more judicious" with "discount levels," Vertiv was "really, really confident that we will be able to recover the vast, vast, vast majority of any inflationary stuff." Opp. at 21-22; ¶59. Niederpruem's

21

November 2021 statement was similarly made in response to an analyst query about "how intense the inflation has been" and whether there was "any pushback from customers about pushing through additional pricing." DX 30 at 5. In response, Niederpruem stated "the majority of the price comes from those price increases, just controlling the discounts and multipliers that our salespeople are able to have"—clearly indicating that a key way Vertiv was successfully managing inflation was "controlling the discounts." Opp. at 21; ¶176. Thus, "Defendants' statements that they were controlling discounting sufficiently to significantly offset inflation would be misleading to a reasonable investor" (R&R at 18)—and "[w]hether and when discounts were freely given during the Class Period are questions of fact that are improper for consideration on a motion to dismiss." *Id.*

### E. The Complaint Adequately Alleges False And Misleading Statements Regarding Vertiv's Use Of Escalation Clauses

The R&R correctly determined that Plaintiffs adequately alleged that Defendant Niederpruem's assurances that Vertiv was utilizing "material clauses" in "larger contracts" to retroactively raise prices on the Company's over $2 billion sales backlog were materially false and misleading. R&R at 16; ¶¶132-33, 147. Indeed, the R&R determined that these statements were directly contradicted by Niederpruem's post-Class Period admission that Vertiv was only "now" beginning to include escalation clauses in "some" larger contracts so "that way, we don't get caught in the same situation again." R&R at 16; ¶75. Defendant Johnson likewise admitted after the Class Period that because Vertiv's larger contracts were in truth devoid of any "material escalation clauses," the Company's "problem" with offsetting inflation in 2021 was that "we didn't get a lot of pricing on the backlog that we had" and "had to burn through that"—exactly what Niederpruem had assured investors Vertiv would <u>not</u> have to do. ¶¶78, 93-97; R&R at 8. The R&R also found these admissions were corroborated by FE accounts, including FE-1's account

22

that Vertiv's large enterprise contracts—comprising between 85% and 90% of its business—"contained no mechanisms to raise prices after the contracts were signed," and FE6's account that Vertiv's backlog was "off the charts unprofitable" due to its discounted pricing. R&R at 16.

Defendants' Objection asserts that these statements were not false because Judge Wang "misread[] both Niederpruem's statement and surrounding context." Obj. at 15. In so doing, Defendants rehash their prior argument that Niederpruem said that Vertiv's existing contracts only "sometimes" contained escalation clauses, and "sometimes" means "on some occasions but not always or often." *Id*. However, the R&R explicitly addressed and rejected this argument, reasoning that while "[i]f even 1% of Vertiv's contracts contained escalation clauses, it would be technically true that the firm's contracts 'sometimes' contained escalation clauses," in "the full context of when and where the statement was made"—i.e., the same "context" Defendants claim Judge Wang ignored—"Plaintiffs have sufficiently shown that these statements were misleading to a reasonable investor." R&R at 17; *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (even literally true disclosures must be "complete and accurate" as the "literal truth of an isolated statement is insufficient").[7]

Indeed, as the R&R noted, Niederpruem made these statements "at an investor conference in response to questions about whether Vertiv was capable of raising prices on existing contracts," R&R at 17—and specifically, in direct response to an analyst question about whether Vertiv had "some mechanism" to raise prices on its massive $2 billion backlog. Indeed, Niederpruem went

---

[7] Defendants' reliance on *Plymouth County Retirement Association v. Array Technologies, Inc.*, 2023 WL 3569068 (S.D.N.Y. May 19, 2023) to assert that their statements about escalation clauses were not false is sorely misplaced. Obj. at 15-16. In *Array*, reports issued after the class period "indicat[ed] that Array did, in fact, have the ability to reevaluate its contracts with its customers to adjust price and, in fact, was doing so." *Id*. at *13. In sharp contrast, here, Defendants themselves starkly admitted that escalation clause were not "in all of [Vertiv's contracts prior," were included in "some" of Vertiv's contracts only after the Class Period, and that, as a result, the Company's "problem" in 2021 was that it "didn't get a lot of pricing on the backlog that we had . . . [w]e had to burn through that." ¶¶63, 75, 78. *Array* is distinguishable for numerous other reasons detailed in Plaintiffs' response to Defendants' supplemental submission of that case. *See* ECF No. 71.

out of his way to reassure investors that "by no means are we just taking a look at that $2 billion of backlog and saying, well, there's nothing we can do"—rather, Vertiv was "taking action" by utilizing the "real-time mechanism" of escalation clauses to raise prices. ¶132. Defendants' assertion that no investor would have understood these statements to mean that Vertiv's use of the escalation clauses would "considerably offset the majority of inflation" (Obj. at 16) not only presents a fact question inappropriate for this stage but is belied by the massive size of Vertiv's backlog, which as the R&R noted was "significant" and "amount[ed] to as much as $3.2 billion" in 2021. R&R at 2. Thus, Vertiv's ability to use escalation clauses to raise pricing would by definition "considerably offset the majority of inflation," and certainly the opposite response— that Vertiv in truth had hardly any such escalation clauses and was instead locked into losing money on its $2 billion backlog as inflation climbed higher and higher—would have painted a materially different and far more dismal picture to investors.

