UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE THE ESTÉE LAUDER CO., INC. SE-CURITIES LITIGATION | 23-cv-10669 (AS) |

23-cv-10669 (AS)

<u>OPINION AND ORDER</u>

ARUN SUBRAMANIAN, United States District Judge:

This is a securities class action against Estée Lauder, its former CEO Fabrizio Freda, and its CFO Tracey Travis. Plaintiffs say that during the COVID-19 pandemic, defendants covered up Estée Lauder's reliance on prohibited gray-market sales of its products in China. When China cracked down on the illicit activity in 2022, Estée Lauder's sales—and its stock price—cratered. Now plaintiffs, on behalf of a class of Estée Lauder shareholders, charge defendants with liability under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5(b). Defendants have moved to dismiss. For the reasons below, the motion is DENIED.

**BACKGROUND**

Defendant Estée Lauder is a prestige beauty company with sales worldwide. Dkt. 47 ¶ 1. Part of its sales in China and South Korea occur through what are known as *daigou*, prohibited gray-market resellers that buy luxury goods at duty-free prices and sell them at a mark-up (though still below retail). *Id.* ¶ 1 & n.3. The Chinese government has repeatedly sought to curb *daigou* activity and in 2019 issued a regulation aimed at eliminating *daigou*'s ability to profit from tax exemptions. *Id.* ¶ 11. When asked about the effect of the 2019 law on Estée Lauder's sales, defendant Freda said:

> First of all, our Travel Retail business has not seen the impact from the stricter enforcement through January. So we don't see the impact so far. It is also important, however, to remember that we at Estée Lauder companies have a long-standing policy that limits the numbers of products that a single consumer can buy at any counter in our travel retail globally—since ever. So we were never benefiting from a lot of the *daigou* business because of our strict policies to avoid any phenomenon like this and, obviously, to limit any risk of gray market around the world.

*Id.* ¶ 80; *see also* Dkt. 52-8 at 17–18.

As plaintiffs tell it, Estée Lauder's strict *daigou* policies didn't last much longer. The Chinese island province of Hainan—a major site of *daigou* activity—increased its duty-free spending limits in 2020. Dkt. 47 ¶ 17. To compensate for sputtering sales growth brought on by the COVID-19 pandemic, plaintiffs say Estée Lauder "capitalized on these loosened regulations in Hainan by supplying massive shipments of products . . . to generate sales through the *daigou* gray market." *See id.* ¶¶ 18, 81.

But the high was short-lived. In mid-2021, Estée Lauder's largest customer, China Duty Free Group, announced that it was "severely cracking down" on *daigou* and no longer allowing any

sales into the gray market. *See id.* ¶¶ 9, 99–100. Then, on December 7, 2021, the Chinese government announced another round of regulations meant to "have a strong impact on *daigou*." *Id.* ¶ 102. Those regulations took effect January 1, 2022. *Id.* ¶ 103.

Plaintiffs say that over the next two years, Estée Lauder's sales tanked, primarily due to the crackdown on *daigou*. But defendants attributed the decline to everything *but* the crackdown and reassured investors that an upswing was coming soon. *Id.* ¶¶ 35–40. They say the full truth was only revealed on November 1, 2023, when Estée Lauder admitted that "changes in government and retailer policies related to unstructured market activity" were among the primary causes of the decline in sales. *Id.* ¶ 41. When that happened, the price of Estée Lauder stock declined $24.36, or nearly 19 percent. *Id.*

Plaintiffs claim defendants misled investors by failing to disclose Estée Lauder's reliance on *daigou*. *Id.* ¶ 1. Plaintiffs identify nine allegedly misleading statements within the class period, which runs between February 3, 2022 and October 31, 2023. Here's the list, with the supposedly fraudulent parts bolded and italicized:

| Speaker/Setting | Statement |
|---|---|
| February 3, 2022, Estée Lauder, 10-Q filing | ***Net sales increased in our travel retail business in both periods, reflecting continued strength of our brands with the Chinese consumer***, the easing of travel restrictions, which drove increased traffic levels compared to the prior-year periods, and continued success of hero product franchises from La Mer, Origins, Clinique, Jo Malone London and Tom Ford Beauty. *Id.* ¶ 130. |
| February 3, 2022, Estée Lauder, press release | ***Global travel retail sales increased double digits, reflecting continued growth from Asia/Pacific, despite ongoing travel restrictions there during much of the second quarter of fiscal 2022.*** Net sales also grew from Europe, the Middle East & Africa and The Americas as the partial lifting of travel restrictions, specifically in the United Kingdom and the United States, increased traffic and supported the reopening of doors. *Id.* ¶ 143. |
| May 3, 2022, Freda, earnings call | But also, we have seen historically, that also the bounce-back can be a very strong, because when this restriction finish, people travel domestically very fast and very happily. And ***so the confidence into Hainan future is un-*** |