Defendants also recycle their prior attacks on Plaintiffs' FEs, baldly asserting that FE-1 and FE-6 did not work with any "enterprise" customers and thus had no knowledge of Vertiv's pricing strategies. Obj. at 17. Aside from the fact that the R&R already explicitly considered and rejected this argument (R&R at 10), nothing in the AC suggests that Vertiv's practice of building backlog by entering into large contracts with locked-in discounting was "specific to [the FEs'] respective regional areas" or "isolated to a certain time period." *In re Tufin Software Techs. Ltd. Sec. Litig.*, 2022 WL 596861, at *8 (S.D.N.Y. Feb. 25, 2022) (Woods, J.). Moreover, both FE-1 and FE-6 were high-ranking executives at Vertiv: FE-1 was the former V.P. of Channel Strategies who directly reported to John Hewitt, former President of the Americas, and participated in regular meetings with Defendant Johnson. ¶83. FE-6 was similarly high-ranking, a former V.P. of Sales at Vertiv from July 2010 until September 2021, who reported to Pete Klanian, Vice President of

24

North America Channel and Federal Sales at Vertiv.  ¶97 & n.9.  There is thus every reason to believe that these FEs had direct knowledge of Vertiv's pricing actions, especially since Defendants' own statements make clear that Vertiv's pricing initiatives were implemented "on a global scale."  ¶¶45, 128 (Vertiv was "driv[ing] prices through with our customers <u>on a global scale</u>"); ¶125 (Vertiv was "[i]nstituting pricing actions <u>around the globe</u>").  Moreover, and significantly, the reliability of these FEs is further confirmed by the fact that their accounts are wholly consistent with each other and <u>fully corroborated by Defendants' own post-Class Period admissions</u>.[8]

## F.      The Remaining Statements Are Actionable

Because Judge Wang correctly sustained Defendants' misrepresentations about price increases, controlling discounts and escalation clauses, she did "not reach[] the other statements" alleged in the Complaint.  R&R at 15 n.6.  This approach accords with case law in this Circuit and others.  When, as here, Plaintiffs have "alleged at least some actionable misrepresentations or omissions, it is unnecessary to address every misrepresentation or omission alleged in the Complaint."  *In re Dentsply Sirona, Inc. Sec. Litig.*, 2023 WL 2682905, at \*14 (E.D.N.Y. Mar. 29, 2023).[9]  In *Greco v. Qudian Inc.*, 2022 WL 4226022, at \*11 (S.D.N.Y. Sept. 13, 2022) (Woods,

---

[8] The cases cited by Defendants where courts did not credit FE statements are distinguishable.  *See Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at \*6 (S.D.N.Y. Dec. 10, 2008) (FEs' information was not contrary to defendants' public statements); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 519, 525 (S.D.N.Y. 2020) (single, uncorroborated FE holding unspecified, low-level position in product development was not shown to have access to nationwide cost and profit data), *aff'd sub nom. Steamfitters Local 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022); *Frankfurt-Tr. Inv. Luxemburg AG* v. *United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (FEs had no contact with defendants), *aff'd sub nom. Kapitalforeningen Laegernes Invest v. United Techs. Corp.*, 779 Fed. App'x 69 (2d Cir. 2019); *In re Hebron Tech. Co. Sec. Litig.*, 2021 WL 4341500, at \*17 (S.D.N.Y. Sept. 22, 2021) (lawyer who drafted compliance opinions and his assistant were not shown to have basis for "conclusory," uncorroborated statements that individual secretly controlled company).

[9] *See also KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, 528 F. Supp. 3d 192, 203 n.6 (S.D.N.Y. 2021); *In re MF Glob. Hldgs. Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013); *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at \*29 n.21 (D. Md. Sept. 1, 2023); *Kendall v. Odonate Theraps., Inc.*, 2021 WL 3406271, at \*5 (S.D. Cal. Aug. 4, 2021).

J.), "analysis of each of the specific, stand-alone statements [wa]s required" because this Court dismissed the complaint in its entirety; *Cf. Wells Fargo*, 2021 WL 4482102, at \*12 (no stated requirement of statement-by-statement analysis where complaint was sustained in part).[10]

Regardless, Judge Wang's refusal to dismiss Defendants' statements concerning "general pricing initiatives, preplanning with suppliers, and the use of advanced pricing tools," R&R at 15 n.6, was correct because, as set forth below, these statements were materially false and misleading. If the Court wishes to evaluate the Complaint on a statement-by-statement basis, Plaintiffs respectfully refer the Court to the chart of Alleged Misstatements, attached as Appendix A, which sets forth the reasons why each statement is actionable.

### 1. Defendants' Misrepresentations About Preplanning Were False Or Misleading

On November 16, 2021, when asked about Vertiv's Q4 guidance, Defendant Fallon assured investors "that we feel very comfortable with the guidance we gave," explaining that purported "preplanning with suppliers" gave Vertiv "really good visibility to the critical components." ¶179. These statements were materially misleading because Fallon failed to disclose that Vertiv's critical component suppliers were in truth aggressively <u>decommitting</u> throughout 2021, which "impacted [Vertiv] significantly" by "really screwing up [Vertiv's] supply chain" and thus resulted in Vertiv having "crisis meetings all over." ¶¶101-02.  Nor did Fallon disclose that supplier decommits had grown increasingly more aggressive throughout 2021 and "got really serious in the second half of 2021." ¶¶101-02 (FE-3 explaining trend and magnitude of supplier decommits in 2021).