| | |
|---|---|
| | *changed actually increased given the incredible development of the place* and the confidence in online is very strong. *Id.* ¶ 145. |
| June 2, 2022, Freda, investor conference | Then I believe that one of the most important opportunities globally in beauty is the development of the Hainan duty-free space, which we believe is just the beginning of the journey.<br><br>. . .<br><br>And that's explained—by the way, *the incredible results in travel retail* during the COVID Western lockdowns [were] *because Hainan was more than substituting the amount of travelers in airports around the world* just because it was domestic travel duty-free in China. So huge opportunity, this will continue. *Id.* ¶ 159. |
| August 18, 2022, Freda, earnings call | [W]e do expect for the full year, China to go back growing double digit. We expect strong recovery in Hainan in the second part, in the second semester of the fiscal year, for sure, a gradual recovery before. That's our assumption, which obviously is going to give us also results in market share.<br><br>. . .<br><br>We believe the Hainan—despite the current lockdown, which is obviously painful in the short term, but is a super strong opportunity for the long term, *the power of Hainan in the future remain[s] intact, and we have strong presence and market share in this operation*. *Id.* ¶ 162. |
| November 2, 2022, Estée Lauder, press release | For fiscal 2023, we are lowering our outlook primarily to reflect tighter inventory management in Asia travel retail, given reduced traffic as a result of COVID-19 restrictions, tightening of inventory by some retailers in the United States, and a greater negative impact from the far-stronger U.S. dollar. *We anticipate sequential acceleration to strong organic sales and adjusted EPS growth in the second half of our fiscal year as these pressures begin to abate*, momentum continues to build in other areas of our business, and our ongoing investments in innovation and advertising drive |

3

| | growth. Our optimism in the long-term growth opportunities for our brands and for prestige beauty remains intact. Reflecting our confidence, today we raised our quarterly dividend. *Id.* ¶ 164. |
|---|---|
| February 2, 2023, Travis, earnings call | We do expect that—we will—two things, one is ***inventory levels are still coming down in Hainan***. They are almost at the level that we would expect sales to accelerate. ***So yes, we should start to see an inventory build related to the shipments that we expect to see in Q4.*** <br><br> In Korea, again, the pace is a little bit more uncertain given the transitory nature of what's going on right now. So we do anticipate, as I mentioned in the prepared remarks, that we will start to see resumption of travel in Korea. And depending on the pace of that resumption, that will depend on the amount of shipments that we have in the quarter. But we have taken obviously an assumption there. ***We are sitting on a decent amount of inventory even in our own warehouses to supply the sales that we expect to see in the fourth quarter***. *Id.* ¶ 166. |
| May 3, 2023, Freda and Travis, earnings call | Freda: Our retail sales growth was even stronger than organic sales growth in many markets around the world, including China and the US. ***Encouragingly, retail sales performance is significantly ahead of organic sales results in Global travel retail, which gives us confidence that the challenges in travel retail are abated with time***. <br><br> Travis: I think the thing that gives us more comfort now on a more continuous steady progression of recovery is the fact that the COVID restrictions have been lifted. And so ***what we were experiencing before with our travel retail business is the volatility related to just some of the COVID restrictions and the flow of traffic in travel and people's comfort with travel, so that gives us more comfort that we're going to see a recovery.*** *Id.* ¶ 169. |
| August 18, 2023, Travis, earnings call | And ***we have no concerns whatsoever about travel retail growing with traveling consumers.*** It's a timing issue for us right now. And so I just want to really underscore that. ***It's a*** |

|  | *pretty—it's having a timing issue that's having a big short-term temporary impact for us.* But we are not concerned at all about what we have shared with you in the past in terms of our strategy to continue to grow travel retail globally and certainly in all of our markets in Asia. *Id.* ¶ 171. |
|---|---|

## LEGAL STANDARDS

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b). *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (citation omitted). "As relevant here, the PSLRA specifically requires a complaint to demonstrate that the defendant made misleading statements and omissions of a material fact, and acted with the required state of mind." *Id.* at 305 (cleaned up). As usual, the Court accepts the complaint's allegations as true. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). But the allegations of fraud must be pled with particularity. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

For the misleading-statement element, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Blanford*, 794 F.3d at 305 (citation omitted); *see also* 15 U.S.C. § 78u-4(b)(1)(B). "[D]raw[ing] all reasonable inferences in the plaintiff's favor," the complaint must plausibly allege that the statements were misleading. *Blanford*, 794 F.3d at 307 (citation omitted).

On scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To decide whether an inference is "strong," the Court "must consider the complaint in its entirety" and "must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 322–23. A "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

## DISCUSSION

"To state a claim under Section 10(b) and Rule 10b-5(b), a plaintiff must plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 351–52 (2d Cir. 2022).

### I.    The complaint alleges several actionable statements.

Plaintiffs successfully point to several misleading omissions, and even the allegedly forward-looking statements and opinions at issue are mired in half-truths.

5

### A. Defendants omitted material information.

Pure omissions aren't actionable, while half-truths are. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016). That is, "there is no duty to disclose a fact . . . merely because a reasonable investor would very much like to know that fact." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (internal quotation marks and citation omitted). But "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id.* "That obligation is triggered once a defendant puts the topic 'in play,' based on 'an examination of defendants' representations, taken together and in context.'" *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024) (quoting *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020); and then quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010)). Put differently, "[a]n omission of information not affirmatively required to be disclosed is . . . actionable only when disclosure of such information is necessary 'to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 150 (S.D.N.Y. 2023) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011)).

The first alleged misstatement is an actionable omission. This statement puts at issue the sources of Estée Lauder's increased travel retail sales during the last three months of 2021 while omitting the company's reliance on *daigou*. "[W]hen a company discloses certain of the reasons for its success that are the result of legal activities, it cannot withhold the reasons for that success that are illegal or improper." *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *17 (S.D.N.Y. Mar. 29, 2021); *see also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) ("[I]f [a defendant] puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information." (internal quotation marks and citation omitted)).

There's little doubt that *daigou* sales, if not illegal, are improper. *See* Dkt. 47 ¶¶ 73, 77, 99–102. That makes this case like others in which companies have touted high sales figures while neglecting to mention that those numbers were thanks to bribery, deceptive marketing, or anti-competitive conduct. *See City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *3, *18 (S.D.N.Y. Sept. 29, 2014) (statements about success of direct-sales efforts misleading where sales licenses were secured through bribery); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675–78 (S.D.N.Y. 1990) (statements touting company's competitive advantages misleading where advantages were obtained through bribery). Rather than create a marketplace for its products through improper conduct, Estée Lauder exploited an existing marketplace of dubious legality. *See* Dkt. 47 ¶ 81.

Sure, *daigou* are gray, not black, markets. But omitted sources of revenue don't need to be "fraudulent or otherwise illegal" for a statement to be misleading under Rule 10b-5(b). *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021). As *Hain* makes clear, *daigou*'s degree of impropriety under Chinese law doesn't matter for Rule 10b-5(b). What matters is that Estée Lauder touted the reasons for its success while leaving out the parts of the truth it found

inconvenient. The telling of half-truths—that's what the securities laws don't tolerate. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024).

Nor does it matter that Estée Lauder's reference to the "continued strength of [its] brands with the Chinese consumer" is technically consistent with reliance on *daigou*. Once Estée Lauder chose to speak about the sources of its success, it had a duty "to disclose the true (and improper) nature" of those sources. *See Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 767–69 (S.D.N.Y. 2019) (statement misleading where company accurately attributed its success to certain marketing efforts but didn't disclose that such efforts were themselves deceptive); *Rosi*, 2021 WL 1177505, at *16 (same). This is especially so given Freda's 2019 statement downplaying Estée Lauder's reliance on *daigou*. *See In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (noting that a court "judg[es] whether an alleged omission was material in light of the information already disclosed to investors").

The fourth statement is actionable for the same reasons. *See* Dkt. 47 ¶ 159. This statement names "domestic . . . duty-free" travel to Hainan as the reason behind Estée Lauder's "incredible results in travel retail" despite COVID lockdowns in many parts of the world. *Id.* Freda points to the volume of travelers but leaves out *daigou*. *See Macquarie*, 601 U.S. at 264 ("In other words, the difference between a pure omission and a half-truth is the difference between a child not telling his parents he ate a whole cake and telling them he had dessert.").