---

[10] Nor is "a definitive ruling as to each statement . . . essential to determine the scope of any future discovery and any motion for class certification." Obj. at 23.  When a complaint "'pleads at least some misstatements sufficient to survive dismissal, 'the Court can evaluate the exact parameters of those claims <u>following discovery</u>, either in connection with a motion for summary judgment or in advance of trial.'" *MF Glob.*, 982 F. Supp. at 318 n.26 (quoting *Citiline Hldgs., Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 515 n.2 (S.D.N.Y.2010)); *accord Dentsply*, 2023 WL 2682905, at \*14. These and other decisions make clear that discovery often is necessary for courts to evaluate each statement—not the other way around, as Defendants incorrectly contend. *See MF Glob.*, 982 F. Supp. at 318 n.26.

Defendants argue that "there is no inconsistency," Obj. at 26, but it was unlawful for Fallon to "omit to state a material fact necessary in order to make [his statements] not misleading." 17 C.F.R. § 240.10b-5(b). By omitting facts about increasingly aggressive decommits by Vertiv's critical component suppliers, Fallon's statements "paint[ed] an incomplete and misleading picture" of the efficacy of Vertiv's preplanning with suppliers and ability to obtain critical components. *Vale*, 2020 WL 2610979, at *15. In other words, this "omission hid from investors an accurate picture of [Vertiv's supply chain] difficulties." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 207 (2d Cir. 2020).

### 2. Defendants' Representations About Pricing Tools Were False Or Misleading

Defendants also misled investors about Vertiv's "pricing tools," which, unbeknownst to investors at the time, had inaccurate pricing information and severely hampered Vertiv's pricing capabilities. When asked about Vertiv's pricing, Defendant Johnson falsely stated that Vertiv employed "sophisticated" methods, including "AI" and "pricing tools" to ensure that its pricing was profitable. ¶¶45, 152. In reality, Vertiv had botched the implementation of its internal pricing system, CPQ, and as a result, Vertiv's sales personnel did not have accurate information about material costs, and thus fundamentally lacked the ability to increase prices to account for inflation. ¶¶81, 105-12, 155. FE-1 described CPQ as a "total disaster," and explained that because CPQ did not integrate well with Vertiv's other systems, the Company's pricing was inaccurate and required manual inputs. ¶107. FE-5 similarly reported that CPQ provided inaccurate information to Vertiv sales representatives, who relied on the system to price products. ¶109.

Defendants assert that "Plaintiffs do not allege how CPQ impacted Vertiv's pricing recovery," Obj. at 27, but that is not accurate. As part of the corrective disclosure on February 23, 2022, Defendant Johnson acknowledged that Vertiv's pricing issues were "exacerbat[ed]" the

implementation "of a new ERP system that came in that we had lack of visibility for a period of time." ¶155. Furthermore, Defendants' suggest that Plaintiffs are required to establish "that the 'pricing tool[]' Johnson referenced <u>was</u> CPQ," Obj. at 26, but FE-5 confirmed that CPQ was the "new ERP system" implemented in 2021. ¶109. That is more than sufficient at the pleading stage. Moreover, neither Defendants nor any FE indicated that Vertiv botched the implementation <u>of any system other than CPQ during 2021</u>, so the only reasonable inference is that CPQ was the "pricing tool" that Johnson referenced.

### 3. Defendants' Arguments As To Statements About Pre- And Post-Class Period Pricing Actions Are Not Persuasive

Defendants again insist that Plaintiffs cannot "challenge backward-looking statements concerning Vertiv's pricing actions prior to 2021," Obj. at 27 (citing ¶¶115-17, 128, 130, 136, 140, 172), such as Defendant Johnson's statement that pre-Class Period initiatives had "continued to yield favorable results" throughout 2021 and would enable Vertiv to "<u>continue</u> passing price along" to achieve "positive price" in 2021, *id.* (citing ¶¶115-16). Defendants are wrong. It is axiomatic that materially false or misleading statements of "past or present" fact are actionable. *See*, *e.g.*, *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011); *In re Vivendi Universal, S.A. Sec. Litig.,* 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts."), *aff'd*, 838 F.3d 223 (2d Cir. 2016). These statements were about Vertiv's <u>past actions</u>—specifically, about pricing actions that Vertiv had purportedly <u>already implemented</u> in 2020 that formed the baseline for price increases in 2021—and they were false because, as Defendants eventually admitted, Vertiv was "never aggressive with pricing," and it "didn't and wasn't set up to drive a lot of price." ¶¶61, 77. Indeed, it was not until <u>after</u> the Class Period that Vertiv implemented many of the pricing actions that Defendants claimed were in place <u>prior to</u> the Class Period. E.g., ¶¶59-67, 73-79.

28

Defendants' arguments about post-Class Period pricing recovery into 2022 also fail. Throughout the Class Period, Defendants falsely assured investors that Vertiv's 2021 pricing actions were "robust" enough to drive price increases in 2022, when, in fact, such actions were anemic and incapable of offsetting inflation. Obj. at 28. As Defendants later starkly admitted, the exact opposite was true: rather than "driving pricing," Vertiv in fact "didn't and wasn't set up to drive a lot of price," as the Company "w[as] never aggressive with pricing." ¶¶77, 118. Defendants' statements in ¶¶157 and 166-67 are thus actionable because these statements misled investors about Vertiv's present and ongoing pricing actions.