However, the second statement is a straightforward report of historical fact. *See* Dkt. 47 ¶ 143. Plaintiffs don't allege that sales weren't growing or that travel restrictions weren't ongoing. And in contrast to the first and fourth statements, nothing in this statement is about specific factors driving Estée Lauder's revenue. *See Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020) (accurate reports about revenue trends don't put the sources of that revenue at issue). The closest the second statement gets is a broad mention of "continued growth from Asia/Pacific." Dkt. 47 ¶ 143. But that's "far too generic to be actionable under the securities laws." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 297 (S.D.N.Y. 2019). Merely reporting sales and noting growth in one part of the globe isn't enough to put the alleged gray-market reliance "in play." *See Setzer*, 968 F.3d at 214 n.15.

Defendants take a different view of the complaint. They say plaintiffs' "case rests entirely on the supposition that, in each disclosure, ELC 'fail[ed] to disclose that the Company had become heavily reliant on the *daigou* gray market to generate sales within the travel retail segment and that its net sales would decline as a result of no longer being able to rely on th[e] [*daigou*] sales channel to drive sales growth' (at some unspecified point in the future)." Dkt. 51 at 11 (quoting Dkt. 47 ¶ 103). So the relevant omission is the effect of the 2022 enforcement actions specifically, not Estée Lauder's reliance on *daigou* sales generally. According to defendants, plaintiffs' theory fails because they haven't pled defendants "knew the steps Chinese government would take … at some specific time … to enforce *daigou* restrictions such that net sales would decline." *Id.* at 12.

Defendants misread the complaint (and confuse materiality with scienter). The complaint alleges that defendants misled investors by omitting mention of Estée Lauder's reliance on *daigou*

7

altogether. *See, e.g.*, Dkt. 47 ¶ 1 (referring to *daigou* as "an unsustainable practice that Defendants concealed from investors"); ¶ 131 (statement allegedly misleading because "Lauder concealed its reliance on *daigou . . .* from investors"); ¶ 144 ("[S]ales growth in Lauder's travel retail business w[as] primarily driven by *daigou* gray market resale in China, an unsustainable practice that Defendants previously denied being involved in."). Plaintiffs don't focus on the effects of the 2022 crackdown at the exclusion of all else. What plaintiffs say is that when times were good, defendants boasted about the sources of Estée Lauder's sales growth while neglecting to mention that the driver of this growth was *daigou*. *See id.* ¶¶ 106, 108. And then when times were bad—because of the 2022 crackdown—the company continued to mislead investors by not owning up to the real source of the decline: again, *daigou*.

Defendants' rejoinder is to point out that this theory of omission would also apply to statements defendants made outside the class period. This non-sequitur does little to salvage their argument. "The plaintiff is the 'master of the complaint,' and therefore controls much about her suit." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (citation omitted). Plaintiffs' choice of class period, much like their choice of "which substantive claims to bring against which defendants," is theirs alone. *See id.* That choice can't be held against plaintiffs to undermine a valid theory of securities fraud.

Even on their interpretation of the complaint, defendants attempt to foist an unreasonable burden on plaintiffs. *Daigou* are gray markets; by their very nature, *daigou* are vulnerable to government enforcement and, because of that, "unsustainable." Dkt. 47 ¶¶ 1, 30. So Estée Lauder should have expected that at some point, the Chinese authorities would catch up—the question wasn't if but when. Far from having to plead that the 2022 crackdown was somehow different in kind from the 2019 and 2021 enforcement actions, plaintiffs can (and, in the case of the 2021 action, do) point to the prior crackdowns as putting defendants on notice that more were coming. *See id.* ¶ 99. That Estée Lauder escaped previous events unscathed doesn't immunize its business model and render information about this source of sales growth immaterial. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) ("An omitted fact may be immaterial if the information is trivial or is so basic that any investor could be expected to know it." (internal quotation marks and citations omitted)). Plaintiffs allege enough to demonstrate that defendants misled investors by promoting the recipe for their secret sauce, while leaving an ingredient of questionable legality off the list.

Defendants also argue that plaintiffs haven't pled enough to support that the company was reliant on *daigou*. Plaintiffs have. To make their argument, defendants ask this Court to discredit plaintiffs' allegations about three anonymous former employees.

Courts have disregarded statements of confidential witnesses who aren't "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Blanford*, 794 F.3d at 305 (citation omitted). Courts have also ignored statements of confidential witnesses that can't situate their allegations in time, aren't particular, and are sourced secondhand. *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799–800 (S.D.N.Y. 2020).