### G. Defendants' Statements Are Not Forward-Looking, Inactionable Opinion, or Puffery

#### 1. Defendants' Statements Are Not Protected By The PSLRA Safe Harbor

Judge Wang correctly held that Defendants' statements are not protected by the PSLRA safe harbor because they "were based on communications about present fact," and specifically, "the asserted fact that Vertiv was actually implementing the pricing actions Defendants said they were implementing." R&R at 15. Defendants mischaracterize the AC as alleging that Vertiv's projections or guidance themselves were false, e.g., Obj. at 32, ignoring Plaintiffs' well-pled allegations that the statements of present fact accompanying those projections, i.e., statements touting pricing actions that Vertiv purportedly had already implemented, were false. E.g., ¶117 (attributing "expectation . . . for '21" to Vertiv's ability "to continue passing pricing along," when, in reality, Vertiv did not have pass-through pricing capabilities); *see In re Salix Pharma., Ltd.*, 2016 WL 1629341, at *10-11 (S.D.N.Y. Apr. 22, 2016) (statements "predict[ing] future inventory levels" were actionable because they also "encompass[ed] representations of present fact"); *see also* Appendix A (statements #2-9, 12-28, 30-37, and 39 are not protected by the safe harbor).

29

Even if Defendants' misrepresentations could be considered purely forward-looking, they nevertheless are actionable because they were not "accompanied by meaningful cautionary language." Obj. at 32.[11] Defendants' cautionary language was instead "boilerplate" and did not "expressly warn of or directly relate to the risk that brought about Plaintiffs' loss" or "convey substantive information." *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *9 (S.D.N.Y. Jan. 5, 2023); *see also In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (cautionary language must "precisely address" substance of statements at issue). For instance, Vertiv's press releases and investor presentations stated that its "projections, forecasts and forward-looking statements [] are not guarantees of performance," Obj. at 32, but this is not adequate cautionary language because it did not fairly apprise investors of the risk stemming from the fact that Vertiv was not taking the pricing actions on which its projections and forecasts relied. Moreover, the risk disclosures were themselves misleading insofar as the risks about which they purported to "warn" investors had already materialized.[12]

Defendants argue that "[Vertiv] not only advised investors that 'there might be a ditch ahead' to be wary of falling into, but also that [Vertiv] was aware of the ditch's location and was actively trying to manage it," Obj. at 31 (quoting *Array*, 2023 WL 3569068, at *13). However, unlike in *Array*, Defendants here did not fairly "disclose [inflationary] pressure throughout the

---

[11] Much of the language that Defendants wrongly contend is cautionary also appeared "in entirely different, unrelated documents," meaning that misrepresentations that did not appear alongside that language were "not 'accompanied by' the purported cautionary language." *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *25 (S.D.N.Y. Mar. 23, 2017) (Woods, J.); *see* Obj. at 32 ("Vertiv's press releases, presentations, and earnings calls all referred to Vertiv's risk factors in its SEC filings"). Rather, Vertiv's press releases, presentations, and earnings calls only contained boilerplate language that, as explained below, is inadequate to invoke the safe harbor. *Compare, e.g.*, ¶¶115-17 (alleging misrepresentations in press release issued on Feb. 24, 2021) *with* DX 9 (Feb. 24 press release containing paragraphs-long boilerplate risk disclosures).

[12] *See In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) ("to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit"); *see also* Appendix A (explaining that risk disclosures in statements #5-6 were false and misleading because the risk had already materialized).

30

Class Period, although continuing to hope that . . . prices would normalize." *Array*, 2023 WL 3569068, at *13. For example, in *Array*, when an analyst "asked [Defendant] whether the 'cost of steel [was] becoming a problem' [by putting] 'pressure on margins from cost inputs,' [the defendant] responded, <u>unequivocally</u>, '<u>Yes</u>.'" *Id.* Here, by contrast, when an analyst asked about "cost pressures," Fallon responded by touting that any "additional inflation" may actually <u>benefit</u> Vertiv by creating an "opportunity to take those pricing assumptions up as well." ¶130.

Defendants also cannot invoke the safe harbor because the Complaint adequately pleads that their statements were "made with actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1)(B). Indeed, "Defendants' own representations, as well as reports of former employees, strongly indicate that Defendants had up-to-date knowledge of pricing data and were approving large discounts throughout the Class Period," R&R at 20, both of which directly contradict their public statements; *see also infra* at Part III.H.2. Defendants thus have failed to identify any valid reason for this Court to depart from Judge Wang's sound conclusion that Defendants' misrepresentations are not protected by the PSLRA safe harbor for forward-looking statements.

### 2. Defendants' Statements Are Not Opinion

Judge Wang correctly held that Defendants' statements "are not protected by *Omnicare*" because "they misled investors about what action[s] Vertiv was tak[ing] at the time the statements were made," i.e., were clear statements of present <u>fact</u>. R&R at 15. For example, on Vertiv's Q1 2021 earnings call, Defendant Johnson expressly assured investors of Vertiv's current ability to drive prices by representing that the Company already had the systems and processes in place to "<u>go forward [and] price things at that higher cost rate</u>." ¶128; *see also* ¶125 (presentation told investors that Vertiv was "<u>[m]anaging</u> the [cost] disruptions" by "<u>[i]mplementing</u>" and "<u>[i]nstituting</u>" pricing actions). These are factual statements, not opinions, because they are "characterizations of the Company's actual business practice" that described "a thing done or

31

existing" or "[a]n actual happening." *In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at *10 n.2 (S.D.N.Y. Mar. 28, 2019).

Even if analyzed as opinions, these statements are still actionable because, as the R&R recognized, they were "accompanied by untrue supporting facts"—specifically, that Vertiv had the ability take, and was in fact taking, "robust pricing actions" to offset inflation. *See, e.g.*, *Nutriband, Inc. v. Kalmar*, 2020 WL 4059657, at *9 (E.D.N.Y. July 20, 2020); *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *14 (S.D.N.Y. Sept. 30, 2021) (Woods, J.). The examples that Defendants cite, Obj. at 30, contain untrue facts. For instance, Defendants' statement that Vertiv was "mak[ing] sure we're getting covered" for any higher-cost "spot buys" by successfully passing those costs along to Vertiv's customers, ¶174, was plainly false—as Defendants later admitted, they were not making any "additional price increases," and could not increase pricing in the backlog, ¶175; *see also* ¶86 (FE-2: "Vertiv was not raising their prices"); *see also* Appendix A (#1-4, 7-9, 12-28, and 30-39 are not inactionable opinions). Accordingly, as Judge Wang correctly determined, Defendants have not demonstrated that any of the alleged misrepresentations are inactionable opinions.