None of those bases applies here. Former Employee-1 worked as "a Regional Marketing Director of Travel Retail for the Asia-Pacific ('APAC') region" for two of Estée Lauder's brands from July 2022 to January 2023. Dkt. 47 ¶ 54. Though defendants say FE-1's knowledge is limited to just the brands she worked on, the complaint alleges enough to show that FE-1 would have been privy to relevant information about Estée Lauder's other brands.[1] *See id.* (noting FE-1 "attended regular sales meetings . . . and participated in monthly meetings with Lauder brand General Managers and Vice Presidents and Presidents of Travel Retail APAC, along with relevant employees from the sales and marketing teams"). And the fact that FE-1 was employed for only a portion of the class period isn't reason to discredit her statements either. *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 407–08 (S.D.N.Y. 2020) (crediting statements made by confidential witnesses present for a portion of the period of alleged misconduct).

Similarly, Former Employee-2 "worked for Lauder for more than ten years ending in mid-2021." Dkt. 47 ¶ 55. During her time at the company, she was a Senior Vice President for a sales region, oversaw demand planning for her region, worked on supply chain and financial planning, and attended financial review meetings for her region. *See id*. Defendants correctly point out that the complaint doesn't specify what region FE-2 worked on and that she left the company before the start of the class period. But her decade-plus tenure at Estée Lauder, coupled with her seniority and work in areas relevant to *daigou* sales makes it likely that she had access to the specific information she alleges. *See id.* ¶ 139 (alleging that "Lauder had 'clear visibility' in its sales because the Company had very detailed sell-through and sales reporting information from its retail partners"); ¶ 98 (alleging that Estée Lauder had the ability to trace where its more expensive products ended up). And as plaintiffs point out, their theory turns on defendants' omissions about Estée Lauder's reliance on *daigou* sales—a reliance that started before the class period. *See City of Omaha*, 450 F. Supp. 3d at 408 (crediting allegations by confidential witnesses who were present for a change in policy but left before the company felt its effects).

Finally, Former Employee-3 "was employed by Estée Lauder in a variety of roles for several years before the Class Period through early 2023." Dkt. 47 ¶ 56. Most recently, she was in senior leadership in travel retail in the sales region spanning Europe, Middle East, and Africa. *See id*. She attended monthly senior-leadership meetings, during which her regional general manager gave her information from meetings attended by travel retail's global president and the general managers of each region. *See id*. Defendants say FE-3's allegations should be discredited because she didn't work in Asia travel retail and because she was a "low-level rank-and-file" employee without access to Estée Lauder's aggregate sales data. Dkt. 51 at 18. Again, defendants demand a level of involvement the case law doesn't. First, FE-3 wasn't a low-level employee, but a member of senior leadership. *See* Dkt. 47 ¶ 56. And her allegations concern the impact of *daigou* sales on supply allocation decisions across regions, *see id.* ¶¶ 90, 97, and that Estee Lauder had a team dedicated to

---

[1] The complaint describes all the confidential witnesses in the feminine to protect their identities. Dkt. 47 at 22 n. 9. The Court follows the complaint's usage.

analyzing *daigou* sales within the travel-retail group, *see id.* ¶¶ 96–97. To make it probable that she'd have this knowledge, FE-3 didn't need to be in the Asia sales region or have access to aggregate sales data; her role in senior leadership in travel retail is enough.

That's not to say the Court accepts all the confidential witnesses' allegations. Defendants correctly identify some statements that are conclusory or speculative and so aren't credited. *See, e.g.*, *id.* ¶ 19 ("FE-1 recalled that large purchases made during the pandemic, from 2020 through her tenure at Estée Lauder, were 'almost definitely' made by *daigou*."); ¶ 20 ("FE-2 remarked that it was hard to reconcile the growth of travel retail in China with the lockdowns and lack of travel, stating that it did not make sense and that the growth was 'counterintuitive.'"). Even still, plaintiffs have plausibly alleged Estée Lauder's reliance on *daigou*.

To shore up their claim that *daigou* sales weren't merely a source of revenue, but a substantial one, plaintiffs point out that, at the end of the day, Estée Lauder itself linked its declining sales to the government's crackdown on *daigou*. *See id.* ¶¶ 214, 225. Defendants say these disclosures don't show that Estée Lauder was reliant on *daigou* throughout the class period or that *daigou* sales were a major revenue source for the company. Defendants' first contention runs into the Second Circuit's contrary view. *See Blanford*, 794 F.3d at 307 ("[A]llegations concerning activity in one period can support an inference of similar circumstances [in another]."). As for the second, defendants' own words cut against them. One of the disclosures characterizes Estée Lauder's drooping travel-retail sales as "*primarily due* to our and our retailers' actions to reset retailer inventory levels, and *changes in government and retailer policies related to unstructured market activity*." Dkt. 47 ¶ 225. Defendants say that's not enough to show that the *daigou* crackdown was the "sole primary basis" for Estée Lauder's sales decline. Dkt. 51 at 26. They point to the company's Form 8-K (filed the same day as the disclosure), which lists more than just *daigou* as responsible for the decline. But whether *daigou* was the "sole primary basis" for the sales decline isn't the issue. The complaint plausibly alleges, based on defendants' own disclosures, that *daigou* sales were a major driver of Estée Lauder's travel-retail sales, and the 2022 crackdown had a strong negative effect on those sales.