### 3.    Defendants' Statements Are Not Puffery

Judge Wang also correctly held that because Defendants' statements "misrepresented existing facts about the state of pricing actions being taken at the Company, they are not immaterial puffery." R&R at 15 (citing *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)). To start, it is improper to resolve questions of materiality at the pleading stage "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." R&R at 13 (quoting *ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)); *see also* *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) (cautioning that

materiality "entail[s] delicate, fact-intensive assessments that are more properly left to the jury"). Here, Defendants' misrepresentations concerned a topic of indisputable importance—Vertiv's ability to increase price and, thus, to generate a profit—which was a major focus for analysts and Defendants alike during the Class Period. *See, e.g.*, *Celestica*, 455 F. App'x at 16 (materiality supported by "the significance of" the topic "to the company's operations and profitability").

Defendants' Objection attempts to recast their misrepresentations as "generalized positive statements" by selectively quoting certain misrepresentations so as to omit the underlying factual basis. Obj. at 33-34. For instance, Defendants describe as puffery their statement that Vertiv was "well positioned for the second half of 2021," but disregard their false assertion that "pricing programs and margin improvement initiatives" were "already underway." Obj. at 34 (selectively quoting ¶142); *see also id.* (arguing that statement in ¶116 touting "confidence in our ability to achieve the expansion plans we laid out" is puffery, while omitting statement in ¶116 attributing these sentiments to Vertiv's purported "pricing initiatives" that "continued to yield favorable results"). Defendants have failed to show that any of their statements are puffery.

## H.    The Complaint Raises A Strong Inference Of Scienter

### 1.    The Complaint Creates A Strong Inference Of "Conscious Misbehavior"

Judge Wang correctly held that the Complaint adequately alleges a strong inference of "conscious misbehavior" sufficient to plead scienter. Specifically, the R&R correctly applied the controlling standard and found that Defendants' knowledge was sufficiently alleged to create an inference of "conscious misbehavior": "Defendants' own representations, as well as reports of former employees, strongly indicate that Defendants had up-to-date knowledge of pricing data and were approving large discounts throughout the Class Period." R&R at 20 (noting, *e.g.*, that Niederpruem emphasized that executive leadership personally reviewed "'pricing and the

33

commodity stuff . . . <u>8 days a week at this point in time</u>").  The R&R thus concluded that these allegations created a strong inference "that the Defendants either had access to facts and information suggesting their statements about Vertiv's pricing response were incorrect, or failed to monitor inflation and pricing metrics they both had a duty to monitor, and that they represented they were monitoring." *Id.* at 21.  Defendants' Objection fails to undermine this holding.

Numerous factual allegations demonstrate that Judge Wang's holding with respect to conscious misbehavior or recklessness was correct.  *First*, the Officer Defendants repeatedly asserted to investors on every earnings call during the Class Period—including in response to analyst questions—that Vertiv's "robust" and "aggressive" pricing would "fully offset" even "potentially worse" inflation, such that Vertiv would "recover the vast, vast, vast majority of any inflationary stuff."  ¶¶49, 136-37, 165-67, 182-84, 190.  It defies credulity to believe that Defendants did not know the truth about the Company's pricing actions (or lack thereof) when they consistently spoke about this subject to investors.  As the R&R noted (at 20), Defendants themselves represented that were "really, really confident" in Vertiv's ability to recover the "vast, vast, vast majority" of inflation <u>because they were personally "review[ing] the pricing and commodity stuff . . . 8 days a week</u>." *See Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (scienter where defendant "held himself out to public as intimately knowledgeable about [the misrepresentations' subject]"); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (defendant's "regular[] detailed reports" about subject indicated that he "must have educated himself" on it); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 369-72 (S.D.N.Y. 2012) (same).[13]

---

[13] Defendants rely on *Ramzan v. GDS Holdings Ltd.*, 2020 WL 1689772, at *5 (S.D.N.Y. Apr. 7, 2020), but the complaint there alleged no facts indicating that defendants had knowledge of falsity.  The *Ramzan* court acknowledged that "the analysis as to [falsity and scienter] at times may overlap" and did not disagree with *Strougo*, *General Electric*, or *Lockheed*'s holding that management's false assurances of knowledge about a subject can support scienter.

*Second*, Defendants' explicit admissions at the end of the Class Period contradicting their prior public statements—including that Vertiv "didn't and wasn't set up to drive a lot of price," had only barely begun to "act[] decisively late last year and early this year [i.e., 2022] with aggressive price action" and "controlling the discounts," and had been "generally underpric[ing]" its contracts and routinely "los[ing] price through discounting"—reflect knowledge. ¶¶186-87; *see also* ¶188. Defendants admitted that Vertiv did not start "putting escalators" in its largest contracts until the end of the Class Period, such that losing "a lot of pricing on the backlog" was inevitable from the start of the Class Period. ¶¶63, 78, 119, 178, 186, 260. These admissions further make clear that the Officer Defendants knew or recklessly disregarded that their statements about Vertiv's ability to raise prices were materially false and misleading. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) (finding scienter based on "contemporaneous facts" and "subsequent admissions" showing that representations were false when made).