**B.  The forward-looking statements contain actionable present-day half-truths.**

Under 15 U.S.C. § 78u-5(c), a speaker "shall not be liable with respect to any forward-looking statement" so long as it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." Forward-looking statements are also protected if they are immaterial or if the plaintiff fails to show that the defendant made them with "actual knowledge" that they were false or misleading. *Id.* But misrepresentations of present fact aren't protected, even if they're part of a forward-looking statement. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 246.

Here, the third, fifth, sixth, seventh, and ninth statements are actionable. *See* Dkt. 47 ¶¶ 145, 162, 164, 166, 171. These weren't *just* "rah-rah" sentiments about the future. In each statement,

the speaker offers glimmering predictions about future sales or prospects in China based on mis-representations of the present-day facts on the ground. The safe harbor doesn't extend that far. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) ("[T]he safe harbor does not protect statements which are misleading about historical and present facts at the time they are made, and whose misleading nature can be verified at the time they are made, simply because the statements are couched as predictions of future events."), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).

Take, for instance, the ninth alleged misstatement, which Travis made during a 2023 earnings call in response to a question about *daigou*. When asked about the crackdown, Travis insisted that the crackdown's effects were limited to a "timing issue" that was having a "big short-term temporary impact for [Estée Lauder]." Dkt. 52-3 at 18. What's not discussed is the elephant in the room addressed in the last section—Estée Lauder's significant reliance on *daigou*, a reliance that pre-dated the crackdown. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 366 (S.D.N.Y. 2012) (holding that allegedly false statements about "present circum-stances" went "well beyond mere 'rosy predictions'" and fell outside the PLSRA's safe harbor). The same is true of the rest of the statements. In each, defendants attribute current lags in sales to transitory issues like temporary COVID-19 lockdowns, inventory issues, or the strong U.S. dollar while neglecting to mention that the *daigou* crackdown was a driver of the sales drop. *See* Dkt. 47 ¶ 145 (blaming sales decline on travel restrictions without mentioning *daigou*); ¶ 162 (same); ¶ 164 (sales outlook lowered to reflect tighter inventory management in Asia and the U.S., reduced traffic, stronger U.S. dollar, but not *daigou*); ¶ 166 (lowered outlook due to supply chain and in-ventory problems, but no discussion of *daigou*). While defendants enjoy protection under the PSLRA for their forward-looking statements, they aren't entitled to base their projections on half-truths about the current goings-on in the market. In doing so, defendants crossed the line from stating an "inherently contingent prediction of risk or future cash flow," to "provid[ing] an ascer-tainable or verifiable basis for the investor to make his own prediction," *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 (2d Cir. 2010), omitting key information in the process.

### C. The eighth statement includes an opinion but is nevertheless actionable.

"Opinions are not actionable unless (i) the speaker did not subjectively believe the opinion; (ii) the opinion contained one or more embedded factual statements that was false; or (iii) the state-ment failed to provide critical context, meaning that the speaker implied he or she had a reasonable basis for the opinion but in fact did not." *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at *6 (S.D.N.Y. Feb. 5, 2024) (cleaned up). "[T]he appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor." *Abramson v. New-link Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). "In assessing what a reasonable investor would expect, the Supreme Court [has] stressed the importance of context, such as 'the customs and practices of the relevant industry' and whether the opinion was expressed in a formal statement such as an S.E.C. filing or instead was a 'baseless, off-the-cuff judgment[ ], of the kind that an individual might communicate in daily life.'" *Id.* (second alteration in original) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)).

The eighth statement is actionable. *See* Dkt. 47 ¶ 169. In context, Travis begins her statement by saying, "I think the thing that gives us more comfort [that Estée Lauder will see its sales recover] . . . is the fact that COVID restrictions have been lifted." Dkt. 52-20 at 10. To support that opinion, she goes on to say: "[W]hat we were experiencing before with our travel retail business is the volatility related to some of the COVID restrictions and the flow of traffic in travel and people's comfort with travel." *Id.*

The latter part of Travis's statement—her assertion about the causes of Estée Lauder's earlier sales decline—is what's relevant here. *See Abramson*, 965 F.3d at 175. Plaintiffs allege that Travis's statement misleadingly omits one of the decline's other causes, namely "*daigou* gray market crackdowns." Dkt. 47 ¶ 170. That omission renders her statement a half-truth. *See Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 163 (D. Conn. 2019) (statement omitting one cause of defendants' profit increases and decreases actionable).