Defendants contend that their post-Class-Period statements "were not admissions of prior falsity, but rather expressing regret for a forecasting miss." Obj. at 39-40. Defendants' contention mischaracterizes their admissions and cannot be accepted on a motion to dismiss, where the Court "'draw[s] all reasonable inferences in the plaintiff's favor.'" *Freudenberg*, 712 F. Supp. 2d at 179. Moreover, Defendants did not say that they were "expressing regret for a forecasting miss." Obj. at 40. Rather, they admitted that they had not implemented the "robust pricing actions" that they said they had, and thus conceded that they had "screwed up," "likely damaged some of our credibility in 2021," and would need to "be fully transparent" in the future in order to regain investors' confidence. ¶¶66, 189. These admissions refute Defendants' proposed nonculpable inference—that their only mistake was that "their [inflation] projections were too low." Obj. at

35

40; *see In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 417 (S.D.N.Y. 2007) ("factual allegations giving rise to [defendants' proposed innocent] inference must appear on the face of the complaint.").[14]

*Third*, analysts excoriated management's credibility, and made clear that management had not been truthful with investors. ¶¶14, 71, 196; *In re FibroGen, Inc. Sec. Litig.*, 2022 WL 2793032, at *22 (N.D. Cal. July 15, 2022) (analysts questioning management's credibility supports scienter). Defendants contend that the analyst reactions are "hindsight-based viewpoint[s]" that do not support scienter. Obj. 40 (quoting *Sinay*, 2013 WL 1890291, at *8). But analysts directly linked their conclusions about management's credibility to Defendants' prior representations about Vertiv's pricing and ability to manage inflation. For example, Cowen wrote that Vertiv's "credibility [was] in question" because "management shared that the price actions it took" earlier in 2021 would "keep up with inflation," thus "providing the investment community with a sense that [Vertiv] was in control of pricing conditions"—but "Vertiv's fourth quarter results suggest otherwise." ¶¶14, 70. Deutsche Bank said it would "take time for VRT to regain credibility" in light of its dismal financial results being released "in the midst of what we would characterize as constructive management commentary at conferences throughout the [fourth] quarter." ¶69.[15]

---

[14] Defendants cite *Frankfurt Trust Investment Luxemburg AG v. United Technologies Corp.*, 336 F. Supp. 3d 196, 228 (S.D.N.Y. 2018), but the purported admission there, unlike here, did not acknowledge previously undisclosed facts contradicting prior public statements. Rather, the purported admission there said only that an assumption underlying a prior statement about expected sales lacked a "strong basis" and went on to explain that the assumption had been based on prior sales and customers' plans. *Id.* Similarly, in *Sinay v. CNOOC Ltd.*, 2013 WL 1890291, at *8 & n.11 (S.D.N.Y. May 6, 2013), *aff'd*, 554 Fed. App'x 40 (2d Cir. 2014), the court rejected as "hindsight" a government agency's investigative report issued a year after the alleged fraud because the report's conclusion was not "in any report known to CNOOC" at the time of its alleged false statements.

[15] Defendants' improper factual assertion that the analysts supposedly overlooked that "Vertiv had publicly disclosed in reporting Q3 results that it anticipated pricing would not keep up with inflation in Q4" (Obj. 40) ignores that, during Vertiv's earnings call announcing those results, Defendants said that Vertiv "was making sure that our pricing actions now and going forward" would "cover" inflation—even if it got "potentially worse"—and that they were "certainly encouraged with what we're seeing in the pricing environment here in the fourth quarter." ¶55. Defendants also again rely on off-point cases in an attempt to evade the analysts' statements. In *In re Ariba, Inc. Sec. Litig.*, 2005 WL 608278, at *1 (N.D. Cal. Mar. 16, 2005), the alleged misrepresentation was the concealment of a secret payment to the CEO,

*Fourth*, former Vertiv employees confirmed that the Officer Defendants personally reviewed pricing data, approved Vertiv's discounting practices, knew that its larger enterprise contracts constituting the majority of its backlog did not allow price increases, and were aware of its supply-chain problems. ¶¶191-92. FE-1 stated that Defendant "Johnson agreed to do these [large] deals without price increases." ¶191. FE-3 stated that Defendants Johnson and Fallon had access to daily, weekly, and monthly updates of sales, pricing, and margins; FE-3, Johnson, and Fallon met and discussed these metrics; and Johnson participated in frequent "crisis meetings" to respond to key suppliers aggressively decommitting throughout 2021. ¶¶192-94. These FE accounts are credible on their face and corroborated by other allegations in the Complaint, including Defendants' admissions. *See Emps. Ret. Sys. of Govt. of Virgin Islands v. Blanford*, 794 F.3d 297, 303, 307 (2d Cir. 2015) (crediting FEs' accounts corroborated by other FEs and other sources); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *14 (S.D.N.Y. Nov. 26, 2018) (same); *Pontiac*, 875 F. Supp. 2d at 369-71 (officers' involvement in negotiating underpriced contracts supports scienter). Because the facts attributed to the FEs squarely contradicted Defendants' public statements about pricing, the cases relied on by Defendants in which allegations that executives had access to business data, but not that the internal data contradicted their public statements, are off point. *See Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011); *Maloney III v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021); *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010).

but analysts' statements questioning management's credibility at the <u>start</u> of the class period concerned not that still-undisclosed payment but a bad earnings announcement that was not alleged to be fraudulent.