## II.    The complaint pleads facts giving rise to a strong inference of scienter.

As to scienter, plaintiffs must allege facts showing (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *Ganino*, 228 F.3d at 168–69. The "motive and opportunity" prong requires that a plaintiff show a defendant "benefitted in some concrete and personal way from the purported fraud," but "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable[,]" aren't enough. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted). Instead, "the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *Id.*

If a plaintiff chooses the "strong circumstantial evidence" route instead, "the strength of the circumstantial allegations must be correspondingly greater if there is no motive." *Id.* at 199 (internal quotation marks and citation omitted). A plaintiff can make this showing by alleging: "the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* (internal quotation marks and citation omitted).

### A.    The complaint sufficiently alleges Freda's and Travis's scienter.

Plaintiffs focus on recklessness. They claim that Freda and Travis had access to information that indicated Estée Lauder was relying on *daigou* sales. On the information available, plaintiffs allege that Estée Lauder "had very detailed sell-through and sales reporting information from its retail partners," Dkt. 47 ¶ 240; that these reports showed sales spikes that happened when one would expect *daigou* sales to occur, *id.* ¶ 241; that the company had "a global database of pricing for every product in every market and region," *id.* ¶ 242; that Estée Lauder employed a team to analyze "disparities in pricing, factoring in different markets, demand, exchange rates, and other variables, such as competition," *id.* ¶ 243; that the employee who headed up the pricing database

12

team became Travis's Chief of Staff; and that the company's senior executives, including Freda, were briefed on these pricing differentials, *id*. Plaintiffs also say there was a team within the Asia travel retail group that specifically analyzed the *daigou* market. *Id.* ¶ 244. And they claim Estée Lauder put pincodes on its more expensive products that allowed it to track where each product ended up. *Id.* ¶ 246.

Plaintiffs have pointed to specific information that would have revealed Estée Lauder's reliance on *daigou* sales—sell-through reports from retail partners, Estée Lauder's pricing database, briefings on pricing differentials, and product pincodes. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."). They've also alleged that Estée Lauder had a dedicated team for tracking *daigou* sales. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 495 (S.D.N.Y. 2004) (holding scienter sufficiently alleged where plaintiffs pointed to red flags that would have alerted defendants to the falsity of their statements). On top of this, both Freda and Travis previously made public statements about the importance of tracking travel-retail data within Estée Lauder's business model. *See* Dkt. 47 ¶ 239. And Freda has spoken multiple times about *daigou* and the company. *See id.* ¶¶ 262–64; *see also Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *9 (S.D.N.Y. Sept. 24, 2018) (inferring scienter as to misstatements and omissions regarding price-fixing scheme where, among other things, individual defendants spoke about pricing issues on earnings calls).

While it's not enough for plaintiffs to point to Travis's and Freda's high-level positions and say they should have known better, plaintiffs haven't done that. Instead, they've alleged a trove of information that would have pointed to *daigou*, highlighted public statements by Travis and Freda about *daigou* and their attentiveness to travel-retail sales data, and alleged that Estée Lauder had a whole team whose purpose was to analyze *daigou* sales. All this "create[s] a compelling inference that [Freda and Travis] made a conscious decision to not disclose [Estée Lauder's reliance on *daigou*] in order to" avoid talking about its legally dubious revenue stream. *Setzer*, 968 F.3d at 215. Freda and Travis had to have known that Estée Lauder's pandemic-induced turn towards the gray market—a market that had been subject to multiple crackdowns and that its competitors had condemned as "dreadful" for luxury brands, *see* Dkt. 47 ¶ 14—"would have been troubling news to [Estée Lauder's] investors." *Setzer*, 968 F.3d at 215.