*Fifth*, Vertiv's ability to use pricing to offset inflation concerned its "core operations." Pricing and profit margins were the most important issues facing the Company during the Class Period—what Defendants called a key "lever" to achieving Vertiv's critical margin expansion plan. ¶¶40, 74, 132, 140, 152, 195. *See Celestica*, 455 F. App'x at 14 & n.3 (invoking core operations); *Skiadas v. Acer Therap. Inc.,* 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020) (scienter found where statements involved "*sin[e] qua non*" for company's "success"); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019).[16]

In response to these detailed facts establishing Defendants' scienter, Defendants claim that Judge Wang erred because the R&R purportedly failed to cite any "contemporaneous information" known to Defendants "that would contradict any particular statement." Obj. at 37. This is incorrect. The R&R specifically referenced the allegations detailed above showing that Defendants possessed contradictory contemporaneous information, including Defendants' own representations that they personally monitored pricing and inflation "8 days a week" to "make sure that we're doing all the right things"—in addition to conducting "monthly reviews" during which they received "very real-time updates." R&R at 5, 20; ¶49. In light of this and numerous FE accounts detailing Defendants' knowledge throughout the Class Period that Vertiv could not raise prices and was in fact not raising prices to offset inflation (R&R at 20; ¶¶83-84, 88-89, 94-97)— which were corroborated by Defendants' own stark admissions at the end of the Class Period that they <u>did not implement</u> any of the "robust pricing actions" they had been touting to investors for nearly a year, including their specific admissions that they had <u>not</u> been "controlling . . . discounts"

---

[16] Defendants cite *Jackson* v. *Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020), but the plaintiff there alleged no facts indicating that executives received information contradicting their public statements, relying entirely on the "naked assertion" that a particular product was "a 'key product.'" Similarly, in *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 358, 360-61 (S.D.N.Y. 2011), the plaintiffs failed to allege that the operations at issue were actually "core operations." Here, Vertiv had only one line of business, and its failure to do what Defendants told investors it was doing with respect to pricing affected substantially all of its business.

or using "escalation clauses"—Defendants clearly had "contemporaneous" knowledge that Vertiv's pricing was unable to offset and was not offsetting the "vast, vast, vast majority" of inflation. Nothing more is needed to establish scienter, as these facts raise a compelling inference that Defendants "either had access to facts and information" contradicting their statements, "or failed to monitor inflation and pricing metrics they both had a duty to monitor, and that they represented they were monitoring." R&R at 20-21.

Defendants also assert that the AC does not adequately allege scienter for each individual Defendant. Obj. at 38-39. Not so. Defendants' admissions at the end of the Class Period include a Vertiv press release and statements by Defendants Johnson and Fallon, senior executives whose scienter can be imputed to Vertiv. *See, e.g.*, *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *6 (S.D.N.Y. June 21, 2021) (key officer's scienter is attributable to company). These admissions thus properly plead Vertiv, Johnson, and Fallon's knowledge of falsity. And Niederpruem's scienter is based on his detailed statements concerning Vertiv's pricing actions and his review of pricing data "8 days a week," and his post-Class Period admissions contradicting his own earlier statements that Vertiv was using "escalation clauses" to offset inflation. ¶¶7, 49, 77, 136, 190. Thus, the AC alleges each of these Defendants' scienter. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009).

### 2.     The Complaint Alleges Scienter Based On Motive and Opportunity

Since the R&R found that Plaintiffs adequately alleged scienter based on conscious misbehavior, it did not conclusively rule on the scienter allegations of motive and opportunity. R&R at 20. While the law does not require allegations of "motive," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007), the AC here does allege that the Officer Defendants were motivated to conceal Vertiv's pricing and supply-chain problems during the Class Period in order to artificially inflate its stock price. ¶197. The Selling Shareholders owned nearly 40% of

Vertiv at the start of the Class Period, were responsible for Vertiv going public, hired Defendant Johnson as CEO, and held two seats on the Company's Board. ¶241. Thus, the R&R correctly holds that the Selling Shareholders controlled Vertiv during the Class Period. R&R at 25 n.9. *See, e.g., FrontFour Cap. Grp. LLC v. Taube*, 2019 WL 1313408 (Del. Ch. Mar. 11, 2019) (15% shareholder had control).

The AC further alleges that Vertiv and the Officer Defendants' fraud enabled the Selling Shareholders to sell $544 million of Vertiv stock at an artificially inflated price. ¶197. Indeed, mere days before the SPO, the Officer Defendants represented that Vertiv's "robust pricing actions" would "cover" inflation even if it got "potentially worse"—and even raised Vertiv's annual operating income guidance from $540 million to $553 million despite having lowered it only weeks before due to supply chain challenges. *Id.*; *see also* ¶¶17, 55. By the end of the Class Period in February 2022, the stock that the Selling Shareholders had sold just three months earlier in November 2021 for just under $25 per share fell to only $12.39 per share in response to the disclosure of the previously concealed truth about pricing—a difference of over $270 million. ¶¶13, 17, 57. This motive, when "taken collectively" with the other allegations summarized above, gives rise to a strong inference of scienter. *Tellabs*, 551 U.S. at 323. *Cf. Lickteig v. Cerberus Cap. Mgmt., L.P.,* 2020 WL 1989424, at *13 (S.D.N.Y. Apr. 26, 2020) (motive to understate earnings in order to buy back stock cheaply); *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 169 (D. Conn. 2019) (motive to artificially inflate stock as acquisition currency).[17]

---

[17] Nor is there any bright-line rule that "other actors' trading is irrelevant to defendants' scienter." Obj. at 35 (citing *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010)). *Arbitron* did not purport to establish such a bright-line rule, which would ignore *Tellabs'* holistic analysis. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1165 (D. Or. 2015) (scienter where CEO "knew and allowed [other] insiders to sell stock during the height of the [fraud]"); *Robertson v. Strassner*, 32 F. Supp.

### 3.    Defendants' Proposed Innocent Inference Is Neither Cogent Nor Compelling

Defendants' assertion that their "nonfraudulent explanation" that "they reasonably believed that Vertiv's pricing actions would offset <u>some</u> anticipated inflation, as disclosed, but did not correctly predict just how much inflation would spike in Q4," (Objection at 41) simply rehashes their alternative version of the facts and the reasonable inferences to be drawn from the facts. That is not a proper basis for a Rule 12(b)(6) motion, and Defendants' arguments fail.

*First*, Defendants' assertion that "Vertiv expressly warned investors, and updated its forecasts, to show that its price increases would <u>not</u> offset the forecast inflation for 2021" (Objection at 41) ignores that Vertiv misleadingly assured investors repeatedly, including after lowering its guidance in September 2021, that its pricing actions would capture most inflation, even if inflation accelerated. ¶¶17, 49, 55, 136-37, 165-67, 182-84, 190, 197.

*Second*, Defendants contend that "no Officer Defendant benefited from the alleged fraud," apparently on the basis that these Defendants did not sell Vertiv shares during the Class Period. Objection at 41. However, insider stock sales are not dispositive of scienter. *See, e.g.*, *MF Glob.*, 982 F. Supp. 2d at 320 (finding scienter where defendants <u>bought</u> stock during class period); *Skiadas*, 2020 WL 3268495 at *11 (finding scienter without insider sales). Indeed, Defendants admit that a complaint pleads motive if it "alleges that Defendants 'benefitted in <u>some</u> concrete and personal way from the purported fraud.'" Objection at 35 (quoting *ECA & Local 134 IBEW*

---

2d 443, 449 (S.D. Tex. 1998) (scienter where public offering was intended to benefit controlling shareholder), *overruled on other grounds, Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004). Rather, *Arbitron* held only that "[g]iven that the plaintiffs have failed to allege any remotely suspicious trading by [one insider], the fact that other insiders may have engaged in unusual trading activity is irrelevant." 741 F. Supp. 2d at 488. Here, the AC alleges numerous facts demonstrating the Officer Defendants' scienter in addition to their desire to facilitate the Selling Shareholders' sales. Defendants' reliance on *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005) also fails because Section 20(a) does not govern whether the Officer Defendants had a motive to benefit the Selling Shareholders.

*Jt. Pens. Tr. of Chicago v. J.P. Morgan Chase & Co.*, 553 F.3d 187, 198 (2d Cir. 2009)). That concrete benefit may be "insider trading or some other type of pecuniary gain by company insiders at the expense of shareholders." *Kalnit v. Eichler,* 99 F. Supp. 2d 327, 335 (S.D.N.Y. 2000), *aff'd,* 264 F.3d 131 (2d Cir. 2001). Here, the Officer Defendants were beholden to the Selling Shareholders and motivated to facilitate the SPO or be ousted by them.

Even apart from the Officer Defendants' motive, their false statements concealing bad news that was secretly known to them support a cogent inference of scienter. As Judge Posner has explained, this kind of reckless gamble is all too common:

> The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

Thus, Defendants' proposed innocent inference is not more compelling than the inference of scienter, as required of defendants by the Supreme Court in *Tellabs*.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Objection to the R&R should be overruled, and the R&R should be adopted in its entirety.

42

Date: January 12, 2024

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**

*/s/ James A. Harrod*
Hannah Ross
(hannah@blbglaw.com)
James A. Harrod
(jim.harrod@blbglaw.com)
Jai K. Chandrasekhar
(jai@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400

Caitlin C. Bozman
(caitlin.bozman@blbglaw.com)
2121 Avenue of the Stars, Ste 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*-and-*

Maya Saxena (msaxena@saxenawhite.com)
Joseph E. White III (jwhite@saxenawhite.com)
Lester R. Hooker (lhooker@saxenawhite.com)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel: (561) 394-3399
Fax: (561) 394-3382

Steven B. Singer
Kyla Grant
**SAXENA WHITE P.A.**
10 Bank Street, 8th Floor
White Plains, New York 10606
Tel: (914) 437-8551
ssinger@saxenawhite.com
kgrant@saxenawhite.com

*Lead Counsel for Lead Plaintiffs and the Class*

**KLAUSNER KAUFMAN JENSEN
 & LEVINSON**
Robert D. Klausner (bob@robertdklausner.com)
Stuart A. Kaufman (stu@robertdklausner.com)
7080 Northwest 4th Street

43

Plantation, Florida 33317
Tel: (954) 916-1202

*Additional Counsel for Lead Plaintiffs Louisiana
Sheriffs, Orlando Police and Plantation General*

**SUGARMAN SUSSKIND BRASWELL &
  HERRERA, P.A.**
Pedro A. Herrera
(pherrera@sugarmansusskind.com)
150 Alhambra Circle, Suite 725
Coral Gables, Florida 33134
Tel: (305) 529-2801

*Additional Counsel for Lead Plaintiff Riviera Beach*

**LORIUM LAW**
Ronald J. Cohen (rcohen@loriumlaw.com)
101 N.E. 3rd Ave., Suite 1800
Fort Lauderdale, FL 33301
Tel: (954) 462-8000

*Additional Counsel for Lead Plaintiff Riviera Beach
Fire*

44

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered participants on the Notice of Electronic Filing (NEF).

/s/ *James A. Harrod*
James A. Harrod