Freda and Travis say that it's more plausible that they were unable to predict that the 2022 *daigou* regulations would be enforced and that this enforcement would cause Estée Lauder's sales to decline. But their argument is unresponsive to plaintiffs' theory of fraud. Why would the unforeseen severity of the 2022 crackdown be a reason to omit *daigou* when talking about the reasons for Estée Lauder's sales growth before the crackdown? The more plausible view is that Estée Lauder saw an opportunity to make up for lost sales, went for it despite the regulatory risks and reputational drawbacks, and then kept quiet out of fear of spooking investors. And zeroing in on the 2022 crackdown, plaintiffs sufficiently allege that Freda and Travis were, at the very least, reckless in failing to put two and two together when Estée Lauder's sales began to drop after the crackdown began. Freda and Travis don't deny plaintiffs' allegations about the wealth of sales

data that was at their fingertips; given that information, Freda and Travis should have been able to look at Estée Lauder's declining sales and pinpoint the 2022 *daigou* crackdown as a major cause, precisely what defendants ended up doing just months later when the bottom fell out from the company's sales.

### B.  The individual defendants' intent can be imputed to the corporation.

To plead corporate scienter, a plaintiff must allege "facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (citation omitted).

There's no real dispute that if plaintiffs succeed in establishing scienter for Freda and Travis, they can do the same for Estée Lauder. "Courts in this district generally conclude that the scienter of 'management level' employees can be attributed to the corporation." *Speakes*, 2018 WL 4572987, at *9. Defendants haven't made any argument as to why that shouldn't be the case here.

### III.   The complaint plausibly alleges loss causation.

Finally, defendants challenge loss causation. "To plead loss causation, plaintiffs must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (internal quotation marks and citation omitted). "Plaintiffs' burden is not a heavy one. The complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin.*, 797 F.3d at 187 (citations omitted). But the causal link must still be sufficiently direct. "[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 261 (internal quotation marks and citation omitted).

Ultimately, loss causation can be pled by alleging that either (1) "the market reacted negatively to a corrective disclosure of the fraud," or (2) "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund*, 750 F.3d at 232–33 (citation omitted). Defendants don't contest that loss-causation allegations are subject to Rule 8(a)'s notice-pleading standard. *See In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 266 n.7 (S.D.N.Y. 2021).

Plaintiffs have successfully pleaded a materialization-of-risk theory. *See DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 212 (S.D.N.Y. 2019) ("Pleading a materialization of the risk requires identifying a particular risk that was allegedly concealed by the defendant's actions and which then materialized to cause a market loss."). The concealed risk here is the risk of regulatory enforcement. That risk materialized in 2022. When Estée Lauder's sales dropped because of the crackdown, there was a corresponding negative impact on Estée Lauder's stock price. *See* Dkt. 47 ¶ 3 (Estée Lauder stock price dropped close to 50 percent); *Castellano v.*

14

*Young & Rubicam, Inc.*, 257 F.3d 171, 189 (2d Cir. 2001) (defendants' omission "disguised the very risk to which [the plaintiff] fell victim").

Defendants say that this theory fails because the effects of the 2022 crackdown weren't foreseeable to Estée Lauder when they made the misleading statements. Not so, says the Second Circuit. In *Castellano*, the Court explained:

> If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.

*Id.* at 188 (quotation omitted). Estée Lauder's own risk calculation isn't what's relevant here; the reasonable investor is the focus. Because defendants didn't tell their investors that the company was relying on *daigou* sales, investors had no reason to think that the risk of sales declining because of a government crackdown was anything but "remote."

Plaintiffs also point to a series of corrective disclosures, which further bolsters their claim of loss causation. Dkt. 47 ¶¶ 181, 192, 202, 213, 225; *see In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 262 ("'[C]orrective disclosure' and 'materialization of risk' are not wholly distinct theories of loss causation."). On plaintiffs' theory, the first four disclosures were the "tip of the iceberg"—revealing the infirmities of Estée Lauder's travel-retail sector—with the fifth and final disclosure exposing that *daigou* had been driving a substantial portion of business. *See* Dkt. 47 ¶ 225; *see also In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 164–65 (S.D.N.Y. 2008) ("[A] corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events."). The accompanying stock price drops—particularly the nineteen-percent reduction that followed the final disclosure—makes even more plausible that defendants' refusal to disclose *daigou* sales lies behind plaintiffs' loss.

## IV.    The complaint plausibly alleges a § 20(a) claim.

Defendants say "[p]laintiffs' Section 20(a) [claim] fails for the same reasons as its Section 10(b) claim." Dkt. 54 at 15. Because plaintiffs have successfully stated a § 10(b) violation, their § 20(a) claim may also go forward. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 274 (S.D.N.Y. 2023).

**CONCLUSION**

For these reasons, defendants' motion to dismiss is DENIED. The Clerk of Court is directed to terminate Dkt. 50.

SO ORDERED.

Dated: March 31, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge